**24-1328**

# United States Court of Appeals
# for the Federal Circuit

MEMORYWEB, LLC
*Appellant*

v.

UNIFIED PATENTS, LLC
*Appellee*

_____

Appeal from the Patent and Trademark Office, Patent Trial and Appeal Board
in Case No. IPR2021-01413

_____

## APPELLANT MEMORYWEB, LLC'S CORRECTED OPENING BRIEF AND NON-CONFIDENTIAL ADDENDUM

JENNIFER HAYES
NIXON PEABODY LLP
300 S. Grand Avenue, Suite 4100
Los Angeles, CA 90071-3151
Tel: 213-629-6000

DANIEL SCHWARTZ
MATTHEW WERBER
ANGELO CHRISTOPHER
NIXON PEABODY LLP
70 W. Madison Street, Suite 5200
Chicago, IL 60602-4378
Tel: 312-977-4400

*Counsel for Appellant MemoryWeb, LLC*

# EXEMPLARY PATENT CLAIM

## Claim 1 of U.S. Patent 10,621,228

1. A method comprising:

responsive to a first input, causing a map view to be displayed on an interface, the map view including:

> (i) an interactive map;

> (ii) a first location selectable thumbnail image at a first location on the interactive map; and

> (iii) a second location selectable thumbnail image at a second location on the interactive map;

responsive to an input that is indicative of a selection of the first location selectable thumbnail image, causing a first location view to be displayed on the interface, the first location view including (i) a first location name associated with the first location and (ii) a representation of at least a portion of one digital file in a first set of digital files, each of the digital files in the first set of digital files being produced from outputs of one or more digital imaging devices, the first set of digital files including digital files associated with the first location;

responsive to an input that is indicative of a selection of the second location selectable thumbnail image, causing a second location view to be displayed on the interface, the second location view including (i) a second location name associated with the second location and (ii) a representation of at least a portion of one digital file in a second set of digital files, each of the digital files in the second set of digital files being produced from outputs of the one or more digital imaging devices, the second set of digital files including digital files associated with the second location; and

responsive to a second input that is subsequent to the first input, causing a people view to be displayed on the interface, the people view including:

> (i) a first person selectable thumbnail image including a representation of a face of a first person, the first person being associated with a third set of digital files including digital photographs and videos;

(ii) a first name associated with the first person, the first name being displayed adjacent to the first person selectable thumbnail image;

(iii) a second person selectable thumbnail image including a representation of a face of a second person, the second person being associated with a fourth set of digital files including digital photographs and videos; and

(iv) a second name associated with the second person, the second name being displayed adjacent to the second person selectable thumbnail image.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 2024-1328

**Short Case Caption** MemoryWeb, LLC v. Unified Patents, LLC

**Filing Party/Entity** MemoryWeb, LLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/28/2024

Signature: /s/ Jennifer Hayes

Name: Jennifer Hayes

**FORM 9. Certificate of Interest**

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| MemoryWeb, LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

FORM 9. Certificate of Interest

---

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑  None/Not Applicable    ☐  Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

---

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)    ☐  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

---

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable    ☐  Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................... i

TABLE OF AUTHORITIES ............................................................ 3

STATEMENT OF RELATED CASES ............................................. 6

JURISDICTIONAL STATEMENT .................................................. 6

INTRODUCTION ........................................................................... 1

STATEMENT OF THE ISSUES ..................................................... 3

STATEMENT OF THE CASE ......................................................... 4

I.     The Inventions of the '228 Patent ........................................... 4

II.    The IPR Proceeding .................................................................. 8

     A.    Claim Construction Positions ................................................ 8

     B.    MemoryWeb's Argument That a Skilled Artisan Would Not
          Combine Okamura and Flora .............................................. 9

     C.    The Board's Decision ......................................................... 13

     D.    The Board's Rehearing Decision ...................................... 15

SUMMARY OF THE ARGUMENT ............................................. 16

STANDARD OF REVIEW ........................................................... 17

ARGUMENT ................................................................................ 18

I.     THE BOARD ERRED BY FAILING TO CONSTRUE "RESPONSIVE
     TO" ........................................................................................ 18

     A.    "Responsive To" Requires a Causal Relationship Between the
          Display of the View and the User Input Rather Than Allowing
          Additional User Inputs ...................................................... 19

     B.    The Specification Supports MemoryWeb's Construction, Not
          Unified's Construction ...................................................... 23

II.    THE BOARD ERRED IN FINDING THAT OKAMURA AND FLORA
     DISCLOSE DISPLAYING THE CLAIMED MAP VIEW ......... 26

III.   THE BOARD ERRED IN FINDING THAT IT WOULD HAVE BEEN
     OBVIOUS TO COMBINE OKAMURA AND FLORA ............. 33

     A.    The Board Mischaracterized MemoryWeb's Arguments

Regarding Okamura's Teaching Away ...............................................33

1.    Okamura Disparages "Related Art" that Suffered from Scaling
      Problems....................................................................................35

2.    Unified's Proposed Combination of Okamura and Flora Has the
      Same Scaling Problems as the Related Art...............................36

3.    The Board Mischaracterized the Issues, Failed to Address
      MemoryWeb's Arguments, and Made Findings Not Supported
      by Substantial Evidence ...........................................................39

B.    The Board Erred by Ignoring Okamura's Preference for Using
      Cluster Maps.......................................................................................43

CONCLUSION AND RELIEF SOUGHT ...........................................................44

## **CONFIDENTIAL MATERIAL OMITTED**

Pursuant to Federal Circuit Rule 25.1(e)(1)(B), material subject to the Protective Order in the underlying proceeding, IPR2021-01413, has been redacted from the public version of the Order Identifying Real Party in Interest (Appx127) included in the addendum. The redacted information includes confidential information relating to Appellee Unified's membership agreements and business operations (Appx135–137, Appx139, Appx143–154, Appx156). Although the Board issued confidential and public versions of the Final Written Decision (Appx9) and the Decision Granting Director Review (Appx162), there is no confidential information in either document. There is no confidential information contained in the Opening Brief.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alacritech, Inc. v. Intel Corp.*,
966 F.3d 1367 (Fed. Cir. 2020) ....................................................44

*BASF Corp. v. Enthone, Inc.*,
749 F. App'x 978 (Fed. Cir. 2018) ...............................................41

*Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*,
533 F.3d 1362 (Fed. Cir. 2008) ....................................................21

*Chemours Co. FC, LLC v. Daikin Indus., Ltd.*,
4 F.4th 1370 (Fed. Cir. 2021) .......................................................33

*DSS Tech. Mgmt., Inc. v. Apple Inc.*,
885 F.3d 1367 (Fed. Cir. 2018) ....................................................30

*Emerson Elec. Co. v. SIPCO, LLC*,
745 F. App'x 369 (Fed. Cir. 2018) ...............................................41

*Fred Beverages, Inc. v. Fred's Cap. Mgmt. Co.*,
605 F.3d 963 (Fed. Cir. 2010) ......................................................32

*Google LLC v. Conversant Wireless Licensing S.A.R.L.*,
753 F.App'x 890 (Fed. Cir. 2018) ....................................34, 39, 44

*Homeland Housewares, LLC v. Whirlpool Corp.*,
865 F.3d 1372 (Fed. Cir. 2017) ....................................................18

*In re Lee*,
277 F.3d 1338 (Fed. Cir. 2002) ....................................................18

*In re Nuvasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) ....................................................44

*In re Warsaw Orthopedic, Inc.*,
832 F.3d 1327 (Fed. Cir. 2016) ....................................................17

iii

*Leica Microsystems, Inc. v. Regents of Univ. of Michigan*,
   No. 2022-1445, 2023 WL 3048244 (Fed. Cir. Apr. 24, 2023)...........................31

*Medgraph, Inc. v. Medtronic, Inc.*,
   843 F.3d 942 (Fed. Cir. 2016) ............................................................20

*Meyer Intell. Properties Ltd. v. Bodum, Inc.*,
   690 F.3d 1354 (Fed. Cir. 2012) ..........................................................19

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
   952 F.3d 1336 (Fed. Cir. 2020) ..........................................................18

*Pers. Web Techs., LLC v. Apple*, Inc.,
   848 F.3d 987 (Fed. Cir. 2017) ............................................................44

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) .....................................................17, 26

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
   882 F.3d 1056 (Fed. Cir. 2018) ..........................................................17

*Praxair Distrib. v. Mallinckrodt Hosp. Prods. IP*,
   890 F.3d 1024 (Fed. Cir. 2018) ..........................................................17

*SharkNinja Operating LLC v. iRobot Corp.*,
   No. 2023-1151, 2024 WL 1132219 (Fed. Cir. Mar. 15, 2024) ...........................31

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
   595 F.3d 1340 (Fed. Cir. 2010) ..........................................................22

*TQ Delta, LLC v. Cisco Systems, Inc.*,
   942 F.3d 1352 (Fed. Cir. 2019) ..........................................................30

*Univ. of Strathclyde v. Clear-Vu Lighting LLC*,
   17 F.4th 155 (Fed. Cir. 2021) ............................................................17

*U.S. v. Arthrex, Inc.*,
   594 U.S. 1 (2021)............................................................................32

*Vicor Corp. v. SynQor, Inc.*,
  869 F.3d 1309 (Fed. Cir. 2017) ............................................34, 39, 41

*Wavetronix LLC v. EIS Elec. Integrated Sys.*,
  573 F.3d 1343 (Fed. Cir. 2009) ........................................................19

*Wi-Fi One, LLC v. Broadcom Corp.*,
  887 F.3d 1329 (Fed. Cir. 2018) ........................................................23

*Xerox Corp. v. Bytemark, Inc.*,
  IPR2022-00624, Paper 9 (PTAB Aug. 24, 2022)................................32

**Statutes**

5 U.S.C. § 706.....................................................................................18

28 U.S.C. § 1295 .................................................................................vi

35 U.S.C. § 6 .......................................................................................vi

35 U.S.C. § 141 ...................................................................................vi

35 U.S.C. § 311 ...................................................................................vi

**Rules and Regulations**

37 C.F.R. § 42.65(a)............................................................................32

37 C.F.R. § 90.3 ..................................................................................vi

Federal Circuit Rule 28(j) .....................................................................2

v

## STATEMENT OF RELATED CASES

No other appeal from these proceedings has previously been before this or any other appellate court. The following proceedings may be directly affected by this Court's decision in these appeals:

- *Apple Inc. v. MemoryWeb, LLC*, Nos. 23-2361, 24-1043, 24-1050, 24-1318, 24-1320 (Fed. Cir.);

- *MemoryWeb, LLC v. Samsung Electronics Co., Ltd.*, Nos. 24-1315, -1316 (Fed. Cir.);

- *MemoryWeb, LLC v. Samsung Electronics Co., Ltd.*, No. 24-1332 (Fed. Cir.);

- *MemoryWeb, LLC v. Apple Inc.*, 3:21-cv-09839-VC (N.D. Cal.); and

- *MemoryWeb, LLC v. Samsung Electronics Co., Ltd. et al.*, 3:22-cv-03776-VC (N.D. Cal.).

Counsel is aware of no other case that may directly affect or be directly affected by the outcome of this appeal.

## JURISDICTIONAL STATEMENT

The Board had jurisdiction under 35 U.S.C. §§ 6(b) and 311 et seq. and issued its final written decision on March 14, 2023 and its rehearing decision on December 4, 2023. Appx9; Appx168. MemoryWeb timely appealed on January 4, 2024. 37 C.F.R. § 90.3(a)(1). Appx1126-1129. This Court has jurisdiction over MemoryWeb's appeal under 35 U.S.C. § 141(c) and 28 U.S.C. § 1295(a)(4)(A).

## INTRODUCTION

This appeal arises from an *inter partes* review involving MemoryWeb's Patent No. 10,621,228 ("the '228 Patent") that is directed to methods for managing digital files such as digital photographs. The claimed methods enable users to navigate through and view their captured memories via an interactive interface in a novel way.

The claims recite displaying a map view, which includes two "location selectable thumbnail image[s]" on an interactive map, "responsive to" a user input. The parties' disputed the meaning of the phrase "responsive to": MemoryWeb argued that "responsive to" requires a direct cause-effect relationship between the user input and displaying the map view, whereas Unified argued that "responsive to" allows for intervening inputs between the user input and the display of the map view. The Board failed to resolve this dispute. The Board, instead, improperly mischaracterized Unified's proposed prior-art combination of Okamura and Flora as disclosing this limitation without intervening inputs and concluded that Unified met its burden to show this limitation would be obvious. Unified, however, expressly relied on Flora's disclosure of additional user interaction in the combination. The Board erred because Flora's teachings require additional user interaction and there is no evidence that it would be obvious to modify the Okamura-Flora combination

to have the direct cause-effect relationship between the input and the display of the map view.

The Board's second series of errors relate to its finding that it would have been obvious to combine Okamura and Flora. Okamura discredits "related art" that used markers on a map to show where photos were taken. Okamura describes scaling problems in the related art and proposes to solve those problems with so-called "cluster maps," which are miniature maps with varying scales. In the Okamura-Flora combination, Okamura's cluster maps are eliminated, reintroducing the exact same problems as the related art. The Board ignored these facts and mischaracterized Okamura's disparagement of the related art.

Pursuant to Federal Circuit Rule 28(j), MemoryWeb provides notice that portions of its brief are duplicative of or nearly duplicative of briefs in related cases *MemoryWeb, LLC v. Samsung Electronics Co., Ltd.*, Nos. 24-1315, -1316 and *MemoryWeb, LLC v. Samsung Electronics Co., Ltd.*, No. 24-1332, which address appeals of other Board Decisions involving the '228 Patent and other MemoryWeb patents that share a common specification and the same "responsive to" construction dispute.

For these reasons, and as explained below, this Court should reverse, or at least vacate and remand for further analysis, the Board's Decision that claims 1-7 of the '228 Patent are unpatentable.

## STATEMENT OF THE ISSUES

1. All claims in the '228 Patent recite the phrase "responsive to." In particular, claim 1 recites causing a map view to be displayed "responsive to a first input." Did the Board err in failing to find that the plain meaning of "responsive to" requires a cause-effect relationship between the first input and causing the map view to be displayed?

2. Unified argued that its secondary reference, Flora, discloses a map view including an interactive map and two location selectable thumbnail images as recited in claim 1 of the '228 Patent. Flora teaches that these images are only displayed on the map responsive to the user moving their cursor to a particular location. Unified proposed combining Flora with its primary reference, Okamura, such that Okamura would include Flora's map.

   a. Is the Board's conclusion that the Okamura-Flora combination discloses displaying a map view including two location selectable thumbnail images "responsive to" a first input supported by substantial evidence?

   b. Did the Board abuse its discretion by crediting Unified's expert who merely endorsed the arguments in the Petition, contrary to its own precedential decision?

3

3. Okamura discredits "related art" that used markers on a map to show where photos were taken. Okamura describes scaling problems in the related art and proposes to solve those problems with so-called "cluster maps." Modifying Okamura with Flora eliminates Okamura's cluster maps. Did the Board err in finding that it would be obvious to combine Okamura and Flora in ways that result in the same scaling problems as the related art discredited by Okamura?

## STATEMENT OF THE CASE

### I.    The Inventions of the '228 Patent

During a time of explosive growth in the field of digital photography, the inventors recognized that the then-existing technology failed to provide a way to easily organize, view, and display digital photos and videos. Appx242 (1:40–51); Appx247 (12:58–62); Appx248 (13:3–10). While prior systems like Facebook, Flickr, Shutterfly, and other social media and specialty sites provided some organization functionality, they all suffered from the same inability to easily organize and navigate the expanding volume of digital files. Appx242 (1:50–56).

The '228 Patent addresses the limitations of prior photo management systems by disclosing and claiming novel methods for organizing and displaying digital files "allowing people to organize, view, preserve and share these files with all the memory details captured, connected, and vivified via an interactive interface." Appx242 (1:61–67). The '228 Patent discloses and claims novel and specific

navigation pathways through a variety of "views" with different content in order to "save a user significant time, provide significant information with minimal screen space, and provide an appealing and customizable interface that will enhance the user experience." Appx242 (2:55–59).

For example, the '228 Patent discloses an interactive map view having individual or groups of photos displayed "as photo thumbnails . . . on the map." Appx256 (29:41–57).



Appx232 (FIG. 41)

Accordingly, a user can select a thumbnail to see all of the photos from the same location. Appx256 (29:48–52). The '228 patent discloses a separate "location view" which displays the "individual location name" and "[t]humbnails of each Digital File within the specific collection." Appx253 (24:37–43).



Appx225 (FIG. 34) (cropped)

The '228 patent also discloses a "people view" which displays a thumbnail of each person's face along with their name. Appx252–253 (22:59–23:6).



Appx223 (FIG. 32) (cropped)

From within the people view, a user can select an individual's thumbnail and navigate to a "person view" that includes the person's name, a profile photo, and photos associated with that person. Appx253 (23:12–20).



Appx223 (FIG. 32) (cropped)

These and other views containing specific content are interconnected in novel ways that allow users to intuitively navigate their web of memories.

The '228 Patent claims methods for a user to intuitively view their organized digital files in multiple connected views. Appx242 (1:21–24). Claim 1 recites "causing a map view to be displayed" that includes "an interactive map," two "location selectable thumbnail image[s]" at different locations on the interactive map. Appx259 (35:33–39). This map view is displayed "responsive to a first input." *Id*.

Claim 1 recites two additional views that can be displayed based on selections in the map view. First, a "first location view" is displayed "responsive to an input" indicative of selecting a thumbnail image at a first location in the map view. Appx259 (35:40–49). The first location view includes "a first location name" and "a representation of at least a portion of one digital file in a first set of digital files"

where "the first set of digital files including digital files [is] associated with the first location." *Id*. Second, and similarly, a "second location view" is displayed "responsive to an input" indicative of selecting a thumbnail image at a second location in the map view, where a second set of digital files is associated with the second location. Appx259 (35:50–60).

The particular navigation of claim 1 also recites causing a "people view" to be displayed, which is "responsive to a second input" subsequent to the first input. Appx259 (35:61–36:11). The people view includes at least two thumbnails which contain an image representing the face of the first and second person, respectively. *Id*. The claimed people view also displays the names of the first and second persons adjacent to the first and second thumbnail images, respectively. *Id*.

## II.    The IPR Proceeding

Unified challenged claims 1-7 of the '228 Patent based on four grounds, all of which depend on a combination of Okamura and Flora. Appx453.

### A.    Claim Construction Positions

Unified initially asserted in its Petition that "no terms of the '228 patent warrant construction beyond their ordinary and customary meaning." Appx457.

MemoryWeb argued that the plain and ordinary meaning of the phrase "responsive to" requires a direct cause-effect relationship. For example, in claim 1, the phrase "responsive to" requires that the claimed first input directly causes the

features of the claimed map view to be displayed. Appx786–787; Appx895–898. Similarly, for claim 3, the phrase "responsive to" requires that the first input directly causes the first indication feature to be displayed. Appx789–790; Appx895–898. MemoryWeb demonstrated that Unified's Okamura-Flora combination does not disclose displaying the claimed map view responsive to the first input because Flora's thumbnails are not displayed unless and until the user provides a different input that is entirely separate from the first input. Appx811–813; Appx910–911.

In its Reply, Unified argued that the phrase "responsive to" does not prohibit intervening inputs between the claimed first input and causing the map view to be displayed. Appx849. Unified argued that examples in the specification "do not exclude intervening inputs" and "should not limit [the] claims" but did not identify any relevant examples in which an intervening input was required to display the claimed map view. Appx849–850. While acknowledging that Flora would require an intervening user input to display thumbnails on an interactive map as required in claim 1 of the '228 Patent, Unified argued that it did "not rely on this aspect of Flora" in its Petition. Appx865–866. In other words, Unified argued that Flora's required additional input would be removed in the proposed combination with Okamura. *Id.*

## B. MemoryWeb's Argument That a Skilled Artisan Would Not Combine Okamura and Flora

MemoryWeb explained that a skilled artisan would not combine Okamura and Flora because Okamura disparages prior art systems that organized photos using a

single map. Appx764–770; Appx798–808. Specifically, Okamura teaches that if a map is zoomed out to show multiple countries or continents, the user cannot see where photos were taken within a relatively small area (e.g., Tokyo). Appx770. Conversely, when the map is zoomed in on a specific location, Okamura's map no longer shows other regions of the world. Appx770; Appx799–801.

Okamura solved this problem by using so-called "cluster maps," which are miniature versions of maps with varying scales. Appx768–770. In one example, Okamura displays these cluster maps in a 3x5 array.



Appx1828 (FIG. 18)

In this example, Okamura addresses the scaling problems in the related art by displaying several cluster maps associated with photos taken in the vicinity of Tokyo

and, at the same time, another cluster map associated with Hawaii. Appx5478 (¶ 63). In another example, Okamura overlays cluster maps on a background map spread out over a relatively large geographic region.



Appx1850 (FIG. 41)

MemoryWeb explained that in view of these teachings, a skilled artisan would not have been motivated to modify Okamura to eliminate its cluster maps and reintroduce the same scaling problems as the disparaged related art. Appx798–809.

Flora has the same limitations as the related art because it utilizes a scalable map overlaid with thumbnail images to show the locations where photos were taken. As illustrated by the example below, Flora (on the right) is substantially similar to the related art described in Okamura (on the left). Appx5494–5495 (¶¶ 107–109).



Appx5610 (FIG. 1) (Related Art)          Appx1921 (FIG. 3) (Flora)

MemoryWeb demonstrated that if the content represented in Okamura's FIG. 18—

which includes photos from Tokyo and Hawaii—were displayed using Flora's map,

this would lead to the exact same problems as the related art Okamura discredits.

MemoryWeb illustrated this problem using the graphic below: the yellow square

represents Okamura's photos taken in Tokyo and the red square represents photos

taken in Hawaii if displayed according to Flora. Appx800–802; Appx5496 (¶ 112).



If Flora's map is displayed as shown above "at a scale sufficiently large to show the countries of the world," this prevents the user from understanding where photos were taken within Tokyo and the surrounding area. Appx1876 (¶ [0009]); Appx5478–5479 (¶ 64). Conversely, if the map were zoomed in and focused on Tokyo, other regions (e.g., Hawaii) would no longer be visible. Appx1876 (¶ [0010]); Appx5478–5479 (¶ 64). This is exactly the same problem as the related art that Okamura discredits. Appx1876 (¶¶ [0009]–[0010]).

### C.    The Board's Decision

The Board found that claims 1-7 were unpatentable as obvious over Okamura, Flora, Wagner, and Gilley. Appx122.

The Board declined to expressly construe any claim terms or resolve the parties' dispute regarding the meaning of "responsive to." Appx26. Instead, the Board stated that "[t]o the extent the meaning of any claim term is addressed," it "use[d] its ordinary and customary meaning" in its analysis. *Id*. However, the Board never addressed the ordinary and customary meaning of "responsive to." Instead, the Board rejected MemoryWeb's "argument that the [Okamura-Flora] combination would not result in displaying Flora's icons" because it supposedly "ignores Okamura and Flora's contributions to [Unified]'s proposed combination." Appx56. Specifically, the Board found that Unified's Petition relied "on Flora's actual display of icons 58 and 59 on map 46 . . . not whether Flora also describes that user input would display such icons." Appx56 (citing Appx450–456). In reaching this conclusion, the Board relied on testimony from the second declaration of Unified's expert, Dr. Bederson, which Unified submitted with its Reply. Appx56 (citing Appx3031–3032 (¶ 64)).

With respect to combining Okamura and Flora, the Board found that "Okamura's choice to use a display of cluster maps as index images . . . is not a 'teaching away'" and that Okamura "does not overtly 'criticize, discredit, or otherwise discourage' investigation into the use of a scalable map for such a display." Appx107. The Board also found that Okamura "does not criticize, discredit or disparage the [Okamura-Flora] combination proposed by" Unified. *Id*.

14

### D.     The Board's Rehearing Decision

MemoryWeb requested rehearing of the Board's Decision on several grounds, including, *inter alia*, the Board's failure to resolve the parties' dispute regarding the meaning of "responsive to," its misapprehension of Unified's Petition in finding that Okamura and Flora disclose the claimed "map view" limitations, and its finding that a skilled artisan would combine Okamura and Flora. *See* Appx1078–1080. The Board denied MemoryWeb's rehearing request. Appx186.

With respect to the meaning of "responsive to," the Board found that its "resolution of the dispute . . . did not require an express construction of the term 'responsive to'" and that the Decision "applied the plain and ordinary meaning of the claims." Appx172–173. The Board reiterated that, in its view, Unified's Petition proposed combining Okamura and Flora in a way that did not require Flora's intervening cursor movement to display icons on the map. Appx172.

With respect to combining Okamura and Flora, the Board acknowledged that the Decision did not address MemoryWeb's argument regarding Okamura's preference for using cluster maps being relevant to whether a skilled artisan would combine Okamura with Flora in a way that eliminates those cluster maps. Appx182. The Board reasoned that it did not need to address every argument and did not substantively address this issue in the Rehearing Decision. *Id*.

## SUMMARY OF THE ARGUMENT

I.      Claim 1 of the '228 Patent recites a "map view" that includes an interactive map, a first location selectable thumbnail image, and a second location selectable thumbnail image. This map view is caused to be displayed "responsive to a first input." The plain and ordinary meaning of this claim language requires a direct cause-effect relationship between the first input and causing the display of the map view, including the interactive map and at least two location selectable thumbnail images.

II.     Flora teaches that to display icons on the map, a user must move the cursor to a specific area of the map. The Board rejected MemoryWeb's argument that Unified's Okamura-Flora combination would include this additional user interaction. The Board did not address MemoryWeb's argument that Unified did not show that a skilled artisan would modify the combination to remove Flora's additional user input. The Board's conclusion is not supported by substantial evidence because it relies on expert testimony that is conclusory and unsupported and because there is insufficient evidence that a skilled artisan would modify the combination to remove Flora's additional user input.

III.    The Board also erred in finding that it would have been obvious to combine Okamura and Flora. Okamura discredits "related art" that used markers on a map to show where photos were taken. Okamura describes scaling problems in the

16

related art and proposes to solve those problems with so-called "cluster maps," which are miniature maps with varying scales. Modifying Okamura with Flora eliminates Okamura's cluster maps and reintroduces the same scaling problems as the related art. The Board ignored these facts and addressed different issues with the related art, which warrants vacatur and remand. Additionally, the Board's failure to address the relevant facts and arguments render its findings unsupported by the record.

## STANDARD OF REVIEW

This Court reviews the Board's legal conclusions *de novo* and its factual findings for substantial evidence. *In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1329 (Fed. Cir. 2016). The Court will reverse decisions where the Board's factual findings lack substantial evidence. *See, e.g.*, *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155 (Fed. Cir. 2021). "A finding is supported by substantial evidence if a reasonable mind might accept the evidence to support the finding." *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1064 (Fed. Cir. 2018).

Claim constructions are reviewed *de novo* and factual findings regarding extrinsic evidence are reviewed for substantial evidence. *Praxair Distrib. v. Mallinckrodt Hosp. Prods. IP*, 890 F.3d 1024, 1031 (Fed. Cir. 2018). The *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), claim construction standard applies to this proceeding because the petition was filed after November 1, 2018. *See*

*Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 n.2 (Fed. Cir. 2020).

This Court reviews the Board's legal conclusions on obviousness *de novo* and its underlying factual findings for substantial evidence. *Polaris*, 882 F.3d at 1064.

This Court reviews the Board's decisions under the Administrative Procedure Act ("APA") to determine whether the Board's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *In re Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002) (quoting 5 U.S.C. § 706(2)).

## ARGUMENT

## I.    THE BOARD ERRED BY FAILING TO CONSTRUE "RESPONSIVE TO"

The Board failed to resolve the parties' dispute regarding the meaning of the phrase "responsive to." In its Rehearing Decision, the Board stated: "[o]ur resolution of the dispute as to whether the asserted prior art met these limitations did not require an express construction of the term 'responsive to' . . . but rather applied the plain and ordinary meaning of the claims consistent with the express position of the partes taken during the proceedings." Appx172–173. The problem with this statement is that the parties disputed the plain and ordinary meaning of the term "responsive to" and whether Unified met its burden of showing it would be obvious to modify Flora or Okamura such that the display of the "map view" is "responsive to" the user input. *Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1375 (Fed. Cir.

2017) (holding that the Board must resolve disputes regarding the proper scope of claims); Appx786–787; Appx895–898; Appx849; Appx1015 (34:4–23). While the Board "found no reason" to construe "responsive to," there is no need to remand this case for the Board to construe "responsive to" in the first instance because it is appropriate for this Court to do so. *Meyer Intell. Properties Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1368–69 (Fed. Cir. 2012) (finding claim limitation may be construed for the first time by the Court where record is sufficiently developed). The record is "sufficiently developed to enable [this Court] to construe the claim term without prejudicing either party." *Wavetronix LLC v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1355 (Fed. Cir. 2009).

The plain and ordinary meaning of the phrase "responsive to" in the '228 Patent claims requires a cause-effect relationship between two events. In particular, claim 1 requires a direct-cause effect relationship between the first input and causing the display of a map view including an interactive map and two thumbnail images. Appx259 (35:33–39). Unified's proposal, which allows intervening inputs between the first input and the display of the map view, should be rejected.

### A.     "Responsive To" Requires a Causal Relationship Between the Display of the View and the User Input Rather Than Allowing Additional User Inputs

The '228 Patent claims a myriad of views, each of which comprise different features, including the "map view," "first location view," "second location view,"

"people view," "first person view," and "second person view." Appx259–260 (35:33–34, 35:40–42, 35:50–53, 35:61–62, 38:7–13, 38:14–19). Claim 1 requires "causing a map view to be displayed" responsive to a first input and that the "map view" includes three features: an interactive map, a first location selectable thumbnail image, and a second location selectable thumbnail image. Appx259 (35:33–39). The "map view" is distinguished from the other claim views at least based on its defining features: the interactive map and first and second location selectable thumbnails.

Claim 1 recites that the "map view" includes:

(i) an interactive map;

(ii) a first location selectable thumbnail image at a first location on the interactive map; ***and***

(ii) a second location selectable thumbnail image at a second location on the interactive map.

Appx259 (35:34-39) (emphasis added). The use of "and" in claim 1 requires construing the limitation such that the three features are displayed in the same view at the same time to form a "map view." *Medgraph, Inc. v. Medtronic, Inc.*, 843 F.3d 942, 949 (Fed. Cir. 2016) (construing "and" as conjunctive).

The plain meaning of the claim language also requires that these three features be displayed in the map view as a direct result of the first input. Appx1000 (39:11–

20). A construction that allows additional user inputs conflicts with the requirement that the map and location thumbnail images be displayed "responsive to" a particular event: the first user input. If "responsive to" were interpreted to allow multiple intervening user inputs between the first input and causing the map view to be displayed, as Unified argued, then the claim would merely require displaying the map view after the first input. However, the '228 Patent expressly draws a distinction between "responsive to" and "subsequent to." For instance, claim 1 of the '228 Patent recites "responsive to" four times and separately recites the phrase "subsequent to" to define a temporal relationship between the "first input" and "second input." Appx259 (35:61–63). It is axiomatic that "[d]ifferent claim terms are presumed to have different meanings." *Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008). In this case, construing "responsive to" to allow multiple intervening user inputs is effectively the same as "subsequent to," which would be improper.

A construction that permits additional user inputs between the claimed first input and the display of the map view would also be improper because it would create unnecessary ambiguity in the claim – how many intervening user inputs can there be between the first user input and the display of the map view? Rather than the untenable result created by Unified's construction, the plain meaning of "responsive to" requires a cause-effect relationship.

21

A construction that permits additional user inputs is also inconsistent with the stated purpose of the invention. The '228 Patent states that its inventions "save a user significant time, provide significant information with minimal screen space, and provide an appealing and customizable interface that will enhance the user experience." Appx242 (2:55–59). Allowing additional user interaction between the first input and the display of the map view would be antithetical to those goals, whereas requiring a direct cause-effect relationship between the display of the map view and the first input is consistent with those objectives. *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1354 (Fed. Cir. 2010) (rejecting construction that would "defy the invention's goal"). As discussed above, the '228 patent discloses and claims an innovative way to organize and navigate large numbers of digital files in order to tell the story of a user's memories using multiple connected views. That navigation sets forth a particular set of steps or flow through the system, and at each particular point, different information is presented to the user. The claims capture this by identifying the particular views and information appearing as the user navigates the system. Unified's overbroad construction for "responsive to" fails to consider the overall structure of the claims, which recite a particular flow through various views with different content.

**B.    The Specification Supports MemoryWeb's Construction, Not Unified's Construction**

Unified failed to identify anything in the specification supporting its broad construction of "responsive to." Appx849–850. While Unified argued that the example shown in FIG. 41 "do[es] not exclude intervening inputs," the Board acknowledged that nothing in the specification requires any user input beyond the first input to display the map view. Appx849. In short, MemoryWeb's construction is consistent with the specification while Unified's is not. *See Wi-Fi One, LLC v. Broadcom Corp.*, 887 F.3d 1329, 1346 (Fed. Cir. 2018) (holding that "the claims must be read . . . in order to be faithful to the invention disclosed in the specification").

The specification is replete with examples illustrating the cause-effect relationship required in the claims. For instance, to display the exemplary map view shown in FIG. 41 that includes two thumbnail images overlaid on an interactive map, the user only needs to provide a single input. Appx256 (29:48–55); Appx5483 (¶ 76).



Appx222 (FIG. 41) (cropped)

As another example, in FIG. 32, "selecting 'People' (1401)" directly results in the people view 1400 being displayed. Appx252 (22:60–64).

people view

Appx223 (FIG. 32) (cropped)

As another example, the specification discloses that selecting an album selectable element directly causes an album view to be displayed. Appx253 (23:51–55).

24



Appx224 (FIG. 33) (cropped and annotated)

These examples confirm that the phase "responsive to" requires a cause-effect relationship between a specific input and causing another view to be displayed.

Unified rationalized its construction by inaccurately characterizing MemoryWeb's construction as being based on "[m]ere embodiments [that] should not limit the claims." Appx850. MemoryWeb did not argue the specification required limiting the plain meaning of the claims. Rather, MemoryWeb argued that its construction is the plain meaning of the phrase "responsive to," as confirmed by the specification. Appx787; Appx898. In fact, MemoryWeb expressly explained that it was "not rely[ing] on the specification as 'limiting.'" Appx898. Rather, MemoryWeb argued that exemplary embodiments in the specification were "consistent with the express words recited in the claim." Appx787. Using the specification to support a claim construction is not tantamount to importing

25

limitations from the specification. *Phillips*, 415 F.3d at 1315 (the specification is the single best guide to the meaning of a disputed term).

## II. THE BOARD ERRED IN FINDING THAT OKAMURA AND FLORA DISCLOSE DISPLAYING THE CLAIMED MAP VIEW

The Board's decision that the Okamura-Flora combination displays the claimed map view "responsive to" to the first input under the proper construction of "responsive to" is not supported by substantial evidence because Flora requires additional intervening user interactions to display the icons and Unified failed to offer any evidence or arguments that it would be obvious to modify Flora to remove that intervening user interaction to display both icons on the geographic map as a direct effect of the first user input.

To address Okamura's shortcomings, Unified argued that a skilled artisan would combine Okamura and Flora to arrive at the claimed map view. Specifically, Unified proposed combining Okamura and Flora such that Okamura's cluster map display area 414 in Figure 18 would be replaced with Flora's scalable geographic map 46 containing icons 58 and 59 and media viewer 64. Unified argued the icons 58 and 59 correspond to the claimed first and second location selectable thumbnail images. Appx451–454.



Appx1827 (FIG. 18) (Okamura)        Appx1921 (FIG. 3) (Flora)

The graphic below illustrates the resulting combination of Okamura and Flora according to Unified's arguments:



In Flora, the icons 58 and 59 on the map are only displayed in response to a user input that occurs *after* the map is already displayed. Appx811–813. Specifically, the user must "pass[] the cursor over the map to a position that is proximate to locations

27

associated with images" and only "[i]n response to this user input" will Flora display the icons 58 and 59 on the map. Appx1927–1928 (6:67–7:8); Appx5192 (71:4–25); Appx5479–5482 (¶¶ 66–70); Appx5510-5511 (¶¶ 142–143). There was no dispute that this is how Flora works and the Board made no contrary findings in its Decisions. *See* Appx865–866; Appx910–911; Appx55–56; Appx173–174.

Unified identified a selection of Okamura's place tab 413—which causes the cluster map display area 414 in FIG. 18 to be displayed—as the first input. Appx463–464. When Flora's teachings are directly inserted in Okamura's cluster map display area 414, then Flora's icons 58 and 59 are only displayed after the user moves the cursor. Appx5510–5511 (¶ 142). That is, a direct combination of Flora with Okamura results in the icons 58 and 59 are displayed responsive to a different input once the interactive map is already displayed; they are ***not*** displayed "responsive to" the first input.

The Board made no findings contradicting MemoryWeb's arguments that (1) Flora requires an additional user input to display the icons 58 and 59 and (2) these additional inputs do not satisfy the "responsive to" requirement in the '228 Patent. *See* Appx55–56; Appx173–174.

Instead, the Board found that Unified's "proposed combination relies on Flora's actual display of icons 58 and 59 on map 46 . . . not whether Flora also describes that user input would display such icons." Appx56. The Board explained,

"Dr. Bederson competently explains Petitioner's basis for the proposed combination, which we credit," citing paragraph 64 of Dr. Bederson's second declaration. Appx55–56 (citing Appx3031–3032 (¶ 64)). Paragraph 64 of Dr. Bederson's second declaration states in full:

> The Patent Owner and Dr. Reinman argue "[n]owhere…does Okamura or Flora, alone or in combination, disclose that the 'map view' displayed *in response to* the 'first input' would 'include[e]' first and second 'thumbnail image[s]…on the interactive map' as claimed." POR, 52-54 (underlining and italics in original). I do not agree. Okamura describes that *responsive to a first input* that is depressing PLACE tab 413, a cluster map display area 414 is displayed (*causing a map view to be* displayed) on a display interface of Okamura's content playback application (*on an interface).* Petition, 14-20. Further, combined with Flora, Okamura's cluster map display area 414 (*map view*) displays content as taught by Flora's geographic map 46 (*interactive map)* and media viewer 64, where Okamura's content is indicated at various locations on the map by Flora's icons 58 and 59 (*first location selectable thumbnail image, second location selectable thumbnail image). Id.,* 20-29. I do not agree with Patent Owner and Dr. Reinman's argument that the combination "would only cause Okamura's cluster map display area 414 (*map view)* and Flora's geographic map 46 (*interactive map)* to be displayed without Flora's icons 58, 59 (*thumbnail image[s])* "on the interactive map" because Flora allegedly requires a separate user input to display its icons. POR, 53-54. This argument is wrong because it fails to account for Okamura and Flora's contributions to the combination. Regardless of whether the Flora describes a user input is required or not to display icons, such an aspect of Flora is not relied on in the combination and the combination instead relies on the fact that Flora displays icons 58 and 59 on a scalable map 46, to show locations associated with media content, and a

29

> media viewer 64. Petition, 25-26. And even if Flora
> required such a user input, the combination would still
> disclose or at least render obvious limitations [1b], [1d],
> and [1e] for the same reasons as those limitations do not
> exclude any such input. *Id.,* 14-31.

Appx3031–3032 (¶ 64). In reaching its conclusions on this limitation, the Board

made no further citation to the record. Appx55–56; Appx173–174. The Board's

reliance on this paragraph is deficient because Dr. Bederson does not offer any

opinions in this paragraph concerning how or why a person of skill in the art would

modify Flora to remove the additional user interaction in the combination.

The Board's reliance on Dr. Bederson's second declaration is deficient at least

because Dr. Bederson's opinions are conclusory and unsupported. These paragraphs

offer no analysis about why a person of skill in the art would modify or selectively

use Flora's teachings. Such "conclusory expert testimony is inadequate to support

an obviousness determination on substantial evidence review." *TQ Delta, LLC v.

Cisco Systems, Inc*., 942 F.3d 1352, 1359 (Fed. Cir. 2019) (noting that "'conclusory

statements and unspecific expert testimony' did not qualify as substantial evidence

that could support the Board's conclusions regarding obviousness") (citing *DSS

Tech. Mgmt., Inc. v. Apple Inc.*, 885 F.3d 1367, 1376 (Fed. Cir. 2018)).

The Petition and Dr. Bederson's first declaration accompanying the Petition

fare no better. The Petition and Dr. Bederson's first declaration specifically cited to

and relied on the teachings from Flora that require the additional user interaction to

display the icons on the map. Appx477 and Appx479 (citing Appx1928 (7:4–13)); Appx1178–1184 (¶¶ 79–84). The Board cited this teaching as well in the Decision. Appx46–47, Appx50, Appx55. Notably, the Petition explicitly stated that in the resulting Okamura-Flora combination, Okamura's "cluster map display area 414 *includes Flora's teachings*." Appx474 (emphasis added); *see also* Appx1181–1184 (¶¶ 82–84). Similarly, the Petition stated "[c]ombining their teachings would have been routine to a POSITA due to this overlap and the simple software modifications to adjust cluster map display area 414 to *include Flora's teachings*." Appx475–476 (emphasis added); Appx1183–1184 (¶ 84). There is no dispute, however, that Flora's teachings include the additional intervening user action to show the icons on the map.

To meet its burden to show obviousness of this limitation, Unified was required to offer evidence that a person of skill in the art would modify Flora's behavior to remove that additional user interaction. *See SharkNinja Operating LLC v. iRobot Corp.*, No. 2023-1151, 2024 WL 1132219, at *3 (Fed. Cir. Mar. 15, 2024) (affirming Board's finding of non-obviousness where petitioner did not provide any motivation to modify a feature in the prior art to arrive at the claimed invention) (non-precedential); *Leica Microsystems, Inc. v. Regents of Univ. of Michigan*, No. 2022-1445, 2023 WL 3048244, at *2 (Fed. Cir. Apr. 24, 2023) (affirming Board's finding of non-obviousness where "one would have needed to modify [one of the

references] to arrive at the claimed invention" and the petitioner failed to whether or how a skilled artisan would do so) (non-precedential). Unified did not do that.

Notably, Dr. Bederson conceded he "did not perform a specific claim by claim or claim element by claim analysis." Appx5725 (167:18–168:2). Instead, Dr. Bederson testified that he "endorsed the technological discussions of the petition" and "agree[d] with the mapping of prior art to the limitations of the challenged claims in the petition." Appx5725 (168:22–169:2). Dr. Bederson's "opinions" are nearly identical to the arguments in the Petition. The Board's precedent holds that little or no weight should be afforded to declarations that merely repeat a party's arguments. *Xerox Corp. v. Bytemark, Inc.*, IPR2022-00624, Paper 9 at 15-17 (PTAB Aug. 24, 2022) (precedential) (citing 37 C.F.R. § 42.65(a)); *U.S. v. Arthrex, Inc.*, 594 U.S. 1, 14 (2021) (noting that the Director may "designate[] past PTAB decisions as 'precedential' for future panels"). The Board abused its discretion by crediting Dr. Bederson's testimony here contrary to its own precedential decision. When the Board "departs from [its] established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious." *Fred Beverages, Inc. v. Fred's Cap. Mgmt. Co.,* 605 F.3d 963, 967 (Fed. Cir. 2010) (reversing TTAB's decision as arbitrary and capricious where it departed from agency precedent).

Even if Dr. Bederson's adoption of the Petition arguments was sufficient, which it is not, the motivation to combine analysis in the Petition and Dr. Bederson's first declaration is deficient because he did not offer any opinions why a person of skill in the art would modify the Flora to remove the intervening user input. In fact, Dr. Bederson admitted during cross-examination that he did not "have an opinion about a [] claim where such an intervening input is required." Appx5695–5696 (49:24–50:1); *see also* Appx5695 (47:4–49:24). This cross-examination testimony confirms that Dr. Bederson did not offer an opinion that a person of skill in the art would modify the Flora to remove the intervening user input.

Because the Board's findings are only supported by conclusory expert testimony and Unified did not offer any evidence that a person of skill in the art would have modified Flora to remove the additional user interaction, the Board's decision should be reversed.

## III. THE BOARD ERRED IN FINDING THAT IT WOULD HAVE BEEN OBVIOUS TO COMBINE OKAMURA AND FLORA

### A. The Board Mischaracterized MemoryWeb's Arguments Regarding Okamura's Teaching Away

The Board's conclusion that it would have been obvious to combine Okamura and Flora should also be reversed, or at least vacated, because the Board failed to address critical arguments and evidence demonstrating non-obviousness. *Chemours Co. FC, LLC v. Daikin Indus., Ltd.*, 4 F.4th 1370, 1377, 1379 (Fed. Cir. 2021)

(reversing Board's obviousness determination, holding the Board relied on an inadequate evidentiary basis and failed to articulate a satisfactory explanation based on substantial evidence for motivation to combine where primary reference taught away from the combination); *Google LLC v. Conversant Wireless Licensing S.A.R.L.*, 753 F.App'x 890, 895 (Fed. Cir. 2018) (holding that "the appropriate course of action when the Board's analysis is incomplete and fails to address key arguments and issues properly before it is to vacate and remand the findings for further consideration") (non-precedential) (citing *Vicor Corp. v. SynQor, Inc.*, 869 F.3d 1309, 1321 (Fed. Cir. 2017)).

MemoryWeb demonstrated that Okamura discredits "related art" that used a single map with markers to show the locations were photos were taken. According to Okamura, the problem with the related art is that using a single map, even with an adjustable scale, limits the amount of information that can be conveyed at any given time. MemoryWeb demonstrated that if Okamura were combined with Flora, this would reintroduce the exact same problems as the related art Okamura discredits. Appx796–809; Appx903–906. The Board mischaracterized the way in which Okamura teaches away from the claimed invention and failed to address MemoryWeb's argument that combining Okamura with Flora would lead to the same problems that Okamura sought to solve. The Board's failure to understand the issue and address MemoryWeb's argument warrants vacatur.

### 1. Okamura Disparages "Related Art" that Suffered from Scaling Problems

Okamura disparages two references it refers to as "related art." Appx1876 (¶¶ [0009]–[0010]). As shown below, the related art used markers overlaid on a map to show locations where photographs were taken.

  

Appx3334 (FIG. 12) (annotated)     Appx5610 (FIG. 1) (annotated)

In the related art, regardless of the zoom-level, the entire displayed map has a single uniform scale. Okamura, however, teaches that displaying a map with a uniform scale will limit how much information can be conveyed at any given time. Appx1876 (¶¶ [0009]–[0010]); Appx5474–5476 (¶¶ 56-60).

Okamura illustrates the scaling problem in the related art using two examples. First, when the map is zoomed out to show multiple countries or continents, all of the images in a large area—such as Tokyo and its vicinity—would be displayed at substantially the same point on the map making it difficult to discern between images taken in downtown Tokyo versus others taken in the surrounding areas. Appx1876

35

(¶ [0009]). Second, and conversely, when the map is zoomed in to show the locations of images taken in Tokyo and the surrounding area, it is not possible to display locations of images taken in other regions (for example, the United States). Appx1876 (¶ [0010]).

Okamura addressed these scaling problems by using so-called "cluster maps" each having different, varying scales to ensure the contents "belonging to each cluster can be . . . easily grasped by the user." Appx1892 (¶¶ [0215]–[0219]), Appx1908 (¶ [0410]). For example, the cluster map 801 in FIG. 44A uses a different scale than the background map 804 to show more detail. Appx1908 (¶¶ [0407]–[0411]); Appx5498–5499 (¶¶ 116–117).



Appx1853 (FIGS. 44A–44B) (annotated)

## 2. Unified's Proposed Combination of Okamura and Flora Has the Same Scaling Problems as the Related Art

The Board improperly found obvious the combination of Flora's single uniformly scaled map—the same type disparaged and taught away from by Okamura—with Okamura's display. Appx796–809; Appx903–905. The Okamura-

Flora combination results in the same scaling problems as the related art Okamura disparages. *Id*.

Specifically, Unified's Okamura-Flora combination replaces Okamura's cluster map display area 414 in FIG. 18 with Flora's map 46. *See* Appx467–476.




Appx1827 (FIG. 18) (Okamura)          Appx1921 (FIG. 3) (Flora)

This modification eliminates Okamura's cluster maps, leaving a single uniform scale map just like the related art. Appx808; Appx909–910.

The resulting Okamura-Flora combination results in the same problems as the related art Okamura discredits. As shown below, Okamura's cluster map display area 414 contains cluster maps corresponding to locations in and around Tokyo (annotated in yellow) and in Hawaii (annotated in red). Appx800; Appx5495–5496 (¶ 111).



Appx1827 (FIG. 18) (excerpted and colorized)

The graphic below illustrates how this information would be displayed using Flora's map: the Tokyo images are represented by a yellow marker and the Hawaii images are represented by a red marker. Appx800–801; Appx5496–5497 (¶ 112).



Okamura's description of the problems in the related art applies equally to this scenario. If Flora's map were displayed as shown above "at a scale sufficiently large to show the countries of the world," this would prevent the user from understanding where photos were taken within Tokyo and the surrounding area. Appx1876 (¶ [0009]); Appx5478–5479 (¶ 64). Conversely, if the map were zoomed in and focused on Tokyo, other regions (e.g., Hawaii) would no longer be visible. Appx1876 (¶ [0010]); Appx5478–5479 (¶ 64). This is exactly the same problem as the related art that Okamura discredits. Appx1876 (¶¶ [0009]–[0010]).

### 3. The Board Mischaracterized the Issues, Failed to Address MemoryWeb's Arguments, and Made Findings Not Supported by Substantial Evidence

While the Decision referenced at least some of MemoryWeb's arguments regarding Okamura's disparagement of the related art and how the Okamura-Flora combination results in the same problems, the Board's substantive obviousness analysis mischaracterized the issues. The Board's failure to address MemoryWeb's arguments at least requires vacatur. *Google*, 753 F.App'x at 895; *Vicor*, 869 F.3d at 1321.

The Board found that "Okamura's choice to use a display of cluster maps as index images . . . is not a 'teaching away'" and that Okamura "does not overtly 'criticize, discredit, or otherwise discourage' investigation into the use of a scalable map for such a display." Appx107. These findings, however, are premised on

39

mischaracterizations of MemoryWeb's arguments. MemoryWeb never argued that Okamura's "choice to use a display of cluster maps" is a teaching away; it argued that Okamura's disparagement of the related art teaches away from any modifications that would result in the same problems as the related art. Appx796–809; Appx903–906. Similarly, the Board's finding that Okamura does not criticize, discredit, or otherwise discourage using a scalable map also rests on a mischaracterization of MemoryWeb's argument. MemoryWeb never argued that Okamura teaches away from using any type of scalable map in any capacity; it argued that Okamura discredits the use of a single scalable map (e.g., with makers designating the locations where photos were taken) in a way that limits the interface's ability to convey certain information at any given time based on the current zoom level on the map. Appx796–809; Appx903–806.

Indeed, the Board's finding that Okamura does not discredit the related art is irreconcilable with its finding in IPR2022-00221—in which the '228 Patent was also challenged based on Okamura and which is subject to related Appeal No. 24-1316—that the related art is "discredited by Okamura." *Samsung Electronics Co., Ltd. v. MemoryWeb, LLC*, IPR2022-00221, Exhibit 2121[1] at 82 (PTAB Dec. 8, 2023). The fact that the Board reached irreconcilable conclusions on the same issue in two

---

[1] The Board did not issue a public version of its final written decision as a separate paper in that proceeding, a redacted copy is available as Exhibit 2121.

proceedings provides an independent basis for the Court to vacate and remand the Decision. *Emerson Elec. Co. v. SIPCO, LLC*, 745 F. App'x 369, 373 (Fed. Cir. 2018) (vacating decision because "[t]he Board came to opposite conclusions on patentability of . . . nearly identical claims despite considering nearly identical evidence in" two different IPRs) (non-precedential); *BASF Corp. v. Enthone, Inc.*, 749 F. App'x 978, 985 (Fed. Cir. 2018) (vacating decision where "[t]he PTAB acted arbitrarily and capriciously by failing to provide a reasoned explanation for reaching an inconsistent finding" in different proceedings) (non-precedential); *see also Vicor*, 869 F.3d at 1312, 1322 (vacating decision where the Board reached opposite conclusions on the same technical issue in different proceedings).

The Board's reasoning that Okamura does not teach away because "some of Okamura's embodiments describe the use of maps with changing or differing scales" was also predicated on its misunderstanding of what aspect of the related art Okamura discredited. Appx107 (citing Appx1877–1892 (¶¶ 19–20, 93, 215, 219)). Moreover, the Board's references to "maps with changing or differing scales" in Okamura relate to changing the scale of the cluster maps. For example, to ensure the content "belonging to each cluster can be . . . easily grasped," Okamura discloses "changing the scale" of individual cluster maps so that multiple cluster maps presented in a single view are displayed with differing scales. Appx1892 (¶¶ [0215]–[0219]); Appx1908 (¶ [0410])). Okamura displays multiple cluster maps, which may

have different scales, at the same time either in an array or overlaid on a background map.





Appx1827 (FIG. 18)                    Appx1850 (FIG. 41)

The fact that Okamura's cluster maps have varying scales misses the point: the Okamura-Flora combination removes these cluster maps in favor of a single map just like the related art. *Supra* § III.A.2.

Finally, the Board's finding that Okamura "does not criticize, discredit or disparage the combination proposed by" Unified is also premised on its misunderstanding of the relevant arguments and issues. Appx107. As demonstrated above, replacing Okamura's cluster map display area 414 with Flora's map 46 results in the ***exact*** same problem as the related art that is discredited by Okamura. *Supra* § III.A.2. The Board's finding to the contrary is not supported by the record and ignores MemoryWeb's arguments and evidence on this point.

In sum, the Board's obviousness analysis is incomplete and fails to address MemoryWeb's key arguments that (1) Okamura disparages the related art for its scaling issues and (2) the allegedly obvious Okamura-Flora combinations have the exact same problem. This failure by the Board warrants reversal or vacatur and remand for proper consideration of the issues.

## B. The Board Erred by Ignoring Okamura's Preference for Using Cluster Maps

Although the Board recognized that "Okamura is expressing a preference for an alternative way of displaying images representing content associated with positions on a map," namely, through the use of cluster maps, it failed to ascribe any relevance to that preference in its obviousness analysis. Appx107. As this Court has recognized, even where a reference is not found to "teach away, its statements regarding preferences are relevant to a finding regarding whether a skilled artisan would be motivated to combine that reference with another reference." *Polaris*, 882 F.3d at 1069. Thus, even if the Board were correct that Okamura does not teach away from Unified's Okamura-Belitz combination (which it does – *supra* § III.A), Okamura's preference for using cluster maps is evidence that a skilled artisan would *not* be motivated to modify Okamura to eliminate its preferred cluster maps.

MemoryWeb explicitly argued this point in both its Response and Sur-Reply. Appx806–807; Appx906–907. However, the Board completely ignored this argument. *See* Appx106–111. In the Rehearing Decision, the Board acknowledged

that it did not address MemoryWeb's argument but stated that it had "considered" it without more. Appx1120. However, as this Court has recognized, "it is not adequate to summarize and reject arguments without explaining why the PTAB accepts the prevailing argument." *In re Nuvasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016); *see also Alacritech, Inc. v. Intel Corp.*, 966 F.3d 1367, 1371 (Fed. Cir. 2020) (vacating decision where Board failed to adequately address patent owner's arguments); *Pers. Web Techs., LLC v. Apple*, Inc., 848 F.3d 987, 994 (Fed. Cir. 2017) (vacating because "the Board's reasoning does not meet the requirements for a sustainable obviousness determination"). Given the Board's failure to expressly weigh Okamura's preferences in its obviousness analysis, as it was required to do under this Court's precedent in *Polaris*, "the appropriate course of action . . . is to vacate and remand the findings for further consideration." *Google*, 753 F.App'x at 895.

## CONCLUSION AND RELIEF SOUGHT

The Board's final written decision should be reversed or vacated and remanded for further proceedings.

Respectfully submitted,

/s/ Jennifer Hayes
JENNIFER HAYES
NIXON PEABODY LLP
300 South Grand Avenue
Suite 4100

Los Angeles, CA 90071-3151
Tel:      213-629-6000
Fax:     213-629-6001

DANIEL SCHWARTZ
MATTHEW WERBER
ANGELO CHRISTOPHER
NIXON PEABODY LLP
70 West Madison Street
Suite 5200-4378
Chicago, IL 60602
Tel:      312-977-4400
Fax:     312-977-4405

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(g)(1) and Federal Circuit Rule 32(b)(3), I certify that the brief contained herein has a proportionally spaced 14-point font typeface and contains 8,378 words, based on the "Word Count" feature of Microsoft Word, excluding the cover page, patent claims, Certificate of Interest, Tables of Contents and Authorities, Statement of Related Cases, signature block, Addendum, Certificate of Compliance, and Certificate of Service.

Date:  May 28, 2024                    */s/ Jennifer Hayes*

JENNIFER HAYES
**NIXON PEABODY LLP**
300 South Grand Avenue
Suite 4100
Los Angeles, CA 90071-3151
Telephone: (213) 629-6000
Facsimile: (213) 629-6001

*Counsel for Appellant MemoryWeb, LLC*

46

## <u>CERTIFICATE OF SERVICE</u>

I, Jennifer Hayes, hereby certify that, on this 28th day of May 2024, I caused

a copy of the foregoing **Appellant MemoryWeb LLC's Corrected Opening Brief**

**and Non-Confidential Addendum** to be served on counsel of record via the Court's

CM/ECF system.


Date:  May 28, 2024               */s/ Jennifer Hayes*
                                  JENNIFER HAYES
                                  **NIXON PEABODY LLP**
                                  300 South Grand Avenue
                                  Suite 4100
                                  Los Angeles, CA 90071-3151
                                  Telephone: (213) 629-6000
                                  Facsimile: (213) 629-6001

                                  *Counsel for Appellant MemoryWeb, LLC*

# ADDENDUM TABLE OF CONTENTS

| Date | Document | Appendix Page(s) |
|---|---|---|
| 2023-03-14 | Paper 58 - '228 Patent Final Written Decision, Case No. IPR2021-01413 | Appx9-Appx126 |
| 2023-06-09 | Paper 79 - ORDER Identifying Real Party in Interest 37 C.F.R. §§ 42.5, 42.8 [Non-Confidential] | Appx127-Appx161 |
| 2023-05-22 | Paper 76 - Decision Granting Director Review [Non-Confidential] | Appx162-Appx167 |
| 2023-12-04 | Paper 82 – Decision Denying Patent Owner's Request for Rehearing | Appx168-Appx187 |
| 2021-09-03 | Ex. 1001 - U.S. Patent No. 10,621,228 ("'228 patent") | Appx188-Appx260 |

ADDENDUM

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

Trials@uspto.gov                                    Paper 58
571-272-7822                             Entered: March 14, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

UNIFIED PATENTS, LLC,
Petitioner,

v.

MEMORYWEB, LLC,
Patent Owner.

---

IPR2021-01413
Patent 10,621,228 B2

---

Before LYNNE H. BROWNE, NORMAN H. BEAMER, and
KEVIN C. TROCK, *Administrative Patent Judges*.

TROCK, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2021-01413
Patent 10,621,228 B2

## I.   INTRODUCTION

We have authority to hear this inter partes review under 35 U.S.C. § 6. This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  For the reasons discussed below, we determine that Petitioner, Unified Patents, LLC ("Unified"), has shown by a preponderance of the evidence that claims 1–7 (the "challenged claims") of U.S. Patent No. 10,621,228 B2 (Ex. 1001, "the '228 Patent") are unpatentable.  *See* 35 U.S.C. § 316(e) (2018); 37 C.F.R. § 42.1(d) (2019).

### A.   Procedural History

The Petition (Paper 2, "Pet." or "Petition") requested *inter partes* review of the challenged claims of the '228 Patent.  Patent Owner, MemoryWeb, LLC, filed a Preliminary Response.  Paper 8 ("Prelim. Resp.").  With our authorization, Petitioner filed a Preliminary Reply (Paper 11), and Patent Owner filed a Preliminary Sur-reply (Paper 12).  Based upon the record at that time, we instituted *inter partes* review on all challenged claims on the grounds presented in the Petition.  Paper 15 ("Institution Decision" or "Dec.").

After institution, Patent Owner filed a Response (Paper 23, "PO Resp."), Petitioner filed a Reply (Paper 29, "Pet. Reply"), Patent Owner filed a Sur-reply (Paper 35, "PO Sur-reply"), and with our authorization, Petitioner filed a Sur-sur-reply (Paper 42, "Pet. Sur-sur-reply").

Petitioner filed a Motion to Exclude certain evidence (Paper 44). Patent Owner opposed the motion (Paper 45).

On December 16, 2022, an oral hearing was held.  The hearing comprised a confidential session and a public session.  A transcript of the

2

IPR2021-01413
Patent 10,621,228 B2

hearing was made a part of this record. Paper 52 (confidential session),
Paper 53 (public session).

B. *Real Party-in-Interest*

In the Petition, Petitioner stated that "[p]ursuant to 37 C.F.R.
§ 42.8(b)(1), Unified Patents, LLC . . . certifies that Unified is the real party-
in-interest and certifies that no other party exercised control or could
exercise control over Unified's participation in this proceeding, filing this
petition, or conduct in any ensuing trial." Pet. 1.

In its Preliminary Response, Patent Owner argued that "Apple and
Samsung[1] should have been [named] as RPIs [(real parties in interest)] in
this proceeding, and the failure to identify Apple and Samsung is a basis for
the Board to deny institution." Prelim. Resp. 28; *see also id.* at 22–28.

As noted above, we authorized additional preliminary briefing to
allow the parties to address RPI issue, as well as other issues. Ex. 1020. In
its Preliminary Reply, Petitioner argued that "Patent Owner's (PO's) RPI
arguments should be rejected as inappropriate or, at best, premature. As is
the case here, the Board need not address whether a party is an unnamed RPI
where no time bar or estoppel provisions under 35 U.S.C. § 315 are
implicated." Paper 11, 1 (citing *SharkNinja Operating LLC v. iRobot Corp.*,
IPR2020-00734, Paper 11 at 18 (PTAB, Oct. 6, 2020) (precedential)

---

[1] We infer from the record that Patent Owner is referring to Samsung
Electronics Co., Ltd. ("Samsung") and Apple, Inc. ("Apple") based on the
petitions filed by these companies challenging the '228 patent. *See* Sec. C,
below.

IPR2021-01413
Patent 10,621,228 B2

(*"SharkNinja"*); *Unified Patents, LLC v. Fat Statz, LLC*, IPR2020-01665,
Paper 19 at 2–3 (PTAB, Apr. 16, 2021).

Based upon the preliminary record at that time, we instituted *inter partes* review on all the challenged claims on the grounds presented in the Petition, but declined to determine whether Apple and Samsung were real parties in interest. Dec. 15. We declined to decide the real party in interest question at that time partly because determining whether a non-party is an RPI is a highly fact-dependent question and the case was still in its preliminary stage without a fully developed factual record. Moreover, we determined that we need not address the RPI issue at that time because there was no allegation that Apple or Samsung were subject to a time bar or estoppel that would preclude *this* proceeding. Accordingly, under the Board's precedential decision in *SharkNinja*, IPR2020-00734, Paper 11 at 18, we declined to decide the RPI issue at that time. *See* Paper 15, 11–14.

After institution, Patent Owner raised the RPI issue again, arguing in its Response that

> the Board should terminate this proceeding because Petitioner has failed to name all real parties-in-interest ("RPIs"), including at least Samsung and Apple. Alternatively, the Board should find that Apple and Samsung are estopped from challenging the validity of claims 1–7 of the '228 patent in related proceedings: *Apple Inc. v. MemoryWeb, LLC*, IPR2022-00031 (the "Apple IPR") and *Samsung Electronics Co., Ltd., v. MemoryWeb, LLC*, IPR2022-00222 (the "Samsung IPR") (collectively, the "Related IPRs").

PO Resp. 14–15.

4

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

Given that we now had a fully-developed factual record before us, including probative evidence on the RPI issue that was not available to us at the institution phase of this case,[2] and the parties have been able to argue this issue before the Board during a confidential session of the hearing in this proceeding (*see* Paper 52), we were able to fully address the real party in interest issue raised by Patent Owner in its Response. Accordingly, based upon the complete evidentiary record and the parties' arguments, we issued an Order on March 8, 2023, (Paper 56) identifying Apple and Samsung as RPIs in this proceeding and instructing Petitioner to "update its Mandatory Notices by March 10, 2023, identifying all Real Parties in Interest consistent with this Order pursuant to its obligations under 37 C.F.R. § 42.8(b)(1)." *See* Paper 56, 34.

C. *Related Matters*

According to the parties, the '228 patent was asserted in the following district court proceedings: *MemoryWeb, LLC v. Samsung Electronics Co., Ltd. et al.*, Case No. 6:21-cv-00411 (W.D. Tex.); *MemoryWeb, LLC v. Apple Inc.*, Case No. 6:21-cv-00531 (W.D. Tex.); and *MyHeritage (USA), Inc. et. al. v. MemoryWeb, LLC*, Case No. 1:21-cv-02666 (N.D. Ill.). Pet. 1–2; Paper 4, 2; Paper 7, 2; Paper 9, 2–3.

Patent Owner also identifies U.S. Patent No. 9,098,531 ("the '531 patent"), U.S. Patent No. 10,423,658 ("the '658 patent"), U.S. Patent No. 9,552,376 ("the '376 patent"), U.S. Patent No. 11,017,020 ("the '020

---

[2] Since institution, the parties supplemented the record with Exhibits 1030–1043 and 2027–2047, which included the deposition transcript of the CEO of Unified (Ex. 2036), as well as other relevant evidence on this issue.

IPR2021-01413
Patent 10,621,228 B2

patent"), U.S. Patent No. 11,163,823 ("the '823 patent"), pending U.S. Patent Application 17/381,047, and pending U.S. Patent Application 17/459,933 as related to the '228 patent.  Paper 7, 2; Paper 9, 2–3.

Patent Owner additionally indicates the following *inter partes* proceedings as related matters:  *Samsung Electronics Co., Ltd., v. MemoryWeb, LLC*, IPR2022-00222 (PTAB) challenging the '228 patent; *Apple Inc. v. MemoryWeb*, LLC, IPR2022-00031 (PTAB) challenging the '228 patent; *Apple Inc. v. MemoryWeb, LLC*, IPR2022-00111 (PTAB) challenging the '020 patent; *Apple Inc. v. MemoryWeb, LLC*, PGR2022-00006 (PTAB) challenging the '020 patent; *Apple Inc. v. MemoryWeb, LLC*, IPR2022-00033 (PTAB) challenging the '658 patent; and *Apple Inc. v. MemoryWeb, LLC*, IPR2022-00032 (PTAB) challenging the '376 patent. Paper 7, 2; Paper 9, 2–3.

D. *The '228 Patent (Ex. 1001)*

The '228 patent is titled "Method and Apparatus for Managing Digital Files" and "relates generally to the management of digital files and, more particularly, to a computer-implemented system and method for managing and using digital files such as digital photographs." Ex. 1001, code (54), 1:21–24.  The '228 patent describes a need for "a medium that allows people to organize, view, preserve and share [digital] files with all the memory details captured, connected and vivified via an interactive interface" and "allow digital files, including documents, photos, videos and audio, to tell a full story now, and for generations to come." *Id.* at 1:61–67.  The '228 patent provides a solution in the form of "a computer-implemented method of associating digital tags with digital files" and "a web-based digital file

IPR2021-01413
Patent 10,621,228 B2

storage system [that] comprises a digital file repository for storing and retrieving digital files." *Id.* at 2:3–6, 2:21–25, 2:40–45.

The '228 patent describes details of an "Application" (also called the "MemoryWeb Application"), which is an online program that can (i) import, associate and embed digital tags to digital files, (ii) view, sort, annotate, and share digital files from various Application Views, and (iii) store the digital files through an interactive storage system through a user relationship table. *Id.* at 8:63–9:16. The '228 patent explains that the Application may be accessible "over various user interfaces" including those of "smart phones (e.g., iPhones), Personal Digital Assistants (PDAs) and Tablets (e.g., iPads)." *Id.* at 9:18–22. The Application provides views (i.e., "Application Views") that utilize the Application's ability to associate digital tags to digital files and display them in customized views such as Uploads, Collections, Slideshow, Location, Timeline, Family Tree, People Profile, and Recipes. *Id.* at 9:23–28. The views enable a user to display the user's digital media files and their tagged attributes. *Id.* at 5:57–60. The views include, *inter alia*: a location view that "identifies within an interactive map ([e.g.,] Google map . . .), where digital files were taken or originated . . . [and] can also provide additional outputs such as a journey route that identifies the specific locations for an event or trip that can be customized by users"; a people view that "shows thumbnail photos of all the people in the system that can be clicked in for a people profile view"; and a people profile view that "shows a profile picture of an individual, their birth/death information, family relationships, overview (comments) on the person, as well as links to other views that contain that individual in the system." *Id.* at

IPR2021-01413
Patent 10,621,228 B2

6:13–30.  Some views provided by the '228 patent's Application are shown
in Figures 32 and 34, reproduced below.  *Id.* at 3:62–66, 28:22–24.

Figure 32 illustrates a People Application View (at indicator 1400)
and a People Profile Application View (at indicator 1430).  *Id.* at 18:37–40,
22:59–61.

**FIG. 32**



In Figure 32, above, People Application View 1400 is used to display
all the people that were created within a user's Application.  *Id.* at 22:60–
23:11.  This view can be seen by selecting "People" (illustrated at menu item
1401) from any of the Application Views within the Application, which then
provides a list of people in various sort orders.  *Id.*  For each person, a
thumbnail of their face along with their name is depicted, as shown in Figure

8

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

32, where Jon Smith (item 1403) and JC Jon Smith (item 1404) along with some other people are illustrated. *Id.* Also, at the top of every Application View within the Application, the user can select to apply filters (Apply Filters at item 1451). *Id.* In the People Profile Application View in Figure 32, a single profile (item 1430) is illustrated. *Id.* at 23:12–49. The profile shows: the individual's name (displayed at the top of the page, at 1431) along with their nicknames (at 1433); when they were born (at 1434); their family members (at 1435, 1436, 1437); their biography (at 1438); and a profile photo (at 1439). *Id.* For each person, the system can allow the user to quickly see all the tags that are associated to a person. *Id.*

In Figure 32, the system illustrates that there are four photos (1452) associated with that person and illustrates thumbnails of each of the four photos (1446). *Id.* These thumbnails can be selected and then the user will be taken to the slideshow view for that digital file. *Id.* If the user selects Locations (1443), all of the locations that the specific person has been tagged within will be displayed. *Id.* If the user selects Family Relationships (1444), the people that the user is associated with will be displayed in a family chart or tree. *Id.* If the user selects any of the Application Dot-Tags such as the individual's mother Jane Smith (Doe) (1449), the application will take the user to an individual people profile view of Jane Smith (Doe). *Id.* An Application Dot-Tag is a structure that enables navigation of the data in the Application, helps the user organize their digital files with key components of related information such as people, date of file, location, and collection, and indicates the manner in which a Digital Tag is displayed within the Application using pill-shaped indicators that can reside near a

9

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

file's image or overlaid on the file's image. *Id.* at 9:40–67. The '228 patent explains that the "Application Dot-Tag is more than just text" because "Memory-Web Application Dot-Tags act as mini search engines that allow the user to see how many matching files there are to that MemoryWeb Tag and if selected will take the user to the corresponding Application View to illustrate the linked search results of that Application Dot-Tag." *Id.*

Figure 34 of the '228 patent, reproduced below, illustrates Location Views. *Id.* at 21:36–38, 24:16–17.



FIG. 34

Figure 34, above, shows Location Application View 1600 that displays all the locations that were created within the user's Application; for each location, a thumbnail of a digital file from that location (e.g., Wrigley Field 1601); a view of a single location (1630), with the individual location

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

name displayed at the top of the page (1632); thumbnails of each digital file within the specific collection, such as a photo (1633) taken at Wrigley Field (1634) that is associated with the location Wrigley Field. *Id.* at 24:16–54. The '228 patent provides that "the Application can interact with a Third Party Geographical Mapping System to pull maps that correspond to the exact location of Digital Files that have a location tag." *Id.* at 32:10–13.

Figure 41 of the '228 patent, reproduced below, is a screenshot of an Application Dot-Tag Filter in a Location Application View. *Id.* at 4:7–8.

**FIG. 41**



Figure 41, above, illustrates filtering results for an Application Dot-Tag filter in a Location Application View (at item 0870), providing a world map view that illustrates all the locations that are associated with one or

IPR2021-01413
Patent 10,621,228 B2

more digital files for a user. *Id.* at 29:41–64, 32:15–18. As shown in Figure 41, digital files are displayed within an interactive map (e.g., a Google map). *Id.* at 29:40–64. Individual or groups of digital files are illustrated as photo thumbnails (at indicators 0874 and 0875) on the map, and the user can select the thumbnail to see all the digital files with the same location, or the user can use the interactive map and narrow the map view by using a zoom in/zoom out bar (0876) or by selecting the map. *Id.* If an advanced filter is applied in the Locations Application View, a filter (e.g., of "JC Smith" at item 0872) is illustrated, and only the digital files that contain the person JC Smith are illustrated with their geographic location on the map. *Id.*

E. *Challenged Claims*

Petitioner challenges claims 1–7 of the '228 patent. Pet. 2, 4. Claim 1 is independent. Claim 1 is illustrative and is set out below.

1. [1a-preamble] A method comprising:

[1b] responsive to a first input, causing a map view to be displayed on an interface, [1c] the map view including:

(i) an interactive map;

[1d] (ii) a first location selectable thumbnail image at a first location on the interactive map; and

[1e] (iii) a second location selectable thumbnail image at a second location on the interactive map;

[1f] responsive to an input that is indicative of a selection of the first location selectable thumbnail image, causing a first location view to be displayed on the interface, [1g] the first location view including (i) a first location name associated with the first location and (ii) a representation of at least a portion of one digital file in a first set of digital files, [1h] each of the digital files in the first set of digital files being produced from outputs

12

IPR2021-01413
Patent 10,621,228 B2

of one or more digital imaging devices, the first set of digital files including digital files associated with the first location;

[1i] responsive to an input that is indicative of a selection of the second location selectable thumbnail image, causing a second location view to be displayed on the interface, [1j] the second location view including (i) a second location name associated with the second location and (ii) a representation of at least a portion of one digital file in a second set of digital files, [1k] each of the digital files in the second set of digital files being produced from outputs of the one or more digital imaging devices, the second set of digital files including digital files associated with the second location; and

[1l] responsive to a second input that is subsequent to the first input, causing a people view to be displayed on the interface, [1m] the people view including:

> (i) a first person selectable thumbnail image including a representation of a face of a first person, the first person being associated with a third set of digital files including digital photographs and videos;

> [1n] (ii) a first name associated with the first person, the first name being displayed adjacent to the first person selectable thumbnail image;

> [1o] (iii) a second person selectable thumbnail image including a representation of a face of a second person, the second person being associated with a fourth set of digital files including digital photographs and videos; and

> [1p] (iv) a second name associated with the second person, the second name being displayed adjacent to the second person selectable thumbnail image.

Ex. 1001, 35:32–36:11 (with brackets noting Petitioner's labels, *see* Pet. 13–60).

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

*F.   Evidence*

| Reference or Declaration | Date | Exhibit No. |
|---|---|---|
| U.S. Patent Application Publication No. 2011/0122153 A1 ("Okamura") | May 26, 2011 | Ex. 1004 |
| U.S. Patent No. 6,714,215 B1 ("Flora") | March 30, 2004 | Ex. 1005 |
| U.S. Patent Application Publication No. 2011/0163971 A1 ("Wagner") | July 7, 2011 | Ex. 1006 |
| U.S. Patent Application Publication No. 2010/0172551 A1 ("Gilley") | July 8, 2010 | Ex. 1007 |
| Declaration of Benjamin Bederson, Ph.D. | Sept. 3, 2021 | Ex. 1002 |
| Reply Declaration of Benjamin Bederson, Ph.D. | Aug. 29, 2022 | Ex. 1038 |
| First Declaration of Professor Glenn Reinman | Dec. 17, 2021 | Ex. 2001 |
| Second Declaration of Professor Glenn Reinman | June 6, 2022 | Ex. 2038 |

14

IPR2021-01413
Patent 10,621,228 B2

### G. Asserted Grounds of Unpatentability

| Claim(s) Challenged | 35 U.S.C. §[3] | Reference(s) |
|---|---|---|
| 1–7 | 103(a) | Okamura, Flora |
| 1-7 | 103(a) | Okamura, Flora, Wagner |
| 1–7 | 103(a) | Okamura, Flora, Gilley |
| 1–7 | 103(a) | Okamura, Flora, Wagner, Gilley |

Pet. 4.

## II.  ANALYSIS

### A. Principles of Law: Obviousness

A claim is unpatentable as obvious under 35 U.S.C. § 103 if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary

_____

[3] The Leahy-Smith America Invents Act, Pub. L. No. 112–29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. § 103.  The '228 patent claims priority to Patent Application No. 13/157,214, providing an effective filing date of June 9, 2011.  *See* Ex. 1001, code (63).  Because this priority date is before the effective date of the applicable AIA amendments (March 16, 2013), we use the pre-AIA version of 35 U.S.C. § 103 in this proceeding.

IPR2021-01413
Patent 10,621,228 B2

considerations.[4]  *See Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966).

The Supreme Court has made clear that we apply "an expansive and flexible approach" to the question of obviousness.  *KSR*, 550 U.S. at 415. Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions. *Id.* at 417.  Reaching this conclusion, however, requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination.  *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011).  Rather, obviousness requires the additional showing that a person of ordinary skill would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention.  *Id.*

B.  *Level of Ordinary Skill*

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention.  *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966).  "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991).

Petitioner contends that a person of ordinary skill in the art "would have had at least a bachelor's degree in computer science, electrical

---

[4] The current record does not present or address any evidence of nonobviousness.

IPR2021-01413
Patent 10,621,228 B2

engineering, or a related field, and at least two years of academic or industry experience in software development related to content management systems and user interfaces," and that "[m]ore education can supplement practical experience and vice-versa." Pet. 8 (citing Ex. 1002 ¶ 23).

Patent Owner does not provide a description of a person of ordinary skill in the art but "does not dispute Petitioner's proposed level of skill." PO Resp. 26.

Petitioner's description of the level of ordinary skill is generally consistent with the subject matter of the '228 Patent, with the exception of the qualifier "at least," which creates a vagueness that may extend the level to that reflecting an expert. Based on the record presented, including our review of the '228 patent and the types of problems and solutions described in the '228 patent and the cited prior art, we determine that a person of ordinary skill in the art is a person with a bachelor's degree in computer science, electrical engineering, or a related field, with two years of academic or industry experience in software development related to content management systems and user interfaces.

C. *Claim Construction*

Pursuant to 37 C.F.R. § 42.100(b), we apply the claim construction standard as set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). Under *Phillips,* claim terms are generally given their ordinary and customary meaning as would be understood by one with ordinary skill in the art in the context of the specification, the prosecution history, other claims, and even extrinsic evidence including expert and inventor testimony, dictionaries, and learned treatises, although extrinsic

IPR2021-01413
Patent 10,621,228 B2

evidence is less significant than the intrinsic record. *Phillips*, 415 F.3d at 1312–17. Usually, the specification is dispositive, and it is the single best guide to the meaning of a disputed term. *Id.* at 1315.

Only terms that are in controversy need to be construed, and then only to the extent necessary to resolve the controversy. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Matal*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (in the context of an *inter partes* review, applying *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

Petitioner asserts that "no terms of the '228 patent warrant construction beyond their ordinary and customary meaning." Pet. 8.

Patent Owner "does not believe claim construction is required because the plain and ordinary meaning of the claims is clear." PO Resp. 26.

For purposes of this Decision, we agree with the parties that no claim terms require express construction. *See Vivid Techs.*, 200 F.3d at 803 (holding that only terms that are in controversy need to be construed, and "only to the extent necessary to resolve the controversy"). To the extent that the meaning of any claim term is addressed, we use its ordinary and customary meaning as discussed in our analysis below.

## D. Relevant Prior Art

### 1. Okamura (Ex. 1004)

Okamura is titled "Information Processing Apparatus, Information Processing Method, and Program" and "relates to . . . an information processing apparatus which displays contents such as image files, an information processing method, and a program for causing a computer to execute the information processing method." Ex. 1004, code (54), ¶ 2. The image files may be digital files, such as "image files recorded by an image

18

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

capturing apparatus such as a digital still camera," and Okamura's information processing apparatus (i) calculates transformed coordinates for each of a plurality of superimposed images associated with coordinates in a background image, by transforming coordinates of other superimposed images with respect to one superimposed image as a reference image in such a way that coordinate intervals within a predetermined area with respect to the reference image become denser with increasing distance from the reference image toward the boundary, (ii) sets coordinates of the reference image on the basis of a mean value obtained by calculating a mean of the calculated coordinates of the other superimposed images with respect to the reference image, and (iii) displays the background image and the plurality of superimposed images on a display section in such a way that the reference image is placed at the set coordinates in the background image. *Id.* at code (57) (Abstract), ¶ 91.

In Okamura, in accordance with an operational input for activating a content playback application, an index screen is displayed on a display. *Id.* ¶ 233. An index screen is a display screen that displays a listing of clusters (including image files, such as still image files) from which to select a desired cluster. *Id.* ¶¶ 125, 233, 139 ("Clustering refers to grouping (classifying) together a plurality of pieces of data within a short distance from each other in a data set" where "[t]he distance between contents refers to the distance between the positions (such as geographical positions, positions along the temporal axis, or positions along the axis representing the similarity between faces) of two points corresponding to contents. A cluster is a unit in which contents are grouped together by clustering.").

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

Examples of displays of index screens are shown in Figures 18 to 21. *Id.*

¶ 233. When a desired cluster is determined by a user operation on the index

screen shown in each of Figures 18 to 21, a content playback screen is

thereafter displayed. *Id.* ¶ 248.

Figures 18 and 19 of Okamura, reproduced below, are examples of

display of index screens that display cluster maps as index images. *Id.*

¶¶ 38–39, 234.



Figure 18 is an example of a display of an index screen. *Id.* ¶ 38.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2



Figure 19 is another example of a display of an index screen. *Id.* ¶ 39.

As shown above in Figures 18 and 19, a cursor (mouse pointer) 419 that moves with the movement of a mouse is displayed on the screen shown on the display. *Id.* ¶ 234. The cursor 419 is a mouse pointer used to point to an object of instruction or operation on the screen displayed on the display section 181. *Id.* As shown in Figure 18, an "EVENT" tab 411, a "FACE" tab 412, a "PLACE" tab 413, a cluster map display area 414, and left and right buttons 415 and 416 are provided on an index screen 410. *Id.* ¶ 235. "EVENT" tab 411, "FACE" tab 412, and "PLACE" tab 413 are tabs for displaying another index screen. *Id.* ¶ 236. In the cluster map display area 414, a listing of marks (cluster maps) representing clusters is displayed. *Id.* ¶ 237. For example, as shown in Figure 18, cluster maps of the same size are displayed in a 3×5 matrix fashion, for example. *Id.* ¶ 237.

21

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

When the mouse is placed over a cluster map 417 by a user operation on index screen 410 shown in Figure 18, as shown in Figure 19, the color of the cluster map 417 is changed, and pieces of information 418 related to the cluster map 417 are displayed. *Id.* ¶ 240. For example, the entire cluster map 417 is changed to a conspicuous color (for example, grey) and displayed. *Id.* As the pieces of information 418 related to the cluster map 417, for example, the number of contents "28" belonging to a cluster corresponding to the cluster map 417, and the cluster title "Mt. Fuji" of the cluster are displayed. *Id.* Also, as the pieces of information 418 related to the cluster map 417, for example, information on the latitude and longitude of the center position of the cluster corresponding to the cluster map 417, "Lat. 35°21'N, Long. 138°43'E," is displayed. *Id.* As pieces of information 418 related to cluster map 417, information indicating the size of the cluster may be also displayed together. *Id.* ¶ 241. For example, the diameter of a circle corresponding to the cluster can be displayed indicating kilometers. *Id.* In order to allow the user to intuitively grasp whether the size of a circle corresponding to a cluster is large or small, display of icons or color can be made to differ depending on whether the size is large or not. *Id.* More particularly, Okamura explains:

> when comparing an urban area and a rural area with each other, it is supposed that while buildings, roads, and the like are densely packed in the urban area, in the rural area, there are relatively many mountains, farms, and the like, and there are relatively few buildings, roads, and the like. For this reason, the amount of information in a map often differs between the urban area and the rural area. Due to this difference in the amount of information in a map, it is supposed that when cluster maps of the urban area and rural area are displayed simultaneously, the user feels a

22

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

> difference in the perceived sense of scale between the urban area and the rural area. Accordingly, for example, by displaying these cluster maps in different manners depending on whether the size of a circle corresponding to a cluster is large or small, it is possible to prevent a difference in the perceived sense of scale between the urban area and the rural area, and intuitively grasp whether the size of a circle corresponding to a cluster is large or small. Also, as the pieces of information 418 related to the cluster map 417, other pieces of information such as the time range of the corresponding contents may be displayed.

*Id.* ¶ 241.

Figure 20 of Okamura, reproduced below, shows an example of a display of an index screen that displays index images generated on the basis of date and time information, and Figure 21 of Okamura, reproduced below, shows an example of a display of an index screen that displays index images generated on the basis of face information. *Id.* ¶ 234.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2



Figure 20 shows an example of a display of an index screen that displays index images generated on the basis of date and time information. *Id.* ¶ 234.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2



FIG. 21

Figure 21 shows an example of display of an index screen that displays index images generated on the basis of face information. *Id.* ¶ 234.

As shown in Figure 20, above, "EVENT" tab 411, "FACE" tab 412, "PLACE" tab 413, left and right buttons 415 and 416, and event cluster image display area 421 are provided on index screen 420. *Id.* ¶ 242. When the mouse is placed over a thumbnail image 422 by a user operation on the index screen 420 shown in Figure 20, the color of the thumbnail image 422 changes, and pieces of information 423 related to the thumbnail image 422 are displayed. *Id.* ¶ 245.

And, as shown in Figure 21, "EVENT" tab 411, "FACE" tab 412, "PLACE" tab 413, left and right buttons 415 and 416, and face cluster image display area 421 are provided on index screen 430. *Id.* ¶ 243. In the face

25

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

cluster image display area 431 shown in Figure 21, images representing face clusters are displayed. *Id.* ¶ 246. Images representing face clusters may be thumbnail images of faces included in contents belonging to the face cluster. *Id.* To obtain a thumbnail image of a face, faces included in the contents belonging to the face cluster are extracted, the best-shot face is selected from among these extracted faces, and the thumbnail image of this selected face is used as the thumbnail image. *Id.* Thumbnail images are displayed, for example, in a 3×5 matrix fashion in the same manner as in Figure 18. *Id.* When the mouse is placed over a thumbnail image 432 by a user operation on the index screen 430 shown in Figure 21, the color of the thumbnail image 432 changes, and pieces of information 433 related to the thumbnail image 432 are displayed. *Id.* ¶ 247. As the pieces of information 433 related to the thumbnail image 432, for example, the number of contents "28" belonging to a cluster corresponding to the thumbnail image 432 is displayed. *Id.*

  2. *Flora (Ex. 1005)*

Flora is titled "System and Method for Displaying Media Interactively on a Video Display Device" and "relates to an interactive map that allows users to display different items of visual and/or audio media corresponding to a location on the geographic map." Ex. 1005, code (54), 1:7–12. Flora's graphical user interface (GUI) allows a user to directly access items of visual and/or audio media by passing a cursor over points on an electronic map. *Id.* at code (57) (Abstract).

Figure 2 of Flora, reproduced below, illustrates a display screen of a software program that illustrates the display of a media icon in response to a selection of a location on an electronic geographic map. *Id.* at 2:66–3:2.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2



**FIG. 2**

Figure 2 illustrates a display screen of a software program that illustrates the display of a media icon in response to a selection of a location on an electronic geographic map. *Id.*

In Figure 2, above, media items, represented by icons 42 (or "thumbnail" versions), are displayed when a position indicator (cursor 44), is moved proximate to certain locations on an electronic geographic map 46. *Id.* at 6:5–21. Icons 42 notify the user that media items are associated with predetermined coordinates or "locations" on the map that are proximate to the position of the cursor 44. *Id.* The icons 42 also provide the user with a visual object to select with the "click" of a mouse button (or another conventional mechanism) to obtain direct access to the content of the associated media items. *Id.* Flora explains that "[a]ll map locations are not

27

IPR2021-01413
Patent 10,621,228 B2

necessarily associated with media items" and "if the user moves the cursor 44 to a new location on the electronic map, the icons 42 displayed proximate to the old location will eventually disappear or fade after a pre-determined period of time." *Id.* If content is associated with the new location, however, new icons will appear proximate to the new cursor position. *Id.*

Flora provides that the geographic map 46 of the globe is scalable and can show fine levels of geography, such as individual cities and towns. *Id.* at 6:22–41. The user may interact with a displayed icon 42 to gain access to further information regarding the subject of the displayed icon. *Id.* For example, the user can quickly see what media items, if any, are available at a chosen location by moving the cursor over an area of the map 46 proximate to that location. *Id.* For visual media, the user is presented with icons 42 or "thumbnail" versions of the available media items associated with one or more locations proximate to the position of the cursor 44. *Id.* In Figure 2, a user has restricted the categories of media to "images" by using media menu 50, such that the user is presented with various types of media for a selected graphical content, such as an electronic map. *Id.* at 6:42–65, 7:53–63.

Figure 3 of Flora, reproduced below, illustrates a display screen of a software program that illustrates the display of a full-size image of an item of visual media in direct response to a user clicking on a visual media icon on an electronic geographic map. *Id.* at 3:2–6.

28

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2



**FIG. 3**

Figure 3 illustrates a display screen of a software program that illustrates the
display of a full-size image of an item of visual media in direct response to a
user clicking on a visual media icon on an electronic geographic map.
*Id.*

In the view illustrated in Figure 3, above, a user has restricted the type
of media to be presented to "images," and has passed the cursor 56 over the
map to a position that is proximate to locations associated with images, and
in response to this user input, the user is presented with icons 58
representing images associated with the locations proximate to the cursor 56.
*Id.* at 6:66–7:8.  In Figure 3, multiple visual media items are associated with
the locations proximate to cursor 56 that have associated media items.  *Id.* at

29

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

7:8–22. Only a single icon 59 can be presented for each specific location in a reduced-pixel or "thumbnail" format due to the limited size of the geographic map 46. *Id.* In order for the user to be presented with all icons for available media, icons representing the pertinent media items at the same location on the geographic map are consecutively displayed to the user, by scrolling among the available icons ("cycling"). *Id.* Thus, an icon representing each additional media item that is available for the locations proximate to the cursor 56 will cycle in the same icon window 60 as the initially displayed icon 59. *Id.*

In Figure 3, the user has moved the cursor 56 so as to contact one of the presented icons 59, and has selected the icon 59 so as to be given direct access to a full-size display of one of the media items 62 represented by the icon 59. *Id.* at 7:23–42. To provide such access, an additional window (media viewer) 64 is opened and displays the full-size image of the media item 62 therein. *Id.* The user can also access all other media items associated with the map location and that are cycled in the icon window 60 by selecting among the icons 66 associated with those other media items from a scrolling list 68 of icons 66 within the media viewer 64. *Id.* In order to access the additional media items, the user can contact the desired media item's icon 66 with the cursor 56 and select the media item through a mouse click. *Id.* Through media viewer 64, the user is also able to execute a hyperlink 70 and display an expanded version of the visual media item. *Id.* at 7:43–52.

> ### 3.  *Wagner (Ex. 1006)*

Wagner is titled "Device, Method, and Graphical User Interface for Navigating and Displaying Content in Context," and "relates generally to

IPR2021-01413
Patent 10,621,228 B2

electronic devices with touch-sensitive surfaces, including but not limited to electronic devices with touch-sensitive surfaces that are used to display and navigate through content." Ex. 1006, code (54), ¶ 2. Wagner describes an electronic device that displays one or more thumbnails, detects a first multi-contact gesture that includes movement of a first contact and a second contact, and, in response to detecting the first multi-contact gesture, the device displays content associated with a respective thumbnail, and enlarges the content associated with the respective thumbnail to a respective enlarged size in accordance with the first multi-contact gesture. *Id.* at code (57) (Abstract). The device further detects termination of the first multi-contact gesture, and, in response, performs the following operations: when a resizing metric based on the first multi-contact gesture is below a predefined threshold, the device ceases to display the content at the respective enlarged size; and, when the resizing metric based on the first multi-contact gesture is above the predefined threshold, the device displays the content on the display in a predefined arrangement. *Id.*

### 4. Gilley (Ex. 1007)

Gilley is titled "Organizing Images by Correlating Faces," and "relates to organizing images, such as digital images, by correlating one or more faces represented in the images." Ex. 1007, code (54), ¶ 2. Gilley describes methods and systems that perform the following operations: generate a correlation value indicating a likelihood that a face included in a test image corresponds to a face associated with a base image; determine that a correlation threshold exceeds the correlation value and that the correlation value exceeds a non-correlation threshold; generate a similarity score based on one or more exposure values and one or more color

31

IPR2021-01413
Patent 10,621,228 B2

distribution values corresponding to the test image and the base image; combine the similarity score with the correlation value to generate a weighted correlation value; and determine that the test image and the base image are correlated when the weighted correlation value exceeds the correlation threshold. *Id.* at code (57) (Abstract).

### E.   *Ground 4 - Obviousness over Okamura, Flora, Wagner, and Gilley*

For Ground 4, Petitioner asserts that claims 1–7 are unpatentable as obvious under 35 U.S.C. § 103 over the combined teachings of Okamura, Flora, Wagner, and Gilley.  Pet. 95–96.[5]  With respect to independent claim 1, Patent Owner specifically contests Petitioner's evidence and arguments directed to limitations [1b], [1d], [1e], [1g], [1j], [1n], and [1p]. PO Resp. 75–77.  Patent Owner does not specifically contest Petitioner's evidence or arguments with respect to the other limitations of claim 1.  *Id.* Patent Owner also contests Petitioner's evidence and arguments regarding dependent claims 2–7, as well as Petitioner's rationale to combine the asserted art.  *Id.* at 76, 78.  We address the parties' evidence and arguments with respect to the contested limitations first.

### 1.   *Claim 1*

Patent Owner contests Petitioner's evidence and arguments regarding the "interactive map" limitations [1b]–[1e][6] of claim 1.  Limitations [1b]–[1e] recite the following:

––––––––––––––––––––

[5] For Ground 4, Petitioner relies in substantial part on the evidence and arguments it provides for Grounds 1–3.  *See* Pet. 95–96.  Patent Owner does the same.  *See* PO Resp. 75–78.

[6] Patent Owner does not specifically contest the preamble [1a] "a method comprising."  *See* PO Resp. 33–78.

IPR2021-01413
Patent 10,621,228 B2

[1b] responsive to a first input, causing a map view to be displayed on an interface,

[1c] the map view including: (i) an interactive map;

[1d] (ii) a first location selectable thumbnail image at a first location on the interactive map; and

[1e] (iii) a second location selectable thumbnail image at a second location on the interactive map;

a) *Contested Limitations [1b]–[1e] – interactive map view*

(1) *Petitioner's Arguments*

Limitation [1b] recites "*responsive to a first input, causing a map view to be displayed on an interface.*" For this limitation, Petitioner relies on Okamura's "content playback application [that] displays a screen having FACE tab 412 and PLACE tab 413, where each tab is selectable by depressing cursor 419 on a desired tab." Pet. 14 (citing Ex. 1004 ¶¶ 91, 232–247, Figs. 17–21).

Okamura's Figure 18 is shown below.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2



Okamura's Figure 18, above, is a diagram showing an example of a display of index screen 410 displaying cluster maps, e.g., 417, in cluster map display area 414 as index images, with EVENT tab 411, FACE tab 412, and PLACE tab 413. Ex. 1004 ¶¶ 234–237. Petitioner explains that "[w]hen the 'PLACE' tab 413 is depressed using the cursor 419 by a user operation (*responsive to a first input*), cluster map display area 414 is displayed (*causing a map view to be displayed*) on a display interface of the content playback application (*on an interface*)." Pet. 14–15 (citing 1004 ¶¶ 232–241, Figs. 17–19).

According to Petitioner, "[c]luster map display area 414 is a *map view* because it has cluster maps 417, which are geographic areas of a map showing where media content (e.g., digital images) have been captured." Pet. 15 (citing Ex. 1004 ¶¶ 232–241, *see also id.* ¶¶ 18, 110, 130–135 (describing a displayed cluster map as "a map image formed by a map

34

IPR2021-01413
Patent 10,621,228 B2

included in a circle corresponding to each cluster"), 139, 213, 275–281, Figs. 27A–27B (discussing a modification to cluster map display area 414 where map display area 282 is displayed); Ex. 1002 ¶¶ 69–70).

Alternatively, Petitioner asserts that "[i]f the Board finds Okamura does not disclose or render obvious the claimed *interface*, Wagner discloses or at least renders obvious the *interface* in the form of software application 136-1's application view 191 that is a 'user interface window . . . in which information is displayed' and inputs (e.g., via touch, mouse clicks) are received." Pet. 70 (citing Ex. 1006 ¶¶ 108–109, 115, 120, 130–132, Fig. 1C; *id.* ¶¶ 66–86, 105).

Petitioner explains that "[b]ased on a detected event (e.g., a touch or mouse input), an application view 191 user interface window is updated to display new user interface objects such as 'digital images, video, text files, audio files, icons, and other graphics' or have the position(s) of displayed objects changed." Pet. 70 (citing Ex. 1006 ¶¶ 4, 45, 105–109, 115, 120, 128, 130–132, Fig. 1C).

Limitation [1c] recites *"the map view including: (1) an interactive map."* For this limitation, Petitioner asserts that " Okamura alone, or Okamura and Flora, discloses or at least renders obvious limitation [1c]." Pet. 18.

According to Petitioner, "Okamura's cluster map display area 414 (*the map view*) includes cluster maps 417 arranged in a 3x5 matrix (*an interactive map*). Pet. 18 (citing Ex. 1004 ¶¶ 234–241, Figs. 18–19).

Petitioner explains that

The arranged cluster maps 417 form *an interactive map* because they show geographic map areas where content has been

IPR2021-01413
Patent 10,621,228 B2

> captured, and when mouse cursor 419 is "placed over a cluster map 417 by a user operation on the index screen 410," the "color of the cluster map 417 is changed" and "pieces of information 418 related to the cluster map 417" are displayed, making the map arrangement *interactive*.

Pet. 19 (citing Ex. 1004 ¶¶ 18, 110, 130–135, 139, 213, 232–248, 275–281, Figs. 18–19; Ex. 1002 ¶ 76).

Alternatively, Petitioner argues that "[i]f Okamura is not found to disclose or render obvious *an interactive map*, Flora discloses or at least renders obvious this element." Pet. 20. According to Petitioner, "Flora describes a GUI having scalable geographic map 46 (*an interactive map*) with 'icons . . . (or thumbnail versions)' of 'media items,' such as icons 58 and 59, positioned at various map locations of the map." Ex. 1005, 5:65–6:11, 6:66–7:42, Figs. 2, 3.

Flora's Figure 3 is shown below.

36

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2



FIG. 3

Flora's Figure 3, above, shows a display screen of a software program that illustrates the display of a full-size image of an item of visual media in direct response to a user clicking on a visual media icon on an electronic geographic map. *Id.* at 3:3–6. Flora's Figure 3 shows media viewer 64 displaying geographic map 46 with cursor 56 and icons 58 and 59, representing images associated with locations proximate to cursor 56. *Id.* at 7:9–34.

Petitioner asserts that

Flora's scalable geographic map 46 with icons 58 and 59 is *an interactive map* because (1) it is "scalable and can show fine

37

IPR2021-01413
Patent 10,621,228 B2

> levels of geography, such as individual cities and towns," where the map can be scaled upwards (e.g., zoomed out) or downwards (e.g., zoomed in) and categories of media displayed on the map via icons can be filtered; (2) a user can "click" an icon (e.g., using a mouse), interacting with the map to "obtain direct access to the content of the associated media item;" and (3) if a user's mouse cursor is moved to a new map location, "icons [] displayed proximate to the old location will eventually disappear or fade away" and, if present, "new icons will appear proximate to the new cursor position." *Id.*, 6:11-7:42, Figs. 2, 3; *id.*, 2:4-37 (describing Flora's GUI displaying the map is "interactive" and allows a user to "interact with a geographic map").

Pet. 21–22 (citing Ex. 1002 ¶¶ 77–80).

Limitation [1d] recites "*a first location selectable thumbnail image at a first location on the interactive map.*" For this limitation, Petitioner asserts that "Okamura and Flora disclose or at least render obvious limitation [1d]." Pet. 28. Petitioner asserts that "Okamura's cluster map display area 414 (*map view*) includes the display of content as taught by Flora's scalable geographic map 46 having icons 58 and 59 representing the locations where Okamura's content was captured." *Id.* Petitioner explains that

> Flora describes a first of the multiple selectable icons 58 and 59 (*a first location selectable thumbnail image*) displayed at a first location (*at a first location*) on scalable geographic map 46 (*on the interactive map*), where each icon 58 and 59 (including the first) is a *selectable thumbnail image* because they are each an "icon[] . . . (or thumbnail version[])" of a "media item[]."

*Id.* (citing Ex. 1005, 5:65–6:11, 7:4–13, Figs. 2, 3) (alterations in original).

Petitioner explains that "Flora states icons 58 and 59 can be presented for each specific location on map 46 in a 'reduced-pixel or "thumbnail" format,'" and that "[e]ach icon 58 and 59 is *selectable* by a 'user input, such

38

IPR2021-01413
Patent 10,621,228 B2

as a mouse click,' which opens media viewer window 64." Pet. 28 (citing Ex. 1005, 7:4–42, Fig. 3).

Limitation [1e] recites *"a second location selectable thumbnail image at a second location on the interactive map."* Petitioner asserts that Okamura and Flora disclose or at least render obvious limitation [1e]. "In the combination, Okamura's cluster map display area 414 (*map view*) includes the display of content as taught by Flora, which describes a second of the multiple selectable icons 58 and 59 (*a second location selectable thumbnail image*) displayed at a second location (*at a second location*) different from the first location on scalable map 46 (*on the interactive map*)." Pet. 29–30 (citing Ex. 1005, 5:65–6:11, 7:4–13, 7:23–42, Figs. 2, 3). According to Petitioner, "[e]ach icon 58 and 59 (including the second) is a *selectable thumbnail image.*" Pet. 30.

(2)  *Patent Owner's Arguments*

(a)  *Limitation [1c] "interactive map"*

Patent Owner argues that "[t]he term 'interactive map' requires a 'map,'" and "[t]he 3x5 matrix consisting of an array of 15 cluster maps of Okamura is not itself a 'map.'" PO Resp. 35 (citing Ex. 2038 ¶¶ 96–97). Patent Owner argues that "Okamura describes Fig. 15B as showing a 'a map 263 of the Japanese archipelago,' and explains that individual 'cluster maps are extracted from a map 263 of the Japanese archipelago' at extraction area 263." PO Resp. 35–36 (citing Ex. 1004 ¶ 226; Ex. 2038 ¶ 98).

Okamura's Figure 15B is shown below.

IPR2021-01413
Patent 10,621,228 B2



Okamura's Figure 15B, shown above, is a diagram showing an example of a map generated by a cluster information generating section. Ex. 1004 ¶¶ 35, 224.  An extraction area of the map is indicated by a thick dotted circle.  *Id.* ¶ 224.

According to Patent Owner, "In Okamura, each individual 'cluster map' is an excerpt of a larger map (e.g., the map of FIG. 15B), and FIG. 18 displays the cluster maps as index images in the cluster map display area 414."  PO Resp. 36 (citing Ex. 1004 ¶¶ 234–235; Ex. 2038 ¶ 98).  Patent Owner argues, "[t]his index (or array or matrix) of these index images (cluster maps) itself is not a map; at most, it is a compilation of excerpts of a map."  *Id*.

Patent Owner argues that Petitioner "provides no obviousness analysis based on Okamura's cluster maps," and that "Dr. Bederson likewise did not offer any opinions on this theory."  PO Resp. 36 (citing Pet. 18–19; Ex.

IPR2021-01413
Patent 10,621,228 B2

1002, 76).  "Accordingly," Patent Owner argues, "Petitioner failed to meet
its burden to demonstrate that limitation [1c] is obvious over Okamura
alone."  PO Resp. 36.

> (b) *Limitations [1b], [1d], [1e] first and second thumbnail
>     images*

With respect to these limitations, Patent Owner argues that "the
claimed 'map view' displayed *in response to* the 'first input' must
'includ[e]' first and second 'thumbnail image[s] … on the interactive map.'"
PO Resp. 52.  Patent Owner argues that "[n]owhere, however, does
Okamura or Flora, alone or in combination, disclose that the 'map view'
displayed *in response to* the 'first input' would 'includ[e]' first and second
'thumbnail image[s] … on the interactive map' as claimed."  *Id.* (citing Ex.
2038 ¶¶ 140–141).  Patent Owner argues that "[i]f Okamura and Flora were
combined as Petitioner proposes, the PLACE tab 413 (*first input*), would
only cause Okamura's cluster map display area 414 (*map view*) and Flora's
geographic map 46 (*interactive map*) to be displayed without Flora's icons
58, 59 (*thumbnail image[s]*) 'on the interactive map' as claimed."  PO Resp.
52–53.

Patent Owner argues that "Flora makes clear that icons 58 and 59 of
Fig. 3 (*first / second thumbnail images*) are not included 'on the interactive
map' in response to a 'first input.'"  *Id.* at 53.  "Rather," Patent Owner
argues, "assuming the thumbnail images are displayed at all, they are only
displayed *after* the user provides an ***entirely separate*** 'user input.'"  *Id.*
(quoting Ex. 1005, 6:67–7:8; citing Ex. 2035, 71:4–25).  According to Patent
Owner, "[t]he so-called 'user input' of 'pass[ing] the cursor 56 over the
map' is ***not*** the Okamura PLACE tab 413 item that Petitioner identified as

41

IPR2021-01413
Patent 10,621,228 B2

the claimed 'first input.'" PO Resp. 53 (citing Ex. 1005, 6:67–7:8; Ex. 2038 ¶ 142).

Patent Owner argues that "Petitioner has not identified any user input other than depressing Okamura's PLACE tab 413." PO Resp 53 (citing Pet. 14). "The Petition," Patent Owner argues, "is entirely silent on the requirement that the claimed 'map view' displayed *in response to* the 'first input' must 'includ[e]' first and second 'thumbnail image[s] … on the interactive map' and declines to proffer an alleged modification of Flora or Okamura addressing this deficiency." *Id.* at 53–54.

### (3) Analysis

Patent Owner's first argument with respect to these limitations is that "[t]he term 'interactive map' requires a 'map,'" and "[t]he 3x5 matrix consisting of an array of 15 cluster maps of Okamura is not itself a 'map.'" PO Resp. 35 (citing Ex. 2038 ¶¶ 96–97).

Petitioner provides two alternative prior art teachings for the recited "interactive map" of claim 1. First, Petition asserts that "Okamura's cluster map display area 414 (*the map view*) includes cluster maps 417 arranged in a 3x5 matrix (*an interactive map*). Pet. 18 (citing Ex. 1004 ¶¶ 234–241, Figs. 18–19). Second, Petitioner argues that "[i]f Okamura is not found to disclose or render obvious *an interactive map*, Flora discloses or at least renders obvious this element." Pet. 20. According to Petitioner, "Flora describes a GUI having scalable geographic map 46 (*an interactive map*) with 'icons [] (or thumbnail versions)' of 'media items,' such as icons 58 and 59, positioned at various map locations of the map." Pet. 20 (citing Ex. 1005, 5:65–6:11, 6:66–7:42, Figs. 2, 3).

42

IPR2021-01413
Patent 10,621,228 B2

Claim 1 recites a "*map view including: (1) an interactive map.*"
Neither party, however, proposed any constructions for the claim terms
"*map view*" or "*interactive map*". *See* Pet. 8 ("Petitioner submits no terms
of the '228 patent warrant construction beyond their ordinary and customary
meaning."); PO Resp 26 ("Patent Owner does not believe claim construction
is required because the plain and ordinary meaning of the claims is clear").

The words of a claim are generally given their ordinary and customary
meaning as understood by a person of ordinary skill in the art in question at
the time of the invention when read in the context of the specification and
prosecution history. *See Phillips*, 415 F.3d at 1313. The person of ordinary
skill in the art is deemed to read the claim term not only in the context of the
particular claim in which the disputed term appears, but in the context of the
entire patent, including the specification. *See Multiform Desiccants, Inc. v.
Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).

The '228 patent does not provide an express definition of the terms
"*map view*" or "*interactive map*" and neither party points to one. The '228
patent does, however, provide some examples of an interactive map. For
example, with respect to Figure 34, the '228 patent explains that "[a]s part of
the individual Location View, an *interactive map* displaying a zoomed-in
image of the specific location is displayed (1635). Ex. 1001, 24:52–54
(emphasis added). The Single Location Application View from Figure 34 of
the '228 patent is shown below.

43

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2



According to the '228 patent, in the Single Location Application View from Figure 34 shown above,

> a single location (1630) is illustrated. The individual location name is displayed at the top of the page (1632). Thumbnails of each Digital File within the specific collections are illustrated. In this example, the system illustrates a one photo (1633) taken at Wrigley Field (1634) that is associated with the location called Wrigley Field. . . . If the user selects View all Collections (1631), the Application will go back to the multiple Collection View (1600). As part of the individual Location View, *an interactive map displaying a zoomed-in image of the specific location is displayed* (1635).

Ex. 1001, 24:37–54 (emphasis added).  In this respect then, the '228 patent illustrates that an "*interactive map*" can be presented as a "*zoomed-in image of the specific location*" as part of a larger location view.

This understanding from the '228 patent is consistent with the teaching provided in Okamura.  Okamura's Figure 18 is shown below.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2



Okamura explains that Figure 18, above, "show[s] an example of display of an index screen [410] that displays cluster maps [417] as index images."  Ex. 1004 ¶ 234.  Okamura describes the interactivity of these maps "when the mouse is placed over a cluster map 417 by a user operation on the index screen 410 shown in FIG. 18 . . . the color of the cluster map 417 is changed, and pieces of information 418 related to the cluster map 417 are displayed."  *Id.* ¶ 240.

Dr. Bederson provides testimony consistent with this understanding.  *See* Ex. 1002 ¶¶ 69–70, 76; Ex. 1038 ¶¶ 34–35.  Dr. Bederson testifies that Okamura's "cluster map display area 414 is a view showing cluster maps 417, which are geographic map locations where Okamura's content, such as digital images, has been captured."  Ex. 1002 ¶ 69; *see also* ¶ 76 (describing the interactive nature of Okamura's arranged cluster maps); Ex. 1038 ¶ 34.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

Patent Owner, however, argues that in Okamura "each individual 'cluster map' is an excerpt of a larger map" and Okamura "displays the cluster maps as index images in the cluster map display area 414." PO Resp. 36 (citing Ex. 1004 ¶¶ 234–235; Ex. 2038 ¶ 98). Patent Owner argues that "[t]his index (or array or matrix) of these index images (cluster maps) itself is not a map; at most, it is a compilation of excerpts of a map." *Id.* Patent Owner's argument, however, is inconsistent with the example of an interactive map provided by the '228 patent, which shows how "*an interactive map*" can be displayed as "*a zoomed-in image of the specific location*" on a larger location view. Ex. 1001, 24:37–54.

Dr. Reinman testifies that "[t]he array of images shown in Okamura FIG. 18 are not a map" because they are "not laid out in a manner to form a map." Ex. 2001 ¶ 84. We find this testimony unpersuasive. Dr. Reinman does not point to anything in the '228 patent that would require such images to be "laid out in a manner to form a map," nor does Dr. Reinman explain why someone of ordinary skill in the art would expect them to be laid out in such a manner. Dr. Reinman also does not address the '228 patent's illustration that an "*interactive map*" can be shown as a "*zoomed-in image of the specific location*" as part of a larger location view. *See* Ex. 1001, 24:37–54. Moreover, neither Patent Owner nor Dr. Reinman address Petitioner's stated basis for asserting that Okamura's cluster map is "interactive" i.e. "when the mouse is placed over a cluster map 417 . . . the color of the cluster map 417 is changed." Ex. 1004 ¶ 240.

In addition to Okamura, Petitioner also provides an alternative argument that Flora "discloses or at least renders obvious the recited

46

IPR2021-01413
Patent 10,621,228 B2

"*interactive map*" limitation of claim 1. *See* Pet. 20. Petitioner asserts that "Flora describes a GUI having scalable geographic map 46 (*an interactive map*) with "icons [] (or thumbnail versions)" of "media items," such as icons 58 and 59, positioned at various map locations of the map. *Id.* (citing Ex. 1005, 5:65–6:11, 6:66–7:42, Figs. 2, 3) (parenthetical of quote in original). Patent Owner, however, does not contest Flora's teaching of this limitation. *See* PO Resp. 34–37.

Patent Owner's second argument with respect to these limitations is that "the claimed 'map view' displayed *in response to* the 'first input' must 'includ[e]' first and second 'thumbnail image[s] … on the interactive map.'" PO Resp. 52. Patent Owner argues that "[i]f Okamura and Flora were combined as Petitioner proposes, the PLACE tab 413 (*first input*), would only cause Okamura's cluster map display area 414 (*map view*) and Flora's geographic map 46 (*interactive map*) to be displayed without Flora's icons 58, 59 (*thumbnail image[s]*) 'on the interactive map' as claimed." PO Resp. 52–53.

We disagree with Patent Owner. The Petition explains that Okamura describes *responsive to a first input* (depressing PLACE tab 413), a cluster map display area 414 is displayed (*causing a map view to be* displayed) on a display interface of Okamura's content playback application (*on an interface*). Pet. 14–20. Combined with Flora, Okamura's cluster map display area 414 (*map view*) displays content as taught by Flora's geographic map 46 (*interactive map*) and media viewer 64, where Okamura's content is indicated at various locations on the map by Flora's icons 58 and 59 (*first location selectable thumbnail image, second location selectable thumbnail*

IPR2021-01413
Patent 10,621,228 B2

*image*).  *Id.* 20–29.  Patent Owner's argument that the combination would not result in displaying Flora's icons ignores Okamura and Flora's contributions to Petitioner's proposed combination.  Petitioner's proposed combination relies on Flora's actual display of icons 58 and 59 on map 46 to show locations associated with media content, not whether Flora also describes that user input would display such icons.  Pet. 22–27.  Dr. Bederson competently explains Petitioner's basis for the proposed combination, which we credit.  Ex. 1038 ¶ 64.

Patent Owner does not contest Petitioner's evidence with respect to Wagner for limitation [1b].

Based on the complete record and for the reasons we discuss, we find that Petitioner has demonstrated that the combination of Okamura and Flora meets limitations [1b]–[1e].  We also find that Petitioner has demonstrated that Wagner meets limitation [1b].

> b)  *Contested Limitations [1g], [1j] - the first (second) location view including (i) a first (second) location name associated with the first (second) location and (ii) a representation of at least a portion of one digital file in a first (second) set of digital files*
>
> (1)  *Petitioner's Arguments*

For limitation 1[g], Petitioner argues that "Flora describes media viewer 64 for the selected first icon (*the first location view*) includes selectable icons 66 representing 'all other media items associated with the map location' of the first icon (i.e., Okamura's content captured at the location of the icon)."  Pet. 33 (citing Ex. 1005, 7:23–42, Fig. 3).  "In view of the combined teaching," Petitioner argues, "Flora's selectable icons 66 are a representation of each of Okamura's digital files (*a representation of at*

IPR2021-01413
Patent 10,621,228 B2

*least a portion of one digital file*) in a set of digital files captured at the location of the first icon (*in a first set of digital files*)." Pet. 33 (citing Ex. 1004 ¶¶ 18, 91–93, 103–106, 110, 123, 130, 135–143, 213–220, 225, 232–241, 267). "The *first set of digital files*," Petitioner argues, "is the set of digital files, shown by icons 66 of the first icon's media viewer 64, captured at the location of the first icon," and "Okamura's captured content are *digital files* including 'image files' and 'moving image content' files." Pet. 33 (citing Ex. 1004 ¶¶ 2, 22, 91–92, 107–110, 139, 149, 501, Figs. 2A-2B).

Petitioner also argues that "Flora further describes media viewer 64 for the selected first icon (*first location view*) includes *a first location name associated with the first location* because media viewer 64 displays the location name associated with the location of a selected icon (including the first icon). Pet. 34 (citing Ex. 1005, 7:23–42, Fig. 3).

Petitioner further argues that Okamura in combination with Flora's media viewer 64 also renders obvious *a first location name associated with the first location* because Okamura describes displaying "'information 418' associated with content that includes the name of the location where content was captured." Pet. 35–36 (citing Ex. 1004 ¶ 240, Fig. 19). Petitioner points out that in "Figure 19 of Okamura, the *location name* 'Mt. Fuji,' corresponding to the location where content represented by cluster map 417 was captured, is displayed." Pet. 36 (citing Ex. 1004 ¶¶ 18, 110, 135–143, 213, 225, 240, Fig. 19). Petitioner argues that "'Mt. Fuji' is a displayed 'cluster title,' where cluster titles represent a *location name* because they refer to the name of a location or place; a cluster title can be a 'place name' such as 'Tokyo-prefecture' or 'Saitama-prefecture,' or an address such as

49

IPR2021-01413
Patent 10,621,228 B2

'Tokyo-prefecture Shinagawa-ward Osaki 1-chome.'" Pet. 36 (citing Ex. 1004 ¶¶ 122–127, 136, 229, 240).

Okamura's Figure 19 is shown below.



Okamura's Figure 19, above, is a diagram showing an example of a display of index screen 410 displaying cluster maps in display area 414, with mouse cursor 419 placed over cluster map 417 displaying information 418 related to cluster map 417. Ex. 1004 ¶ 240.

Petitioner argues that combined, "Flora's media viewer window 64 for the first of the multiple selectable icons 58 and 59 (*first location view*) would have included the display of information including the location name associated with the location of a selected first icon (e.g., a 'place name' such as 'Mt. Fuji,' a prefecture, or a full address as discussed above) (*a first location name associated with the first location*). Pet. 36–37 (citing Ex. 1004 ¶ 240, Fig. 19; Ex. 1005, 7:23–42, Fig. 3; Ex. 1002 ¶ 94).

50

IPR2021-01413
Patent 10,621,228 B2

In the alternative, Petitioner argues that "[i]f the Board finds Okamura and Flora do not disclose or render obvious displaying a *location name*, Wagner discloses or at least renders obvious this element." Pet. 74. Petitioner argues that "Wagner describes 'user interfaces for displaying and navigating through content on a map interface' in Figures 5S-5V below." *Id.* at 75 (citing Ex. 1006 ¶¶ 183, 228, Figs. 5S-5V). "In Figure 5S," Petitioner explains, "a displayed map includes pins 5026 representing content associated with geographic locations," and "Pin 5026-1 represents content 'associated with San Francisco, Calif.'" Pet. 75.

Wagner's Figure 5S is shown below.



Figure 5S

Wagner's Figure 5S, above, depicts multifunction device 300 with touch-sensitive display 112 showing a map of the United States having a

IPR2021-01413
Patent 10,621,228 B2

plurality of pins 5026 associated with geographic locations on the map.
Ex. 1006 ¶ 183. Petitioner explains that "[b]ased on user input selecting pin
5026-1, 'representations of content 5808' associated with pin 5026-1's
location (San Francisco, California) are displayed by a location viewer
shown in Figure 5V." Pet. 75 (citing Ex. 1006 ¶¶ 183, 228, Fig. 5S-5V).
Petitioner further explains that in Wagner's Figure 5V, "the location viewer
displays a *location name* of 'San Francisco,' showing the arranged content
(photos 1-8) is associated with the location San Francisco, California
identified by pin 5026-1 in Figure 5S." Pet. 76.

 With respect to limitation 1[j], Petitioner makes similar arguments and
cites to similar evidence to meet the recited second location name associated
with the second location and a representation of at least a portion of one
digital file in a second set of digital files of the limitation. *See* Pet. 43–46.

 In the alternative, Petitioner argues

> [i]f the Board finds Okamura and Flora do not disclose or render
> obvious displaying a *location name*, Wagner discloses or at least
> renders obvious this element for the same reasons discussed in
> Section VI.B.2.d. As discussed in Section VI.B.2.d, media
> viewer 64 for the selected second icon (*the second location view*)
> would have displayed a *second location name associated with
> the second location* as taught by Wagner where content for the
> second icon is captured.

Pet. 80 (citing Ex. 1002 ¶¶ 135–142).

### (2) Patent Owner's Arguments

 Patent Owner argues that "the cited text in Flora does not disclose that
the caption 72 includes any location name." PO Resp. 54 (citing Ex. 1005,
7:23–42). Patent Owner argues that "Petitioner's annotated version of
Flora's Fig. 3 is *not* from the actual Flora patent reference Petitioner relies

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

on under Ground 1 (EX1005)," but "was actually taken from Flora's prosecution file history (EX1008), which appears to contain higher resolution versions of Flora's drawings" and "Petitioner did not identify Flora's file history as part of its specific statutory grounds." PO Resp. 55–56, 58.

Patent Owner also argues that in Okamura, "when one of the cluster maps in Fig. 18 is selected, content 'corresponding to the selected cluster map [is] sequentially displayed on the content playback screen 440 shown in FIG. 22.'" PO Resp. 60 (citing Ex. 1004 ¶ 268). Okamura's Figure 22 is shown below.

**FIG. 22**



Okamura's Figure 22, above, depicts content playback screen 440 with content display area 441, preceding content display area 442, and succeeding content display area 443. Ex. 1004 ¶ 250.

53

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

Patent Owner argues that "the information 418 that was displayed when the mouse is placed over a cluster map in Fig. 18 is not included in the content playback screen 440 in Fig. 22." PO Resp. 61.

Patent Owner further argues that

> [i]n Okamura, the information 418 only appears in the cluster map display area 414 in Fig. 18, not the content playback screen 440 in Fig. 22 when one of the cluster maps is selected. In Petitioner's combination, following Okamura's teachings, the information 418 similarly could be displayed on the geographic map 46 when the cursor is moved over the icon 58, not the media viewer 64 after the icon 58 is selected.

*Id.* at 61–62.

(3) *Analysis*

We agree with Petitioner that the proposed combination of Okamura and Flora teaches a *first (second) location view including a first (second) location name associated with the first (second) location*.

Here, Okamura describes displaying "information 418" associated with content that includes the name of the location where the content was captured. Ex. 1004 ¶ 240, Fig. 19. For example, in Okamura's Figure 19, a location name, Mt. Fuji, corresponds to the location where the content represented by cluster map 417 was captured. *Id.* ¶ 240, Figs. 18, 19. Okamura explains how such "cluster titles," represent location names because they refer to the place name for a group of image files created in that location. *Id.* ¶¶ 102, 109, 112, 116, 122–123, 136, 229–230, 240. Okamura explains that a cluster title can be a "place name" such as "Tokyo-prefecture" or "Saitama-prefecture," or an address such as "Tokyo-prefecture Shinagawa-ward Osaki 1-chome." *Id.* ¶¶ 122–123, 136, 229, 240.

54

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

Okamura's Figure 19 is shown below.



Okamura's Figure 19, above, is a diagram showing an example of a display of index screen 410 displaying cluster maps in display area 414, with cluster map 417 displaying location information 418 (including cluster title "Mt. Fuji" and latitude/longitude) related to cluster map 417. Ex. 1004 ¶ 240.

Flora describes media viewer 64 for the selected first icon (*the first location view*) that includes selectable icons 66 representing "all other media items associated with the map location" of the first icon (i.e., Okamura's content captured at the location of the icon). Ex. 1005, 7:23–42, Fig. 3. In view of Petitioner's combined teaching, Flora's selectable icons 66 are a representation of each of Okamura's digital files (*a representation of at least a portion of one digital file*) in a set of digital files captured at the location of the first icon (*in a first set of digital files*). *Id.* at 7:23–42, Fig. 3.; Ex. 1004

55

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

¶¶ 18, 91–93, 103–106, 110, 123, 130, 135–0143, 213–220, 225, 232–241, 267.  The *first set of digital files* is the set of digital files, shown by icon 66 of the first icon's media viewer 64, captured at the location of the first icon. Okamura's captured content are *digital files* including "image files" and "moving image content" files.  Ex. 1004 ¶¶ 2, 22, 91–92, 107–110, 139, 149, 501, Figs. 2A–2B.

Petitioner's position is supported by the testimony of Dr. Bederson, which we credit, because it is consistent with the teachings of Okamura and Flora as well as the disclosure of the '228 patent.  Ex. 1002 ¶¶ 87–90.

Patent Owner argument that "Petitioner's annotated version of Flora's Fig. 3 is *not* from the actual Flora patent reference Petitioner relies on under Ground 1 (EX1005)," but "was actually taken from Flora's prosecution file history (EX1008)" is moot because we rely on Okamura's Figure 19, not Flora's Figure 3, for this particular teaching.

Patent Owner's other argument that "the information 418 that was displayed when the mouse is placed over a cluster map in Fig. 18 is not included in the content playback screen 440 in Fig. 22" is not availing.  PO Resp. 61.  Simply because location information displayed in association with a map cluster may not also be shown on a content playback screen does not negate the teaching to a person of ordinary skill in the art that the location information is displayed in association with a map cluster.

Patent Owner does not contest Petitioner's evidence with respect to Wagner for these limitations.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

Based on the complete record and for the reasons we discuss, we find that Petitioner has demonstrated that the combination of Okamura and Flora, and in the alternative Wagner, meets limitations [1g] and [1j].

>    c) *Contested Limitations [1n], [1p] - a first (second) name associated with the first (second) person, the first (second) name being displayed adjacent to the first (second) person selectable thumbnail image*
>
>     (1) *Petitioner's Arguments*

Petitioner asserts that "Okamura discloses or at least renders obvious limitation [1n]." Pet. 55. According to Petitioner,

> Okamura describes face cluster display area 431 (*the people view*) includes "information 433 related to the thumbnail image 432 [that] are displayed" and displayed information 433 includes "the name of the person corresponding to the face" of the person shown in a thumbnail image 432; thus, for the first person's thumbnail image 432, displayed information 433 includes that first person's name (*a first name associated with the first person*).

*Id.* (citing Ex. 1004 ¶ 247, Fig. 21).

Okamura's Figure 21 is shown below.

57

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2



FIG. 21

Okamura's Figure 21, above, depicts face cluster display area 431 having e.g. thumbnail image 432 with display information 433 related to thumbnail image 432, such as the name of the person corresponding to the face.  Ex. 1004 ¶¶ 246–247.

Petitioner explains that information 433 can be displayed *adjacent* or next to thumbnail images because Okamura's Figure 20 figure shows date information "02.3-01.04.2004" of information 433 displayed *adjacent* or next to a thumbnail image.  Pet. 56 (citing Ex. 1004 ¶ 247, Fig. 20).  Petitioner state's that "[i]t therefore follows that when the information 433 [is] the person's name, it is similarly displayed in the same *adjacent* location as "02.3-01.04.2004" in Fig. 20."  Pet. 56.

58

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

Okamura's Figure 20 is shown below.



Okamura's Figure 20, above, depicts index screen 420 and event cluster image display area 421. Pieces of information 423 related to the thumb nail image 422 are displayed, for example, the time range 02.03-01.04.2004 of the contents belonging to the cluster are displayed. Also, as the pieces of information 423 related to the thumbnail image 422, other pieces of information such as a title may be displayed as well. Ex. 1004 ¶¶ 242, 244–245.

Petitioner argues that a person of ordinary skill in the art "would have understood when information 433 includes name information as discussed for Figure 21, Okamura discloses or at least renders obvious displaying name information for the first person's thumbnail image 432 (*the first name*

59

IPR2021-01413
Patent 10,621,228 B2

*being displayed*) adjacent or next to the first person's thumbnail image 432 (*adjacent to the first person selectable thumbnail image*).  Pet. 57 (citing Ex. 1002 ¶¶ 110–114).

Petitioner similarly argues that Okamura discloses or at least renders obvious limitation [1p].  Petitioner argues that

> Okamura describes face cluster display area 431 (*the people view*) includes displayed "information 433 related to the thumbnail image 432" including "the name of the person corresponding to the face" of the person shown in a thumbnail image 432; thus, for the second person's thumbnail image 432, displayed information 433 includes that second person's name (*a second name associated with the first person*).

Pet. 60 (citing Ex. 1004 ¶ 247, Fig. 21).

Petitioner argues that

> Information 433 can be displayed *adjacent* to thumbnail images as discussed [above].  Thus, a [person of ordinary skill in the art] would have understood when information 433 includes name information as discussed for Figure 21, Okamura discloses or at least renders obvious displaying that name information for a second person's thumbnail image 432 (*the second name being displayed*) adjacent to the second person's thumbnail image 432 (*adjacent to the second person selectable thumbnail image*).

Pet. 61 (citing Ex. 1002 ¶¶ 118–122).

In the alternative, Petitioner argues that

> [i]f the Board finds Okamura does not disclose or render obvious *a first name associated with the first person, the first name being displayed adjacent* to a thumbnail image of the first person (limitation [1n]) and/or Okamura does not disclose or render obvious *a second name associated with the second person, the second name being displayed adjacent* to a thumbnail image of the second person (limitation 1[p]), Gilley discloses or at least renders obvious these concepts for the reasons discussed in

60

IPR2021-01413
Patent 10,621,228 B2

> Sections VI.C.2.b (limitation [1n]) and VI.C.2.c (limitation [1p]).

Pet. 95.

### (2) Patent Owner's Arguments

Patent Owner argues that

> Nowhere . . . does Okamura teach that its face cluster display area 431 (people view) includes both a "first name" and ["]second name" in the same view. EX2038, ¶¶145-146. As discussed above, to display name information 433 corresponding to an individual thumbnail image, the user must place "the mouse . . . over a thumbnail image 432 by a user operation." EX1004, 0247; EX2035, 89:20-90:5; EX2038, ¶146. Doing so displays name information 433 for one person only – e.g. only the "first person." EX2038, ¶147. Nowhere does Okamura disclose or suggest any means for simultaneously including a second name in that same view, nor does the Petition articulate any proposed modification to Okamura's cursor input for doing so.

PO Resp. 63–64 (citing Ex. 2035, 85:5–86:6, 81:3–16; Ex. 2038 ¶ 148).

### (3) Analysis

We agree with Petitioner that Okamura teaches the recited limitations [1n] and [1p]. Okamura describes face cluster display area 431 (*the people view*) that includes related information 433 such as "the name of the person corresponding to the face" shown in thumbnail image. Thus, for the first person's thumbnail image 432, displayed information 433 includes that first person's name (*a first name associated with the first person*). Ex. 1004 ¶¶ 246–247, Fig. 21.

61

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

Okamura's Figure 21 is shown below.



FIG. 21

Okamura's Figure 21, above, depicts face cluster display area 431 having e.g. thumbnail image 432 with display information 433 related to thumbnail image 432, such as the name of the person corresponding to the face. *Id.*

Okamura also explains that information 433 can be displayed *adjacent* or next to thumbnail images because Okamura's Figure 20 figure shows related date information "02.3-01.04.2004" displayed *adjacent* or next to the thumbnail image. Ex. 1004 ¶ 247, Fig. 20. When information 433 is the person's name, as Okamura shows in Figure 21, a person of ordinary skill in the art would understand that it could similarly be displayed in the same *adjacent* position as shown in Figure 20.

62

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

Dr. Bederson provides supporting testimony, which we credit, because it is consistent with the teachings of Okamura. *See* Ex. 1002 ¶¶ 110–114, 118–122.

We disagree with Patent Owner's assertion that claim 1 requires the "simultaneous" display of a "first name" and a "second name" in the same view. PO Resp. 63–64.

The relevant portion of claim 1 is set out below:

> [1l] responsive to a second input that is subsequent to the first input, causing a people view to be displayed on the interface,
>
> [1m] the people view including: (i) a first person selectable thumbnail image including a representation of a face of a first person, the first person being associated with a third set of digital files including digital photographs and videos;
>
> [1n] (ii) a first name associated with the first person, the first name being displayed adjacent to the first person selectable thumbnail image;
>
> [1o] (iii) a second person selectable thumbnail image including a representation of a face of a second person, the second person being associated with a fourth set of digital files including digital photographs and videos; and
>
> [1p] (iv) a second name associated with the second person, the second name being displayed adjacent to the second person selectable thumbnail image.

Ex. 1001, 35:61–36:11.

Patent Owner states in its Response that it "does not believe claim construction is required because the plain and ordinary meaning of the claims is clear." PO Resp. 26. In its Response, however, Patent Owner

IPR2021-01413
Patent 10,621,228 B2

points to Figure 32 of the '228 patent as "an exemplary embodiment showing a people view 1400 that includes 'a thumbnail of [each person's] face along with their name,'" concluding that "the 'people view' *must* 'includ[e]' both a 'first name' and a 'second name' displayed in the same view." *Id.* at 29 (citing Ex. 2038 ¶¶ 80–81) (emphasis added). Patent Owner then later argues that "[n]owhere does Okamura disclose or suggest any means for *simultaneously* including a second name in that same view." PO Resp. 63 (emphasis added).

Claim 1, however, does not recite the term "*simultaneously*" that Patent Owner now seeks to add, nor can the claim be reasonably read to impose such a requirement. Moreover, Patent Owner provides no compelling rationale for incorporating its interpretation of Figure 32 as "an exemplary embodiment" in order to restrict claim 1 in this way. The Federal Circuit has repeatedly explained that "[a] particular embodiment appearing in the written description <u>may not</u> be read into a claim when the claim language is broader than the embodiment." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) (emphasis added). We, therefore, decline Patent Owner's invitation do so here.

Patent Owner does not contest Petitioner's evidence with respect to Gilley for this limitation.

Based on the complete record and for the reasons we discuss, we find that Petitioner has demonstrated that Okamura, and in the alternative, Gilley, meets limitations [1n] and [1p].

> *d)  Uncontested limitations*

Petitioner provides evidence and arguments that the combined teachings of Okamura, Flora, Wagner, and Gilley meet the remaining

64

IPR2021-01413
Patent 10,621,228 B2

portions of independent claim 1, namely [1a-preamble], [1f], [1h], [1i], [1k], [1l], [1m], and [1o]. *See* Pet. 13, 31–32, 40–43, 46–55, 58–60, 74, 79–81, 84, 86, and 95. Petitioner provides the testimony of Dr. Bederson in support of its position with respect to these portions of claim 1. *See* Ex. 1002 ¶¶ 69–125.

Patent Owner does not contest Petitioner's evidence and arguments with respect to these portions of claim 1. *See* PO Resp. 34–64

For the preamble [1a], "[a] method comprising," Petitioner relies on Okamura's method of using a "content playback application" to display media content. Pet. 13 (citing Ex. 1004 ¶¶ 232–248, Figs. 17–21). [7]

Petitioner asserts that Okamura and Flora teach limitation [1f], "*responsive to an input that is indicative of a selection of the first location selectable thumbnail image, causing a first location view to be displayed on the interface*."

Petitioner explains that

[i]n the combination, Flora describes responsive to a "user input, such as a mouse click" selecting the first of multiple selectable icons 58 and 59 (*responsive to an input that is indicative of a selection of the first location selectable thumbnail image*), a media viewer 64 for the selected first icon opens and provides access to a media item 62 represented by the first icon and "all other media items associated with the map location" of media item 62 (*causing a first location view to be displayed on the interface*). EX1005, 5:65-6:11, 7:4-42, Figs. 2, 3; [Pet.] Sections VI.A.3.c-VI.A.3.d. Media viewer 64 for the first icon is *a first location view* because it provides a display window for viewing each media item for a map location associated with the first icon;

---

[7] We need not determine whether the preamble is limiting as the prior art satisfies the recitation in the preamble and is not contested by the parties.

IPR2021-01413
Patent 10,621,228 B2

> this is just like the '228 patent's description of a location view showing content associated with a selected location. *Id.*; EX1001, 24:37-51, Fig. 34. Media viewer 64 is *displayed on the interface* because it is displayed on GUI 40 and, combined with Okamura, is displayed using cluster map display area 414 that is itself displayed on the interface provided by Okamura's content playback application; content playback application is further displayed on a physical display of apparatus 100.

Pet. 31 (citing Ex. 1005, 7:8–42, Fig. 3; [Pet.] Sections VI.A.3.b-VI.A.3.d; Ex. 1002 ¶¶ 87–89).

In the alternative, Petitioner argues that

> [i]f the Board finds Okamura's content playback application does not disclose or render obvious the claimed *interface*, Wagner discloses or at least renders obvious this element for the reasons discussed in Section VI.B.2.b. Combining the Okamura-Flora system with Wagner in this manner would have provided Okamura-Flora's content playback application implements an updatable user interface window on which cluster map display area 414, displaying content as taught by Flora's geographic map 46 and media viewer 64 (and describing a *first location view* as discussed in Section VI.A.3.f), is displayed.

Pet. 74 (citing [Pet.] Sections VI.A.3.c, VI.A.3.f-VI.A.3.g, VI.B.2.b; Ex. 1002 ¶¶ 128–134).

Petitioner asserts that Okamura and Flora teach limitation [1h], "each of the digital files in the first set of digital files being produced from outputs of one or more digital imaging devices, the first set of digital files including digital files associated with the first location." Pet. 40.

Petitioner asserts that

> [i]n the combination, Flora describes media viewer 64 for the selected first icon (*the first location view*) includes selectable icons 66 representing each of Okamura's digital files (*a representation of at least a portion of one digital file*) in a set of

66

IPR2021-01413
Patent 10,621,228 B2

digital files captured at the location of the first icon (*in a first set of digital files*). EX1005, 7:23- 42, Fig. 3; [Pet.] Sections VI.A.3.c, VI.A.3.f-VI.A.3.g. In the combination, because the set of digital files (*first set of digital files*) are the set of Okamura's digital files captured at the location of Flora's first icon and represented by icons 66, the set is *including digital files associated with the first location* as claimed. *Id.*

Moreover, *each of the digital files in the first set of digital files* [is] *being produced from outputs of one or more digital imaging devices* because Okamura describes captured content at each location, including the set at the first location, is formed by "image files" and "moving image content" files (*each of the digital files in the first set of digital files*) produced by outputs from a "image capturing apparatus such as a digital still camera" and devices capturing "moving image content" (*being produced from outputs of one or more digital imaging devices*).

Pet. 40–42 (citing Ex. 1004 ¶¶ 2, 22, 91–92, 107–110, 139, 149, 501, Figs. 2A–2B).

Petitioner asserts that Okamura and Flora teach limitation [1i], "*responsive to an input that is indicative of a selection of the second location selectable thumbnail image, causing a second location view to be displayed on the interface.*" Pet. 42.

Petitioner asserts that in the combination,

by selecting the second of the multiple selectable icons 58 and 59 (*responsive to an input that is indicative of a selection of the second location selectable thumbnail image*), a media viewer 64 for the selected second icon opens and provides access to a media item 62 represented by the second icon and "all other media items associated with the map location" of media item 62 (*causing a second location view to be displayed on the interface*). EX1005, 5:65-6:11, 7:4-42, Figs. 2, 3; [Pet.] Sections VI.A.3.c-VI.A.3.e. Media viewer 64 for the second icon is *a second location view* because it provides a display window allowing a

67

IPR2021-01413
Patent 10,621,228 B2

user to view each media item for a map location associated with the second icon at a second location different from the first location. *Id.*; Section VI.A.3.f; EX1002, ¶90. The media viewer 64 is *displayed on the interface* for the same reasons discussed in Section VI.A.3.f. *Id.*

Pet. 42.

In the alternative, Petitioner argues that

[i]f the Board finds Okamura's content playback application does not disclose or render obvious the claimed *interface*, Wagner discloses or at least renders obvious this element for the reasons discussed in Section VI.B.2.b. Combining the Okamura-Flora system with Wagner in this manner would have provided Okamura-Flora's content playback application has an updatable user interface window on which cluster map display area 414, displaying content as taught by Flora's geographic map 46 and media viewer 64 (and describing a *second location view* as discussed in Section VI.A.3.i), is displayed.

Pet. 79 (citing Pet. Sections VI.A.3.c, VI.A.3.i, VI.B.2.b; Ex. 1002 ¶¶ 128–134).

Petitioner asserts that Okamura and Flora teach limitation [1k], "*each of the digital files in the second set of digital files being produced from outputs of the one or more digital imaging devices, the second set of digital files including digital files associated with the second location.*" Pet. 46.

Petitioner asserts that

[i]n the combination, Flora describes media viewer 64 for the selected second icon (*the second location view*) includes selectable icons 66 that are a representation of each of Okamura's digital files (*a representation of at least a portion of one digital file*) in a set of digital files captured at the location of the second icon (*in a second set of digital files*), which is a different location to the first icon's. EX1005, 7:23-42, Fig. 3; [Pet.] Sections VI.A.3.c, VI.A.3.f-VI.A.3.j. In the combination, because the set

68

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

of digital files (*second set of digital files*) are the set of Okamura's digital files captured at the location of Flora's second icon and represented by icons 66, the set is *including digital files associated with the second location* as claimed. *Id.* Moreover, *each of the digital files in the second set of digital files* [is] *being produced from outputs of the one or more digital imaging devices* because content files are captured by Okamura's digital camera and devices capturing moving images discussed in Section VI.A.3.h.

Pet. 46–47.

Petitioner asserts that Okamura teaches limitation [1l], "*responsive to a second input that is subsequent to the first input, causing a people view to be displayed on the interface.*" Pet. 47.

According to Petitioner,

Okamura states "when the 'FACE' tab 412 is depressed using the cursor 419 by a user operation" (*responsive to a second input*) face cluster display area 431 showing "a thumbnail image of each of faces included in contents" is displayed (*causing a people view to be displayed*) on the display interface of the content playback application (*on the interface).* EX1004, ¶¶0099, 0110, 0139, 0234-0248, 0261-0262, 0267, Fig. 21; [Pet.] Section VI.A.3.b.

Face cluster display area 431 is a *people view* because it shows thumbnail images 432 having the faces of different people (including a first person and a second person) who are included in captured content and allows for selection of content according to a person's presence. *Id.*, ¶¶0099, 0110, 0139, 0246-0260, 0267; EX1002, ¶¶100-101. A POSITA would have understood Okamura's content playback application provides the claimed *interface* on which face cluster display area 431 (*people view*) is displayed, and Okamura at least renders obvious having a single *interface* window on which the claimed *map view* and the claimed *people view* are displayed, for the same reasons discussed in Section VI.A.3.b.

IPR2021-01413
Patent 10,621,228 B2

> A POSITA would have also understood Okamura discloses or at least renders obvious the *second input* of selecting FACE tab 412 being *subsequent to the first input* of selecting PLACE tab 413. EX1004, ¶¶0232-0247, 0297-0302, Figs. 18-21, 31; [Pet.] Section VI.A.3.b; EX1002, ¶102. This is because Okamura's EVENT tab 411, FACE tab 412, and PLACE tab 413 are each selectable by a user from any of the index screens 410, 420, and 430 displaying cluster map display area 414, event cluster image display area 421, and face cluster display area 431, and tabs can be selected and display areas switched to in any order, including the selection of FACE tab 412 (*second input*) after or *subsequent* to the selection of PLACE tab 413 (*first input*). *Id.*; EX1004, ¶¶0297-0302, Fig. 31 (describing switching between index screens showing display areas).

Pet. 47–50.

> In the alternative, Petitioner argues that

> [i]f the Board finds Okamura's content playback application does not disclose or render obvious the claimed *interface*, Wagner discloses or at least renders obvious this element for the reasons discussed in Section VI.B.2.b. In the combination of Okamura, Flora, and Wagner, Okamura-Flora's content playback application implements an updatable user interface window as described by Wagner, where Okamura's face cluster display area 431 is displayed on the updatable user interface window (*people view to be displayed on the interface*).

Pet. 80–81 (citing [Pet.] Sections VI.B.2.b, VI.A.3.l; Ex. 1002 ¶¶ 128–134).

Petitioner asserts that Okamura teaches limitation [1m], "*the people view including: (i) a first person selectable thumbnail image including a representation of a face of a first person, the first person being associated with a third set of digital files including digital photographs and videos.*"

Pet. 53.

> Petitioner asserts that

70

IPR2021-01413
Patent 10,621,228 B2

Okamura describes face cluster display area 431 (*the people view*) including a thumbnail image 432 of a first person that includes a representation of a face of the first person (*a first person selectable thumbnail image including a representation of a face of a first person*). EX1004, ¶¶0099, 0110, 0139, 0234-0248, 0261-0262, 0267, Fig. 21; [Pet.] Section VI.A.3.l. Each thumbnail image 432, including that of the first person, is *selectable* because a user can click it using cursor 419, which begins content playback of content associated with the thumbnail image. EX1004, ¶¶0234, 0246-0250, Fig. 21.

The first person (*first person*) shown by the thumbnail image 432 of the first person is *associated with a third set of digital files including digital photographs and videos* because the thumbnail image represents the set of digital content files including that person's face (shown in Figure 21 as including "28" files). EX1004, ¶¶0099, 0110, 0139, 0232-248, 0267, Fig. 21. This *third set* of content is different from the *first* and *second* sets of content because it is content including the first person's face and is not dependent on location. *Id.*; [Pet.] Sections VI.A.3.g-VI.A.3.h, VI.A.3.j-VI.A.3.k. The content forming the *third set* includes *digital photographs and videos* because Okamura's content includes "image files recorded by an image capturing apparatus such as a digital still camera" and its embodiments apply to "cases where moving image contents are used." EX1004, ¶¶0002, 0022, 0091-0092, 0107-0110, 0139, 0149, 0501, Figs. 2A-2B. Thus, at a minimum, a POSITA would have understood Okamura discloses or at least renders obvious *digital photographs and videos* included in the *third set of digital files* where the first person's face is present.

Pet. 53–55 (citing Ex. 1002 ¶¶ 107–109).

In the alternative, Petitioner argues that "[i]f the Board finds Okamura and Flora do not disclose or render obvious the *third set of digital files including digital photographs and videos* or *the fourth set of digital files*

IPR2021-01413
Patent 10,621,228 B2

*including digital photographs and videos*, Wagner discloses or at least renders obvious these concepts." Pet. 80. Petitioner argues

> Wagner discloses that sets of content items managed by a content navigation system include "at least one video and at least one image," meaning Wagner teaches sets of content including at least one video (i.e., one or more videos) (*digital videos*) and at least one image (i.e., one or more images) (*digital photographs*).

*Id.* (citing Ex. 1006 ¶¶ 259–262; Ex. 1002 ¶ 143).

Petitioner asserts that Okamura teaches limitation [1o], "*[the people view including:] (iii) a second person selectable thumbnail image including a representation of a face of a second person, the second person being associated with a fourth set of digital files including digital photographs and videos.*" Pet. 58.

> Petitioner asserts that
>
> Okamura describes face cluster display area 431 (*the people view*) includes a thumbnail image 432 of a second person (different from that of the first person as shown in Figure 21) including a representation of a face of the second person (*a second person selectable thumbnail image including a representation of a face of a second person*). EX1004, ¶¶0099, 0110, 0139, 0234-0248, 0261-0262, 0267, Fig. 21; [Pet.] Section VI.A.3.l- VI.A.3.m. Each thumbnail image 432, including that of the second person, is *selectable* for the reasons discussed in Section VI.A.3.m.
>
> The second person (*second person*) shown by thumbnail image 432 of the second person is *associated with a fourth set of digital files including digital photographs and videos* because the thumbnail image represents the set of digital content files including that person's face. EX1004, ¶¶0099, 0110, 0139, 0232-248, 0267, Fig. 21. This *fourth set* of content is different from the *first* and *second* sets because it is content including the second person's face and is not dependent on location, and is different

IPR2021-01413
Patent 10,621,228 B2

> from the *third set* because it includes content featuring a different
> person's face (second person's face rather than first person's
> face). *Id.*; [Pet.] Sections VI.A.3.g-VI.A.3.h, VI.A.3.j-VI.A.3.k,
> VI.A.3.m. Okamura describes the content forming the *fourth set*
> includes *digital photographs and videos*, and that a POSITA
> would have understood Okamura discloses or at least renders
> obvious *digital photographs and videos* being included in the
> *fourth set of digital files* where the second person's face is
> present, because the same reasons discussed in Section VI.A.3.m
> with respect to the third set apply to the fourth set.

Pet. 58–60 (citing Ex. 1002 ¶¶ 115–117).

In the alternative, Petitioner argues that "[i[f the Board finds Okamura
and Flora do not disclose or render obvious *the fourth set of digital files
including digital photographs and videos*, Wagner discloses or at least
renders obvious this element for the reasons discussed in [the Petition]
Section VI.B.2.h." Pet. 84. Petitioner argues that "[i]n the Okamura, Flora,
and Wagner combination, Okamura's content forming the *fourth set of
digital files* would have included at least one image and at least one video
(*digital photographs and videos*). *Id.* (citing [Pet.] Sections VI.A.3.m,
VI.A.3.o, VI.B.2.h; Ex. 1002 ¶¶ 143–147).

We have considered Petitioner's evidence and arguments with respect
to these portions of claim 1, as well as the testimony of Dr. Bederson. Based
on the complete record, we determine that Petitioner has demonstrated that
the combined teachings of Okamura and Flora meet the remaining portions
of independent claim 1, namely [1a-preamble], [1f], [1h], [1i], [1k], [1l],
[1m], and [1o]. We also find that in the alternative, Wagner meets
limitations [1f], [1i], [1l], [1m], and [1o].

73

IPR2021-01413
Patent 10,621,228 B2

### 2. *Rationale to Combine*

#### a) *Petitioner's Arguments*

Petitioner argues that a person of ordinary skill in the art

> would have been motivated to combine Okamura and Flora such
> that when organizing content according to location, Okamura's
> cluster map display area 414 displays content as taught by Flora's
> geographic map 46 and media viewer 64, where Okamura's
> content is indicated at various locations on the map by Flora's
> icons 58 and 59 and Flora's media viewer 64 provides a window
> for viewing Okamura's content associated with the locations,
> shown by icons 66.

Pet. 22 (citing Ex. 1002 ¶ 81).

Petitioner argues that a person of ordinary skill in the art "would have been motivated to combine Okamura and Flora in this manner because the combination enhances how Okamura displays content associated with various locations, using Flora's scalable geographic map with icons and media viewer, improving user experience." Pet. 24 (citing Ex. 1002 ¶ 82). Petitioner argues that "[c]ombining the teachings provides an interface displaying locations where Okamura's content has been captured on a scalable map and allows a user to view the content captured at a specific location using a media viewer, which provides a user with improved awareness regarding locations associated with content." Pet. 24–25.

Petitioner indicates that "Okamura explains its displayed cluster maps help a user 'easily grasp[]' areas where content has been captured and allow a user to 'easily grasp the distribution of the location of generation of contents' included in the cluster. *Id.* at 25 (citing Ex. 1004 ¶¶ 213–215, 222, 272; *see also id.* ¶¶ 18, 110, 123, 130, 139). "[E]nhancing Okamura with Flora's discussed teachings," Petitioner argues, "furthers these goals because

74

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

Flora's system improves how a user views content organized by location, 'allow[ing] a user to interface with' a map displaying content and 'facilitate[][ing] access to content associated with locations of the electronic map.'" Pet. 25 (citing Ex. 1005, 1:56–55, 2:2–9, 3:22–46; Ex. 1002 ¶ 82).

Petitioner also argues that a person of ordinary skill in the art "would have combined Okamura and Flora in the above manner using known programming techniques, adjusting the software of Okamura's content playback application such that cluster map display area 414 includes Flora's teachings." Pet. 25 (citing Ex. 1004 ¶¶ 232–241). "In particular," Petitioner argues, "the software of Okamura's cluster display control section 180 would have been adjusted using such techniques so cluster map display area 414 is modified to display content as taught by Flora's scalable map 46 with icons 58 and 59 and media viewer 64, where icons 58 and 59 represent locations on the scalable map 46 where Okamura's content was captured and the media viewer 64, displaying Okamura's content captured at specific locations via icons 66, is accessed by selecting respective icons 58 and 59." Pet. 25–26 (citing Ex. 1004 ¶¶ 18, 91–93, 103–106, 110, 123, 130, 135–143, 213–220, 225, 232–241, 267; Ex. 1005, 3:40–45, 7:3–52, Fig. 3; Ex. 1002 ¶ 83). "Okamura and Flora's teachings," Petitioner argues, "would have performed the same function of displaying content according to location whether separate or combined." Pet. 26.

Petitioner further argues that a person of ordinary skill in the art "would have recognized the combination's results would have been predictable: using Flora's geographic map 46 with icons 58 and 59 and media viewer 64 to organize and display Okamura's content on cluster map

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

display area 414 according to location associated with the content." Pet. 26 (citing Ex. 1004 ¶¶ 18, 91–93, 103–106, 110, 123, 130, 135–143, 213–220, 225, 232–241, 267; Ex. 1005, 3:40–45, 6:66–7:52, Fig. 3; Ex. 1002 ¶ 84). Petitioner argues that "[t]his is because Okamura organizes and displays content based on the location at which content was captured, and Flora organizes and displays content according to its associated location using an interactive map." Pet. 26. Petitioner argues a person of ordinary skill in the art "would have had a reasonable expectation of success in combining Okamura and Flora's teachings because the combination's results would have been predictable as discussed above, and because both references relate to organizing content according to location associated with content." *Id.* "Combining their teachings," Petitioner argues, "would have been routine to [a person of ordinary skill in the art] due to this overlap and the simple software modifications to adjust cluster map display area 414 to include Flora's teachings." *Id.* at 26–27.

> Petitioner argues that this demonstrates

> [c]ombining prior art elements (Okamura's cluster map display area 414; Flora's geographic map 46 with icons 58 and 59 and media viewer 64) according to known methods (known programming techniques to adjust the software of Okamura's content playback application) to yield predictable results (using Flora's geographic map 46 with icons 58 and 59 and media viewer 64 to organize and display Okamura's content on cluster map display area 414 according to location associated with the content).

Pet. 27.

> Petitioner also argues that this demonstrates

IPR2021-01413
Patent 10,621,228 B2

> [s]imple substitution of one known element (Flora's geographic map 46 with icons 58 and 59 and media viewer 64) for another (Okamura's cluster map display area 414) to obtain predictable results (using Flora's geographic map 46 with icons 58 and 59 and media viewer 64 to organize and display Okamura's content according to location associated with the content).

Pet. 27 (citing MPEP 2143; *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 415–421 (2007); Ex. 1002 ¶¶ 85–86).

Petitioner argues that a person of ordinary skill in the art "would have been further motivated to combine these references such that Flora's media viewer 64 displays the location name, as described by Okamura, that relates to the location of a selected icon 58 or 59 (including the first icon and second icon) and corresponds to content displayed by the media viewer." Pet. 37 (citing Ex. 1002 ¶¶ 91–95; [Pet.] Sections VI.A.3.i-VI.A.3.j).

Petitioner argues that

> [c]ombining Okamura and Flora such that media viewer 64 explicitly displays a location name that (1) includes address and/or place name and (2) corresponds to a selected icon and content displayed by the media viewer would have further provided such improvements because a user would have had increased awareness of location associated with content, particularly for unfamiliar locations.

Pet. 37 (citing Ex. 1002 ¶ 96). According to Petitioner, "[t]his would have provided more information to a user viewing content and helped them understand the name, address, and spelling of locations at which content was captured. *Id.* Petitioner argues that "[t]his would have helped the user avoid confusion and ensure accuracy, for example, when researching and viewing a content library." *Id.*

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

Petitioner argues that a person of ordinary skill in the art "would have combined Okamura and Flora in the above manner using known programming techniques, where software implementing media viewer 64 would have simply been modified so the discussed location name associated with a selected icon and corresponding content is displayed." Pet. 38 (citing Ex. 1004 ¶ 240, Fig. 19; Ex. 1005, 7:23–42, Fig. 3; Ex. 1002 ¶ 97).

"Further," Petitioner argues, "Flora's media viewer 64 includes displayed text as shown in Figure 3. Having the displayed text include location associated with a selected icon and corresponding content would have been routine and well within the capabilities of a POSITA because it would have simply entailed adjusting the text already displayed." Pet. 38. Petitioner argues that "Okamura and Flora's teachings would have also performed the same function of displaying content according to location whether separate or combined." Pet. 38.

Petitioner argues that a person of ordinary skill in the art "would have recognized the combination's results would have been predictable: Flora's media viewer 64 displaying a location name, as described by Okamura, that relates to the location of the selected icon and corresponds to content displayed by the media viewer." *Id.* (citing Ex. 1004 ¶ 240, Fig. 19; Ex. 1005, 7:23–42, Fig. 3; Ex. 1002 ¶ 98). Petitioner explains that "Flora and Okamura describe organizing and displaying content based on the location at which content was captured, Flora describes displaying a location name in its media viewer, and Okamura's teachings simply make explicit the associated location name including address and/or place name is displayed by the viewer." Pet. 38–39. According to Petitioner, a person of ordinary

78

IPR2021-01413
Patent 10,621,228 B2

skill in the art "would have also had a reasonable expectation of success in combining Okamura and Flora's teachings because the combination's results would have been predictable as discussed, and because both references relate to organizing content according to location associated with content." *Id.* at 39. "Combining their teachings," Petitioner argues, "would have been routine to a POSITA due to their overlap in subject matter and the simple programming modifications to adjust media viewer 64 to display location name as described by Okamura." *Id.*

> Petitioner argues that
>
> [t]his analysis demonstrates a POSITA would have been motivated to combine the above teachings of Okamura and Flora because the combination would have combined prior art elements (Flora's media viewer 64; Okamura's displayed information 418 that includes location name) according to known methods (known programming techniques to adjust the software implementing Flora's media viewer 64) to yield predictable results (Flora's media viewer 64 displaying a location name that relates to the location of the selected icon and corresponds to content displayed by the media viewer).

*Id.* (citing Ex. 1002 ¶ 99).

> Petitioner argues that a person of ordinary skill in the art would have been
>
> further motivated to combine the Okamura-Flora system with Wagner such that Okamura-Flora's content playback application implements an updatable user interface window as described by Wagner on which cluster map display area 414 (corresponding to the claimed *map view* (*see* [Pet.] Section VI.A.3.b)) displaying content as taught by Flora's geographic map 46 and media viewer 64, and face cluster display area 431 (corresponding to the claimed *people view* (*see* [Pet.] Section VI.A.3.l)) are displayed. EX1004, ¶¶0232-0248, Figs. 17-21; EX1006, ¶¶0004,

79

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

> 0045, 0105-0109, 0115, 0120, 0128, 0130-0132, Fig. 1C; [Pet.] Section VI.A.3.b- VI.A.3.c, VI.A.3.l; EX1002, ¶¶128-130. The Okamura-Flora system describes using an application (Okamura's content playback application) to display cluster map display area 414 and face cluster display area 431, and Wagner simply teaches using an application's updatable interface window to display these items. *Id.* Because the combination implements Wagner's interface teachings, providing an interface is updated to display different screens, it allows for a "more efficient method[] and interface[] for displaying and navigating through content" and can "conserve power and increase the time between battery charges" for the computing device displaying the interface.

Pet. 71 (citing Ex. 1006 ¶¶ 6–7, 13).

According to Petitioner, a person of ordinary skill in the art "would have effectuated the combination using known programming techniques, adjusting the content playback application software such that cluster map display area 414 and face cluster display area 431 are displayed on an updatable user interface window as taught by Wagner." Pet. 72 (citing Ex. 1004 ¶¶ 232–248, Figs. 17–21; Ex. 1006 ¶¶ 4, 45, 108–109, 115, 120, 128, 130–132, Fig. 1C). "Indeed," Petitioner indicates, "the software of Okamura's cluster display control section 180 controlling display on display section 181 would have been adjusted using such techniques." Pet. 72 (citing Ex. 1004 ¶¶ 91, 103–104, 232–249; Ex. 1002 ¶ 131). According to Petitioner, "[t]he Okamura-Flora and Wagner teachings would have performed the same function of displaying information by an application whether separate or combined." Pet. 72.

Petitioner argues a person of ordinary skill in the art "would have recognized the combination's results would have been predictable: the

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

Okamura-Flora system's content playback application implementing an updatable user interface window as described by Wagner that displays cluster map display area 414 and face cluster display area 431." *Id.* (citing Ex. 1004, ¶¶ 232–248, Figs. 17–21; Ex. 1006, ¶¶ 4, 45, 108–109, 115, 120, 128, 130–132, Fig. 1C; [Pet.] Sections VI.A.3.c, VI.A.3.g; Ex. 1002, ¶ 131–132).

According to Petitioner "[t]he Okamura-Flora system describes displaying cluster map display area 414 and face cluster display area 431, and Wagner simply specifies that an application's updatable user interface window displays these items." Pet. 72. Petitioner argues a person of ordinary skill in the art "would have had a reasonable expectation of success in combining the Okamura-Flora system with Wagner's teachings due to the predictability as discussed above, and because both references relate to user interface systems used to navigate and display content." Pet. 72–73. "Combining their teachings," Petitioner argues, "would have been routine to a POSITA due to the overlap in subject matter and the simple software modifications to adjust the content playback application to include Flora's teachings." *Id.* at 73.

Petitioner argues,

[t]his analysis demonstrates a POSITA would have been motivated to combine the Okamura-Flora system with Wagner because it is a combination of prior art elements (Okamura-Flora's content playback application including cluster map display area 414 and face cluster display area 431; Wagner's a updatable user interface window (application view 191) of software application 136-1 as discussed) according to known methods (known programming techniques to adjust the software of Okamura's content playback application) to yield predictable

81

IPR2021-01413
Patent 10,621,228 B2

> results (the Okamura-Flora system's content playback
> application implementing an updatable user interface window as
> described by Wagner that displays cluster map display area 414
> and face cluster display area 431).

Pet. 73 (citing Ex. 1002 ¶¶ 132–134).

Petitioner argues that a person of ordinary skill in the art would have
been "further motivated to combine the Okamura-Flora system with Wagner
such that Okamura-Flora's media viewer 64 displays the location name of a
location associated with content as described by Wagner." Pet. 76 (citing
Ex. 1002 ¶¶ 135–138). Petitioner argues that

> [i]n the combination, media viewer 64 for the first icon (*the first
> location view*) would have displayed a *first location name
> associated with the first location* that is the location where
> content for the first icon is captured, and media viewer 64 for the
> second icon (*the second location view*) would have displayed a
> *second location name associated with the second location* that is
> the location where content for the second icon captured.

Pet. 76–77 (citing [Pet.] Sections VI.A.3.g, VI.A.3.j).

According to Petitioner,

> [t]he Okamura-Flora combination describes media viewer 64
> displays a location name associated with a selected icon
> (including the first icon and second icon) and content displayed
> by the viewer (*see* EX1005, 7:23-42, Fig. 3; [Pet.] Sections
> VI.A.3.f-VI.A.3.g, VI.A.3.i-VI.A.3.j) and Wagner simply
> specifies the displayed location name in such a viewer is a city
> name associated with content.

Pet. 77 (citing Ex. 1006 ¶¶ 183, 228, Figs. 5S-5V). "Moreover," Petitioner
argues, "because the combination uses Wagner's interface teachings and
makes clear the city associated with content, it allows for a 'more efficient

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

method[] and interface[] for displaying and navigating through content.'"
Pet. 77 (citing Ex. 1006 ¶¶ 6–7, 13; Ex. 1002 ¶ 139).

Petitioner argues a person of ordinary skill in the art "would have combined the Okamura-Flora system with Wagner in the above manner using known programming techniques, adjusting media viewer 64's software such that location name as taught by Wagner is displayed." Pet. 77 (citing Ex. 1004 ¶¶ 232–248, Figs. 17–21; Ex. 1005, 7:23–42, Fig. 3; Ex. 1006 ¶¶ 183, 228, Figs. 5S-5V; Ex. 1002, ¶ 140). "Additionally," Petitioner argues, "the Okamura-Flora and Wagner teachings would have performed the same function of displaying location information whether separate or combined." Pet. 77–78.

Petitioner argues a person of ordinary skill in the art "would have recognized the combination's results would have been predictable: the Okamura-Flora system's media viewer 64 displays the location name of a location associated with content as described by Wagner." Pet. 78 (citing Ex. 1004 ¶¶ 232–248, Figs. 17–21; Ex. 1005, 7:23–42, Fig. 3; Ex. 1006 ¶¶ 183, 228, Figs. 5S-5V; Ex. 1002 ¶ 141). Petitioner argues that "[t]his is because the Okamura-Flora system describes media viewer 64 displaying a location name associated with content displayed by the viewer, and Wagner simply specifies the displayed location name in a viewer is a city name (e.g., San Francisco)." Pet. 78. According to Petitioner, a person of ordinary skill in the art "would have had a reasonable expectation of success in combining the Okamura-Flora system with Wagner's teachings because the combination's results would have been predictable as discussed, and because both references relate to user interface systems used to navigate and display

83

IPR2021-01413
Patent 10,621,228 B2

content." *Id.* "Combining their teachings," Petitioner argues, "would have been routine to a POSITA due to the overlap in subject matter and the simple software modifications to adjust media viewer 64 to include Wagner's displayed location name teachings." *Id.*

According to Petitioner,

[t]his analysis demonstrates a POSITA would have been motivated to combine the Okamura-Flora system with Wagner because it is a combination of prior art elements (Okamura-Flora's media viewer 64 that displays location information; Wagner's location viewer that displays a location name associated with content) according to known methods (known programming techniques, adjusting the Okamura-Flora media viewer 64's software such that location name as taught by Wagner is displayed) to yield predictable results (the Okamura-Flora system's media viewer 64 displays the location name of a location associated with content as described by Wagner).

Pet. 78–79 (citing Ex. 1002 ¶ 142).

Petitioner argues that a person of ordinary skill in the art would have been "further motivated to combine the Okamura-Flora system with Wagner such that the Okamura-Flora system manages content sets including at least one image and at least one image." Pet. 82 (citing Ex. 1006 ¶¶ 259–262; Ex. 1002 ¶¶ 143–144). Petitioner asserts that

[i]n the combination, Okamura's content forming the *third set of digital files* would have included at least one image and at least one image (*digital photographs and videos*), and Okamura's content forming the *fourth set of digital files* would have included at least one image and at least one image (*digital photographs and videos*).

Pet. 82 (citing [Pet.] Sections VI.A.3.m, VI.A.3.o).

IPR2021-01413
Patent 10,621,228 B2

According to Petitioner, "Okamura's content includes 'image files recorded by an image capturing apparatus such as a digital still camera' and embodiments apply to 'cases where moving image contents are used.'" Pet. 82 (citing Ex. 1004 ¶¶ 2, 22, 91–92, 107–110, 139, 149, 501, Figs. 2A–2B). Petitioner argues that "[t]he Okamura-Flora combination therefore describes managing image and video content, and Wagner simply makes explicit that sets of managed content include at least one image and at least one video." Pet. 82 (citing Ex. 1006 ¶¶ 259–262).

According to Petitioner, a person of ordinary skill in the art "would have combined the Okamura-Flora system with Wagner in the above manner using known programming techniques, adjusting the Okamura-Flora content playback application's software such that Okamura manages content including both videos and image content." Pet. 82 (citing Ex. 1004 ¶¶ 2, 22, 91–92, 107–110, 139, 149, 501, Figs. 2A-2B). 'In particular," Petitioner argues, "the software of Okamura's content playback application would have been adjusted such that content storing section 210 stores content including videos and images to implement Wagner's teachings." Pet. 82–83 (citing Ex. 1004 ¶¶ 91–92, 267). Petitioner argues that "[t]his would have been straightforward because Okamura's system is applicable to image and video." Pet. 83. "Additionally," Petitioner argues, "the Okamura-Flora and Wagner teachings would have performed the same function of providing content for display whether separate or combined." *Id.* (citing Ex. 1002 ¶¶ 145–146).

According to Petitioner, a person of ordinary skill in the art "would have recognized the combination's results would have been predictable: the

85

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

Okamura-Flora system's sets of content include both at least one image and at least one video." Pet. 83 (citing Ex. 1004 ¶¶ 2, 22, 91–92, 107–110, 139, 149, 501, Figs. 2A–2B; Ex. 1006 ¶¶ 259–262; Ex. 1002 ¶ 146). Petitioner argues that "[t]his is because the Okamura-Flora's system is applicable to image and video content and Wagner simply makes explicit that sets of managed content include at least one image and at least one video." Pet. 83. Petitioner argues that a person of ordinary skill in the art "would have also had a reasonable expectation of success in combining the Okamura-Flora system with Wagner's teachings because the combination's results would have been predictable as discussed above, and because both references relate to user interface systems used to navigate and display content." *Id.* "Combining their teachings," Petitioner argues, "would have been routine to a POSITA due to the overlap in subject matter and the simple software modifications to adjust the content playback application to include Wagner's teachings." *Id.*

> Petitioner argues that
>
> [t]his analysis demonstrates a POSITA would have been motivated to combine the Okamura-Flora system with Wagner because it is a combination of prior art elements (Okamura-Flora's system that manages content; Wagner's teachings that sets of content being managed include at least one video and at least one image) according to known methods (known programming techniques to adjust the software of Okamura's content playback application in the Okamura-Flora system) to yield predictable results (the Okamura-Flora system manages sets of content that include both at least one video and at least one image).

Pet. 84 (citing Ex. 1002 ¶ 147).

86

IPR2021-01413
Patent 10,621,228 B2

Petitioner also argues that a person of ordinary skill in the art would have been

> further motivated to combine the Okamura-Flora system with Gilley such that Okamura's face cluster display area 431 (*the people view*) displays thumbnail images 432 of people's faces included in content (including the first and second person thumbnail images) along with the name of each person adjacent to each thumbnail image 432 as taught by Gilley.

Pet. 88 (citing Ex. 1002 ¶¶ 152–154).

Petitioner argues that "[t]he Okamura-Flora system includes Okamura's face cluster display area 431 having thumbnail images 432 of people included in content, where 'information 433 related to the thumbnail image 432' including 'the name of the person corresponding to the face' of the person shown in each thumbnail image 432 is displayed." Pet. 88 (citing Ex. 1004 ¶ 247, Figs. 20, 21; [Pet.] Sections VI.A.3.m-VI.A.3.p; Ex. 1002 ¶ 155).

According to Petitioner,

> [t]he Okamura-Flora combination therefore describes face cluster display area 431 displaying the name of a person shown in each thumbnail image 432 (including the first and second person thumbnails), and Gilley specifies the name of each person, including first and second people, is displayed adjacent to each thumbnail image of a person, and at the same time as shown by Gilley's Figure 7.

Pet. 89 (citing Ex. 1007, Abstract, ¶¶ 2, 5, 15, 99–103, Figs. 7, 8).

Petitioner argues that

> [t]he combination would have provided benefits: displaying the name a person next to a thumbnail image representing a set of content including that person would have helped a user understand how content is organized and which content features

87

IPR2021-01413
Patent 10,621,228 B2

> specific people identified by name, providing an intuitive system
> that improves content management system accessibility.

Pet. 90.

According to Petitioner, "Gilley recognizes these benefits, stating its system provides an organizational scheme 'intuitive for users of an image system, enabling users to quickly understand the functioning of the system' and improved 'accessibility, organization and usability' of images in a library.'" *Id.* (citing Pet. 90; Ex. 1007 ¶¶ 14–16; Ex. 1002 ¶¶ 156–157).

Petitioner argues that a person of ordinary skill in the art

> would have combined the Okamura-Flora system with Gilley in
> the above manner using known programming techniques,
> adjusting the Okamura-Flora content playback application's
> software such that face cluster display area 431 displays
> thumbnail images 432 of people's faces along with the name of
> each person adjacent to each thumbnail image.

Pet. 91 (citing Ex. 1004 ¶ 247, Figs. 20, 21; Ex. 1007, Abstract, ¶¶ 2, 5, 15, 99–103, Figs. 7, 8). "Indeed," Petitioner points out, "the software of Okamura's cluster display control section 180 that controls display on display section 181 would have been adjusted using such techniques to implement Gilley's teachings." Pet. 91 (citing Ex. 1004 ¶¶ 91, 103–104, 232–249; Ex. 1002 ¶ 158). According to Petitioner, "[t]he Okamura-Flora and Gilley teachings would have performed the same function of displaying information associated with content (e.g., Okamura's information 433; Gilley's names associated with content in Figure 7) whether separate or combined." Pet. 91.

Petitioner argues a person of ordinary skill in the art "would have recognized the combination's results would have been predictable:

IPR2021-01413
Patent 10,621,228 B2

Okamura's face cluster display area 431 displays thumbnail images 432 of people's faces included in content along with the name of each person displayed adjacent to each of thumbnails images 432 as taught by Gilley." Pet. 91 (citing Ex. 1004 ¶ 247, Figs. 20, 21; [Pet.] Sections VI.A.3.m-VI.A.3.p; Ex. 1007, Abstract, ¶¶ 2, 5, 15, 99–103, Figs. 7, 8; Ex. 1002 ¶ 159). Petitioner argues that

> [t]he Okamura-Flora system describes face cluster display area 431 displaying information 433 (including name information) associated with each thumbnail images 432, and Gilley simply specifies displayed information is the name of a person shown by thumbnail image 432, the name is displayed adjacent to each thumbnail image 432, and the names are displayed for each thumbnail image 432 at the same time as shown in Gilley's Figure 7.

Pet. 91–92. Petitioner argues that a person of ordinary skill in the art "would have had a reasonable expectation of success in combining the Okamura-Flora system with Gilley's teachings because the combination's results would have been predictable as discussed above, and because both references relate to user interface systems used to navigate and display content." *Id.* at 92. "Combining their teachings," Petitioner argues, "would have been routine to a POSITA due to the overlap in subject matter and the simple software modifications to adjust the content playback application to include Gilley's teachings." *Id.*

> Petitioner argues that
>
> [t]his analysis demonstrates a POSITA would have been motivated to combine the Okamura-Flora system with Gilley because it is a combination of prior art elements (Okamura-Flora's face cluster display area 431 that displays thumbnail images 432 showing each person contained in content and

89

IPR2021-01413
Patent 10,621,228 B2

> information 433 for each thumbnail image 432; Gilley's display
> of thumbnail images showing each person's face contained in
> content and the name of each person adjacent to their respective
> thumbnail image) according to known methods (known
> programming techniques to adjust the software of Okamura's
> content playback application such that face cluster display area
> 431 displays thumbnail images 432 of people's faces included in
> content along with the name of each person displayed adjacent
> to each thumbnail image) to yield predictable results (Okamura's
> face cluster display area 431 displays thumbnail images 432 of
> people's faces included in content along with the name of each
> person displayed adjacent to each thumbnails image 432 as
> taught by Gilley).

Pet. 92–93 (citing Ex. 1002 ¶ 160).

>    *b)  Patent Owner's Arguments*

Patent Owner argues that a person of ordinary skill in the art "would

not combine Okamura with Flora as proposed, because Flora's use of a

geographic map is analogous to the maps in Fujiwara and Takakura

disparaged by Okamura."  PO Resp. 39 (citing Ex. 1004 ¶¶ 3–11; Ex. 2038

¶¶ 106–107).

Patent Owner argues that "Okamura expressly disparages Fujiwara

and Takakura's use of a geographic maps, i.e., the same type of map as

Flora, when discussing "the related art" in its paragraphs 0004-0006 and

0008-0011."  PO Resp. 40 (citing Ex. 2038 ¶ 110).  "In particular," Patent

Owner argues, "Okamura states that using a geographic map makes it

'necessary to display the map at a scale sufficiently large to show the

countries of the world' to convey 'correspondence between images taken in

Tokyo and its vicinity and images taken in other regions.'"  PO Resp. 40

(citing Ex. 1004 ¶ 9).  Patent Owner argues that "[t]his 'makes it difficult to

IPR2021-01413
Patent 10,621,228 B2

intuitively grasp the geographical correspondence between individual contents.'" PO Resp. 40 (citing Ex. 1004 ¶ 8).

Patent Owner argues that "Okamura also warns that the ability to zoom in on a scalable geographic map created problems because at this scale, 'it is not possible to display the generated positions of images taken in other regions . . . on the map.'" PO Resp. 40 (citing Ex. 1004 ¶ 10). "For these reasons," Patent Owner argues, "Okamura recommends using 'maps corresponding to individual clusters,' such as the static cluster map matrix of Fig. 18, so that the user can easily visualize the relative locations of various content." PO Resp. 40–41 (citing Ex. 1004 ¶¶ 213–215).

Patent Owner argues that "the content represented by the cluster maps in Fig. 18 of Okamura include images at various locations, including several locations in or around Tokyo . . . and at least one location in Hawaii." PO Resp. 41. Patent Owner argues that "[i]f the content from Okamura's Fig. 18 were displayed as taught by Flora, then the content in the Tokyo and its vicinity represented as separate map clusters in Fig. 18 . . . would need to be consolidated when the map is zoomed out at a scale that allows the content from Hawaii . . . to also be seen." Id.

Patent Owner argues that "Okamura also emphasizes the importance of showing content from different locations simultaneously regardless of how geographically far apart those locations are." Id. at 42 (citing Ex. 1004 ¶ 9 ("when displaying the correspondence between images taken in Tokyo and its vicinity and images taken in other regions, and their generated positions"); Ex. 2038 ¶ 130). "However," Patent Owner argues, "in Flora, the user needs move the cursor 44 'proximate to certain locations on an

IPR2021-01413
Patent 10,621,228 B2

electronic geographic map 46' to cause the icons to appear, and the icons disappear within a certain time after the cursor is moved away from a location." PO Resp. 42–43 (citing Ex. 1005, 6:5–19).

Patent Owner argues that "[i]f the user wanted to know whether or not there is content associated with other locations . . . the user would need to move the cursor in those areas." PO Resp. 43 (citing Ex. 1005, 6:5–19; Ex. 2038 ¶ 132). "Further," Patent Owner argues, "previously displayed icons may disappear after a certain period of time, such that the user would need to remember that there were icons one location to understand the correspondence between the various content associated with each icon that may appear on the map." PO Resp. 43 (citing Ex. 1004 ¶ 11; Ex. 2038 ¶ 132–133).

Patent Owner concludes that "Okamura teaches away from Petitioner's proposed use of Flora's scalable geographic map because a POSITA 'would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant.'" PO Resp. 44.

Patent Owner also argues that "Petitioner separately provides reasons to combine (1) Okamura, Flora and Wagner and (2) Okamura, Flora and Gilley," but "Petitioner does not provide an independent rationale for combining Okamura, Flora, Wagner *and* Gilley." PO Resp. 76.

c)  *Analysis*

Petitioner asserts that a person of ordinary skill in the art

would have been motivated to combine Okamura and Flora such that when organizing content according to location, Okamura's cluster map display area 414 displays content as taught by Flora's

92

IPR2021-01413
Patent 10,621,228 B2

> geographic map 46 and media viewer 64, where Okamura's
> content is indicated at various locations on the map by Flora's
> icons 58 and 59 and Flora's media viewer 64 provides a window
> for viewing Okamura's content associated with the locations,
> shown by icons 66.

Pet. 22 (citing Ex. 1002 ¶ 81).

Petitioner explains that a person of ordinary skill in the art "would
have been motivated to combine Okamura and Flora in this manner because
the combination enhances how Okamura displays content associated with
various locations, using Flora's scalable geographic map with icons and
media viewer, improving user experience." Pet. 24 (citing Ex. 1002 ¶ 82).
Petitioner explains that combining the teachings provides an interface
displaying locations where Okamura's content has been captured on a
scalable map and allows a user to view the content captured at a specific
location using a media viewer, which provides a user with improved
awareness regarding locations associated with content. *Id.* at 24–25.

Petitioner also explains that Okamura's displayed cluster maps help a
user easily grasp areas where content has been captured and allow a user to
easily grasp the distribution of the location of generation of contents
included in the cluster. *Id.* at 25 (citing Ex. 1004 ¶¶ 213–215, 222, 272; *see
also id.* ¶¶ 18, 110, 123, 130, 139). Enhancing Okamura with Flora's
teachings, Petitioner explains, furthers these goals because Flora's system
improves how a user views content organized by location, allowing a user to
interface with a map displaying content and facilitating access to content
associated with locations on an electronic map. Pet. 25 (citing Ex. 1005,
1:56–55, 2:2–9, 3:22–46; Ex. 1002 ¶ 82).

IPR2021-01413
Patent 10,621,228 B2

Petitioner also asserts that a person of ordinary skill in the art would have been further motivated to combine the Okamura-Flora system with Wagner such that Okamura-Flora's content playback application implements an updatable user interface window as described by Wagner on which cluster map display area 414 displaying content as taught by Flora's geographic map 46 and media viewer 64, and face cluster display area 431 are displayed. Pet. 71 (citing Ex. 1004 ¶¶ 232–248, Figs. 17–21; Ex. 1006 ¶¶ 4, 45, 105–109, 115, 120, 128, 130–132, Fig. 1C; Ex. 1002 ¶¶ 128–130).

Petitioner explains that the Okamura-Flora system describes using an application (Okamura's content playback application) to display cluster map display area 414 and face cluster display area 431, and Wagner simply teaches using an application's updatable interface window to display these items. Pet. 71. Petitioner explains that because the combination implements Wagner's interface teachings of providing an interface updated to display different screens, it allows for a more efficient method and interface for displaying and navigating through content and can conserve power and increase the time between battery charges for the computing device displaying the interface. Pet. 71 (citing Ex. 1006 ¶¶ 6–7, 13).

Petitioner also explains that a person of ordinary skill in the art would have been further motivated to combine the Okamura-Flora system with Wagner such that Okamura-Flora's media viewer 64 displays the location name of a location associated with content as described by Wagner. Pet. 76 (citing Ex. 1002 ¶¶ 135–138).

Petitioner explains that because the combination uses Wagner's interface teachings and makes clear the city associated with the content, it

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

allows for a more efficient method and interface for displaying and navigating through content.  Pet. 77 (citing Ex. 1006 ¶¶ 6–7, 13; Ex. 1002 ¶ 139).

Petitioner asserts that a person of ordinary skill in the art would have been further motivated to combine the Okamura-Flora system with Gilley such that Okamura's face cluster display area 431 displays thumbnail images 432 of people's faces included in the content (including the first and second person thumbnail images) along with the name of each person adjacent to each thumbnail image 432 as taught by Gilley.  Pet. 88 (citing Ex. 1002 ¶¶ 152–154).

Petitioner explains that the combination would have provided benefits, such as displaying the name a person next to a thumbnail image representing a set of content.  Pet. 90.  Including that person would have helped a user understand how content is organized and which content features specific people identified by name, providing an intuitive system that improves content management system accessibility.  *Id.*

Petitioner indicates that Gilley recognizes these benefits, explaining its system provides an organizational scheme intuitive for users of an image system, enabling users to quickly understand the functioning of the system with improved accessibility, organization and usability of images in a library.  *Id.* (citing Ex. 1007 ¶¶ 14–16; Ex. 1002 ¶¶ 156–157).

Petitioner explains that a person of ordinary skill in the art would have combined the asserted art using known programming techniques, such as adjusting the software of Okamura's content playback application so that

IPR2021-01413
Patent 10,621,228 B2

cluster map display area 414 includes Flora's teachings.  Pet. 25 (citing Ex. 1004 ¶¶ 232–241).

With respect to Wagner, Petitioner explains that the programming techniques would include adjusting the content playback application software such that cluster map display area 414 and face cluster display area 431 are displayed on an updatable user interface window as taught by Wagner.  Pet. 72 (citing Ex. 1004 ¶¶ 232–248, Figs. 17–21; Ex. 1006 ¶¶ 4, 45, 108–109, 115, 120, 128, 130–132, Fig. 1C).

With respect to Gilley,  Petitioner explains that the techniques would have adjusted the Okamura-Flora content playback application's software such that face cluster display area 431 displays thumbnail images 432 of people's faces along with the name of each person adjacent to each thumbnail image.  Pet. 91 (citing Ex. 1004 ¶ 247, Figs. 20, 21; Ex. 1007, Abstract, ¶¶ 2, 5, 15, 99–103, Figs. 7, 8).

Petitioner explains that a person of ordinary skill in the art would have recognized the combination's results would have been predictable, such as using Flora's geographic map 46 with icons 58 and 59 and media viewer 64 to organize and display Okamura's content on cluster map display area 414 according to location associated with the content.  Pet. 26 (citing Ex. 1004 ¶¶ 18, 91–93, 103–106, 110, 123, 130, 135–143, 213–220, 225, 232–241, 267; Ex. 1005, 3:40–45, 6:66–7:52, Fig. 3; Ex. 1002 ¶ 84).  Petitioner explains this is because Okamura organizes and displays content based on the location at which content was captured, and Flora organizes and displays content according to its associated location using an interactive map.  Pet. 26.

IPR2021-01413
Patent 10,621,228 B2

Petitioner also indicates that a person of ordinary skill in the art would have had a reasonable expectation of success in combining the prior art's teachings in this manner, in part because the combination's results would have been predictable, for example in the case of Okamura and Flora, the references relate to organizing content according to location associated with the content. Pet. 38–39.

Petitioner indicates combining the teachings of the prior art would have been routine to a person of ordinary skill because of this overlap and the simple software modifications required, for example, to adjust cluster map display area 414 to include Flora's teachings. *Id.* at 26–27.

Petitioner's position is corroborated by the testimony of Dr. Bederson, which we credit, as it is consistent with the teachings of Okamura, Flora, Wagner, and Gilley, the analysis is well-reasoned and supported by the evidence of record. *See* Ex. 1002 ¶¶ 81–86, 91–99, 123–125, 128–134, 154–160, 163; Ex. 1038 ¶¶ 38, 55–56, 60, 67, 70, 75.

Patent Owner argues that "Okamura teaches away from Petitioner's proposed use of Flora's scalable geographic map because a POSITA 'would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant.'" PO Resp. 44.

Patent Owner argues that Okamura expressly disparages the use of geographic maps of the type used by Flora. PO Resp. 40 (citing Ex. 2038 ¶ 110). Patent Owner argues that Okamura states that using a geographic map makes it necessary to display the map at a scale sufficiently large to show the countries of the world to convey correspondence between images

97

IPR2021-01413
Patent 10,621,228 B2

taken in one vicinity and the vicinity where images are taken in other regions.  PO Resp. 40 (citing Ex. 1004 ¶ 9).  Patent Owner argues that this makes it difficult to intuitively grasp the geographical correspondence between individual contents.  PO Resp. 40 (citing Ex. 1004 ¶ 8).

Patent Owner argues that Okamura also warns that the ability to zoom in on a scalable geographic map creates problems because at this scale it is not possible to display the generated positions of images taken in other regions on a map.  PO Resp. 40 (citing Ex. 1004 ¶ 10).  For these reasons, Patent Owner argues, Okamura recommends using maps corresponding to individual clusters, such as the static cluster map matrix of Fig. 18, so that the user can easily visualize the relative locations of various content.  PO Resp. 40–41 (citing Ex. 1004 ¶¶ 213–215).  Patent Owner provides the testimony of Dr. Reinman in support of its position.  Ex. 2038 ¶¶ 102–133.

To teach away, however, a reference must actually "criticize, discredit, or otherwise discourage" investigation into the claimed solution. *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004).  A reference does not teach away if it merely expresses a general preference for an alternative invention from amongst options available to the ordinarily skilled artisan, and the reference does not discredit or discourage investigation into the invention claimed.  *Id.*

Here, Patent Owner argues that "Okamura states that using a geographic map makes it 'necessary to display the map at a scale sufficiently large to show the countries of the world' to convey 'correspondence between images taken in Tokyo and its vicinity and images taken in other regions,'" and that this "makes it difficult to intuitively grasp the geographical

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

correspondence between individual contents." PO Resp. 40 (citing Ex. 1004
¶¶ 8–9). Patent Owner argues that "Okamura also warns that the ability to
zoom in on a scalable geographic map created problems because at this
scale, "it is not possible to display the generated positions of images taken in
other regions . . . on the map" and that "Okamura recommends using 'maps
corresponding to individual clusters.'" PO Resp. 40 (citing Ex. 1004 ¶¶ 10,
213–215).

Okamura's choice to use a display of cluster maps as index images,
however, is not a "teaching away" as Patent Owner argues. Okamura is
expressing a preference for an alternative way of displaying images
representing content associated with positions on a map. Okamura explains
that "it is important to be able to easily grasp the correspondence between a
plurality of contents on the map, and each individual content" and so
chooses to use a cluster map of index images. *See* Ex. 1004 ¶¶ 11, 234–241.

Okamura, however, does not overtly "criticize, discredit, or otherwise
discourage" investigation into the use of a scalable map for such a display as
Patent Owner argues and it certainly does not criticize, discredit or disparage
the combination proposed by Petitioner. *See, e.g.,* Ex. 1038 ¶¶ 50–60.
Moreover, some of Okamura's embodiments describe the use of maps with
changing or differing scales as a way of displaying their information. *See,
e.g.,* Ex. 1004 ¶¶ 19–20, 93, 215, 219. For example, Okamura uses the very
characteristics Patent Owner says it disparages. Okamura's first
embodiment displays content organized by location, where "cluster map
display screen 480 is provided with list display area 481 and map display
area 482." Ex. 1004 ¶ 275–281, Figs. 27A, 27B. *See In re Gurley*, 27 F.3d

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

551, 552–553 (Fed. Cir. 1994) (reference's "statement of inferiority" does not teach away where reference utilized alleged inferior aspect).

Patent Owner also asserts that "Petitioner separately provides reasons to combine (1) Okamura, Flora and Wagner and (2) Okamura, Flora and Gilley," but "Petitioner does not provide an independent rationale for combining Okamura, Flora, Wagner *and* Gilley." PO Resp. 76. Patent Owner, however, provides no argument or discussion related to this point and cites to no particular authority to support it.

Significantly, the Federal Circuit has stated,

we have repeatedly held that an implicit motivation to combine exists not only when a suggestion may be gleaned from the prior art as a whole, but when the 'improvement' is technology-independent and the combination of references results in a product or process that is more desirable, for example because it is stronger, cheaper, cleaner, faster, lighter, smaller, more durable, or more efficient. Because the desire to enhance commercial opportunities by improving a product or process is universal—and even common-sensical—we have held that there exists in these situations a motivation to combine prior art references even absent any hint of suggestion in the references themselves. In such situations, the proper question is whether the ordinary artisan possesses knowledge and skills rendering him *capable* of combining the prior art references.

*Dystar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick,* 464 F.3d 1356, 1368, (Fed. Cir. 2006).

Patent Owner has not argued that the ordinary artisan in this field of endeavor does not possesses the knowledge and skills rendering him *incapable* of combining the prior art references. Indeed, the level of ordinary skill here is a person with a bachelor's degree in computer science, electrical engineering, or a related field, with two years of academic or

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

industry experience in software development related to content management systems and user interfaces. *See* Sec. II.B, above. Dr. Bederson testifies that a person of ordinary skill in the art "would have combined Okamura and Flora . . . *using known programming techniques*, adjusting the software of Okamura's content playback application such that cluster map display area 414 includes Flora's teachings" and "would have recognized the combination's results would have been predictable . . . because it is simple substitution of one known element . . . for another." Ex. 1002 ¶¶ 83, 84, 86 (emphasis added).

Here, Petitioner provides a proposed combination of prior art that is supported by the evidentiary record, and is explained in ample detail by the reasoned testimony of Dr. Bederson. Petitioner also identifies a number of benefits of the proposed combination that would have served as a reasoned basis for a person of ordinary skill in the art to combine the prior art in the manner described in the Petition.

As Petitioner explains, for example, the combination of Okamura and Flora enhances how Okamura displays content associated with various locations, using Flora's scalable geographic map with icons and media viewer, thus improving user experience. Pet. 24 (citing Ex. 1002 ¶ 82). Displaying locations where Okamura's content has been captured on a scalable map allows a user to view the content captured at a specific location using a media viewer, which provides a user with improved awareness regarding locations associated with content. Pet. 24–25 (citing Ex. 1005, 1:56–55, 2:2–9, 3:22–46; Ex. 1002 ¶ 82). Flora's system improves how a user views content organized by location, allowing a user to interface with a

<div align="center">101</div>

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

map displaying content and facilitating access to content associated with locations on an electronic map. Pet. 25 (citing Ex. 1005, 1:56–55, 2:2–9, 3:22–46; Ex. 1002 ¶ 82). Wagner's teachings of providing an interface updated to display different screens allows for a more efficient method and interface for displaying and navigating through content and can conserve power and increase the time between battery charges for the computing device displaying the interface. Pet. 71 (citing Ex. 1006 ¶¶ 6–7, 13). Gilley displays the name a person next to a thumbnail image representing a set of content, so that including that person would have helped a user understand how content is organized and which content features specific people identified by name, providing an intuitive system that improves content management system accessibility. Pet. 88, 90 (citing Ex. 1002 ¶¶ 152–154).

Petitioner also explains how a person of ordinary skill in the art would have combined the references using known programming techniques, such as adjusting the software of Okamura's content playback application so that cluster map display area 414 includes Flora's teachings. Pet. 25 (citing Ex. 1004 ¶¶ 232–241). Petitioner explains that such modifications would have been routine simple software modifications (Pet. 26–27), with predictable results (Pet. 26 (citing Ex. 1004 ¶¶ 18, 91–93, 103–106, 110, 123, 130, 135–143, 213–220, 225, 232–241, 267; Ex. 1005, 3:40–45, 6:66–7:52, Fig. 3; Ex. 1002 ¶ 84)), and that a person of ordinary skill in the art would have had a reasonable expectation of success in combining the prior art's teachings in this manner (Pet. 38–39).

Based upon consideration of the entire record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that a

IPR2021-01413
Patent 10,621,228 B2

person of ordinary skill in the art at the time of the invention would have had sufficient reason to combine the teachings of Okamura, Flora, Wagner, and Gilley in the manner proposed and would have had a reasonable expectation of success in doing so.

### 3.  Conclusion as to Claim 1

Based upon consideration of the entire record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Okamura, Flora, Wagner, and Gilley meet the recited limitations of independent claim 1.  We are also persuaded that a person of ordinary skill in the art would have had sufficient reason to combine the teachings of the asserted art in the manner described in the Petition and would have had a reasonable expectation of success in doing so.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that independent claim 1 is unpatentable under 35 U.S.C. § 103(a) as obvious over the combined teachings of Okamura, Flora, Wagner, and Gilley.

### 4.  Dependent Claims 2–7

Petitioner argues that Okamura, Flora, Wagner, and Gilley teach the recited limitations of dependent claims 2–7.  Pet. 62–69, 85, 94, 96.

### a)  Claim 2

Dependent claim 2 recites "*[t]he method of claim 1, wherein the map view further includes a first indication feature associated with the first location selectable thumbnail image, the first indication feature being based on a number of digital files in the first set of digital files*."

Petitioner asserts that the combination of Okamura and Flora teaches claim 2.  Pet. 62.  Petitioner asserts that Okamura displays "'information

103

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

418' including 'the number of contents [] belonging to a cluster corresponding to the cluster map 417.'" *Id.* (citing Ex. 1004 ¶ 240, Fig. 19). In Figure 19's example, "28" is the number of content files for the grayed cluster map. *Id.*

> Petitioner asserts that
>
> [i]n the Okamura and Flora combination, Okamura's cluster map display area 414 (*the map view*) displays content organized by location using Flora's geographic map 46 and media viewer 64, where Okamura's content is indicated at various locations on the map by Flora's icons 58 and 59. [Pet.] Section VI.A.3.c. Combining Okamura's teachings regarding displayed information 418 with Flora would have resulted in Okamura's cluster map display area 414 (*the map view*) including Okamura's displayed information 418 showing the number of contents being displayed with Flora's icons 58 and 59, including the first of icons 58 and 59; thus, the first icon would include Okamura's displayed information 418 showing the number of contents associated with that first icon (*includes a first indication feature associated with the first location selectable thumbnail image*), where the displayed information 418 for the first icon (*the first indication feature*) shows the number of files in the first set of digital files at the location associated with the first icon (*being based on a number of digital files in the first set of digital files*). *Id.*; EX1004, ¶0240, Fig. 19; [Pet.] Section VI.A.3.c-VI.A.3.d, VI.A.3.g. Information 418 showing the number of contents of each icon, including that for the first icon (*the first indication feature*), would have been connected to each of icons 58 and 59, including the first icon, by overlapping each icon as shown by Okamura in Figures 19-21 below. EX1004, Figs. 19-21 (showing information 418 and 433 overlapping an associated cluster map).

Pet. 63.

> Petitioner's position is supported by the testimony of Dr. Bederson.

*See* Ex. 1002 ¶¶ 123–125.

IPR2021-01413
Patent 10,621,228 B2

Patent Owner argues that "[b]ecause Petitioner has failed to carry its burden . . . as to claim 1, Petitioner has also failed to do so in relation to dependent claims 2–7 as they incorporate the same limitations." PO Resp. 64. Patent Owner's argument, however, is premised on an incorrect assumption, because we have found that Petitioner has met its burden with respect to claim 1. *See* Sec. II.E.3.

Based on the complete record and for the reasons we discuss, we find that Petitioner has demonstrated that the combination of Okamura and Flora meets the limitations of dependent claim 2.

> b) *Claim 3*

Dependent claim 3 recites "*[t]he method of claim 2, wherein the first indication feature is connected to the first location selectable thumbnail image.*"

Petitioner asserts that the combination of Okamura and Flora teaches claim 3. Pet. 66. Petitioner argues that "the combination of Okamura and Flora provides that information 418 for each icon, including information 418 for the first icon (*the first indication feature*), would have been connected to each of icons 58 and 59, including the first icon (*the first location selectable thumbnail image*), by overlapping each icon (*is connected to the first location selectable thumbnail image*). *Id.* at 66–67.

Patent Owner argues that "[n]owhere does Okamura teach that the cluster map display area 414 (*map view*) displayed in response to the PLACE tab 413 (*first input*) includes a first indication feature that is "connected to" a first thumbnail image on an interactive map. PO Resp. 65 (citing Ex. 2038 ¶ 155). "To include number of contents information 418," Patent Owner argues, "Okamura teaches that the user must first provide an

IPR2021-01413
Patent 10,621,228 B2

*entirely separate input* that involves placing "the mouse ... over a cluster map 417 by a user operation." PO Resp. 65. "The 'user operation' of placing 'the mouse ... over a thumbnail image 432' is not the PLACE tab 413 Petitioner identified as the claimed 'first input.'" *Id.* at 66.

Patent Owner misapprehends the combination of Okamura and Flora described by Petitioner. The Petition explains that Okamura's teaches depressing the "PLACE" tab (*first input*) which causes the display of cluster map display area 414, and in the combination Okamura's display area 414 (*the map view*) displays content indicated at various locations on Flora's geographic map 46 by icons 58 and 59. *See* Pet. 14–18, 62–67. Okamura's information 418 teaches displaying the number of contents for each icon and would have been connected to each icon by overlapping as taught by Okamura's Figures 19–21. *Id.* That Okamura also teaches a feature whereby a user operation, such as a mouse movement, may display information 418 is not part of Petitioner's combination and therefore not relevant to Petitioner's proposed combination, which simply utilized the teaching that information 418 is displayed in overlapping form. *Id.*; *see also* Ex. 1038 ¶ 72. Dr. Bederson's testimony is consistent with this understanding, which we credit. *See id.*

Based on the complete record and for the reasons we discuss, we find that Petitioner has demonstrated that the combination of Okamura and Flora meets the limitations of dependent claim 3.

c) *Claim 4*

Dependent claim 4 recites "*[t]he method of claim 2, wherein the first indication feature includes a first number indicative of the number of digital files in the first set of digital files.*"

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

Petitioner asserts that the combination of Okamura and Flora teaches claim 4.  Pet. 67.  Petitioner argues that "[i]n the combination, Okamura's displayed information 418 for the first icon (*the first indication feature*) shows the number of files in the first set of digital files at the location associated with the first icon (*includes a first number indicative of the number of digital files in the first set of digital files*)."  *Id.* (citing Ex. 1004 ¶ 240, Fig. 19; [Pet.] Section VI.A.3.c-VI.A.3.d, VI.A.3.g, VI.A.4).

Patent Owner argues that "[b]ecause Petitioner has failed to carry its burden . . . as to claim 1, Petitioner has also failed to do so in relation to dependent claims 2–7 as they incorporate the same limitations."  PO Resp. 64.  Patent Owner's argument, however, is premised on an incorrect assumption, because we have found that Petitioner has met its burden with respect to claim 1.  *See* Sec. II.E.3.

Based on the complete record and for the reasons we discuss, we find that Petitioner has demonstrated that the combination of Okamura and Flora meets the limitations of dependent claim 4.

### d)  Claim 5

Dependent claim 5 recites "*[t]he method of claim 2, wherein the map view further includes a second indication feature associated with the second location selectable thumbnail image, the second indication feature being based on a number of digital files in the second set of digital files.*"

Petitioner asserts that the combination of Okamura and Flora teaches claim 5.  Pet. 67.  Petitioner argues that in the combination,

Okamura's cluster map display area 414 (*the map view*) includes Okamura's displayed information 418 displayed with Flora's icons 58 and 59, including the second of the icons 58 and 59; thus, the second icon would include Okamura's displayed

107

IPR2021-01413
Patent 10,621,228 B2

> information 418 showing the number of contents associated with
> the second icon (*includes a second indication feature associated
> with the second location selectable thumbnail image*) where
> displayed information 418 for the second icon shows the number
> of files in the second set of digital files at the location associated
> with the second icon (*being based on a number of digital files in
> the second set of digital files*).

*Id.* (citing Ex. 1004 ¶ 240, Fig. 19; [Pet.] Sections VI.A.3.e, VI.A.3.j, VI.A.4).

Patent Owner argues that "[n]owhere, however, does Okamura teach that its cluster map display area 414 (*map view*) includes both a "first indication feature" and "second indication feature" in the same view. PO Resp. 67 (citing Ex. 2038 ¶ 161). Patent Owner argues that "Okamura states that to include number of contents information 418, the user must first provide an *entirely separate input* that involves placing "the mouse ... over a cluster map 417 by a user operation," and "doing so displays a number of contents indication for one location thumbnail image only – e.g. only the 'first location selectable thumbnail image.'" PO Resp. 67 (citing Ex. 2038 ¶ 162). Patent Owner also argues that "[n]owhere, however, does Okamura disclose or suggest any means for simultaneously including two indication features in that same view using Okamura's cursor. PO Resp. 67 (citing Ex. 2038 ¶ 163).

We disagree with Patent Owner. First, as we previously discussed, Claim 1 does not include the term "*simultaneously*" that Patent Owner seeks to add, nor can the claim be reasonably read to impose such a requirement. *See* Sec. II.E.1.c.3, above. The same analysis applies equally as well to dependent claim 5.

IPR2021-01413
Patent 10,621,228 B2

Moreover, Patent Owner's argument is flawed because Okamura's displayed information 418 shows the number of contents associated with both the first and second of icons 58 and 59 (*first indication feature* and *second indication feature*) displayed for each icon. As Dr. Bederson explains,

> in the combination, "Okamura's displayed information 418 showing the number of contents [][is] displayed with Flora's icons 58 and 59," where Okamura's cluster map display area 414 includes "displayed information 418 for the first icon (*the first indication feature*) [that] shows the number of files in the first set of digital files at the location associated with the first icon" and "displayed information 418 for the second icon [*the second indication feature*] [that] shows the number of files in the second set of digital files at the location associated with the second icon." *Id.*, 63, 68. Thus, a POSITA would have understood or at least found obvious that in the combination, because information 418 displaying contents is displayed with each of Flora's icons 58 and 59 (which includes the *first* and *second* claimed *thumbnail images*), *the first indication feature* and *the second indication feature* are provided for each of the icons.

Ex. 1038 ¶ 73.

Based on the complete record and for the reasons we discuss, we find that Petitioner has demonstrated that the combination of Okamura and Flora meets the limitations of dependent claim 5.

> *e)  Claim 6*

Dependent claim 6 recites "*[t]he method of claim 5, wherein the second indication feature is connected to the second location selectable thumbnail image.*"

Petitioner asserts that the combination of Okamura and Flora teaches claim 6. Pet. 68. Petitioner argues that "[i]nformation 418 of the second

109

IPR2021-01413
Patent 10,621,228 B2

icon (*the second indication feature*) would have been connected to the second icon (*connected to the second location selectable thumbnail image*) for the same reasons discussed in [the Petition] Section VI.A.4. *Id.*

Patent Owner argues "[b]ecause Petitioner has failed to carry its burden . . . as to claim 5 Petitioner has also failed to do so in relation to dependent claims 6 and 7 as they depend on claim 5 and incorporate the same limitations." PO Resp. 68.

Patent Owner's argument, however, is premised on an incorrect assumption, because we have found that Petitioner has met its burden with respect to claim 5. *See* Sec. II.E.4.d, g.

Based on the complete record and for the reasons we discuss, we find that Petitioner has demonstrated that the combination of Okamura and Flora meets the limitations of dependent claim 6.

     *f)   Claim 7*

Dependent claim 7 recites "*[t]he method of claim 5, wherein the second indication feature includes a second number indicative of the number of digital files in the second set of digital files.*"

Petitioner asserts that the combination of Okamura and Flora teaches claim 7. Pet. 69. Petitioner argues that "[i]n the combination, Okamura's displayed information 418 for the second icon (*the second indication feature*) shows the number of files in the second set of digital files at the location associated with the second icon (*includes a second number indicative of the number of digital files in the second set of digital files*). *Id.* (citing Ex. 1004 ¶ 240, Fig. 19; [Pet.] Section VI.A.3.c- VI.A.3.e, VI.A.3.i-VI.A.3.j, VI.A.7).

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

Patent Owner argues that "[b]ecause Petitioner has failed to carry its burden . . . as to claim 5 Petitioner has also failed to do so in relation to dependent claims 6 and 7 as they depend on claim 5 and incorporate the same limitations." PO Resp. 68.

Patent Owner's argument, however, is premised on an incorrect assumption, because we have found that Petitioner has met its burden with respect to claim 1. *See* Sec. II.E.4.d, g.

Based on the complete record and for the reasons we discuss, we find that Petitioner has demonstrated that the combination of Okamura and Flora meets the limitations of dependent claim 7.

### g) *Conclusion as to Dependent Claims 2–7*

Based upon consideration of the entire record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Okamura, Flora, Wagner, and Gilley meet the recited limitations of dependent claims 2–7. We are also persuaded that a person of ordinary skill in the art would have had sufficient reason to combine the teachings of the asserted art in the manner described in the Petition and would have had a reasonable expectation of success in doing so.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that dependent claims 2–7 are unpatentable under 35 U.S.C. § 103(a) as obvious over the combined teachings of Okamura, Flora, Wagner, and Gilley.

### F. *Other Asserted Grounds*

Petitioner asserts that claims 1–7 of the '228 patent are unpatentable as obvious under 35 U.S.C. § 103 over Okamura and Flora (Ground 1),

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

Okamura, Flora, and Wagner (Ground 2), and Okamura, Flora, and Gilley (Ground 3).  Pet. 4.

Because Petitioner has shown that all of the challenged claims are unpatentable with respect to Ground 4 as discussed above, we do not reach these other asserted grounds.  *See Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984) ("The Commission . . . is at perfect liberty to reach a 'no violation' determination on a single dispositive issue."); *Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) (recognizing that "[t]he Board has the discretion to decline to decide additional instituted grounds once the petitioner has prevailed on all its challenged claims").

G.  *Motion to Exclude*

Petitioner filed a Motion (Paper 44) to exclude exhibits 2041, 2042, and 2045, arguing that Patent Owner improperly filed the exhibits with its Sur-Reply (Paper 35) in violation of 37 C.F.R. § 42.23(b) (2020), which states in part that "[a] sur-reply may only respond to arguments raised in the corresponding reply and may not be accompanied by new evidence other than deposition transcripts of the cross-examination of any reply witness." Petitioner states that the exhibits are not deposition transcripts, and must be excluded.  Paper 44, 2.

Patent Owner filed an Opposition (Paper 45), explaining that Patent Owner "introduced and cross-examined Dr. Bederson regarding each of the contested exhibits to test the opinions of Dr. Bederson's Second declaration (EX1038)."  Paper 45, 1.  Patent Owner does not contest that the exhibits are not deposition transcripts.  *Id.*

112

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

The documents in question, Exhibits 2041, 2042, and 2045, were not relied upon by the Panel in arriving at its Decision in this matter. Therefore, Petitioner's motion to exclude is *denied* as moot.

## III. CONCLUSION

For the foregoing reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1–7 of U.S. Patent No. Patent 10,621,228 B2 are unpatentable on the bases set forth in the following table.[8]

------

[8] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Final Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

113

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–7 | 103(a) | Okamura, Flora[9] | | |
| 1–7 | 103(a) | Okamura, Flora, Wagner | | |
| 1–7 | 103(a) | Okamura, Flora, Gilley | | |
| 1–7 | 103(a) | Okamura, Flora, Wagner, Gilley | 1–7 | |
| **Overall Outcome** | | | 1–7 | |

[9] Because each of the challenged claims is held unpatentable on the ground combining Okamura, Flora, Wagner, and Gilley as a basis for unpatentability, we do not reach the other asserted grounds in the Petition.

114

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2

## IV.  ORDER

In consideration of the foregoing, it is hereby

ORDERED that Petitioner has demonstrated by a preponderance of the evidence that claims 1–7 of U.S. Patent No. Patent 10,621,228 B2 are unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude (Paper 44) is *denied* as moot;

FURTHER ORDERED that the parties shall, no later than 14 days from the entry of this Decision, jointly email a proposed redacted version of this Decision, which identifies proposed redactions with red highlighting,  to trials@uspto.gov; and

FURTHER ORDERED that because this is a Final Written Decision, any party to the proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

IPR2021-01413
Patent 10,621,228 B2


PETITIONER:

Ellyar Y. Barazesh
Ashraf Fawzy
UNIFIED PATENTS, LLC
ellyar@unifiedpatents.com
afawzy@unifiedpatents.com


PATENT OWNER:

Jennifer Hayes
George Dandalides
NIXON PEABODY LLP
jenhayes@nixonpeabody.com
gdandalides@nixonpeabody.com

Trials@uspto.gov                                          Paper 56
571-272-7822                                    Entered: March 8, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

UNIFIED PATENTS, LLC,
Petitioner,

v.

MEMORYWEB, LLC,
Patent Owner.

———————————

IPR2021-01413
Patent 10,621,228 B2

———————————

Before LYNNE H. BROWNE, NORMAN H. BEAMER, and
KEVIN C. TROCK, *Administrative Patent Judges.*

TROCK, *Administrative Patent Judge.*


ORDER
Identifying Real Party in Interest
*37 C.F.R. §§ 42.5, 42.8*

IPR2021-01413
Patent 10,621,228 B2

### A.    Background

Petitioner, Unified Patents, LLC, filed a Petition (Paper 2, "Pet." or "Petition") to institute *inter partes* review of claims 1–7 ("the challenged claims") of U.S. Patent No. 10,621,228 B2 (Ex. 1001, "the '228 patent"). The Petition states that "[p]ursuant to 37 C.F.R. § 42.8(b)(1), Unified Patents, LLC ("Unified" or "Petitioner") certifies that Unified is the real party-in-interest and certifies that no other party exercised control or could exercise control over Unified's participation in this proceeding, filing this petition, or conduct in any ensuing trial."  Pet. 1.

Patent Owner, MemoryWeb, LLC, filed a Preliminary Response. Paper 8 ("Prelim. Resp.").  In its Preliminary Response, Patent Owner argued that "Apple and Samsung[1] should have been [named] as RPIs [(real parties in interest)] in this proceeding, and the failure to identify Apple and Samsung is a basis for the Board to deny institution pursuant to 35 U.S.C. § 312."  Prelim. Resp. 28; *see also id.* at 22–28.

We authorized additional preliminary briefing to allow the parties to address this issue, as well as other issues.  Ex. 1020.  Petitioner subsequently filed a Preliminary Reply (Paper 11), and Patent Owner filed a Preliminary Sur-reply (Paper 13), further addressing the RPI issue.  *See* Paper 11, 1–8; Paper 13, 6–7.

In its Preliminary Reply, Petitioner argued that "Patent Owner's (PO's) RPI arguments should be rejected as inappropriate or, at best,

---

[1] We infer from the record that Patent Owner is referring to Samsung Electronics Co., Ltd. ("Samsung") and Apple, Inc. ("Apple").  *See* Section B, below.

2

IPR2021-01413
Patent 10,621,228 B2

premature.  As is the case here, the Board need not address whether a party
is an unnamed RPI where no time bar or estoppel provisions under
35 U.S.C. § 315 are implicated."  Paper 11, 1 (citing *SharkNinja Operating
LLC v. iRobot Corp.*, IPR2020-00734, Paper 11 at 18 (PTAB, Oct. 6, 2020)
(precedential) (*"SharkNinja"*); *Unified Patents, LLC v. Fat Statz, LLC*,
IPR2020-01665, Paper 19 at 2–3 (PTAB, Apr. 16, 2021)).

Based upon the preliminary record at that time, we instituted *inter
partes* review on all the challenged claims on the grounds presented in the
Petition, but declined to determine whether Apple and Samsung were real
parties in interest.  *See* Paper 15 ("Dec." or "Decision").  We declined to
decide the real party in interest question at that time partly because
determining whether a non-party is an RPI is a highly fact-dependent
question and the case was still in its preliminary stage without a fully
developed factual record.  Moreover, we determined that we need not
address the RPI issue at that time because there was no allegation of a time
bar or estoppel that would preclude *this* proceeding.  Accordingly, under the
Board's precedential decision in *SharkNinja*, IPR2020-00734, Paper 11 at
18, we declined to decide the RPI issue at that time.  *See* Paper 15, 11–14.

After institution, Patent Owner filed a Response (Paper 23, "PO
Resp."), Petitioner filed a Reply (Paper 29, "Pet. Reply"), Patent Owner
filed a Sur-reply (Paper 35, "PO Sur-reply"), and with our authorization,
Petitioner filed a Sur-sur-reply (Paper 42, "Pet. Sur-sur-reply").

In its Response, Patent Owner raises the RPI issue again, asserting
that "Petitioner has failed to name all real parties-in-interest ("RPIs"),
including at least Samsung and Apple," but this time implicating estoppel

3

IPR2021-01413
Patent 10,621,228 B2

under 35 U.S.C. § 315. *See* PO Resp. 14–26. Patent Owner now argues that "the Board should find that Apple and Samsung are estopped from challenging the validity of claims 1-7 of the '228 patent in related proceedings: *Apple Inc. v. MemoryWeb, LLC*, IPR2022-00031 (the "Apple IPR"); *Samsung Electronics Co., Ltd., v. MemoryWeb, LLC*, IPR2022-00222 (the "Samsung IPR") (collectively, the "Related IPRs")." *Id.* at 14–15.

Patent Owner argues that "a petitioner—and any RPIs—are estopped from maintaining a follow-on IPR challenging the same claims when the first IPR results in a final written decision." PO Resp. 16 (citing *Intuitive Surgical, Inc. v. Ethicon LLC*, No. IPR2018-01248, Paper 34, 10-18 (PTAB Feb. 6, 2020) (terminating petitioner from IPR based on final written decision in earlier IPR challenging same claims). *Id.* at 16.

Patent Owner asserts that

Apple and Samsung filed their own follow-on IPRs challenging all claims of the '228 patent. Paper 15, 12 n.2. If (1) this IPR results in a final written decision and (2) Apple and Samsung are RPIs (which they are), Apple and Samsung would be estopped from maintaining their IPRs against claims 1-7 of the '228 patent.

PO Resp. 16 (citing 35 U.S.C. § 315(e)(1)).

In its Reply, Petitioner asserts that "Unified is the sole RPI, making questions of estoppel under §315(e) irrelevant." Pet. Reply 33. Petitioner argues that

prospectively finding that RPIs would be hypothetically estopped from maintaining their proceedings under §315(e)(1) . . . would both apply to and be considered in those proceedings—not here—and only after a final written decision, if any, issues. That would presuppose future events that may

4

IPR2021-01413
Patent 10,621,228 B2

> never come to pass, making it an inappropriate advisory inquiry
> at this stage.

*Id.* at 33–34 (citing 35 U.S.C. § 315(e)(1); PO Resp. 14–17).

We agree with Patent Owner that it is appropriate to now address the question of whether Unified should have named Apple and Samsung RPIs in this proceeding, for several reasons. We also agree with Petitioner that determining whether Apple or Samsung should be estopped in a subsequent proceeding would be premature. That is a decision best left to those presiding over any subsequent proceeding who would have Apple or Samsung in front of them, which we do not. Moreover, no such estoppel would attach until after a final written decision in this case. *See* 35 U.S.C. § 315(e)(1).

It is appropriate for us to decide the RPI question now because we have a more fully-developed factual record before us, providing us with probative evidence that was not available at the institution phase of this case. For example, during discovery the parties have supplemented the record with Exhibits 1030–1043 and 2027–2047, which includes the deposition transcript of the CEO of Unified (Ex. 2036), as well as other probative evidence on the RPI issue. In addition, on December 16, 2022, an oral hearing was held during which the parties were able to argue the RPI issue before the Board during a confidential session  A transcript of the hearing was made a part of this record. Paper 52 (confidential session), Paper 53 (public session).

Second, Patent Owner now squarely puts the issue before us that "Apple and Samsung's follow-on IPRs challenging the '228 patent *do*

IPR2021-01413
Patent 10,621,228 B2

implicate estoppel" under 35 U.S.C. § 315(e)(1), and because of that "the Board must address whether Apple and/or Samsung are RPIs."  PO Resp. 16.

Third, if we do not decide the RPI issue now, as Patent Owner urges, then the underlying purpose of Section 315(e) would potentially be frustrated.  Determining whether Apple or Samsung are RPIs in this case is a necessary precursor to determining whether they would be estopped in a subsequent proceeding.  Otherwise, Patent Owner may have to continue to unnecessarily defend against two subsequent IPR challenges filed by Apple and Samsung should they have been named as RPIs in this case.

Because the issue of Section 315(e) estoppel has been put before us, and we now have a complete factual record available to fully address the RPI question, and to avoid unnecessary prejudice to Patent Owner should Apple and Samsung be RPIs in this case, we conclude that it is appropriate to now decide whether Apple and Samsung are real parties in interest in this proceeding and whether Unified should have named them as RPIs.

### B.  Related Matters

According to the parties, the '228 patent was asserted in the following district court proceedings:  *MemoryWeb, LLC v. Samsung Electronics Co., Ltd. et al.*, Case No. 6:21-cv-00411 (W.D. Tex.); *MemoryWeb, LLC v. Apple Inc.*, Case No. 6:21-cv-00531 (W.D. Tex.); and *MyHeritage (USA), Inc. et. al. v. MemoryWeb, LLC*, Case No. 1:21-cv-02666 (N.D. Ill.).  Pet. 1–2; Paper 4, 2; Paper 7, 2; Paper 9, 2.

Patent Owner also identifies U.S. Patent No. 9,098,531 ("the '531 patent"), U.S. Patent No. 10,423,658 ("the '658 patent"), U.S. Patent No.

6

IPR2021-01413
Patent 10,621,228 B2

9,552,376 ("the '376 patent"), U.S. Patent No. 11,017,020 ("the '020 patent"), U.S. Patent No. 11,163,823 ("the '823 patent"), pending U.S. Patent Application 17/381,047, and pending U.S. Patent Application 17/459,933 as related to the '228 patent.  Paper 7, 2; Paper 9, 2–3.

Patent Owner additionally indicates the following *inter partes* proceedings as related matters:  *Samsung Electronics Co., Ltd., v. MemoryWeb, LLC*, IPR2022-00222 (PTAB) challenging the '228 patent; *Apple Inc. v. MemoryWeb*, LLC, IPR2022-00031 (PTAB) challenging the '228 patent; *Apple Inc. v. MemoryWeb, LLC*, IPR2022-00111 (PTAB) challenging the '020 patent; *Apple Inc. v. MemoryWeb, LLC*, PGR2022-00006 (PTAB) challenging the '020 patent; *Apple Inc. v. MemoryWeb, LLC*, IPR2022-00033 (PTAB) challenging the '658 patent; and *Apple Inc. v. MemoryWeb, LLC*, IPR2022-00032 (PTAB) challenging the '376 patent. Paper 7, 2; Paper 9, 2–3.

> C.    *Legal Principles*

Our regulations require that parties "identify each real party-in-interest for the party" as part of its mandatory notices, and to timely update any change in the information provided in those notices.  37 C.F.R. §§ 42.8(a), (b)(1) (2023).  The parties have a duty of candor and good faith when they comply with the requirements set forth in Section 42.8.  *See* 37 C.F.R. § 42.11(a) (2023) (stating that parties have a duty of candor and good faith in proceedings).

The mandatory notice provision requiring the identification of all real parties in interest serves important notice functions to patent owners, to identify whether the petitioner is barred from filing a petition because of a

7

IPR2021-01413
Patent 10,621,228 B2

real party in interest that is time-barred or otherwise estopped, and to the
Board, to identify conflicts of interests that are not readily apparent from the
identity of the petitioner. *See NOF Corp. v. Nektar Therapeutics*, IPR2019-
01397, Paper 24 at 6 (PTAB Feb. 10, 2020) (citing Patent Trial and Appeal
Board Consolidated Trial Practice Guide 12 (Nov. 2019) ("*TPG*")).[2]

Whether a non-party is an RPI is a "highly fact-dependent question"
and must be considered on a case-by-case basis. *Ventex Co. v. Columbia
Sportswear N. Am., Inc.*, IPR2017-00651, Paper 152 at 6 (PTAB Jan. 24,
2019) (precedential). With respect to a petition's identification of real
parties in interest, the Federal Circuit has stated that

> [a] petition is presumed to identify accurately all RPIs. *See Zerto,
> Inc. v. EMC Corp.*, Case IPR2014-01295, slip op. at 6–7 (PTAB
> Mar. 3, 2015) (Paper 34). When a patent owner provides
> sufficient evidence prior to institution that reasonably brings into
> question the accuracy of a petitioner's identification of RPIs, the
> overall burden remains with the petitioner to establish that it has
> complied with the statutory requirement to identify all RPIs.

*Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1343 (Fed.
Cir. 2018) ("*AIT*"). In a slightly later case, the Federal Circuit also stated
that

> [a] "petitioner's initial identification of the real parties in interest
> should be accepted unless and until disputed by a patent owner."
> *Worlds Inc. v. Bungie, Inc*., 903 F.3d 1237, 1243 (Fed. Cir.
> 2018). To dispute it, the patent owner "must produce *some*
> evidence that tends to show that a particular third party should be
> named a real party in interest." *Id*. at 1244.

---

[2] Available at
*https://www.uspto.gov/sites/default/files/documents/tpgnov.pdf?MURL=*

IPR2021-01413
Patent 10,621,228 B2

*VirnetX Inc. v. Mangrove Partners Master Fund, Ltd.*, 778 Fed. Appx. 897, 902 (Fed. Cir. 2019) ("*VirnetX*").

D.    Threshold Question

Given this direction, we must first consider the threshold question of whether Patent Owner has produced "some evidence that tends to show that a particular third party should be named a real party in interest" and whether that evidence "reasonably brings into question the accuracy of a petitioner's identification of RPIs" in the Petition. We also keep in mind that "the overall burden remains with the petitioner to establish that it has complied with the statutory requirement to identify all RPIs." *AIT*, 897 F.3d at 1343.

As noted above, Petitioner, as part of its mandatory notice obligations, identified Unified as the only real party in interest in this proceeding. Pet. 1. Since filing the Petition, Petitioner has updated its mandatory notices four times, but on each occasion has indicated that "[n]o updates to the real party-in-interest . . . are made at this time." *See* Papers 6, 14, 17, 39.

Patent Owner disputes Petitioner's identification of Unified as the only real party in interest, and contends that Apple and Samsung must also be identified as RPIs. PO Resp. 14–15. To support this contention, Patent Owner points to evidence indicating that Unified uses a business model that relies on collecting substantial membership fees from paid members, including Apple and Samsung, in exchange for Unified filing validity challenges that benefit its members. PO Resp. 19–20; Ex. 2036, 74:22–75:10; 89:16–23. ███████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

9

IPR2021-01413
Patent 10,621,228 B2

█████████████████████████████

███████████████████. PO Resp. 20; Ex. 1024, 1, 15; Ex. 1025,
1; Ex. 2036, 74:5–10, 75:1–10, 88:25–89:23.

████████████████████████████

████████████████████████████

██████████████████████████████████

████████████████████████████

██████████████████████████████

███████████████████████ Ex. 1024, Sec. 2.2.

███████████████████████

█████████████████████████████

████████████████████████

█████████████████████████

██████████████████████████████

PO Resp. 20–21; Ex. 1024, Sec. 4.1, 4.1(c); Ex. 1025, Sec. 3.1, 3.1(c)).

Unified's website states that "Unified works to reduce NPE activity through

monitoring, market intelligence, analytic tools, prior art, and USPTO

challenges." Ex. 2017, 1. Unified's website also indicates that Unified has

filed "185 IPRs since 2012" and claims a "95% Success Rate in 2020."

Ex. 2018, 1–2.

████████████████████████

██████████████████████████████████

██████ PO Resp. 20; Ex. 2036, 36:5–13; 73:3–75:10; 89:5–23.

██████████████████████████

███████████████████████. PO Resp. 23; Ex. 2036,

10

IPR2021-01413
Patent 10,621,228 B2

131:23–132:2.

████████████████████████████████
██████████████████████████████████████
███████████████ PO Resp. 23; Ex. 2033, 11–12; Ex. 2036, 131:23–132:2,
133:4–15.

███████████████████████████████
███████████████████████████████████████
██████████████████████████████████
██████████████████████████ PO Resp 21; Ex. 2036, 62:19–63:10.

Unified filed this Petition challenging claims 1–7 of the '228 patent on
September 3, 2021.  Paper 2.  Four days after filing the Petition, Unified
emailed Samsung, Apple and other Unified members advising them that
Unified had filed a Petition for IPR challenging the '228 patent that "is
currently asserted against Apple and Samsung."  PO Resp. 21; Ex. 2027;
Ex. 2028; Ex. 2036, 51:13–18, 54:24–55:1.  After institution of this IPR,
Unified again emailed Apple, Samsung and other Unified members, this
time advising them that the '228 patent was "likely invalid."  Ex. 2029.



        Sometime after Unified filed the Petition in this case, ███████
█████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████████████████████████████
████████████████ PO Resp. 22; Ex. 2032; Ex. 2033; Ex. 2036, 98:2–100:7.
According to Patent Owner, ████████████████████████████████
████████████████████████████████████████
██████████████████ PO Resp. 22; Ex. 2033, 20.

11

**Appx137**

IPR2021-01413
Patent 10,621,228 B2

Patent Owner asserts that the fact that Apple and Samsung filed their own petitions for IPR challenging the '228 patent, including the same claims challenged in this proceeding, shows that Apple and Samsung desire review of the '228 patent. PO Resp. 24; s*ee Apple,* IPR2022-00031, Paper 1, 1; *Samsung,* IPR2022-00222, Paper 2, 1.[3] According to Patent Owner, if Unified succeeds in demonstrating that the challenged claims in the current proceeding are unpatentable, Apple and Samsung would benefit directly from that result. PO Resp. 24 (citing *RPX Corp. v. Applications in Internet Time, LLC,* IPR2015-01750, Paper 128 at 24–25 (PTAB Oct. 2, 2020) (precedential) ("*RPX*"); *AIT*, 897 F.3d at 1363).

According to Patent Owner, Unified faces no risk of liability from enforcement of the '228 patent, and the evidence suggests that Unified may have selected the '228 patent to challenge based, at least in part, on the fact that Patent Owner was enforcing the '228 patent against Unified's members, Apple and Samsung. PO Resp. 24–25. Patent Owner argues that Unified's interest in filing this IPR includes using this IPR to promote its services to existing members and potential new members. *Id.* at 25; *see also* Ex. 2018, 1 ("Unified has filed more patent challenges than all other third-party petitioners combined . . . we have successfully neutralized more patents than any other third-party."); Ex. 2033, 3, 17–20.

The evidence suggests that Unified's operations and communications with its members may have been crafted with an eye toward RPI

---

[3] We note for the record that claims 1–19 of the '228 patent are challenged in both IPR2022-00031 and IPR2022-00222.

IPR2021-01413
Patent 10,621,228 B2

identification requirements, which Patent Owner argues is to avoid the appearance of influence or control by Unified's member companies.  PO Resp. 25–26; *see also* Paper 11, 4 ("███████████████████████████ █████████████████████████████████████████ ████████████").  Unified's CEO has stated that "legal rules concerning estoppel, time bars, and real party-in-interest (RPI) are important issues considered any time an IPR is filed. . . . Unified Patents is well-aware of these issues, and has carefully structured our solution to comply with all of the existing legal requirements to file administrative challenges as the sole RPI." Ex. 2011, 1.

Nonetheless, according to Unified, its strategic operating "structure provides complete alignment between Unified Patents and its member companies." Ex. 2016, 1.  Such a structure suggests independence, but also suggests that a reason for such an arrangement is to enable Unified to file IPRs that directly benefit its members without having to name those members as RPIs.

Taken together, the evidence identified and argued by Patent Owner supports its assertion that Apple and Samsung are potential beneficiaries to this proceeding, and have preexisting, established relationships with Petitioner.  The evidence also supports Patent Owner's contention that Apple and Samsung should have been named as real parties in interest in this case. The evidence reasonably calls into question the accuracy of Petitioner's identification of Unified as the sole RPI in this proceeding.

13

IPR2021-01413
Patent 10,621,228 B2

### E.    Identifying RPIs

Having resolved the threshold question, we now consider the question of whether Petitioner has complied with its obligation to "identify each real party-in-interest." 37 C.F.R. §§ 42.8 (2023); *AIT*, 897 F.3d at 1343 ("the overall burden remains with the petitioner to establish that it has complied with the statutory requirement to identify all RPIs").

As stated by the Federal Circuit, "[d]etermining whether a non-party is a 'real party in interest' demands a flexible approach that takes into account both equitable and practical considerations, with an eye toward determining whether the non-party is a clear beneficiary that has a preexisting, established relationship with the petitioner." *AIT*, 897 F.3d at 1351.

In *RPX*, the Board considered a number of factors to determine whether an unnamed third-party should have been named as an RPI in a proceeding. The factors[4] relevant to the inquiry here would include: (a) Unified's business model, including the nature of Unified as an entity; (b) Unified's interests in the IPR; (c) whether, and under what circumstances, Unified takes a particular member's interests into account when determining whether to file IPR petitions; (d) Apple and Samsung's relationship with Unified; (e) Apple and Samsung's interest in and potential benefit from the

_____

[4] We recognize that some of the factors we consider, such as "control," are not among the enumerated factors listed in the "Factual Findings" section of the *RPX* decision. *See RPX*, IPR2015-01750, Paper 128 at 10. However, the issue of "control" is discussed in the "Analysis" section of that case and these factors are relevant to the RPI inquiry here. *See id.* at 32–33; *see also TPG* at 15–17.

14

IPR2021-01413
Patent 10,621,228 B2

IPR; (f) whether Unified can be said to be representing that interest; (g) whether Apple and Samsung actually desired review of the '228 patent; (h) whether Apple, Samsung, and Unified have any board members in common; (i) any communications between Unified, Apple, and Samsung; and (j) whether Apple or Samsung funded, directed, influenced, or exercised control over Unified's participation in this IPR. *See RPX*, IPR2015-01750, Paper 128 at 10 (citing *AIT*, 897 F.3d at 1358)[5]; *TPG* at 12–18.

    F.    *Parties' Arguments*

    *1.*    *Petitioner's Arguments*

Unified argues that Patent Owner "alleges Apple and Samsung should be [named] RPI[s] using the same arguments the Board has routinely rejected" and "has not alleged or submitted any evidence of direction, control, joint funding, or any relevant communication or coordination between Unified and any other entity." Pet. Reply 22–23 (citing *Unified v. Arigna Tech. Ltd.*, IPR2022-00285, Paper 10, 6-7 (PTAB June 17, 2022); *Unified Patents, LLC v. Intellectual Ventures II*, LLC, IPR2022-00429, Paper 12, 10-11 (PTAB 2022); *Unified Patents Inc. v. Barkan Wireless IP Holdings, LP*, IPR2018-01186, Paper 57, 3-12 (PTAB Dec. 4, 2019), *aff'd*, 838 F'Appx 565 (Fed. Cir. 2021); *Unified Patents, LLC v. American Patents, LLC*, IPR2019-00482, Paper 115, 40-52 (PTAB Aug. 13, 2020).[6]

---

[5] We recognize that the *AIT* and *RPX* decisions involved a question of 35 U.S.C § 315(b) estoppel, which is not at issue in this proceeding. Nonetheless, we understand the RPI analysis to be equally applicable here.

[6] We acknowledge that the Board decisions cited by Petitioner here determined that Unified was the sole RPI in those cases. However, two of these cases are Decisions on Institution, (IPR2022-00429; IPR2022-00285),

IPR2021-01413
Patent 10,621,228 B2

Unified asserts that its "decision to challenge the '228 Patent was without the insight, assistance, or approval from any member, and was not in furtherance of any member's stated or implied benefit." *Id.* at 25 (citing Ex. 1023 ¶ 13).

According to Unified, "(1) no member made Unified aware of, or expressed any interest in, the ['228] patent or [Patent Owner]; (2) Unified never sought to ascertain the desires of any third-party regarding the ['228] patent; and (3) Unified does not and cannot know if there is a specific benefit to any individual members from this IPR." Pet. Reply 25 (citing Ex. 1023 ¶ 13). "Unified had no knowledge of Apple and Samsung's desires regarding the '228 patent when filing [this Petition]. Unified never communicated with or conveyed any of its plans regarding the '228 patent to any member at any time nor coordinated with them in any way." Pet. Reply 28.

Petitioner argues that Patent Owner's assertion that Apple and Samsung desire review of the '228 patent because they each filed their own challenges "is misleading because Apple and Samsung each filed different challenges against claims 1-19 rather than 1-7." *Id.* at 25. Petitioner argues that Unified has "no way of knowing whether its members will benefit from its validity challenges or not, not only because it has no member pre-filing

--------------------

which were decided on a preliminary factual record unlike the case before us. The other two cases are Final Written Decisions, (IPR2018-01186; IPR2019-00482), but were decided before the Board's remand decision in *RPX* was issued, and therefore did not have the benefit of that precedential decision as guidance.

communications about particular challenges, but also because its many members [are] from various diverse industries and market positions." *Id.* Petitioner asserts that "[a]ny supposed benefit to Apple and Samsung from Unified's IPR is entirely speculative and questionable." *Id.* at 26. According to Petitioner, whether "Apple and Samsung may (or may not) benefit, directly or indirectly, from Unified's challenge due to a suit is not enough." *Id.* at 26–27.

Petitioner asserts that "[n]either this specific nor any other proceeding was filed at another's behest and no third party is or could exercise control over this proceeding." *Id.* at 27 (citing Ex. 1023 ¶¶ 5–6, 24). Petitioner asserts that "Apple's and Samsung's filings are indicative of this lack of direction or control and demonstrate 'the companies were not motivated to avoid the estoppel associated with filing an IPR.'" Pet. Reply 27.

Petitioner explains that "Unified does not discuss forthcoming IPRs at least because it seeks to maintain total independence and control over its deterrence activities." *Id.* "No Unified member funded this petition. As a result, no member has control, has had an opportunity to control, or has coordinated this or any other challenge Unified chooses to pursue." *Id.* at 28 (citing Ex. 1023 ¶ 24).

With respect to the agreements between Unified and its member companies, Apple and Samsung, Unified states that ███████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████████ ███████████████████████████████████████████████████

IPR2021-01413
Patent 10,621,228 B2

███████████████████████████████████████ Pet. Reply
28–29 (citing Ex. 1024, Sec. 4.2; Ex. 1025, Sec. 3.2).

With respect to the emails Unified sent to its membership regarding this case, Petitioner states that "these emails are standardized emails sent to mailing lists after Unified files a petition, and they identify the defendants in related litigation who have had the challenged patent asserted against them regardless of whether they are members or not."  Pet. Reply 30 (citing Ex. 2036, 47:10–20, 58:5–11; Ex. 1023 ¶¶ 13–17; Ex. 1029; Ex. 1027).

With respect to ██████████████████████████
██████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████
█████████████████

With respect to Patent Owner's analysis of Unified's financials, Petitioner asserts that "[n]o Unified member directly funded this specific petition or proceeding, and there were no specific payments made to Unified by Apple or Samsung shortly before filing this petition."  *Id.* at 31.  "[Patent Owner] has not shown any specific evidence of any direction, funding, or control of *this* proceeding."  *Id.* at 32.

Petitioner argues that Patent Owner "has shown no 'expectation' for any member regarding challenges specific to the '228 patent or [Patent Owner] . . .  and its allegations amount to nothing more than unsupported attorney argument."  *Id.*  Petitioner argues that "Unified has no clients and selects patents to challenge to deter NPE litigation in technology zones—not

18

**Appx144**

due to any particular member's risk or litigation." *Id.* at 33 (citing Ex. 1023 ¶¶ 4–7, 18, 23).

Petitioner argues that "Apple's and Samsung's filings do not show they desired Unified file *this IPR* and surely does not indicate that Unified filed at their *behest*." *Id.* at 33. "When Unified filed, it had no knowledge of any its members' desires regarding the '228 patent." *Id.* (citing Ex. 1023 ¶¶ 8, 10, 16). "No shared board members exist, Unified has no attorney-client relationship with, and does not act as legal counsel to, members, and Unified had no communications with members regarding this patent, MemoryWeb, or this IPR save those regarding general, public information." *Id.* (citing Ex. 1023 ¶¶ 16–17, 23–24).

### 2.    Patent Owner's Arguments

In its Sur-reply, Patent Owner argues that "[d]espite its self-professed 'independence,' the reality is that Unified monitors court filings and selectively challenges patents to benefit its members.  In return, Apple and Samsung ████████████████████████████████ PO Sur-reply 23.  Patent Owner points out that ███████████████████████████ ██████████████████████████████████████ ████████████████  *Id.* at 25.

Patent Owner also argues that "even though the risk of NPE litigation does not fall on Unified . . . Unified challenges patents to reduce or eliminate risk to members like Apple and Samsung.  Indeed, reducing members' litigation risk by challenging patents is the 'sole purpose' of Unified's business, weighing in favor of finding Apple and Samsung to be RPIs." PO Sur-reply 26 (citing Ex. 1023 ¶ 5). "███████████████████████

19

**Appx145**

IPR2021-01413
Patent 10,621,228 B2

███████████████████████████████████████████

███.” PO Sur-reply 25 (citing Ex. 1024; Ex. 1025). "[I]f Unified's challenge succeeds, Samsung and Apple will benefit from no longer facing liability for infringing claims 1–7." PO Sur-reply 24.

Patent Owner asserts that "present here—is evidence that Unified challenged several patents argued against Samsung ████████████████ ██████████████████████████████" Id. at 23. Patent Owner points out that "Unified challenged the '228 patent after learning that it was asserted against Samsung, a paying member." Id. at 24 (citing Ex. 2036, 62:19–63:10; Ex. 2027; Ex. 2028). "This IPR—along with others challenging patents asserted against Samsung— █████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████" Id. (citing Ex. 2033, 17–20).

G.    Analysis[7]

1.    Unified's Business Model, Finances, and Operations

The evidence shows that Unified operates as a membership organization wherein member companies, such as Apple and Samsung, enter into annual "Membership Agreements" with Unified and pay Unified "annual, non-refundable, membership fees" in exchange for Unified's services. Ex. 2016, 1; Ex. 2017, 1; Ex. 1024, 1, 6; Ex. 1025, 1, 5.

---

[7] The factors enumerated in *RPX* for analyzing whether an unnamed third-party is an RPI have been partially consolidated here to facilitate the analysis of the evidence in this case. *See RPX*, IPR2015-01750, Paper 128 at 10–11.

20

IPR2021-01413
Patent 10,621,228 B2

The evidence also shows that Unified seeks to "[d]eter Non-Practicing Entities (NPEs) who assert bad patents (aka Patent Trolls)" and "protect against frivolous patent litigation." Ex. 2017, 1. Unified "[m]onitor[s] companies in the protected technology (Micro-Pool) to identify NPE activity." Ex. 2016, 1. Unified provides "benefits" to its member companies by "work[ing] to reduce NPE activity through monitoring . . . and USPTO challenges." Ex. 2017, 1. Unified's operating structure "provides complete alignment between Unified Patents and its member companies." Ex. 2016.

Unified's Membership Agreements provide that Unified "



. Ex. 1024, Sec. 4.1, 4.1(c); *see also* Ex. 1025 Sec. 3.1, 3.1(c)).

The evidence shows that                         Ex. 2036, 36:3–13. Unified's members pay subscription fees based upon the company's revenue and the number of Unified's "zones" they wish to subscribe to. *Id.* at 74:5–21, 75:4–6.                                                      *Id.* at 74:22–75:10.                                         *Id.* at 75:7–10.                                         *Id.* at 89:5–23.                         *Id.* at 36:3–13.

21

IPR2021-01413
Patent 10,621,228 B2

According to Unified's CEO, ██████████████████████████

██████████████████████████████    *Id.* at 131:23–132:2.

According to Patent Owner's analysis, ██████████████████████

████████████████████████    PO Resp. 23 (citing Ex. 2033, 11–12;

Ex. 2036, 131:25–132:2, 133:4–15).  Unified's website indicates that

Unified has filed "185 IPR petitions since 2012" and claims a "95% Success

Rate in 2020".  Ex. 2018, 1–2.  Unified claims to have "filed more patent

challenges than all other third-party petitioners combined," and that it has

"successfully neutralized more patents that any other third-party."  *Id.* at 1.

Taken together, this evidence indicates that Unified's business model,

finances, and operations are structured to support Unified's patent validity

challenges, including patent reexamination and the filing of petitions for

IPR.  These activities act to protect Unified's members, including Apple and

Samsung, from the threat of patent litigation and are important components

of Unified's core subscription business.  This is substantial evidence that

Unified has a strong financial incentive to serve its members' needs—

expressed or not—and those of its other current and potential future clients.

This evidence leads to the inference that Unified filed the Petition in this

case to benefit its members Apple and Samsung, supporting a conclusion

that Apple and Samsung are RPIs in this proceeding.

> 2.    *Unified's Relationships and Communications with Apple
> and Samsung*

████████████████████████████████████████    Ex. 1023

¶ 19; Ex. 1024.  ██████████████████████████████████

████.  Ex. 1023 ¶ 20; Ex. 1025.

22

**Appx148**

IPR2021-01413
Patent 10,621,228 B2

Unified's CEO, Mr. Jakel, testified that "█████████████████
███████████████████████████████████████████████████████
██████████████████████████████" Ex. 2036, 46:17–
47:1.  Mr. Jakel testified that ███████████████████████████
██████" *Id.* at 48:7–8.

At deposition, Mr. Jakel confirmed that Unified first learned of the
'228 patent when the '228 patent was asserted against Samsung in a lawsuit
filed on April 26, 2021.  Ex. 2036, 62:19–63:10.  The lawsuit accusing
Apple of infringing the '228 patent was filed on May 25, 2021.  *Id.*

Unified relied on its in-house attorney team to prepare the Petition,
which was filed September 3, 2021, challenging claims 1–7 of the '228
patent.  *Id.* at 129:24-130:3; Pet. 1.  Four days after filing the Petition,
Unified emailed Samsung, Apple and other Unified members advising them
that Unified had filed a Petition for an IPR challenging the '228 patent that
"is currently asserted against Apple and Samsung."  Ex. 2027; Ex. 2028; Ex.
2036, 51:13–18, 54:24–55:1.  After institution of this IPR on March 14,
2022, Unified again emailed Apple, Samsung and other Unified members,
this time advising them that the '228 patent was "likely invalid."  Ex. 2029.

█████████████████████████████████████████████████████
██████████████████████████████████████████
Ex. 2036, 98:2–22, 100:4–7; *see* Ex. 2032; Ex. 2033.  ████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████  *Id.* at 100:21–101:4.  ██████████████████████████

23

IPR2021-01413
Patent 10,621,228 B2



████████████████████████████████████

████████████ *Id.* at 101:11–14.

██████████████████████████████

██████████████████████████████

███████████████████████████████

████████████████████████████████

████████████████████████████████████

██████████

████████████████████████████████

███████████████████████████████████

████████████████████ Ex. 2036, 50:1–5.

The sequence and timing of this evidence, including Unified's first learning that the '228 patent was being asserted against its members, Apple and Samsung, the subsequent preparation and filing of the Petition by Unified's in-house attorneys, the reporting of the filing of the Petition and Decision to Institute to Apple, Samsung, and other Unified members, ███

█████████████████████████████████████████

██████████████████████████████████

████████████████ , all indicate that Unified prepared and filed the Petition in this case to benefit its members Apple and Samsung, supporting a conclusion that Apple and Samsung are RPIs in this proceeding.

     *3.    Common Members Among Unified, Apple, and Samsung*

The record in this case indicates that Unified, Apple, and Samsung do not have any board members in common.  Ex. 1023 ¶ 23.  █████████████

███████████████████████████████████████

IPR2021-01413
Patent 10,621,228 B2



The record shows that part of Unified's strategy for dealing with NPE patent litigation is to create "complete business alignment" between Unified and its member companies through Unified's various activities. Ex. 2015; Ex. 2016. These activities include PTAB patent validity challenges, where, according to Unified's own documents, Unified has filed 185 petitions for IPR since 2012, claiming a 95% success rate in 2020. Ex. 2017, 1; Ex. 2018, 1–2.

IPR2021-01413
Patent 10,621,228 B2

███████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████

> 4.    *Apple and Samsung's Influence, Direction, or Control*

In his declaration, Unified's CEO, Mr. Jakel, states that Unified "has sole and absolute discretion over its decision to contest patents." Ex. 1023 ¶ 5.  According to Mr. Jakel, "Unified members are unable to participate or exercise any direction or control over Unified's filings, and Unified does not coordinate with members regarding Unified's filings or members' litigation."  *Id.*  Mr. Jakel, also states that "Unified has not coordinated or communicated with members regarding litigation or the substance of its IPR."  *Id.* ¶ 22.  Mr. Jakel further states that "Unified has not acted at another's behest, and it has sole control, direction, and funding over this IPR."  *Id.* ¶ 24.  At his deposition, Mr. Jakel testified that "[w]e do not communicate with Samsung, Apple or any of our members about their litigation in any way."  Ex. 2036, 117:12–14, *see also id.* at 9:4–16; 136:16–138:7.

We can accept Unified's representations that Unified's members do not exercise direction or control over Unified's decisions to contest patents and its filings.  There is no evidence of overt direction or control by Unified's members in the record. ███████████████████████████████

███████████████████████████████████████████

IPR2021-01413
Patent 10,621,228 B2

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

█████████████████████████████

Unified's stated limits on member rights, however, appear to be crafted with an eye toward RPI identification requirements, suggesting that they are written to avoid the appearance of any influence by Unified's member companies.  Mr. Jakel has even stated publicly that "legal rules concerning estoppel, time bars, and real party-in-interest (RPI) are important issues considered any time an IPR is filed. . . . Unified Patents is well-aware of these issues, and has carefully structured our solution to comply with all of the existing legal requirements to file administrative challenges as the sole RPI."  Ex. 2011, 1.

Nonetheless, Unified touts that its strategic operating "structure provides complete alignment between Unified Patents and its member companies."  Ex. 2016, 1.  Unified's approach includes "us[ing] ex-parte reexamination and inter partes review procedures at the United States Patent Office to protect technologies from attack by invalid or dubious patents."  Ex. 2015.  Unified claims that its "proactive approach is a unique, effective and far less costly solution than litigating against NPEs."  Ex. 2016.  According to Unified, "[c]hallenging invalid patents instead of paying for expensive licenses has proved to be the most cost-effective and successful way to stop unreasonable assertions."  Ex. 2018, 1.

27

IPR2021-01413
Patent 10,621,228 B2

Despite Unified's ████████████████████



     *See* Ex. 2033; Ex. 2036, 99:16–101:14.  Such conduct suggests that Unified acts for the financial benefit of its members ████

████████████████████████████████████████████ This indicates that Unified has crafted its membership agreements and its communication protocols with an eye to avoid naming members as RPIs.  This creates an obvious advantage for Unified's members because it allows Unified to act as a proxy for its members interests while attempting to avoid naming its members as an RPI, thus insulating Unified's members from being subjected to the statutory estoppel provisions of 35 U.S.C. § 315(e).

The Board's precedential decision in *RPX* points out, "intentionally avoiding discussion about a forthcoming IPR [challenging a patent asserted] against its [member] for the sole purpose of avoiding having to name the [member] as an RPI, yet challenging patents asserted against its [member], suggests a 'willful blindness' strategy."  *See RPX*, IPR2015-01750, Paper 128 at 17–20 (citing *AIT*, 897 F.3d at 1355).  Unified's CEO essentially admits as much, supporting a conclusion that Apple and Samsung are RPIs in this proceeding. *See* Ex. 2011, 1 ("Unified has carefully structured our solution to comply with all of the existing legal requirements to file administrative challenges as the sole RPI.").

28

IPR2021-01413
Patent 10,621,228 B2

> 5.    *IPR Related Interests and Benefits of Unified, Apple, and Samsung*

According to the record, the '228 patent has not been asserted against Unified.  Pet. 1–2; Paper 4, 2.  Unified, therefore, faces little or no risk of direct liability for infringement of the '228 patent.  This lack of risk raises the question of Unified's interest in petitioning for *inter-partes* review of the '228 patent.  Unified must expect to derive some benefit from directly challenging the '228 patent itself.

One obvious benefit to Unified is that if Unified is successful in this IPR, it will have provided a valuable service to its members, in particular Apple and Samsung who are being sued for infringement of the '228 patent.  If Unified is successful in having claims 1–7 of the '228 patent found unpatentable, then Apple and Samsung will receive a valuable direct benefit from this IPR, in that they may be relieved from defending allegations of infringement of those particular claims.

Moreover, if Unified is successful, Apple and Samsung may no longer have to incur the expense of establishing the unpatentability of claims 1–7 in their own IPRs.  *See Samsung Electronics Co., Ltd., v. MemoryWeb, LLC*, IPR2022-00222 (PTAB) (challenging claims 1–19 of the '228 patent); *Apple Inc. v. MemoryWeb*, LLC, IPR2022-00031 (PTAB) (challenging claims 1–19 of the '228 patent).  Given this situation, Unified's statement that "Unified does not and cannot know if there is a specific benefit to any individual members from this IPR" rings hollow.  Ex. 1023 ¶ 13.

The record indicates that Unified's interest in filing this Petition is directly aligned with Apple and Samsung's interest and benefit from a

IPR2021-01413
Patent 10,621,228 B2

successful IPR outcome. Unified's documents acknowledge this alignment of interests and benefits between Unified and its member companies. Unified's website describes how its strategic operational structure "provides complete alignment between Unified Patents and its member companies." Ex. 2016, 1.



Indeed, soon after filing the Petition challenging the '228 Patent,

*See* Ex. 2033, 20; 2036, 100:21–101:10.

Even though Unified's members may not decide which patents Unified challenges, it is not credible to suggest that Apple and Samsung do not expect Unified to file petitions for IPRs against patents they are accused of infringing *See* Ex. 2036, 75:7–10, 89:16–20.

IPR2021-01413
Patent 10,621,228 B2

Unified claims that it "filed this IPR to deter the use of invalid patents in its Content Zone, not to protect the interests of any one member."  Ex. 1023 ¶ 18.  Yet, Unified does not provide a specific rationale tied to the '228 patent to explain why it chose to challenge *this* patent, as opposed to a different patent being enforced in Unified's "Content Zone."

Moreover, simply because Unified may have filed this Petition to "deter the use of invalid patents in its Content Zone," does not mean that Unified did not recognize, understand, and fully appreciate that it was choosing to challenge a patent that was already being enforced against two of its paying members, Apple and Samsung.  Indeed, Mr. Jakel acknowledged that Unified first learned about the '228 patent precisely because it was being enforced against Samsung and Apple in district court. *See* Ex. 2036, 62:19–63:10.

The record shows that Unified files petitions for *inter-partes* review of patents that are being asserted against Unified members, in this case, Apple and Samsung.  *See* Ex. 2033, 17–20.  The fact that Unified may file other petitions for *inter-partes* review of patents that are not being asserted against Unified members does not detract from this finding.

The evidence also indicates that Unified was, or should have been, cognizant that filing the Petition in this case would provide a direct benefit to Apple and Samsung, if successful.  In these situations, Unified and its members accused of patent infringement share a common interest in having the asserted patent claims challenged and found unpatentable.  This supports a finding that when Unified files a petition for *inter-partes* review under these circumstances, it is representing the interests of those members.

31

**Appx157**

IPR2021-01413
Patent 10,621,228 B2

This scenario was addressed in one of the PTAB's precedential decisions.  There, the Board stated

> [t]hat is not to say that arrangements in which an entity would benefit from having another entity file a petition on its behalf—or on the behalf of it and other similarly-situated entities—is impermissible.  But all such entities should be named as RPIs to ensure that pertinent statutory time bars and estoppels apply.

*RPX*, IPR2015-01750, Paper 128 at 32 (emphasis added).

Given this record, we find that Unified filed the Petition in this case to benefit the interests of its existing clients, Apple and Samsung, supporting a conclusion that Apple and Samsung are RPIs in this proceeding.

> 6.     *Apple and Samsung's Desired Review of the '228 Patent*

Subsequent to the filing of this Petition challenging claims 1–7 of the '228 patent, Apple and Samsung each filed their own petitions challenging all 19 claims of the '228 patent.  *See Apple Inc. v. MemoryWeb*, LLC, IPR2022-00031, Paper 1 (Oct. 30, 2021); *Samsung Electronics Co., Ltd., v. MemoryWeb, LLC*, IPR2022-00222, Paper 2 (Dec. 3, 2021).

Patent Owner argues that Apple and Samsung filing "their own IPR petitions challenging the same claims Unified challenges" shows that "Apple and Samsung desire review of the '228 patent."  PO Resp. 24.  Patent Owner argues that it "is not credible" to argue "that Apple and Samsung do not desire review of claims 1-7 when both parties invested in seeking review of the same claims in the Related IPRs under their own names."  *Id.*

Petitioner argues that Patent Owner's assertion "is misleading because Apple and Samsung each filed different challenges against claims 1-19 rather than 1-7."  Pet. Reply 25.  Petitioner argues that "Apple's and

32

IPR2021-01413
Patent 10,621,228 B2

Samsung's filings do not show they desired Unified file *this IPR* and surely does not indicate that Unified filed at their *behest*." *Id.* at 33.

We agree with Patent Owner that the fact that Apple and Samsung each filed separate petitions requesting *inter-partes* review of the '228 Patent demonstrates that they each desire review of the '228 patent. The fact that Apple and Samsung included *more* claims in their petitions than the seven claims under review in this proceeding does not detract from the reasoning that they both desire review of the '228 patent.

We find that Apple and Samsung's separate filing of petitions for *inter-partes* review of all the claims of the '228 patent demonstrates that they each desired review of the patent, supporting a conclusion that Apple and Samsung are RPIs in this proceeding.

    *7.    Summary*

Having considered all the evidence of record and the parties' arguments, we find that Unified has a long-term, established, mutually beneficial relationship with its members, Apple and Samsung. We also find that Apple and Samsung are clear beneficiaries to this proceeding and that Unified is representing their interests. We therefore find that Unified has failed to show, by a preponderance of the evidence, that Apple and Samsung are not RPIs in this proceeding.

IPR2021-01413
Patent 10,621,228 B2

## ORDER

Accordingly, it is

ORDERED that Apple, Inc. and Samsung Electronics Co., Ltd.  are Real Parties in Interest to this Proceeding;

FURTHER ORDERED that Petitioner shall update its Mandatory Notices by March 10, 2023, identifying all Real Parties in Interest consistent with this Order pursuant to its obligations under 37 C.F.R. § 42.8(b)(1); and

FURTHER ORDERED that the parties shall, no later than 14 days from the entry of this Decision, jointly email a proposed redacted version of this Order, which identifies proposed redactions with red highlighting, to trials@uspto.gov.

IPR2021-01413
Patent 10,621,228 B2


PETITIONER:

Ellyar Y. Barazesh
Michelle Aspen
UNIFIED PATENTS, LLC
ellyar@unifiedpatents.com
michelle@unifiedpatents.com


PATENT OWNER:

Jennifer Hayes
George Dandalides
NIXON PEABODY LLP
jenhayes@nixonpeabody.com
gdandalides@nixonpeabody.com

Director_PTABDecision_Review@uspto.gov                    Paper 76
571.272.7822                                        Date: May 22, 2023

*PUBLIC VERSION*

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE
FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE
UNITED STATES PATENT AND TRADEMARK OFFICE

———————

UNIFIED PATENTS, LLC,
Petitioner,

v.

MEMORYWEB, LLC,
Patent Owner.

———————

IPR2021-01413
Patent 10,621,228 B2

———————

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.*

DECISION
Granting Director Review,
Vacating-in-part the Final Written Decision and Vacating Board Order

IPR2021-01413
Patent 10,621,228 B2

## I. INTRODUCTION

The Office received a request for Director Review of the Final
Written Decision (Paper 58 (confidential) and Paper 67 (public) ("Decision"
or "Final Written Decision")) for the above-captioned case. *See* Paper 70
(confidential); Ex. 3100. Petitioner Unified Patents, LLC ("Unified")
requests Director Review of the Board's real party in interest ("RPI")
determination in Section I.B. of the Decision that incorporates the Board's
Order Identifying Real Party in Interest (Paper 56 (confidential) ("RPI
Order")). Ex. 3100.

I have reviewed the request, the Board's Decision, the RPI Order, and
the relevant filed papers and exhibits in the above-listed proceeding. I
determine that Director Review of the Board's Decision is appropriate. *See*
Interim process for Director Review § 8 (setting forth scope of Director
Review) and § 10 (issues that may warrant Director Review). Concurrent
with this Decision, the Precedential Opinion Panel ("POP") dismissed
Petitioner's additional requests for rehearing and POP review of the RPI
Order. *See* Paper 62, Ex. 3001.

For the reasons set forth below, I vacate the Board's RPI discussion in
the Final Written Decision (Section I.B.), and the RPI Order (Paper 56)
underlying that discussion.

## II. BACKGROUND

Unified filed a Petition requesting *inter partes* review of claims 1–7 of
U.S. Patent No. 10,621,228 B2 (Ex. 1001, "the '228 Patent"), certifying that
it "is the real party-in-interest." Paper 2 ("Petition" or "Pet."), 1. Although
Unified and Patent Owner MemoryWeb LLC ("MemoryWeb") briefed and
argued, pre-institution, whether Unified should have named third parties

IPR2021-01413
Patent 10,621,228 B2

Apple and Samsung as RPIs under 35 U.S.C. § 312(a)(2), the Board "decline[d] to determine whether Apple and Samsung are real parties in interest" in its Institution Decision because the Board found that "there is no allegation in *this* proceeding of a time bar or estoppel based on an unnamed RPI." Paper 15, 13–14 ("Institution Decision") (citing Paper 11, 1) (emphasis added). Accordingly, the Board did "not address whether Apple and Samsung are unnamed RPIs because, even if either were, it would not create a time bar or estoppel under 35 U.S.C. § 315." *Id.* at 13 (citing *SharkNinja Operating LLC v. iRobot Corp.*, IPR2020-00734, Paper 11, 18 (PTAB Oct. 6, 2020) (precedential)). The Board instituted *inter partes* review as to all challenged claims on all grounds raised in the Petition.

Following institution, MemoryWeb again argued that the Board should terminate this proceeding because of Unified's alleged failure to name Apple and Samsung as RPIs. *See* Decision 4 (citing Paper 23, 14–26 ("Patent Owner's Response" or "PO Resp.") (confidential)). MemoryWeb argued that, "[a]lternatively, the Board should find that Apple and Samsung are estopped from challenging the validity of claims 1–7 of the '228 patent in" IPR2022-00031 (as to Apple) and IPR2022-00222 (as to Samsung). *Id.* (quoting PO Resp. 14–15). Unified and MemoryWeb submitted briefing on the RPI issue, and provided additional evidence as Exhibits 1030–1043 and 2027–2047. *See* Paper 29, 22–34 (Petitioner's Reply) (confidential); Paper 30 (public); Paper 35, 23–27 (Patent Owner's Sur-Reply) (confidential). The Board held a confidential hearing on the RPI issue. *See* Paper 52 (confidential transcript); Paper 53 (public transcript).

Following the post-institution briefing, submission of additional evidence, and confidential hearing, the Board issued an Order identifying

IPR2021-01413
Patent 10,621,228 B2

Apple and Samsung as RPIs.  *See* Decision 5 (incorporating RPI Order).
The Board determined that it was appropriate to decide whether Apple and
Samsung are RPIs in this proceeding "[b]ecause the issue of Section 315(e)
estoppel has been put before us [as relevant to the subsequent IPR
challenges filed by Apple and Samsung], and we now have a complete
factual record available to fully address the RPI question, and to avoid
unnecessary prejudice to Patent Owner."  RPI Order 6.

III.    DISCUSSION

In the RPI Order, the Board held "if we do not decide the RPI issue
now, as Patent Owner urges, then the underlying purpose of Section 315(e)
would potentially be frustrated.  Determining whether Apple or Samsung are
RPIs in this case is a necessary precursor to determining whether they would
be estopped in [] subsequent proceeding[s]."  RPI Order 6.  Absent an RPI
determination, "Patent Owner may have to continue to unnecessarily defend
against two subsequent IPR challenges filed by Apple and Samsung should
they have been named as RPIs in this case."  *Id.*

The precedential *SharkNinja* decision held that it best serves the
Office's interests in cost and efficiency to not resolve an RPI issue when "it
would not create a time bar or estoppel under 35 U.S.C. § 315" in that
proceeding.  *SharkNinja*, Paper 11, 18.  *SharkNinja* further acknowledged
that patent owners "should not be forced to defend against later judicial or
administrative attacks on the same or related grounds by a party that is so
closely related to the original petitioner as to qualify as a real party in
interest," but held that was not the case before the Board.  *Id.* at 20 (quoting
*Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1350 (Fed.
Cir. 2018)).

IPR2021-01413
Patent 10,621,228 B2

Petitioner contends that *SharkNinja*'s reasoning should apply here, where neither a time bar nor estoppel applies in this proceeding. *See* Paper 70, 3. Accordingly, Petitioner contends "the panel erred by issuing a non-binding advisory opinion" on RPI, which prejudices Apple and Samsung by "prejudg[ing] the RPI issue without their participation," where that determination could bind Apple and Samsung in their subsequently-filed proceedings. *See id.*

The Board can and should make a determination of the real parties in interest or privity in any proceeding in which that determination may impact the underlying proceeding, for example, but not limited to, a time bar under 35 U.S.C. § 315(b) or an estoppel under 35 U.S.C. § 315(e) that might apply. That is not the situation here. The Board should not have determined whether Apple and Samsung are RPIs in this proceeding given that determination was not necessary to resolve the proceeding.

Accordingly, I vacate the Board's RPI determination in the Final Written Decision (pages 3–5, Section I.B.) and the Board's RPI Order, Paper 56, on which the Final Written Decision's RPI determination is based.

## IV.   ORDER

In consideration of the foregoing, it is hereby:

ORDERED that the Board's real party in interest determination in the Final Written Decision (Section I.B.) is vacated; and

FURTHER ORDERED that the Board's Order Identifying Real Party in Interest (Paper 56) is vacated.

IPR2021-01413
Patent 10,621,228 B2

PETITIONER:

Jonathan Strang
LATHAM & WATKINS LLP
jonathan.strang@lw.com

Michelle Aspen
Roshan Mansinghani
Ellyar Barazesh
UNIFIED PATENTS, LLC
michelle@unifiedpatents.com
roshan@unifiedpatents.com
ellyar@unifiedpatents.com

PATENT OWNER:

Jennifer Hayes
George Dandalides
NIXON PEABODY LLP
jenhayes@nixonpeabody.com
gdandalides@nixonpeabody.com

Trials@uspto.gov                                                          Paper: 82
571-272-7822                                                  Date: December 4, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

UNIFIED PATENTS, LLC,
Petitioner,

v.

MEMORYWEB, LLC,
Patent Owner.

———————

IPR2021-01413
Patent 10,621,228 B2

———————

Before LYNNE H. BROWNE, NORMAN H. BEAMER, and
KEVIN C. TROCK, *Administrative Patent Judges*.

TROCK, *Administrative Patent Judge*.

DECISION
Denying Patent Owner's Request on
Rehearing of Final Written Decision
*37 C.F.R. § 42.71(d)*

IPR2021-01413
Patent 10,621,228 B2

## I.  INTRODUCTION

Unified Patents, LLC ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting *inter partes* review of claims 1–7 (the "challenged claims") of U.S. Patent No. 10,621,228 B2 (Ex. 1001, "the '228 Patent").  We determined, based on the record at that time, that the '228 patent was eligible for *inter partes* review, and instituted review on all challenged claims on the grounds presented in the Petition.  Paper 15 ("Institution Decision" or "Inst. Dec.").

We entered a Final Written Decision (Paper 58, "Decision" or "Dec.") finding that Petitioner had demonstrated by a preponderance of the evidence that the challenged claims are  unpatentable.  Patent Owner filed a Request for Rehearing of the Decision.  Paper 69 ("PO Req." or "Req. Reh'g").  We address the issues raised in Patent Owner's request below.

*A.  Legal Standards*

The applicable requirements for a request for rehearing are set forth in 37 C.F.R. § 42.71(d), which provides:

> A party dissatisfied with a decision may file a single request for rehearing without prior authorization from the Board.  The burden of showing a decision should be modified lies with the party challenging the decision.  The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, an opposition, a reply, or a sur-reply.

We review our Decision under an abuse of discretion standard. 37 C.F.R. § 42.71(c).  An abuse of discretion may arise if a decision is based on an erroneous interpretation of law, if a factual finding is not supported by substantial evidence, or if the decision represents an unreasonable judgment in weighing relevant factors.  *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005); *Arnold P'ship v. Dudas*, 362 F.3d 1338, 1340

IPR2021-01413
Patent 10,621,228 B2

(Fed. Cir. 2004); *In re Gartside*, 203 F.3d 1305, 1315–16 (Fed. Cir. 2000). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *OSI Pharm., LLC v. Apotex Inc.*, 939 F.3d 1375, 1381 (Fed. Cir. 2019) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). "The substantial evidence standard asks 'whether a reasonable fact finder could have arrived at the agency's decision.'" *OSI Pharm.*, 939 F.3d at 1381–82 (quoting *Gartside*, 203 F.3d at 1312).

## B. New Evidence or Argument in Reply

Patent Owner asserts that "[t]he Board failed to address Patent Owner's argument that Petitioner's Reply and Dr. Bederson's Reply Declaration (Ex. 1038) were improper because they presented new arguments and evidence that were not in the Petition." PO Req. 2 (citing PO Sur-reply 1–2).

We disagree with Patent Owner's assertions. First, the Board is not required to address every argument raised by a party or explain every possible reason supporting the Board's conclusions. *See Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1328 (Fed. Cir. 2017). Second, we disagree that Petitioner's arguments and evidence submitted in reply are improper. Rather, they are responsive to arguments raised by Patent Owner in its Response. *See Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1078–1080 (Fed. Circ. 2015) (evidence submitted with an expert declaration filed with petitioner's reply does not violate 37 C.F.R. § 42.23(b) where the expert declaration is responsive to patent owner's arguments). Third, we fully considered Patent Owner's arguments and evidence, but determined that Petitioner's arguments and evidence were persuasive.

For example, Patent Owner argues in its Sur-reply that Petitioner's Reply is improper because "several paragraphs of Dr. Bederson's new declaration now claims it would have been obvious that Okamura's cluster map matrix forms a map" although "[t]he Petition provided no obviousness analysis based on Okamura alone." PO Sur-reply, 1 (citing Pet. Reply 3; Ex. 1038 ¶¶ 32–37; Pet. 19–20). However, Dr. Bederson's testimony responds to Patent Owner's argument and Dr. Reinman's testimony that "Okamura alone does not render obvious a "*map view including…an interactive map*" and statement that the Petition "provides no obviousness analysis based on Okamura's cluster maps." Ex. 1038 ¶ 32 (citing PO Resp. 34–37), *see also id.* ¶¶ 33–37. Petitioner's reply and Dr. Bederson's declaration (Ex. 1038) do not violate 37 C.F.R. § 42.23(b) where they are clearly responsive to Patent Owner's arguments and evidence. *See Belden,* 805 F.3d at 1078–1080.

## C. Limitations [1b], [1d], [1e], and Claim 3

### 1. Construction of "Responsive To"

Patent Owner argues that "[t]he Board should have construed this phrase and adopted Patent Owner's construction of 'responsive to,'" after "Petitioner relied on prior art requiring separate intervening inputs (rather than the single claimed input directly causing display of the claimed view)." PO Req. 3.

With respect to claim construction, however, Patent Owner took the position in its Response that it "does not believe claim construction is required because the plain and ordinary meaning of the claims is clear." PO Resp. 26. Petitioner was in accord, stating in the Petition that "no terms of the '228 patent warrant construction beyond their ordinary and customary

IPR2021-01413
Patent 10,621,228 B2

meaning." Pet. 8. We agreed with the parties that "no claim terms require express construction." Dec. 18 (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

Nonetheless, with respect to these limitations, Patent Owner made the argument that "the claimed 'map view' displayed *in response to* the 'first input' must 'includ[e]' first and second 'thumbnail image[s] … on the interactive map.'" PO Resp. 52. Patent Owner further argued that "[i]f Okamura and Flora were combined as Petitioner proposes, the PLACE tab 413 (*first input*), would only cause Okamura's cluster map display area 414 (*map view*) and Flora's geographic map 46 (*interactive map*) to be displayed without Flora's icons 58, 59 (*thumbnail image[s]*) 'on the interactive map' as claimed." PO Resp. 52–53.

In our analysis, we pointed out that "[t]he Petition explains that Okamura describes *responsive to a first input* (depressing PLACE tab 413), a cluster map display area 414 is displayed (*causing a map view to be displayed*) on a display interface of Okamura's content playback application (*on an interface*). Dec. 47 (citing Pet. 14–20). "Combined with Flora," we explained, "Okamura's cluster map display area 414 (*map view*) displays content as taught by Flora's geographic map 46 (*interactive map*) and media viewer 64, where Okamura's content is indicated at various locations on the map by Flora's icons 58 and 59 (*first location selectable thumbnail image*, *second location selectable thumbnail image*)." Dec. 47–48) (citing Pet. 20–29. We noted that "Patent Owner's argument that the combination would not result in displaying Flora's icons ignores Okamura and Flora's contributions to Petitioner's proposed combination." Dec. 48.

Our resolution of the dispute as to whether the asserted prior art met these claim limitations did not require an express construction of the term

IPR2021-01413
Patent 10,621,228 B2

"*responsive to*" as Patent Owner now argues in retrospect, but rather applied the plain and ordinary meaning of the claims consistent with the express position of the parties taken during the proceedings. Although Patent Owner might now disagree with the outcome of our decision on these issues, such disagreement is not a basis for rehearing.

## 2. Limitations [1b], [1d], and [1e]

Patent Owner argues that "paragraph [64] of Dr. Bederson's second declaration improperly introduced new evidence and argument not presented in the Petition." PO Req. 4. Patent Owner asserts that "[t]he Petition did not argue that selecting Okamura's PLACE tab 413 (first input) would cause the display of Flora's geographic map 46 (interactive map) with Flora's icons 58, 59 (thumbnail image[s]) "responsive to" that that first input." *Id.* at 5 (citing Pet. 28–30). "In fact," Patent Owner argues, "Petitioner and Dr. Bederson declined to acknowledge the causal relationship expressly required by the 'responsive to' claim term." PO Req. 5.

We disagree with Patent Owner. This argument is similar to Patent Owner's argument that we address in Section I.B above. Dr. Bederson's declaration is not improper. Rather, it is directly responsive to Patent Owner's arguments and Dr. Reinman's testimony. For example, Paragraph 64 of Dr. Bederson's declaration begins by stating that

> [t]he Patent Owner and Dr. Reinman argue "[n]owhere . . . does Okamura or Flora, alone or in combination, disclose that the 'map view' displayed *in response to* the 'first input' would 'include[e]' first and second 'thumbnail image[s] . . . <u>on the interactive map</u>' as claimed." POR, 52-54 (underlining and italics in original). I do not agree.

Ex. 1038 ¶ 64. Dr. Bederson then goes on to explain why he believes Patent Owner and Dr. Reinman are incorrect based on his understanding of the

6

IPR2021-01413
Patent 10,621,228 B2

teachings of Okamura and Flora. *Id.* This is responsive testimony, to which Patent Owner had an opportunity to respond, and is not improper. *See Belden,* 805 F.3d at 1078–1080.

Moreover, contrary to Patent Owner's argument here, the Petition explains that in Okamura, "selection of PLACE tab 413 causes the single *interface* [in Okamura] to display cluster map display area 414 (*map view*) on the *interface*," and a person of ordinary skill in the art "would have been motivated to combine Okamura and Flora such that when organizing content according to location, Okamura's cluster map display area 414 displays content as taught by Flora's geographic map 46 and media viewer 64, where Okamura's content is indicated at various locations on the map by Flora's icons 58 and 59." Pet. 18, 22.

Patent Owner has not demonstrated that there was an error that warrants rehearing related to this issue.

### 3. *Claim 3*

Patent Owner argues that "[t]he Board misapprehended the Petition and overlooked Patent Owner's arguments," because "the Petition (i) expressly quoted and relied on Okamura's intervening mouse-hover operation for displaying information 418 (*see*, Pet. 19) and corresponding 'software' (*see,* Pet. 25-27), and (ii) cited back to the same discussion in relation to the 'indication feature' of claims 2-3." PO Req. 6–7. Patent Owner also argues that "[t]he Board also overlooked Patent Owner's argument that it is "'impermissible' to 'pick and choose' from the relevant portions of Okamura 'to the exclusion of' when and how information 418 is displayed." *Id.* at 7.

IPR2021-01413
Patent 10,621,228 B2

We disagree.  Claim 3 depends from dependent claim 2.  With respect to claim 2, the Petition states that

> [c]ombining Okamura's teachings regarding displayed information 418 with Flora would have resulted in Okamura's cluster map display area 414 (*the map view*) including Okamura's displayed information 418 showing the number of contents being displayed with Flora's icons 58 and 59, including the first of icons 58 and 59; thus, the first icon would include Okamura's displayed information 418 showing the number of contents associated with that first icon (*includes a first indication feature associated with the first location selectable thumbnail image*), where the displayed information 418 for the first icon (*the first indication feature*) shows the number of files in the first set of digital files at the location associated with the first icon (*being based on a number of digital files in the first set of digital files*).

Pet. 63.  With respect to claim 3, the Petition further states that

> the combination of Okamura and Flora provides that information 418 for each icon, including information 418 for the first icon (*the first indication feature*), would have been connected to each of icons 58 and 59, including the first icon (*the first location selectable thumbnail image*), by overlapping each icon (*is connected to the first location selectable thumbnail image*).

*Id.* at 66–67.

Nowhere with respect to claims 2 or 3 does the Petition state that it is relying on an "intervening mouse-hover operation" for these claims, as Patent Owner now argues.  The mere fact that a petition may cite to other portions of the document for purposes of reference or context does that mean that the express combination being described should be ignored or embellished, as Patent Owner appears to be doing here.  Rather, as we explained in our Decision,

> [t]he Petition explains that Okamura's teaches depressing the "PLACE" tab (*first input*) which causes the display of cluster

IPR2021-01413
Patent 10,621,228 B2

> map display area 414, and in the combination Okamura's display area 414 (*the map view*) displays content indicated at various locations on Flora's geographic map 46 by icons 58 and 59. *See* Pet. 14–18, 62–67. Okamura's information 418 teaches displaying the number of contents for each icon and would have been connected to each icon by overlapping as taught by Okamura's Figures 19–21. *Id.* That Okamura also teaches a feature whereby a user operation, such as a mouse movement, may display information 418 is not part of Petitioner's combination and therefore not relevant to Petitioner's proposed combination, which simply utilized the teaching that information 418 is displayed in overlapping form.

Dec. 106 (citing Ex. 1038 ¶ 72). Patent Owner has not demonstrated that there was an error that warrants rehearing of this issue.

## D. Limitations [1n], [1p], and Claim 5

### 1. Construction of Limitations [1n] and [1p]

Patent Owner asserts that "[t]he Decision misapprehended Patent Owner's argument" as "Patent Owner did not seek to read Fig. 32 into claim 1." PO Req. 8 (citing PO Resp. 28–29, 32; PO Sur-reply 6–8). Patent Owner explains that it "relied on the 'express words recited in the claim' while noting that Fig. 32 'discloses an exemplary embodiment consistent with those express words.'" PO Req. 8.

Patent Owner also asserts that the Decision overlooked Patent Owner's argument that including the first name and second name at separate times would "conflict with" the "responsive to" relationship between the "second input" and display of the "people view" and its constituent elements. PO Req. 9 (citing PO Sur-reply 7).

Although Patent Owner admits that "claim 1 does not recite the word 'simultaneously,'" Patent Owner nonetheless faults the Decision for not explaining "how a view that includes *only* a 'first name' but not a 'second

IPR2021-01413
Patent 10,621,228 B2

name' can qualify as the claimed 'people view.'" PO Req 9. Patent Owner

argues that "[t]he Board's misapprehension of Patent Owner's arguments

warrants rehearing." *Id.* at 10.

We disagree with Patent Owner. The Decision explains our analysis

and rationale regarding this issue as follows:

> Patent Owner states in its Response that it "does not believe
> claim construction is required because the plain and ordinary
> meaning of the claims is clear." PO Resp. 26. In its Response,
> however, Patent Owner points to Figure 32 of the '228 patent as
> "an exemplary embodiment showing a people view 1400 that
> includes 'a thumbnail of [each person's] face along with their
> name,'" concluding that "the 'people view' *must* 'includ[e]' both
> a 'first name' and a 'second name' displayed in the same view."
> *Id.* at 29 (citing Ex. 2038 ¶¶ 80–81) (emphasis added). Patent
> Owner then later argues that "[n]owhere does Okamura disclose
> or suggest any means for *simultaneously* including a second
> name in that same view." PO Resp. 63 (emphasis added).
>
> Claim 1, however, does not recite the term "*simultaneously*" that
> Patent Owner now seeks to add, nor can the claim be reasonably
> read to impose such a requirement. Moreover, Patent Owner
> provides no compelling rationale for incorporating its
> interpretation of Figure 32 as "an exemplary embodiment" in
> order to restrict claim 1 in this way. The Federal Circuit has
> repeatedly explained that "[a] particular embodiment appearing
> in the written description may not be read into a claim when the
> claim language is broader than the embodiment." *SuperGuide
> Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir.
> 2004) (emphasis added). We, therefore, decline Patent Owner's
> invitation do so here.
>
> Dec. 63–64.

Patent Owner's arguments on rehearing do not change our view. In

its papers, Patent Owner looked to the claim language and Figure 32 to

argue that "[n]owhere does Okamura disclose or suggest any means for

*simultaneously* including a second name in that same view." PO Resp. 63

IPR2021-01413
Patent 10,621,228 B2

(emphasis added). In our view, Patent Owner uses its interpretation of Figure 32 as a basis to incorporate a limitation ("simultaneously") that does not appear in claim 1, as Patent Owner now concedes. *See* PO Req. 9 ("claim 1 does not recite the word simultaneously"). As we explained in our Decision, we agreed with Petitioner that Okamura teaches limitations [1n] and [1p] and we credited the testimony of Dr. Bederson because it is consistent with the teachings of Okamura. *See* Dec. 61–63 (citing Ex. 1002 ¶¶ 110–114, 118–122). Patent Owner has not demonstrated that there was an error that warrants rehearing of this issue.

## 2. *Construction of Claim 5*

Patent Owner asserts that "[t]he Board overlooked the same argument and evidence when it disagreed that claim 5 requires simultaneously including a 'first indication feature' and a 'second indication feature' in the same 'map view.'" PO Req. 11. Patent Owner argues that "[b]ecause the Board applied the 'same analysis' of limitations [1n], [1p] to claim 5, the Board should rehear Patent Owner's claim construction argument as to claim 5 for the same reasons discussed immediately above." *Id.*

For the reasons we discussed in Section I.D.1, Patent Owner has not demonstrated that there was an error that warrants rehearing of this issue.

## 3. *Limitations [1n] and [1p]*

Patent Owner asserts that "[t]o the extent the Board rehears the construction issues, it should also rehear the finding that Okamura meets limitations [1n] and [1p]." PO Req. 11–12. Patent Owner argues that "[f]or 'people view' limitations [1n] and [1p], Petitioner relied only on Okamura under Ground 1," and "Patent Owner established that Okamura fails to disclose that its face cluster display area 431 (alleged *people view*) includes

11
**Appx178**

IPR2021-01413
Patent 10,621,228 B2

both a "first name" and second name" in the same view, as required by the express language of claim 1." *Id.*

For the reasons we discussed in Section I.D.1, Patent Owner has not demonstrated that there was an error that warrants rehearing of this issue.

### 4. Claim 5

Patent Owner asserts that "claim 5, when properly construed, requires a 'map view' that includes a 'first indication feature' and a 'second indication feature' in the same view." PO Req. 12. Patent Owner argues that it "established Okamura requires a mouse hover to display an indication feature and that 'doing so displays a number of contents indication for one location thumbnail image only.'" *Id.* (citing PO Resp. 66–68; PO Sur-reply 22). Patent Owner requests that "[t]o the extent the Board rehears its construction requiring the simultaneous display of the claimed elements in the views, it should also rehear its finding that Okamura meets this limitation." *Id.*

Patent Owner also asserts that "the Board adopted a new obviousness theory Petitioner raised for the first time in reply," that "Okamura 'renders obvious claim 5' under an interpretation requiring 'simultaneous' inclusion of first/second indication features." *Id.* at 13 (citing PO Sur-reply 2, 22; Dec. 109; Ex. 1038 ¶ 73). Patent Owner asserts that "[t]he Board did not address Patent Owner's objection or Dr. Bederson's relevant testimony." *Id.*

Because we decline Patent Owner's request to rehear the construction of claim 5, we decline to rehear the finding that the asserted prior art meets the limitations of claim 5. With respect to Patent Owner's assertion that we "adopted a new obviousness theory Petitioner raised for the first time in reply," we disagree.

IPR2021-01413
Patent 10,621,228 B2

With respect to claim 5, we explained that Petitioner provided evidence that the combination of Okamura and Flora teaches claim 5 because

> Okamura's cluster map display area 414 (*the map view*) includes Okamura's displayed information 418 displayed with Flora's icons 58 and 59, including the second of the icons 58 and 59; thus, the second icon would include Okamura's displayed information 418 showing the number of contents associated with the second icon (*includes a second indication feature associated with the second location selectable thumbnail image*) where displayed information 418 for the second icon shows the number of files in the second set of digital files at the location associated with the second icon (*being based on a number of digital files in the second set of digital files*).

Dec. 107–108 (citing Ex. 1004 ¶ 240, Fig. 19; [Pet.] Sections VI.A.3.e, VI.A.3.j, VI.A.4).

In response to Patent Owner's argument that "[n]owhere, however, does Okamura disclose or suggest any means for simultaneously including two indication features in that same view using Okamura's cursor," we explained that "[c]laim 1 does not include the term '*simultaneously*' that Patent Owner seeks to add, nor can the claim be reasonably read to impose such a requirement." Dec. 108 (citing *id.* at Dec. Sec. II.E.1.c.3). We found that "[t]he same analysis applies equally as well to dependent claim 5." *Id.*

We then explained that "Patent Owner's argument is flawed because Okamura's displayed information 418 shows the number of contents associated with both the first and second of icons 58 and 59 (*first indication feature* and *second indication feature*) displayed for each icon." *Id.* at 109. We then pointed out that Dr. Bederson explained (in response to Patent Owner's "simultaneous" argument) that

IPR2021-01413
Patent 10,621,228 B2

> in the combination, "Okamura's displayed information 418
> showing the number of contents [][is] displayed with Flora's
> icons 58 and 59," where Okamura's cluster map display area 414
> includes "displayed information 418 for the first icon (*the first
> indication feature*) [that] shows the number of files in the first set
> of digital files at the location associated with the first icon" and
> "displayed information 418 for the second icon [*the second
> indication feature*] [that] shows the number of files in the second
> set of digital files at the location associated with the second
> icon." *Id.*, 63, 68. Thus, a POSITA would have understood or at
> least found obvious that in the combination, because information
> 418 displaying contents is displayed with each of Flora's icons
> 58 and 59 (which includes the *first* and *second* claimed *thumbnail
> images*), *the first indication feature* and *the second indication
> feature* are provided for each of the icons.

Dec. 109 (citing Ex. 1038 ¶ 73).

Because Dr. Bederson's testimony is responsive to Patent Owner's

"simultaneous" argument raised by Patent Owner in its Response (see

Ex. 1036 ¶ 73 (citing PO Resp. 66–67)), and Patent Owner had an

opportunity to respond to the testimony, Dr. Bederson's testimony is

appropriate to consider and does not violate 37 C.F.R. § 42.23(b). *See

Belden*, 805 F.3d at 1078–1080.  Accordingly, Patent Owner has not

demonstrated that there was an error that warrants rehearing of this issue.

*E.  Okamura/Flora Combination*

Patent Owner asserts that the Decision overlooked the following

arguments:

> 1. Patent Owner argued, citing *Trivascular, Inc. v. Samuels*, 812
> F.3d 1056, 1068 (Fed. Cir. 2016), that Petitioner's proposed
> combination would eliminate Okamura's "primary objective" of
> presenting multiple cluster maps having differing scales to avoid
> the scaling issues associated with presenting only a single map.
> POR, 10, 44-45, 48-49; POSR 11-12; EX1004, Fig. 18, ¶¶0019,
> 0093, 0215, 0219; EX2038, ¶¶113-116;

IPR2021-01413
Patent 10,621,228 B2

> 2. Patent Owner argued that Okamura's stated preference is relevant to whether a person of skill in the art would combine Okamura and Flora, even if it does not teach away, citing *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1070 (Fed. Cir. 2018). POR, 47-49; POSR, 13-14; and

> 3. Petitioner's Okamura Figs. 27A-B argument was not in the Petition and was presented for the first time in the Reply. PO Sur-reply 14–15; Pet. 22–27.

PO Req. 13–14.

Patent Owner's citations to *Trivascular* and *Polaris* are related to Patent Owner's argument that a person of ordinary skill in the art would not combine Okamura with Flora because Flora's use of a geographic map is similar to art allegedly "disparaged" by Okamura, because use of such a geographic map "makes it difficult to intuitively grasp the geographical correspondence between individual contents," and Okamura allegedly "emphasizes the importance of showing content from different locations simultaneously regardless of how geographically far apart those locations are." *See* PO Resp. 40 (quoting Ex. 1004 ¶ 8), 42. Patent Owner concludes that such evidence "teaches away from Petitioner's proposed use of Flora's scalable geographic map because a POSITA 'would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant.'" *Id.* at 44.

We fully considered all of Patent Owner's arguments concerning its position that a person of ordinary skill in the art would not have combined Okamura and Flora in the manner proffered by Petitioner. *See* Dec. 90–92, 97–101. Simply because we do not mention *Trivascular* or *Polaris* by name or distinguish them expressly, does not mean that Patent Owner's arguments were not considered in rendering the Decision. The Board is not required to address every argument raised by a party or explain every possible reason

15

IPR2021-01413
Patent 10,621,228 B2

supporting the Board's conclusions. *See Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1328 (Fed. Cir. 2017).

With respect to Patent Owner's argument that Okamura's Figures 27A–B were discussed by Petitioner for the first time in the Reply, as we have noted several times already, Petitioner is not required to anticipate each and every possible argument that a Patent Owner may raise in its Response. As long as Petitioner's arguments and evidence provided in its Reply are responsive to the issues raised in Patent Owner's Response and Patent Owner has an opportunity to respond to the evidence, Petitioner does not run afoul of 37 C.F.R. § 42.23(b). *See Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1078–1080 (Fed. Circ. 2015) (evidence submitted with an expert declaration filed with petitioner's reply does not violate 37 C.F.R. § 42.23(b) where the expert declaration is responsive to patent owner's arguments).

*F. Burden Shifting*

Patent Owner argues that the Decision "faults Patent Owner for not arguing a skilled artisan 'that the ordinary artisan in this field of endeavor does not possess the knowledge and skills rendering him incapable of combining the prior art references.'" PO Req. 14 (citing Dec. 100). Patent Owner argues that "[t]his is legal error," because "[t]o require Patent Owner to demonstrate that a skilled artisan is incapable of combining the prior art improperly shifted the burden to Patent Owner." *Id.* Patent Owner misconstrues the Decision.

The Decision points out that while Patent Owner asserts that "Petitioner does not provide an independent rationale for combining Okamura, Flora, Wagner *and* Gilley," Patent Owner "provides no argument or discussion related to this point and cites to no particular authority to support it," meaning that Patent Owner's assertion is unsupported attorney

IPR2021-01413
Patent 10,621,228 B2

argument. Dec. 100. This observation in the Decision does not "improperly shift the burden to Patent Owner to prove patentability" as Patent Owner now alleges. Rather, the Decision points out that according to *Dystar*, "the proper question is whether the ordinary artisan possesses knowledge and skills rendering him *capable* of combining the prior art references," and that Patent Owner provides no argument or evidence on that question. *Id.* (citing *Dystar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick,* 464 F.3d 1356, 1368, (Fed. Cir. 2006).

> The Decision then goes on to explain that

> Dr. Bederson testifies that a person of ordinary skill in the art "would have combined Okamura and Flora . . . *using known programming techniques*, adjusting the software of Okamura's content playback application such that cluster map display area 414 includes Flora's teachings" and "would have recognized the combination's results would have been predictable . . . because it is simple substitution of one known element . . . for another." Ex. 1002 ¶¶ 83, 84, 86 (emphasis added).

Dec. 101.

> The Decision also points out that

> Petitioner provides a proposed combination of prior art that is supported by the evidentiary record, and is explained in ample detail by the reasoned testimony of Dr. Bederson. Petitioner also identifies a number of benefits of the proposed combination that would have served as a reasoned basis for a person of ordinary skill in the art to combine the prior art in the manner described in the Petition.

*Id.*

> Patent Owner's argument that "the Decision improperly rested on Patent Owner's alleged failure to establish that the skilled artisan was not incapable," and that "[t]he Board also overlooked Patent Owner's argument

IPR2021-01413
Patent 10,621,228 B2

that Petitioner failed to establish 'a skilled artisan would have been motivated' to combine Okamura, Flora and Gilley" is simply meritless.

## II.    CONCLUSION

For the reasons stated above, Patent Owner has not demonstrated an abuse of discretion meriting a rehearing of the issues raised in the request.

Outcome of Decision on Rehearing:

| Claims | 35 U.S.C. § | References | Denied | Granted |
|--------|-------------|------------|--------|---------|
| 1–7 | 103(a) | Okamura, Flora[1] | | |
| 1–7 | 103(a) | Okamura, Flora, Wagner | | |
| 1–7 | 103(a) | Okamura, Flora, Gilley | | |
| 1–7 | 103(a) | Okamura, Flora, Wagner, Gilley | 1–7 | |
| Overall Outcome | | | 1–7 | |

---

[1] Because each of the challenged claims is held unpatentable on the ground combining Okamura, Flora, Wagner, and Gilley as a basis for unpatentability, we do not reach the other asserted grounds in the Petition.

18

IPR2021-01413
Patent 10,621,228 B2

Final Outcome of Final Written Decision after Rehearing:

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–7 | 103(a) | Okamura, Flora[2] | | |
| 1–7 | 103(a) | Okamura, Flora, Wagner | | |
| 1–7 | 103(a) | Okamura, Flora, Gilley | | |
| 1–7 | 103(a) | Okamura, Flora, Wagner, Gilley | 1–7 | |
| **Overall Outcome** | | | 1–7 | |

## III.    ORDER

Accordingly, it is

ORDERED that Patent Owner's Request for Rehearing is *denied*.

---

[2] Because each of the challenged claims is held unpatentable on the ground combining Okamura, Flora, Wagner, and Gilley as a basis for unpatentability, we did not reach the other asserted grounds in the Petition.

IPR2021-01413
Patent 10,621,228 B2

FOR PETITIONER:

Ellyar Y. Barazesh
Michelle Aspen
UNIFIED PATENTS, LLC
ellyar@unifiedpatents.com
michelle@unifiedpatents.com

PATENT OWNER:

Jennifer Hayes
George Dandalides
NIXON PEABODY LLP
jenhayes@nixonpeabody.com
gdandalides@nixonpeabody.com



US010621228B2

(12) **United States Patent**
Desmond et al.

(10) Patent No.: **US 10,621,228 B2**
(45) Date of Patent: **\*Apr. 14, 2020**

(54) **METHOD AND APPARATUS FOR MANAGING DIGITAL FILES**

(71) Applicant: **NCM IP Holdings, LLC**, Glen Ellyn, IL (US)

(72) Inventors: **Christopher J. Desmond**, Glen Ellyn, IL (US); **Nancy L. Desmond**, Glen Ellyn, IL (US); **L. Michael Taylor**, Chicago, IL (US)

(73) Assignee: **NCM IP Holdings, LLC**, Glen Ellyn, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/578,238**

(22) Filed: **Sep. 20, 2019**

(65) **Prior Publication Data**

US 2020/0026727 A1    Jan. 23, 2020

**Related U.S. Application Data**

(63) Continuation of application No. 16/536,300, filed on Aug. 8, 2019, which is a continuation of application
(Continued)

(51) **Int. Cl.**
**G06F 16/58** (2019.01)
**G06F 16/901** (2019.01)
(Continued)

(52) **U.S. Cl.**
CPC .......... **G06F 16/5866** (2019.01); **G06F 16/51** (2019.01); **G06F 16/901** (2019.01); **G06F 16/907** (2019.01); **G06F 3/0481** (2013.01)

(58) **Field of Classification Search**
CPC ... G06F 16/5866; G06F 16/907; G06F 16/901
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,694,514 A | 12/1997 | Evans |
| 6,629,104 B1 | 9/2003 | Parulski |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 102591922 B | 10/2015 |
| EP | 2466869 A3 | 2/2017 |

(Continued)

OTHER PUBLICATIONS

Kustanowitz et al., "Motivating Annotation for Personal Digital Photo Libraries: Lowering Barriers while Raising Incentives," Tech. Report HCIL-2004-18, U. Maryland, 2005 (10 pages).

(Continued)

*Primary Examiner* — Loc Tran
(74) *Attorney, Agent, or Firm* — Nixon Peabody LLP

(57) **ABSTRACT**

A computer-implemented method of associating digital tags with digital files comprises storing a plurality of digital files having embedded therein content data and metadata including tags; receiving, via a user interface device of a client device, a first tag label containing alphanumeric text created and inputted by a user of the client device; modifying, using a controller device, a selected first one of the tags of the metadata in a first of the digital files to include the first tag label; receiving, via the user interface device or another user interface device, an instruction to search for all of the digital files having at least the first tag label; responsive to receiving the instruction, automatically searching for all of the digital files having at least the first tag label; and displaying, on a video display device associated with the client device, a first indication of the first tag label.

**19 Claims, 50 Drawing Sheets**



**UNIFIED PATENTS EXHIBIT 1001**
**Page 1 of 73**

US 10,621,228 B2
Page 2

**Related U.S. Application Data**

No. 15/375,927, filed on Dec. 12, 2016, now Pat. No. 10,423,658, which is a continuation of application No. 14/193,426, filed on Feb. 28, 2014, now Pat. No. 9,552,376, which is a continuation-in-part of application 13/157,214, filed on Jun. 9, 2011, now Pat. No. 9,098,531.

(51) **Int. Cl.**
*G06F 16/51* (2019.01)
*G06F 16/907* (2019.01)
*G06F 3/0481* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,372,976 | B2 | 5/2008 | Rhoad |
| 7,475,060 | B2 | 1/2009 | Toyama |
| 7,480,669 | B2 | 1/2009 | Lo |
| 7,694,236 | B2 | 4/2010 | Gusmorino |
| 7,822,746 | B2 | 10/2010 | Svendsen |
| 7,860,846 | B2 | 12/2010 | Takahashi |
| 7,991,283 | B2 | 8/2011 | Chen |
| 8,001,124 | B2 | 8/2011 | Svendsen |
| 8,015,144 | B2 | 9/2011 | Zheng |
| 8,024,317 | B2 | 9/2011 | Nair |
| 8,032,508 | B2 | 10/2011 | Martinez |
| 8,055,675 | B2 | 11/2011 | Higgins |
| 8,060,492 | B2 | 11/2011 | Nair |
| 8,069,142 | B2 | 11/2011 | Davis |
| 8,086,048 | B2 | 12/2011 | Naaman |
| 8,108,778 | B2 | 1/2012 | Athsani |
| 8,150,844 | B2 | 4/2012 | Redstone |
| 8,150,967 | B2 | 4/2012 | King |
| 8,166,016 | B2 | 4/2012 | Higgins |
| 8,166,168 | B2 | 4/2012 | Hayashi |
| 8,171,388 | B2 | 5/2012 | Zaltzman |
| 8,230,338 | B2 | 7/2012 | Dugan |
| 8,255,379 | B2 | 8/2012 | Govindachetty |
| 8,264,570 | B2 | 9/2012 | Karimoto |
| 8,271,506 | B2 | 9/2012 | Martinez |
| 8,281,027 | B2 | 10/2012 | Martinez |
| 8,285,483 | B2 | 10/2012 | Amer-Yahia |
| 8,307,029 | B2 | 11/2012 | Davis |
| 8,315,959 | B2 | 11/2012 | Zheng |
| 8,359,314 | B2 | 1/2013 | Svendsen |
| 8,364,611 | B2 | 1/2013 | Tendjoukian |
| 8,380,039 | B2 | 2/2013 | Luo |
| 8,386,506 | B2 | 2/2013 | Martinez |
| 8,390,702 | B2 | 3/2013 | Bhatt |
| 8,401,771 | B2 | 3/2013 | Krumm |
| 8,402,356 | B2 | 3/2013 | Martinez |
| 8,429,156 | B2 | 4/2013 | Buchmueller |
| 8,447,120 | B2 | 5/2013 | Ji |
| 8,452,855 | B2 | 5/2013 | Higgins |
| 8,458,115 | B2 | 6/2013 | Cai |
| 8,463,931 | B2 | 6/2013 | Evans |
| 8,484,223 | B2 | 7/2013 | Ota |
| 8,489,115 | B2 | 7/2013 | Rodriguez |
| 8,490,011 | B2 | 7/2013 | Stapleton |
| 8,493,495 | B2 | 7/2013 | D'Souza |
| 8,503,791 | B2 | 8/2013 | Conwell |
| 8,504,073 | B2 | 8/2013 | Svendsen |
| 8,520,979 | B2 | 8/2013 | Conwell |
| D689,079 | S | 9/2013 | Edwards |
| D689,080 | S | 9/2013 | Edwards |
| D689,083 | S | 9/2013 | Pasceri |
| D689,084 | S | 9/2013 | Pasceri |
| D689,085 | S | 9/2013 | Pasceri |
| 8,538,811 | B2 | 9/2013 | Higgins |
| 8,538,813 | B2 | 9/2013 | Kakarla |
| 8,542,294 | B2 | 9/2013 | Bhatt |
| 8,554,623 | B2 | 10/2013 | Higgins |
| 8,560,390 | B2 | 10/2013 | Higgins |
| 8,560,517 | B2 | 10/2013 | Yang |
| 8,583,620 | B2 | 11/2013 | Govindachetty |
| 8,583,668 | B2 | 11/2013 | Higgins |
| 8,589,389 | B2 | 11/2013 | Bisdikian |
| 8,589,486 | B2 | 11/2013 | Martinez |
| 8,594,702 | B2 | 11/2013 | Naaman |
| 8,606,021 | B2 | 12/2013 | Conwell |
| 8,626,699 | B2 | 1/2014 | Xie |
| 8,671,154 | B2 | 3/2014 | Davis |
| 8,676,001 | B2 | 3/2014 | Brucher |
| 8,706,406 | B2 | 4/2014 | Kalaboukis |
| 8,745,133 | B2 | 6/2014 | Martinez |
| 8,762,285 | B2 | 6/2014 | Davis |
| D708,196 | S | 7/2014 | Pasceri |
| D708,197 | S | 7/2014 | Pasceri |
| D708,198 | S | 7/2014 | Pasceri |
| 8,769,099 | B2 | 7/2014 | Kalaboukis |
| 8,769,393 | B1 | 7/2014 | Abhyanker |
| 8,799,371 | B2 | 8/2014 | Davis |
| 8,805,165 | B2 | 8/2014 | Luo |
| 8,806,365 | B2 | 8/2014 | Stapleton |
| 8,810,597 | B2 | 8/2014 | Akiya |
| 8,813,107 | B2 | 8/2014 | Higgins |
| 8,825,472 | B2 | 9/2014 | Raghuveer |
| 8,831,352 | B2 | 9/2014 | Gao |
| 8,849,854 | B2 | 9/2014 | Kakarla |
| 8,849,909 | B2 | 9/2014 | Farmer |
| D715,819 | S | 10/2014 | Pasceri |
| 8,880,568 | B2 | 11/2014 | Perczynski |
| 8,890,888 | B2 | 11/2014 | Lee |
| 8,892,495 | B2 | 11/2014 | Hoffberg |
| 8,914,342 | B2 | 12/2014 | Kalaboukis |
| 8,923,889 | B2 | 12/2014 | Svendsen |
| 8,930,848 | B2 | 1/2015 | Lim |
| 8,949,212 | B1 | 2/2015 | Dhandapani |
| 8,954,425 | B2 | 2/2015 | Xiao |
| 8,966,121 | B2 | 2/2015 | Josefsberg |
| 8,972,177 | B2 | 3/2015 | Zheng |
| 8,998,422 | B1 | 4/2015 | Snavely |
| 9,009,177 | B2 | 4/2015 | Zheng |
| 9,014,511 | B2 | 4/2015 | Brucher |
| 9,015,617 | B2 | 4/2015 | Stapleton |
| 9,015,633 | B2 | 4/2015 | Takamura |
| 9,020,247 | B2 | 4/2015 | Adam |
| 9,031,953 | B2 | 5/2015 | Rathnavelu |
| 9,032,320 | B2 | 5/2015 | Crawford |
| 9,055,037 | B2 | 6/2015 | Evans |
| 9,063,226 | B2 | 6/2015 | Zheng |
| 9,076,259 | B2 | 7/2015 | Hourie |
| 9,092,409 | B2 | 7/2015 | Charaniya |
| 9,098,545 | B2 | 8/2015 | Abhyanker |
| 9,104,729 | B2 | 8/2015 | Dong |
| 9,104,915 | B2 | 8/2015 | Conwell |
| 9,110,903 | B2 | 8/2015 | Martinez |
| 9,151,618 | B2 | 10/2015 | Amer-Yahia |
| 9,158,794 | B2 | 10/2015 | Higgins |
| 9,160,802 | B2 | 10/2015 | Svendsen |
| 9,172,666 | B2 | 10/2015 | Murdock |
| 9,202,200 | B2 | 12/2015 | Stibel |
| 9,218,328 | B2 | 12/2015 | Stapleton |
| 9,224,172 | B2 | 12/2015 | Churchill |
| 9,235,766 | B2 | 1/2016 | Li |
| 9,239,848 | B2 | 1/2016 | Liu |
| 9,245,041 | B2 | 1/2016 | Pilskalns |
| 9,261,376 | B2 | 2/2016 | Zheng |
| D751,597 | S | 3/2016 | Pasceri |
| 9,311,396 | B2 | 4/2016 | Meadow |
| 9,336,240 | B2 | 5/2016 | Bhatt |
| 9,372,931 | B2 | 6/2016 | Capt |
| 9,390,104 | B2 | 7/2016 | Thomee |
| 9,405,981 | B2 | 8/2016 | Li |
| 9,418,485 | B2 | 8/2016 | Lindberg |
| 9,424,595 | B2 | 8/2016 | Svendsen |
| 9,460,116 | B2 | 10/2016 | Pilskalns |
| 9,462,054 | B2 | 10/2016 | Poletto |
| 9,465,513 | B2 | 10/2016 | Sims |
| 9,471,834 | B1 | 10/2016 | Filip |
| 9,483,500 | B2 | 11/2016 | Brucher |
| 9,501,577 | B2 | 11/2016 | Zheng |
| 9,507,778 | B2 | 11/2016 | Jaffe |

**UNIFIED PATENTS EXHIBIT 1001**
Page 2 of 73

**US 10,621,228 B2**

Page 3

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,519,682 | B1 | 12/2016 | Pujara |
| 9,535,563 | B2 | 1/2017 | Hoffberg |
| 9,536,146 | B2 | 1/2017 | Zheng |
| 9,552,376 | B2 | 1/2017 | Desmond |
| 9,557,162 | B2 | 1/2017 | Rodriguez |
| 9,576,253 | B2 | 2/2017 | Zaltzman |
| 9,582,546 | B2 | 2/2017 | Hartford |
| 9,593,957 | B2 | 3/2017 | Zheng |
| 9,600,484 | B2 | 3/2017 | Davis |
| 9,626,685 | B2 | 4/2017 | Martinez |
| 9,646,025 | B2 | 5/2017 | Boyns |
| 9,654,570 | B2 | 5/2017 | Bisdikian |
| 9,674,650 | B2 | 6/2017 | Hartford |
| 9,679,456 | B2 | 6/2017 | East |
| 9,680,929 | B2 | 6/2017 | Tseng |
| 9,683,858 | B2 | 6/2017 | Zheng |
| 9,691,073 | B2 | 6/2017 | Zheng |
| 9,706,345 | B2 | 7/2017 | Davis |
| 9,710,961 | B2 | 7/2017 | Setlur |
| 9,721,188 | B2 | 8/2017 | Adam |
| 9,754,226 | B2 | 9/2017 | Zheng |
| 9,772,745 | B2 | 9/2017 | Hasenei |
| 9,787,799 | B2 | 10/2017 | Grue |
| 9,805,123 | B2 | 10/2017 | Nair |
| 9,811,879 | B2 | 11/2017 | Miller |
| 9,858,348 | B1 | 1/2018 | Higgins |
| 9,870,572 | B2 | 1/2018 | Chapin |
| 9,881,179 | B2 | 1/2018 | Patton |
| 9,882,994 | B2 | 1/2018 | Bisdikian |
| 9,942,121 | B2 | 4/2018 | Poletto |
| 10,019,850 | B2 | 7/2018 | Lindberg |
| 10,037,327 | B2 | 7/2018 | Thomee |
| 10,068,178 | B2 | 9/2018 | van Zwol |
| 10,074,093 | B2 | 9/2018 | Higgins |
| 10,083,533 | B2 | 9/2018 | Bhatt |
| 10,110,541 | B2 | 10/2018 | Li |
| 10,187,543 | B2 | 1/2019 | Lahcanski |
| 10,223,701 | B2 | 3/2019 | King |
| 10,230,803 | B2 | 3/2019 | Higgins |
| 10,235,444 | B2 | 3/2019 | Poletto |
| 10,242,051 | B2 | 3/2019 | Shinn |
| 10,282,752 | B2 | 5/2019 | Athsani |
| 10,288,433 | B2 | 5/2019 | Zheng |
| 10,289,643 | B2 | 5/2019 | Brucher |
| 10,303,975 | B2 | 5/2019 | Adam |
| 10,311,611 | B2 | 6/2019 | Stoop |
| 10,318,110 | B2 | 6/2019 | Naaman |
| 10,331,863 | B2 | 6/2019 | Patton |
| 10,360,352 | B2 | 7/2019 | Patton |
| 10,430,452 | B2 | 10/2019 | Ross |
| 10,445,346 | B2 | 10/2019 | Govindachetty |
| 2005/0060299 | A1 | 3/2005 | Filley |
| 2006/0165380 | A1* | 7/2006 | Tanaka .................. G11B 27/34 |
| | | | 386/227 |
| 2007/0118508 | A1 | 5/2007 | Svendsen |
| 2007/0282908 | A1 | 12/2007 | Van Der Meulen |
| 2008/0040034 | A1 | 2/2008 | Kanno |
| 2008/0051994 | A1 | 2/2008 | Fisher |
| 2008/0148175 | A1 | 6/2008 | Naaman |
| 2008/0201302 | A1 | 8/2008 | Kimchi |
| 2008/0250398 | A1 | 10/2008 | Takahashi |
| 2009/0013041 | A1 | 1/2009 | Farmer |
| 2009/0019085 | A1 | 1/2009 | Abhyanker |
| 2009/0049408 | A1 | 2/2009 | Naaman |
| 2009/0106705 | A1 | 4/2009 | Takamura |
| 2009/0113350 | A1* | 4/2009 | Hibino .................. G06F 16/41 |
| | | | 715/853 |
| 2009/0132689 | A1 | 5/2009 | Zaltzman |
| 2009/0132941 | A1 | 5/2009 | Pilskalns |
| 2009/0135438 | A1 | 5/2009 | Chopra |
| 2009/0216704 | A1 | 8/2009 | Zheng |
| 2009/0222302 | A1 | 9/2009 | Higgins |
| 2009/0254867 | A1 | 10/2009 | Farouki |
| 2009/0265631 | A1 | 10/2009 | Sigurbjornsson |
| 2009/0279794 | A1 | 11/2009 | Brucher |
| 2009/0288005 | A1 | 11/2009 | Stapleton |
| 2009/0290812 | A1 | 11/2009 | Naaman |
| 2009/0307618 | A1 | 12/2009 | Lawler |
| 2009/0325602 | A1 | 12/2009 | Higgins |
| 2010/0041419 | A1 | 2/2010 | Svendsen |
| 2010/0046842 | A1 | 2/2010 | Conwell |
| 2010/0053371 | A1 | 3/2010 | Karimoto |
| 2010/0064239 | A1 | 3/2010 | Crawford |
| 2010/0082427 | A1 | 4/2010 | Burgener |
| 2010/0107125 | A1 | 4/2010 | Ockene |
| 2010/0153348 | A1 | 6/2010 | Perczynski |
| 2010/0162411 | A1 | 6/2010 | Chang |
| 2010/0171763 | A1 | 7/2010 | Bhatt |
| 2010/0182341 | A1 | 7/2010 | Lee |
| 2010/0185509 | A1 | 7/2010 | Higgins |
| 2010/0241689 | A1 | 9/2010 | Davis |
| 2010/0241944 | A1 | 9/2010 | Athsani |
| 2010/0268717 | A1 | 10/2010 | Pilskalns |
| 2010/0268766 | A1 | 10/2010 | Bouget |
| 2010/0280913 | A1 | 11/2010 | O'Sullivan |
| 2010/0293035 | A1 | 11/2010 | Athsani |
| 2010/0293193 | A1 | 11/2010 | Harrison |
| 2011/0040779 | A1 | 2/2011 | Svendsen |
| 2011/0093458 | A1 | 4/2011 | Zheng |
| 2011/0109769 | A1 | 5/2011 | Bhatt |
| 2011/0113064 | A1 | 5/2011 | Govindachetty |
| 2011/0145258 | A1 | 6/2011 | Kankainen |
| 2011/0191014 | A1 | 8/2011 | Feng |
| 2011/0191253 | A1 | 8/2011 | Pilskalns |
| 2011/0202267 | A1 | 8/2011 | Amer-Yahia |
| 2011/0208426 | A1 | 8/2011 | Zheng |
| 2011/0289031 | A1 | 11/2011 | Zheng |
| 2011/0301832 | A1 | 12/2011 | Zheng |
| 2011/0314016 | A1 | 12/2011 | Svendsen |
| 2012/0114249 | A1 | 5/2012 | Conwell |
| 2012/0158755 | A1 | 6/2012 | Gammill |
| 2012/0218150 | A1 | 8/2012 | Oyabu |
| 2012/0220311 | A1 | 8/2012 | Rodriguez |
| 2012/0251011 | A1 | 10/2012 | Gao |
| 2012/0266090 | A1 | 10/2012 | Nealer |
| 2012/0278171 | A1 | 11/2012 | Tang |
| 2012/0278767 | A1 | 11/2012 | Stibel |
| 2012/0329441 | A1 | 12/2012 | Tseng |
| 2012/0331091 | A1 | 12/2012 | Tseng |
| 2013/0018881 | A1 | 1/2013 | Bhatt |
| 2013/0036165 | A1 | 2/2013 | Tseng |
| 2013/0063613 | A1 | 3/2013 | Conwell |
| 2013/0073202 | A1 | 3/2013 | Zheng |
| 2013/0101157 | A1 | 4/2013 | Li |
| 2013/0138685 | A1 | 5/2013 | Brucher |
| 2013/0141612 | A1 | 6/2013 | Bhatt |
| 2013/0151597 | A1 | 6/2013 | Akiya |
| 2013/0202198 | A1 | 8/2013 | Adam |
| 2013/0275536 | A1 | 10/2013 | Murdock |
| 2013/0339440 | A1 | 12/2013 | Balassanian |
| 2014/0059477 | A1 | 2/2014 | Wong |
| 2014/0071272 | A1 | 3/2014 | Rodriguez |
| 2014/0089811 | A1 | 3/2014 | Meadow |
| 2014/0101531 | A1 | 4/2014 | Capt |
| 2014/0101601 | A1 | 4/2014 | Tang |
| 2014/0143247 | A1 | 5/2014 | Rathnavelu |
| 2014/0149036 | A1 | 5/2014 | Amer-Yahia |
| 2014/0181089 | A1 | 6/2014 | Desmond |
| 2014/0188880 | A1 | 7/2014 | Abhyanker |
| 2014/0193087 | A1 | 7/2014 | Conwell |
| 2014/0354628 | A1 | 12/2014 | Lindberg |
| 2015/0039630 | A1 | 2/2015 | Thomee |
| 2015/0070165 | A1 | 3/2015 | East |
| 2015/0070397 | A1 | 3/2015 | Miller |
| 2015/0116540 | A1 | 4/2015 | Zheng |
| 2015/0117713 | A1 | 4/2015 | Zheng |
| 2015/0156247 | A1 | 6/2015 | Hensel |
| 2015/0186389 | A1 | 7/2015 | Zheng |
| 2015/0213057 | A1 | 7/2015 | Brucher |
| 2015/0213329 | A1 | 7/2015 | Adam |
| 2015/0244794 | A1 | 8/2015 | Poletto |
| 2015/0244833 | A1 | 8/2015 | Grue |
| 2015/0358224 | A1 | 12/2015 | Poletto |
| 2016/0092741 | A1 | 3/2016 | Li |

**UNIFIED PATENTS EXHIBIT 1001**

**Page 3 of 73**

US 10,621,228 B2

Page 4

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2016/0162512 A1 | 6/2016 | Battistini |
| 2016/0247307 A1 | 8/2016 | Stoop |
| 2016/0253358 A1 | 9/2016 | Bhatt |
| 2016/0314187 A1 | 10/2016 | Poletto |
| 2016/0321269 A1 | 11/2016 | Thomee |
| 2016/0328444 A1 | 11/2016 | Shinn |
| 2016/0344888 A1 | 11/2016 | Lahcanski |
| 2017/0024415 A1 | 1/2017 | Brucher |
| 2017/0103081 A1 | 4/2017 | Jones |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 2410414 B1 | 10/2019 |
| WO | WO 2011/070225 A1 | 6/2011 |
| WO | WO 2013/019376 A1 | 2/2013 |
| WO | WO 2013/099704 A1 | 7/2013 |

OTHER PUBLICATIONS

Miller et al., "Give and take: a study of consumer photo-sharing culture and practice," CHI '07 Proceedings of the SIGCHI Conference on Human Factors in Computing Systems, pp. 347-356, 2007 (10 pages).
Ames et al., "Why we tag: motivations for annotation in mobile and online media," CHI '07 Proceedings of the SIGCHI Conference on Human Factors in Computing Systems, pp. 971-980, ACM, 2007 (10 pages)10083533.
Yee et al., "Faceted Metadata for Image Search and Browsing," CHI 2003, pp. 401-408, 2003, ACM.
Ferre, "CAMELIS: Organizing and Browsing a Personal Photo Collection with a Logical Information System", Int. Conf. Concept Lattices and Their Applications, pp. 112-123, 2007, HAL.
Tomasson et al., "PhotoCube: Effective and Efficient Multi-Dimensional Browsing of Personal Photo Collections", ICMR '11, 2011, ACM.
Bartolini et al., "Integrating Semantic and Visual Facets for Browsing Digital Photo Collections", SBED, pp. 65-72, 2009.
Trattner et al., "Evaluating Tag-Based Information Access in Image Collections", Proceedings of the 23rd ACM Conference on Hypertext and Social Media, pp. 113-122, 2012 ACM.
Kang et al., "Capture, Annotate, Browse, Find, Share: Novel Interfaces for Personal Photo Management", International Journal of Human-Computer Interaction, 23(3), pp. 315-337, 2007, Lawrence Eribaum Associates, Inc.
Jaffe et al., "Generating Summaries and Visualization for Large Collections of GeoReferenced Photographs", MIR '06, pp. 89-98, 2006 ACM.
Torniai et al., "Sharing, Discovering and Browsing Geotagged Pictures on the Web", 2007, Hewlett-Packard Development Company, L.P., pp. 1-18 (19 pages).
Snavely et al., "Photo Tourism: Exploring Photo Collection in 3D", SIGGRAPH '06 ACM Transactions on Graphics, vol. 25, Issue 3, pp. 835-846, 2006 ACM.

Kisilevich et al., "Event-based analysis of People's Activities and Behavior Using Flickr and Panoramic Geotagged Photo Collections", 14th International Conference Information Visualization, pp. 289-296, 2010 IEEE.
Ahern et al., "World Explorer: Visualizing Aggregate Data From Unstructured Text in Geo-Referenced Collections", JCDL '07, pp. 1-10, 2007, ACM.
Kopf et al., "Deep photo: model-based photograph enhancement and viewing", ACM Transactions on Graphics, vol. 27, No. 5, Article 116, Dec. 2008, ACM (10 pages).
Amundsen, J.; "Using the Geographical Location of Photos in Mobile Phones"; Master of Science in Computer Science submission; Norwegian University of Science and Technology; Jul. 2008 (112 pages).
Gentile, L; "Using Flickr Geotags to Find Similar Tourism Destinations"; master thesis, 2011; Politecnico di Milano, Dept. of Computer Engineering (96 pages).
Hollenstein, L.; "Capturing Vernacular Geography from Georeferenced Tags"; Master Thesis; Institute of Geography, University of Zurich; Nov. 2008 (139 pages).
Nutanong, S. et al.; "An Efficient Layout Method for a Large Collection of Geographic Data Entries"; Center for Automation Research, Institute for Advanced Computer Studies, Dept. of Computer Science, University of Maryland; pp. 717-720 (4 pages).
Slingsby, A. et al.; "Interactive tag maps and tag clouds for the multiscale exploration of large spatio-temporal datasets"; Information Visualization, pp. 497-504; 2007, IV '07. 11th International Conference. ISSN: 1550-6037 (9 pages).
Hoffman, A.; "Create Great iPhone Photos: Apps, Tips, Tricks, and Effects"; copyright 2011; ISBN-10: 1-59327-285-5, ISBN-13: 978-1-59327-285-2 (216 pages).
Chen, Y-F. et al.; "GeoTracker: Geospatial and Temporal RSS Navigation"; AT&T Labs—Research, Florham Park, NJ; WWW 2007 / Track: Browsers and User Interfaces, Session: Smarter Browsing, pp. 41-50 (10 pages).
Goodman, E.; "Destination Services: Tourist media and networked places"; School of Information, UC Berkeley; Mar. 2, 2007 (11 pages).
Rattenbury, T. et al.; "Towards Automatic Extraction of Event and Place Semantics from Flickr Tags"; SIGIR '07, Jul. 23-27, 2007; Amsterdam, The Netherlands; ACM 978-1-59593-597-7/07/0007 (8 pages).
Kadar, B. et al.; "Where Do Tourists Go? Visualizing and Analysing the Spatial Distribution of Geotagged Photography"; Cartographica 48:2, pp. 78-88; 2013; University of Toronto Press; doi: 10.3138/carto.48.2.1839 (11 pages).
Kennedy, L. et al.; "How Flickr Helps Us Make Sense of the World: Context and Content in Community-Contributed Media Collections"; MM '07, Sep. 23-28, 2007; Augsburg, Bavaria, Germany; Copyright 2007; ACM 978-1-59593-701-8/07/0009 (10 pages).
Richard, G. et al.; "Geotagging Photographs for Distribution on the Web"; Mineral Physics Institute, Earth and Space Sciences Building, Stony Brook University, Stony Brook, NY; date unknown (9 pages).

* cited by examiner

**FIG. 1**



# FIG. 2





Comments:
Suzanne and Anthony's Wedding Party where the cousins posed for a photo in the grass.  Note, Jack with the lollipop and the photographer with his shoe in the photo

People:
Jack Wong
CJ Wong
Mary Firestone
Zoe Peika
Nick Persons

Event: Suzanne & Anthony's Wedding Reception 2010

Camera Details: more

Location:
Historical Society
Lisle, IL 60532

**UNIFIED PATENTS EXHIBIT 1001**

**FIG. 3**



**FIG. 4**



UNIFIED PATENTS EXHIBIT 1001

**FIG. 5**



UNIFIED PATENTS EXHIBIT 1001
Page 9 of 73

**FIG. 6**



UNIFIED PATENTS EXHIBIT 1001
Page 10 of 73

**FIG. 7**



**Clinton Dewitt Firestone IV**

Birth:       July 12, 1896
Death:      April 29, 1971
Parents:   Clinton Dewitt Firestone III and Viola Miller
Comments:  He was a WWII U.S. Air force pilot and POW in WWII and veteran honorably discharged in December of 1947. He worked for 44 years for the Firestone Tire and Rubber Company in retail, wholesale and original equipment sales, marketing and management. He was born in Akron, OH and is buried in Columbiana, OH.

Edit bio

| Locations | Timeline | Family Tree | Recipes |
|-----------|----------|-------------|---------|

  

UNIFIED PATENTS EXHIBIT 1001
Page 11 of 73

**FIG. 8**



UNIFIED PATENTS EXHIBIT 1001
Page 12 of 73

**FIG. 9**



UNIFIED PATENTS EXHIBIT 1001
Page 13 of 73

# FIG. 10



**Desmond's Yellow Thai Chicken Curry**

Curry Mix
- Coconut milk (400 ml) – DO NOT SHAKE IT UP
- 800 gram of chicken (4 chicken breast)
- Fish sauce (Nam Pla) Thai Bamboo Garden – Bottle
- Garlic (2 cloves)
- Broccoli ( 2cups chopped)
- 2 Peppers (chopped)
- 2 Carrots (chopped)

- 1 Zucchini (chopped)
- Thai Basil (8 leaves)
- Lemon Grass (in jar) 1 teaspoon
- Chinese Ginger Root (in jar) 1 teaspoon

Rice
- Thai Rice (something that only takes 2 cups of water)
- Dice chicken in bowl and add two tablespoons of fish sauce. Let marinate for 20 minutes.
- Take thick part of coconut milk out into pan (about 4 tablespoons), Curry paste, 1 spoon of lemon grass, 1 spoon of ginger and garlic. Heat over high with boil and THEN stir for 1 minute. Add meat (uncooked) and fry until cooked over high heat
- Add milk, brown sugar and salt. Bring back to slight boil and constantly stir. Add veggies and soy sauce. Cook for about 10-14 minutes COVERED until veggies are cooked. Serve with a smile.

Chef: Barry Desmond



Video on How to Make It



Original Handwritten Recipe

**FIG. 11**

Thumbnail | Table

| Album/Event | Date | Location | # Photos | # Videos | # Docs |
|---|---|---|---|---|---|
| Jack Monk's Arrival | 26-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's First Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 2nd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 3rd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Wrigley Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 4th Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Nancy Learns How to Ride a Bike | 21-Jul-1978 | St. Louis, MO | 76 | 2 | 0 |

**UNIFIED PATENTS EXHIBIT 1001**

## FIG. 12

Thumbnail | Table

| Album/Event | Date | Location | # Photos | # Videos | # Docs |
|---|---|---|---|---|---|
| Jack Monk's Arrival | 26-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's First Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 2nd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 3rd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Wrigley Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 4th Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Nancy Learns How to Ride a Bike | 21-Jul-1978 | St. Louis, MO | 76 | 2 | 0 |

**UNIFIED PATENTS EXHIBIT 1001**
**Page 16 of 73**

**FIG. 13**

Thumbnail | Table

| Last Name | # People | # Photos | # Videos | # Docs |
|---|---|---|---|---|
| + Alberts | 2 | 8 | 0 | 0 |
| + Annex | 2 | 7 | 0 | 0 |
| + Bade | 3 | 8 | 0 | 0 |
| + Bacon | 4 | 8 | 0 | 0 |
| + Bates | 5 | 7 | 1 | 0 |
| + Boone | 6 | 6 | 2 | 2 |
| + Danas | 7 | 5 | 4 | 1 |
| + Danes | 8 | 7 | 3 | 2 |
| - Monk (All) | 2 | 499 | 4 | 14 |
| Monk, CJ | 1 | 200 | 2 | 7 |
| Monk, Jack | 1 | 199 | 2 | 7 |
| + Firestone | 21 | 1249 | 17 | 39 |
| + Moore | 1 | 4 | 6 | 3 |
| + Slythe | 1 | 9 | 0 | 9 |
| + Stein | 2 | 249 | 1 | 3 |
| + Testy | 4 | 788 | 2 | 12 |

**U.S. Patent**    **Apr. 14, 2020**    **Sheet 14 of 50**    **US 10,621,228 B2**

## FIG. 14

Thumbnail | Table

| Last Name | Relationship | # Photos | # Videos | # Docs |
|---|---|---|---|---|
| Alberts, John | Cousin | 8 | 0 | 0 |
| Killian, Jack | Son | 7 | 0 | 0 |
| Killian, Brian | Nephew | 8 | 0 | 0 |
| Killian, Kevin | Nephew | 8 | 0 | 0 |
| Killian, Sarah | Daughter-in-law | 7 | 1 | 0 |
| Killian, John | Great Nephew | 6 | 2 | 2 |
| Killian, Mark | Great Nephew | 5 | 4 | 1 |
| Killian, Louis | Great Grandson | 7 | 3 | 2 |
| Killian, John | Grandson | 499 | 4 | 14 |
| Monk, CJ | Great Grandson | 200 | 2 | 7 |
| Monk, Jack | Great Grandson | 199 | 2 | 7 |
| Firestone, Mike | Third Cousin | 1249 | 17 | 39 |
| Moore, Bertha | Great Niece | 4 | 6 | 3 |
| Slythe, Sarah | Sister | 9 | 0 | 9 |
| Killian, John | Brother | 249 | 1 | 3 |
| Killian, Mike | Brother | 788 | 2 | 12 |

UNIFIED PATENTS EXHIBIT 1001
Page 18 of 73

## FIG. 15

Thumbnail | Table

| Location Name | Address | City | State | Country | # Photos | # Videos | # Docs |
|---|---|---|---|---|---|---|---|
| Dom | | Cologne | | Germany | 3 | 2 | 0 |
| Lucilla & Roberto | | Montalcino | | Italy | 6 | 1 | 0 |
| Lisle Home | 898 West St | Lisle | IL | USA | 45 | 12 | 2 |
| College | 545 Market | Akron | OH | USA | 64 | 2 | 0 |
| Amazon Trip | | Manus | | Brazil | 235 | 8 | 2 |
| Cabin | 999 Pine | Lake Geneva | WI | USA | 98 | 2 | 0 |
| Grad School | 903 Plymouth | Charleston | IL | USA | 1256 | 32 | 4 |
| Griffith Park | 298 Glencarin | Los Feliz | CA | USA | 12 | 0 | 0 |
| LA Equestrian Ctr | 568 Horse Dr | Glendale | CA | USA | 4 | 4 | 0 |
| Del Coronado | 12 Coronado Dr | Coronado | CA | USA | 321 | 4 | 0 |
| Fenway Park | 123 Yawke | Boston | MA | USA | 57 | 3 | 5 |
| Wrigley Field | 1190 W Addison | Chicago | IL | USA | 498 | 7 | 3 |
| Home | 444 Main | Anywhere | IL | USA | 10,987 | 49 | 9 |
| GA Grill Party | 321 Silver | Macon | GA | USA | 15 | 0 | 0 |
| Pike's Market | 786 Market | Seattle | WA | USA | 18 | 1 | 0 |
| Raffels | 345 Fong | Singapore | | Singapore | 23 | 2 | 0 |

**UNIFIED PATENTS EXHIBIT 1001**
**Page 19 of 73**

**FIG. 16**

Category | Card | Table

| Recipe | Chef | Date | Category |
|---|---|---|---|
| Blacks Yellow Thai Chicken Curry | Jack Black | 31 Jan 2010 | Dinner |
| Skinny Germans | Gerda | 29 Dec 2003 | Breakfast |
| KFC in a Bag | The Kernal | 13 Sept 1988 | Anytime |
| Shit on a Shingle | George James | 5 Aug 1998 | Anytime |
| Mrs. Fields Cookies | Mrs. Fields | 21 July 1978 | Dessert |
| Chicken Pot Pie | Jack Black | 31 Jan 2010 | Dinner |
| Roll Your Own Dough | Vito Spadavecchio | 29 Dec 2003 | Dinner |
| Pizza ala Franciscan | Charles Faso | 13 Sept 1988 | Dinner |
| Meatball Delight | Ben Delight | 5 Aug 1998 | Dinner |
| Almond Cookies | Lori James | 21 July 1978 | Dessert |
| Jumpin Jack Flap Jacks | Jack Jack | 31 Jan 2010 | Breakfast |
| Vicki's Chow Mein | Vicki Firestone | 29 Dec 2003 | Dinner |
| Fat Steak | Barry Monk | 13 Sept 1988 | Dinner |
| Mud Pie | Nancy Monk | 5 Aug 1998 | Dessert |
| Caesar Salad | Christopher Monk | 21 July 1978 | Anytime |
| Daddio Pancakes | Barry Monk | 2 March 2011 | Breakfast |

**UNIFIED PATENTS EXHIBIT 1001**

**FIG. 17**



UNIFIED PATENTS EXHIBIT 1001
Page 21 of 73

**FIG. 18**



**UNIFIED PATENTS EXHIBIT 1001**
**Page 22 of 73**

**FIG. 19**



**Captain Phil's Memory-Webb**

Welcome, Captain Phil
Last Login:        11.18.2010

**My recent memories:**
- 123 Photos uploaded on 11.07.10
- 2 albums created 11.17.10
- 12 visitors since last login date
- 123 Photos uploaded on 11.07.10
- 2 albums created 11.17.10

**My recent Webb views:**
- Captain Phil 2010 (photo album)
- Chicken Pot Pie (recipe)
- Captain Phil (Timeline)

**Updates and Alerts:**
- License renewal due 1.15.2011

| Media | Count | Archive Status | Count |
|---|---|---|---|
| # Photos | 1,342 | | 80% complete |
| # Videos | 75 | | 61% complete |
| # Documents | 173 | | |

**People Stats:**

| Last Name | # People | # Photos | # Videos | # Docs |
|---|---|---|---|---|
| Monk | 7 | 499 | 4 | 14 |
| Firestone | 11 | 1,249 | 17 | 39 |
| Testy | 4 | 788 | 1 | 12 |

**Event Stats:**

| Event | Date | Location | # Media |
|---|---|---|---|
| Mike Testy's 1st Birthday | 13-Sept-1988 | Minneapolis, MN | 21 |
| Cubs Beat Cards Aug 1998 | 5-Aug-1998 | Chicago, IL | 2,199 |
| Nancy Learns to Ride Bike | 21-July-1978 | St. Louis, MO | 2 |

UNIFIED PATENTS EXHIBIT 1001
Page 23 of 73

**FIG. 20**



**FIG. 21**



**UNIFIED PATENTS EXHIBIT 1001**
Page 25 of 73

**FIG. 22**



EXIF Tags version 2.3 Image File Directories (Data Blocks) — 0320
0321 · 0322 · 0323

MemoryWeb_Tag (Data Blocks) — 0360
0361

| Tag Labels | EXIF Family Group Name | Location | | MemoryWeb Tag |
|---|---|---|---|---|
| Description Title | IFD0 | 0x9c9b or 0x010e | | MediaAsset.Caption — 0362 |
| Description Subject | IFD0 | 0x9c9f | | |
| Description Rating | | N/A | | MediaAsset.StarRanking — 0363 |
| Description Tags | IFD0 | 0x9c9e | | |
| Description Comments | IFD0 | 0x9c9c | | |
| Origin Authors | IFD0 | 0x9c9d | | |
| Origin Date Taken | ExifIFD | 0x9003 | | MediaAsset.DateCreated — 0364 |
| Origin Date Acquired | | N/A | | |
| Origin Copyright | IFD0 | 0x8298 | | |
| *Image (Image ID, Dimensions, Width Height, etc)* | | *Multiple* | | |
| Width | | 0xbc80 | | MediaAsset.Width — 0365 |
| Height | | 0xbc81 | | MediaAsset.Height — 0366 |
| *Camera (Camera Maker, Camera Model, etc)* | | *Multiple* | | |
| *Advanced Photo (Lens Maker, Lens Model, etc)* | | *Multiple* | | |
| User Comment | ExifIFD | 0x9286 | | This is used to inject information that do not currently have EXIF standardized tags including Collection, People, Location Name, Recipe Name, Person Tag Data Blocks (0380), etc. — 0367 |
| GPS Latitude | GPS | 0x0002 | | MediaAsset.Location.Latitude — 0368 |
| GPS Latitude Ref | GPS | 0x0003 | | MediaAsset.Location.Latitude — 0369 |
| GPS Longitude | GPS | 0x0004 | | MediaAsset.Location.Longitude — 0370 |
| GPS Longitude Ref | GPS | 0x0005 | | MediaAsset.Location.Longitude — 0371 |
| GPS Altitude | GPS | 0x0006 | | |

(row labels at left: 0324, 0325, 0326, 0327, 0328, 0329, 0330, 0331, 0332, 0333; inline references 0334, 0335)

**FIG. 23**



**UNIFIED PATENTS EXHIBIT 1001**
**Page 27 of 73**

**FIG. 24**



UNIFIED PATENTS EXHIBIT 1001
Page 28 of 73

FIG. 25

0400
0401
Third Party Facial Recognition Provider
Outside MW System
Inside MW System
Start
0402
System request for thumbnails of all Digital Files that have unconfirmed faces
0300
User Relationship Table
0403
Retrieves Thumbnails of all Digital Files that have unconfirmed faces
0404
System sends Digital Files to Third Party Facial Recognition Provider
0405
System receives response from Third Party Facial Recognition Provider
0406
System parses identified faces and corresponding Facial Recognition data for each Digital File
0407
Existing (Trained) Face ID in User Relationship Table?
Yes
No
0408
Is Face Recognition above score threshold?
Yes
No
0409
System records and associates specific face for Digital File with a MemoryWeb Person ID and sends to MemoryWeb Person Tag (Data Blocks) in User Relationship Table
0410
System generates facial recognition record for unknown person and then sends information to MemoryWeb Person Tag (Data Blocks) in User Relationship Table
0411
System generates virtual unconfirmed facial recognition record for person and then sends information to MemoryWeb Person Tag (Data Blocks) in User Relationship Table



**FIG. 26**

0500
0501
Third Party Media Provider
Outside MW System
Inside MW System
0503
Systems sends registration confirmation
0504
Systems receives registration confirmation, Third Party Media ID
0507
System receives contact names and IDs from Third Party Media Provider (daily)
0502
User selects sharing of their information with Third Party Media Provider with MemoryWeb
Start
0505
System sends registration information to User Setting Table?
0506
System requests contact names and IDs from Third Party Media Provider (daily)
0508
Is Person a Match
Yes
No
0509
System associates existing Person to Tag Data Block of Relationship Table for Digital File
0510
System add new person to Tag Data Block of Relationship Table for Digital File
0300
User Relationship Table
User Settings Table
1900
1000
Share to Third Party Media Provider System

**FIG. 27**



1900

| Item |
|------|
| 1901 — User's Name |
| 1902 — Payment ID |
| 1903 — Password |
| 1904 — Account Type |
| 1905 — User's email |
| 1906 — Language preference |
| 1907 — Date format |
| 1908 — Email notifications |
| 1909 — Contacts (with third Party Social Media) |
| 1910 — Facebook ID |
| 1911 — API Token |
| 1912 — Payment Date |
| 1913 — ... |

UNIFIED PATENTS EXHIBIT 1001
Page 31 of 73

FIG. 28

Start
User selects Digital File in MW
0601
System sends request to Relationship Table for specific Digital File
0602
User Relationship Table
0300
System retrieves Digital File and Digital File Tag Data Blocks from User Relationship Table
0603
System will display the Digital File and the corresponding Digital File Tag Data Blocks in the form of Application Dot-Tags
0604
User selects Application Dot-Tag
0605
Continuous Link of Application Dot-Tag System
0700
0600
User selects add for a MemoryWeb Tag
0606
Tag data exists?
0607
Yes
No
User selects matching MemoryWeb Tag
0608
User adds New MemoryWeb Tag
0609
System associates new MemoryWeb tag to Tag Data Block of Relationship Table for Digital File
0610
System creates new MemoryWeb tag to Tag Data Block of Relationship Table for Digital File
0611
User selects edit for a MemoryWeb Application Dot-Tag
0612
Tag data exists?
0613
User selects matching MemoryWeb Tag
0614
User adds New MemoryWeb Tag
0615
System associates existing MemoryWeb Tag to Tag Data Block of Relationship Table for Digital File
0616
System creates new MemoryWeb tag to Tag Data Block of Relationship Table for Digital File
0617
User selects delete for a MemoryWeb Application Dot-Tag
0618
System deletes association of MemoryWeb tag to Tag Data Block of Relationship Table for Digital File
0619



Case: 24-1328   Document: 19   Page: 273   Filed: 05/28/2024



**FIG. 29**

**Structure**

0652 0653 0651

####  User Defined Tag Label

0650

**Examples**

Within Character Limit for Labels and Numbers

453  Cologne Germany

0654

Exceeds Character Limit for Labels and Numbers

>999  Holiday Photos from …

0655   0657   0658

Dotted Application Dot-Tag denotes partial relationship.
In this example, person is a half-sibling to another person.

45  Frank Smith

0656

**UNIFIED PATENTS EXHIBIT 1001**
**Page 33 of 73**

FIG. 30

Start
User selects Application Dot-Tag
0700
0716
Displays Image in Slideshow view
0701
0702
Is Person Dot-Tag?
Yes
No
0709
If Person Application Dot-Tag, system retrieves data for that person from User's User Relationship Table and displays relationship data in People Profile View
0703
Is Collection Dot-Tag?
Yes
No
0710
If Collection Application Dot-Tag, system retrieves data from that collection from User's User Relationship Table and displays relationship data in Collection View
0708
System sends request to Relationship Table
User Relationship Table
0704
Is Location Dot-Tag?
0711
If Location Application Dot-Tag, system retrieves data from that Location from User's User Relationship Table and displays relationship data in individual Location View
0715
Is Image Selected?
0705
Is Date Dot-Tag?
0300
0712
If date Application Dot-Tag, system retrieves data from that date from User's User Relationship Table and displays relationship data in Uploads View
0717
User selects Application Dot-Tag
0706
Is Recipe Dot-Tag?
0713
If Recipe Application Dot-Tag, system retrieves data from that Recipe from User's User Relationship Table and displays relationship data in Recipe View
0707
0714
•••

Case: 24-1328     Document: 19     Page: 275     Filed: 05/28/2024



FIG. 31

**UNIFIED PATENTS EXHIBIT 1001**

Page 35 of 73

**FIG. 32**

Multiple People Application View
1401
1450
1451
1400
Uploads Collections People Locations Recipe Family Tree
Fast Search
Apply Filters
Sort By: Newest to Oldest
1402
Jon Smith
Jane Smith (Doe)
Jackson Smith
JC Jon Smith
1405
Page: 1
1403
1404
Items Per Page: 20 50 100
1430
Single People Profile Application View
Uploads Collections People Locations Recipe Family Tree
Fast Search
Apply Filters
< View all People
1432
1431—JC Jon Smith
Edit
1447
1453
1454
1433—Nicknames: Chip
1434—Born: 5 1/1/2004
1448
1449
1435—Parents: 4 Jon Smith and 4 Jane Smith (Doe)
1436—Siblings: 5 Jackson Smith
1437—Children:
1438—Biography: JC was named after his great, great grandfather from German who's real name was Johan Christoph.
1439
1452
JC Tags:
1441
1442
1443
1444
1445
4 Photos 3 Collections 2 Facial Recognitions 3 Locations 7 Family Relationships 1 Recipe
Change Profile Photo
1440
1446
Page: 1
Items Per Page: 20 50 100

FIG. 33

Multiple Collection View
1501
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
1500
Sort By: Newest to Oldest
1502
1507
our family
Smith Family Photos
Europe Trip
SCHOOL
First Day of School
Jackson and JC Photos 2013
Baseball Games
Page: 1
1503
1504
1505
1506
Items Per Page: 20 50 100
1530
Individual Collection View
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
< View all Collections
1531
Share this Collection:
Edit
1534
Smith Family Photos
1532
1535
our family
SCHOOL
1533
Page: 1
Items Per Page: 20 50 100

FIG. 34

Multiple Location Application View
1605
Uploads Collections People Locations Recipe Family Tree
Fast Search
Apply Filters
1600
Sort By: Newest to Oldest
1606
Wrigley Field
Abe Lincoln Elementary School
Home Sweet Home
Stonehenge
Page: 1
1601
1602
1603
1604
Items Per Page: 20 50 100
1630
Single Location Application View
Uploads Collections People Locations Recipe Family Tree
Fast Search
Apply Filters
< View all Locations
1631
Wrigley Field
3651 N. Clark St.
1632
Chicago Illinois, United States
Share this Collection:
1636
Edit
1637
1633
1 Photos
1634
1635
Page: 1
Items Per Page: 20 50 100



**FIG. 35**



UNIFIED PATENTS EXHIBIT 1001
Page 39 of 73

FIG. 36

1800
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
Show all Recipes
1802
Lori Doe Pecan Puffs
1801
Share this Collection:
1812
Edit
1813
Chef
1804
Lori Doe
1816
+ add / edit Chef
1803
Recipe Photos
1806
1807
Ingredients
1809
1 Stick of butter
1 cup of flour
½ teaspoon of vanilla
1 cup of grand pecans
2 tablespoons of sugar
Directions
1810
Mix all. Roll gently into 1 inch balls. 300
and immediately roll in sugar.
Comments
1811
This is one of my favorite recipes around the holidays and was
one of Grandma Lori's best!
1814
1808
1815

**FIG. 37**

0800
Start
User selects Advanced Filter
0801
0802
User types information into the text box
0803
System sends request
0300
User Relationship Table
0804
0805
System displays possible matches of filters
System produces request
0806
User selects filter(s)
0807
User selects apply
0808
System sends request
0809
If in Uploads view, system retrieves data for applied filter(s) from User's User Relationship Table and displays relationship data
0810
If in Collections view, system retrieves data for applied filter(s) from User's User Relationship Table and displays relationship data
0811
If in Locations view, system retrieves data for applied filter(s) from User's User Relationship Table and displays relationship data
0814
If in People view, system retrieves data for applied filter(s) from User's User Relationship Table and displays relationship data
0812
...
0813
User desires to add additional Advanced Filter
Continuous Link of Application Dot-Tags System
0700

FIG. 38

0830
Fast Search
Apply Filters...
0831
Apply Multiple Filters
0838
0836
Search for Filters to Add:
Smith
0832
Available Filters
Current Active Filters
Person: JC Smith
Person: Jackson Smith
Person: Jon Smith
Person: Jane Smith
Location: Smithsonian
Collection: Smithsonian Trip
Apply
Clear Filters
Cancel
0839
0833
Apply Multiple Filters
Search for Filters to Add:
Smith
0837
Available Filters
Current Active Filters
0834
Person: JC Smith
Person: Jackson Smith
Person: Jon Smith
Person: Jane Smith
Location: Smithsonian
Collection: Smithsonian Trip
Person: JC Smith
Apply
Cancel
0835

**FIG. 39**



FIG. 40



UNIFIED PATENTS EXHIBIT 1001
Page 44 of 73

**FIG. 41**



**FIG. 42**



UNIFIED PATENTS EXHIBIT 1001

**FIG. 43**



FIG. 44

0900
Start
0901
User selects Search bar
0902
User types information to search
0903
System sends request
0300
User Relationship Table
0904
System searches all potential tags blocks
0905
System displays possible matches by category
0906
User selects match
0907
If user selects Person fast search tag, system retrieves data Person Profile from User's User Relationship Table and displays relationship data in Person Profile View
0908
If user selects Collection fast search tag, system retrieves data Person Profile from User's User Relationship Table and displays relationship data in Collections View
0909
If user selects Location fast search tag, system retrieves data Person Profile from User's User Relationship Table and displays relationship data in Locations View
0910
If user selects Date fast search tag, system retrieves data Person Profile from User's User Relationship Table and displays relationship data in Uploads View
0911
...
Continuous Link of Application Dot-Tags System
0700

FIG. 45

0930
Fast Search
Apply Filters...
0931
0932
Wrigley
0933
Results
Person: Jon Wrigley Doe
Collection: Family trip to Wrigley August 2013
Location: Wrigley Field
Recipe: Wrigley Field Cookies
Comments: Jon and Jane's first game at Wrigley Field
0934
Wrigley
Results
Person: Jon Wrigley Doe
Album: Family trip to Wrigley August 2013
Location: Wrigley Field
Recipe: Wrigley Field Cookies
Comments: Jon and Jane's first game at Wrigley Field
0935
0936

FIG. 46

0501
Share to Third Party Media Provider
1000
Outside MW System
Inside MW System
1300
Application Export System
Start
1001
User selects share of Digital File or collection of Digital Files
1002
System requests Digital File and Tag Data Blocks
1003
System retrieves Digital File from Relationship Table
1006
Save Original Digital File with new tags within EXIF Image File Directories as MW Modified File
1004
System retrieves Digital Tags for Digital File from Relationship Table
1005
Inject tags into EXIF Tag Data Blocks
User Relationship Table
0300

FIG. 47

1100
1101
Third Party Geographical Mapping Provider
Outside MW System
Inside MW System
Start
1102
Location Application Dot-Tag?
Yes
No
1104
User selects location Application Dot-Tag
1105
System sends request to Relationship Table
1106
System requests mapping for specific location to Third Party Mapping System
1107
System receives mapping for specific location from Third Party Mapping System
1110
Systems combines map from Third Party Mapping System with Application Dot-Tags for specific location in Location View
1103
User selects Location Application View
0300
User Relationship Table
1108
System retrieves data from that Location from User's User Relationship Table.
1109
System sends Application Dot-Tags for that specific location



FIG. 48

1207
Individual / Group of People
1200
Outside MW System
Inside MW System
1300
Application Export System
Start
1201
User selects share of Digital File or collection of Digital Files
1202
System requests Digital File and Tag Data Blocks
1203
System retrieves Digital File from Relationship Table
1205
Save Original Digital File with new tags within EXIF Image File Directories as MW Modified File
1204
System retrieves tags for Digital File from Relationship Table
1206
Inject tags into EXIF Tag Data Blocks
User Relationship Table
0300

**FIG. 49**



UNIFIED PATENTS EXHIBIT 1001
Page 53 of 73

**FIG. 50**



| Sample EXIF Image File Directories and ExifTool family 1 group names | Original File EXIF Tag Data | MW Modified File Tag Data |
|---|---|---|
| Description Title | | |
| Description Subject | | |
| Description Rating | —— 1416 | ☆☆☆☆☆ — 1410 |
| Description Tags | | |
| Description Comments | —— 1417 | CAPTION: Jackson and JC's first day at school<br>PERSON: Jackson Smith, JC Smith<br>LOCATION NAME: Abe Lincoln Elementary School<br>COLLECTION: First Day of School<br>COLLECTION: Jackson and JC Photos 2013<br>DATE: 8/28/2013 — 1411 |
| Origin (Authors, Date Taken, Date Acquired, Copyright) | | |
| Image (Image ID, Dimensions, Width, Height, etc.) | | |
| Camera (Camera Maker, Camera Model, etc.) | | |
| Advanced Photo (Lens Maker, Lens Model, etc.) | | |
| GPS Latitude | —— 1418 | 39; 46; 4.3774999999999999 — 1412 |
| GPS Longitude | —— 1419 | 89; 39; 55.3199999999999953 — 1413 |
| File Name | IMG_3826.JPG | IMG_3826.JPG |
| File Item Type | JPG | JPG |
| File Folder Path | C:\Photos\2013 —— 1420 | C:\Photos\MW Backup\2013 — 1414 |
| File Date Created | 11/01/2013 10:00 AM —— 1421 | 08/28/2013 8:00 AM — 1415 |
| File Date Modified | | |
| File Size | 2.42 MB | 2.42 MB |
| File Attributes | A | A |
| File (Offline availability, Offline status, Shared with, Owner, Computer, etc.) | | |

1401  1402  1403
1404  1405  1406  1407  1408  1409

UNIFIED PATENTS EXHIBIT 1001<br>Page 54 of 73

US 10,621,228 B2

**1**

# METHOD AND APPARATUS FOR MANAGING DIGITAL FILES

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 16/536,300, filed Aug. 8, 2019, which is a continuation of U.S. patent application Ser. No. 15/375,927, filed Dec. 12, 2016, now U.S. Pat. No. 10,423,658, which is a continuation of U.S. patent application Ser. No. 14/193, 426, filed Feb. 28, 2014, now U.S. Pat. No. 9,552,376, which is a continuation-in-part of U.S. patent application Ser. No. 13/157,214, filed Jun. 9, 2011, now U.S. Pat. No. 9,098,531, each of which is hereby incorporated by reference herein in its entirety.

## FIELD OF THE INVENTION

The present invention relates generally to the management of digital files and, more particularly, to a computer-implemented system and method for managing and using digital files such as digital photographs.

## BACKGROUND OF THE INVENTION

Prior to the invention of digital photography, people tended to share photos by displaying printed copies in frames and albums, or would store them in a container in hope of preserving these assets for future use or future generations. Important photos would often be inscribed on the back with significant details (people, location, event, etc.) to preserve the memory of that particular occasion. Many people would share their memories by assembling an album that could be viewed with others. Occasionally, extra copies of special photos were printed for friends, relatives, etc. At one time, film slide shows were also a popular medium for sharing photo memories.

With the evolution of digital files, there has been explosive growth in the number of individuals taking digital photos, converting old photos to digital copies, making movies and gathering digital documents and in the sheer number of files people are capturing digitally. Today, virtually every personal computing device contains some kind of photo, movie or other type of digital file creator/player/viewer/storer/etc.

At the same time, there is little to no cost for people to store large amounts of photos in various "containers" of the modern age. Facebook, Flickr, Shutterfly and countless other social media and specialty digital files sites allow users to post and share images to a community with a frequency and ease that continues to feed the fire of the digital revolution. However, they don't allow much organization of digital tags, dynamic viewing of digital files, and the ability to export the digital files with new digital tags. Questionable and ever-changing privacy terms for vital account information, including digital files, have also left the marketplace leery of posting their full digital archive and associated context to these sites.

What is needed to complement the widespread availability of digital files is a medium that allows people to organize, view, preserve and share these files with all the memory details captured, connected and vivified via an interactive interface. Such a solution would allow digital files, including documents, photos, videos and audio, to tell a full story now, and for generations to come.

**2**

## SUMMARY

In accordance with one embodiment, a computer-implemented method of associating digital tags with digital files comprises (1) storing, on one or more non-transitory computer-readable storage media, a plurality of digital files, each of the digital files having embedded therein content data and metadata including tags; (2) receiving, via a user interface device of a client device, a first tag label containing alphanumeric text created and inputted by a user of the client device; (3) modifying, using a controller device, a selected first one of the tags of the metadata in a first of the digital files to include the first tag label; (4) receiving, via the user interface device or another user interface device, an instruction to search for all of the digital files having at least the first tag label; (5) responsive to receiving the instruction, automatically searching for all of the digital files having at least the first tag label; and (6) displaying, on a video display device associated with the client device, a first indication of the first tag label.

In another embodiment a computer-implemented method of associating digital tags with digital files comprises storing, on one or more non-transitory computer-readable storage media, a plurality of digital files, each of the digital files having a content data portion and a metadata portion including tags; displaying, on a video display device associated with a client device, a first graphical representation of a first tag label of a first of the tags and associated with a first of the digital files; receiving, via a user interface device of the client device, a selection by a user of the client device of the first graphical representation of the first tag label as a search filter criterion or a search string entered via the user interface device corresponding to the first tag label; responsive to the receiving, automatically searching through the digital files, using at least the first tag label as a search filter, for the digital files satisfying at least the search filter criterion; and displaying, on the video display device, an indication of the first tag label and a representation of the number of the digital files satisfying at least the search filter criterion.

In accordance with a further embodiment, a web-based digital file storage system comprises a digital file repository for storing and retrieving digital files; a digital tagging system permitting the user to assign a plurality of digital tags to each of the digital files, wherein the digital tagging system comprises at least one type of data selected from the group consisting of a person's name, a location, a recipe, a date, a family relationship, a person's profile, an event name, a rating, and a document type; a search filter, wherein the search filter allows the digital files to be searched according to a plurality of types of data; and a user interface that presents the digital files on a user's screen based on the digital tags, wherein the user interface further comprises a digital tag image, the digital tag image having at least one type of data represented thereon with text.

As described in detail below, the various embodiments provide much-needed platforms that save a user significant time, provide significant information with minimal screen space, and provide an appealing and customizable interface that will enhance the user experience.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention may best be understood by reference to the following description taken in conjunction with the accompanying drawings, in which:

FIG. **1** is a screenshot of an organizational functionality view of one embodiment of the disclosed system.

**UNIFIED PATENTS EXHIBIT 1001**
**Page 55 of 73**

US 10,621,228 B2

3

FIG. **2** is a screenshot of a photo detail view of one embodiment of the disclosed system.

FIG. **3** is a screenshot of a gallery view of an event or album of one embodiment of the disclosed system.

FIG. **4** is screenshot of an individual event or album view of one embodiment of the disclosed system.

FIG. **5** is a screenshot of a location view of one embodiment of the disclosed system.

FIG. **6** is a screenshot of a people thumbnail view of one embodiment of the disclosed system.

FIG. **7** is a screenshot of a people profile view of one embodiment of the disclosed system.

FIG. **8** is a screenshot of a family tree view of one embodiment of the disclosed system.

FIG. **9** is a screenshot of a timeline view of one embodiment of the disclosed system.

FIG. **10** is a screenshot of a recipe chart, according to one embodiment of the disclosed system.

FIG. **11** is a screenshot of an album chart view of one embodiment of the disclosed system.

FIG. **12** is a screenshot of an event chart view of one embodiment of the disclosed system.

FIG. **13** is a screenshot of a people chart view of one embodiment of the disclosed system.

FIG. **14** is a screenshot of a family tree chart view of one embodiment of the disclosed system.

FIG. **15** is a screenshot of a location chart view of one embodiment of the disclosed system.

FIG. **16** is a screenshot of a recipe chart view of one embodiment of the disclosed system.

FIG. **17** is a screenshot of a slideshow view of one embodiment of the disclosed system.

FIG. **18** is a screenshot of an advanced search filter view of one embodiment of the disclosed system.

FIG. **19** is a screenshot of a homepage view of one embodiment of the disclosed system.

FIG. **20** is a diagram of the Overall System Process Flow of MemoryWeb.

FIG. **21** is a diagram of the System for Reading Phase, System Interpreting, and Adding Digital File and Corresponding Data to Relationship Table Phase.

FIG. **22** is a table of the EXIF and MemoryWeb Tag Data Blocks

FIG. **23** is a table of the Microsoft Windows and MemoryWeb Tag Data Blocks.

FIG. **24** is a table of the MemoryWeb Person Tag Data Blocks.

FIG. **25** is a diagram of the Third Party Facial Recognition System.

FIG. **26** is a diagram of the Third Party Media System (Data Exchange).

FIG. **27** is a table of the User Settings Table.

FIG. **28** is a diagram of the Application Digital Tag Organizer System.

FIG. **29** is an illustration of the Application Dot-Tag Shape and Content.

FIG. **30** is a diagram of the Continuous Link of Application Dot-Tag System.

FIG. **31** is an illustration of the Slideshow View of Digital File and Application Dot-Tags.

FIG. **32** is a screenshot of People Application Views.

FIG. **33** is a screenshot of Collection Application Views.

FIG. **34** is a screenshot of Location Application Views.

FIG. **35** is screenshot of Uploads Application View.

FIG. **36** is a screenshot of Recipe Application View.

FIG. **37** is a diagram of the Advanced Filters System.

4

FIG. **38** is a screenshot of Adding the First Application Dot-Tag using Advanced Filter.

FIG. **39** is a screenshot of Single Application Dot-Tag Filter for Each Application View.

FIG. **40** is a screenshot of Single Application Dot-Tag Filter for Date in Uploads Application View.

FIG. **41** is a screenshot of the Single Application Dot-Tag Filter in Location Application View.

FIG. **42** is a screenshot of Adding Another Application Dot-Tag Filter.

FIG. **43** is a screenshot of the Multi-Dot-Tag Filter in Location Application View.

FIG. **44** is a diagram of the Keyword Fast Search System.

FIG. **45** is a screenshot illustration of Using Keyword Fast Search.

FIG. **46** is a diagram of the Share to Third Party Social Network Provider System.

FIG. **47** is a diagram of the Third Party Location Mapping System.

FIG. **48** is a diagram of the Share to Individual System.

FIG. **49** is a diagram of the Application Export System.

FIG. **50** is a table illustrating the Digital File Image File Directory Data Blocks of JPG Photo within Microsoft Before and After MemoryWeb.

DETAILED DESCRIPTION OF ILLUSTRATED EMBODIMENTS

Although the invention will be described in connection with certain preferred embodiments, it will be understood that the invention is not limited to those particular embodiments. On the contrary, the invention is intended to cover all alternatives, modifications, and equivalent arrangements as may be included within the spirit and scope of the invention as defined by the appended claims.

The present disclosure relates to one or more of the following features, elements or combinations thereof. A web-based digital file storage system is disclosed. The storage system may include a digital file repository for storing and retrieving digital files, such as photos, a digital tagging system configured to assign digital tags to the digital files, a sorting system, and a user interface.

The digital tagging system may include various types of data, such as a person's name, a location, a recipe, a date, a family relationship to the user, an event name, a rating, sharing rights, file type and a document name. The sorting system can allow the digital files to be searched and sorted according to a plurality of types of data and can be used for creating and organizing special views. The user interface may be user-configurable, and can present the digital files on a user's screen based on these user inputs.

The digital file repository may be accessible over the Internet. The sorting system may provide a user with the ability to search based on a plurality of digital tags. The disclosed system may also provide a way to track relationships between users, so that a family tree can be displayed.

Recipes may also be linked to a person's name, with, for example, a video and digital copy of original hand-written recipe to create a recipe view.

Moreover, the digital files and data can be exported as a single file with the digital tagging embedded within the exported file.

In another embodiment, a method of storing digital photographs is disclosed. The method may include the steps of storing a digital photograph in a file repository, associating a plurality of digital tags having different tag types with the digital photograph, providing a search function that permits

UNIFIED PATENTS EXHIBIT 1001
Page 56 of 73

US 10,621,228 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

searching by a plurality of digital tag types and provides a search result, and providing a user-configurable output to display the search result. The digital tag types may include, for example, a person's name, a location, a recipe, a date, a relationship, an event name, a rating, file type and a document type. The method may include a further step of providing access to the file repository via the Internet. The method may also allow for tracking relationships between users so that a family tree can be displayed.

Additional features of the disclosure will become apparent to those skilled in the art upon consideration of the following detailed description of preferred embodiments exemplifying the best mode of carrying out the invention as presently perceived.

The presently disclosed method and application (herein alternatively referred to as a "system") provides users with an Internet-based interactive platform to gather, organize, view, share and archive digital files using a proprietary organization system and export tagging process. As used herein, the word "tag" refers to any type of digital data that can be assigned to a file to describe some aspect of that file through a tagging process. For images, the tagging is preferably in EXIF format. For videos, documents and other file formats, any appropriate format may be used. The disclosed system allows users to create, view and share digital files, which could represent, for example, the memories a user has collected from the past and present, and could incorporate additional memories for generations to come. As outlined herein, various embodiments are disclosed that can accomplish these and other goals.

One disclosed embodiment includes an import feature. Users can import media files from users' favorite sources (e.g., computers, mobile phones, social networks, etc.). If any meta-tag information is embedded within the media (e.g., date taken and GPS coordinates), the system could automatically read and utilize it for the user. Digital files, media, meta-tags, and other data discussed herein may be saved to one or more file repositories (also referred to as a database herein).

In another aspect of the disclosed system, organizational functionality is provided. Similar to the concept of writing certain information "on the back of a photo," the system's digital tagging system and organizing feature allows a user to arrange large amounts of digital files with tags that can characterize and document the digital file(s). Digital files can be individually or group organized at the same time for many tags including, but not limited to, a person's name, family relationships of the subjects to the user and between each other (e.g., mother/father), location, date, event, album, comments, document type (e.g., birth certificate, poetry), recipe, ranking or rating, and sharing rights. Tags can be assigned to a single file at a time, or to a plurality of files at once. For example, if a user wishes to assign the tag "grandma" to 100 photos at once, the system provides a way for a user to select all 100 photos and enter the tag only once. An example of the manner in which digital photos can be organized is presented is seen in FIG. 1.

Yet another feature is the multiple views from which a user can display his or her digital media files and their tagged attributes. Using a user interface (e.g. a keyboard, mouse, or touch screen), users can select individual files, groups of files meeting specific criteria, or all files in their account from which to create views. These views may alternately take the form of a chart. These views will be auto-populated based upon either tag information already associated with the digital file upon import or the tags assigned to the digital files by the user within the aforementioned organization functionality. Each digital file can be enlarged, from any view or chart, by clicking an information ("i") button to show an enlarged version of the digital media file with all the tags that are assigned to that digital file, as illustrated in FIG. 2. In another embodiment, the user interface may be user-configurable, as discussed further herein.

The following views are shown with particularity. In FIG. 1, the gallery view allows the user to see all the digital media that are associated within a group such as an event or custom album. The gallery view for either events or albums is illustrated in FIG. 3.

As shown in FIG. 2, an individual album or event view allows one to see the files associated with a specific group. For example, one can view the digital files that relate to a group of files called "Trip to Italy 2011." The individual album or event view is illustrated in FIG. 4.

A location view, as shown in FIG. 5, identifies within an interactive map (Google map shown as an example), where digital files were taken or originated. The location view can also provide additional outputs such as a journey route that identifies the specific locations for an event or trip that can be customized by users.

A people view, as shown in FIG. 6, shows thumbnail photos of all the people in the system that can be clicked in for a people profile view. A people profile view, as shown in FIG. 7, shows a profile picture of an individual, their birth/death information, family relationships, overview (comments) on the person, as well as links to other views that contain that individual in the system.

A family tree view, as shown in FIG. 8, can illustrate interactive family trees where one can see the family tree of an individual or family. If a user clicks on an individual within the family tree, it will take him or her to the people profile view of that person.

The timeline view, as shown in FIG. 9, will be an interactive timeline that allows you to set ranges of digital files by year, month and day. The digital files shown in the timeline will also be interactive and if the user clicks on a digital file or group of digital files (e.g., event or album), the user will then view the information related to the digital file(s).

A recipe view, as shown in FIG. 10, will show a recipe along with any digital files that are associated with it. For example, a cherished family recipe may show a digital copy of the original handwritten recipe, a photo of the family member who was the chef and a video of the family member making the recipe.

Each of the aforementioned views may also be seen in a chart format view that is interactive when any item on the chart is clicked, the user will them be taken to a new screen that details all relevant digital files (and file types) for the clicked item.

For album or event chart views, as shown in FIGS. 11 and 12, the elements listed in those charts will include individuals who are part of each album/event, number of digital files, date and other pertinent information.

A people view, shown in FIG. 13, may demonstrate all the names of individuals that are in the system in an alphabetical listing. Such a people view can also contain details on each person such as the number of photos and videos that are associated with that person. The user can click on that person to pull up the profile view of the individual or click on the number of photos to see all the photos associated with that person.

In the family tree chart view, shown in FIG. 14, family lineage can be viewed in multiple ways. For example, a user

UNIFIED PATENTS EXHIBIT 1001
Page 57 of 73

US 10,621,228 B2

7      8

can set himself as the tree anchor and then see a tree of all people entered into the database related to the user. The user could also set a contact as the tree anchor and then just view the descendants of that individual.

For a location chart view, as show in FIG. **15**, listings of all the locations that are in the system are displayed along with the number of digital files, as well as names of persons associated with each. A user can click on the location to see all the digital media files that are associated with a specific location.

A recipe chart, as shown in FIG. **16**, can show recipes that uploaded to the system. Along with the ingredients and steps of each recipe, this view can identify the chef(s) name, number of photos and videos associated with each.

For any of the views, the user can click on the digital file to start a slideshow feature that will allow them to scroll through an enlarged view of the digital file as illustrated in FIG. **17**.

Another aspect of the disclosure is the search filter. This filter allows users to select one or more criteria that will narrow down their results to just those digital files matching input criteria. The entire system can be filtered by, for example, key words (or plurality of key words), event names, location, people, albums, star rating, file type, document type, and dates. A user may filter based on more than one criterion at a time. To help users quickly identify digital files that may still need to be organized, the advanced search filter also allows users to isolate files that have no date, no location, no people, no specific date/range, no upload date information or are lacking any other tag.

It should be noted that in one embodiment, searching via key word will search through all tagged information (user populated or auto-generated upon import). For example, if a user searched for the term "Ohio," the system would search for that term associated with any file in any way. If the user had files with Ohio as a state, file name, street name, person's name, file comment, etc., all would be retrieved.

Settings applied in the advanced search filter can cumulatively carry over to any subsequent pages until new criteria are selected. For example, a user can apply a filter to retrieve files associated with a particular person. Then the user can set a date range to further narrow results to show only those files for that selected person within the date range. Any pages viewed from that point forward throughout the entire site would only contain files associated with person and the date range specified. The advanced search filter is illustrated in FIG. **18**.

Yet another feature can be a user's homepage, as illustrated in FIG. **19**, that can summarize the user's content within the system including relevant information in the system. It is contemplated that a user's homepage may show a summary of the total number of photos, videos, documents and audio files that the user has uploaded. In this embodiment, for each group of digital files (e.g., photos), the percent of files that has been organized with pertinent data such as date, name(s) and location can be noted. In addition, the homepage can show a list of people that are in the system and the respective count for photos, videos, documents and audio files associated with each person. Also contemplated is a summary of the events, albums and locations that have been entered into the system. The user homepage may serve as an executive summary dashboard of one's entire system and can be modified to provide data in an executive summary format for a user.

Another feature is that the entire system including the dynamic views can be presented in a wide range of user outputs—e.g. on the user's computer, smartphone or tablet display. The user may choose to present the digital files in any of the various types of ways disclosed herein. Other ways of outputting the files are also possible. The user can create and modify various sharing rights so that third parties may view the files and if desired, provide comments, apply tags or even download/copy the files for their own use.

Still another embodiment can provide export functionality. Once a user has used the organization functionality to assign information to data file(s), a user may want to export the data file in its original form (e.g., .jpg, .mp4, etc.) with the tags embedded within the digital file in the form of EXIF tags. In other words, a user can export his or her entire set of digital files, or may choose a subset based on keywords and tags. The exported digital files can include key tags and attributes users have assigned, and in one embodiment, such tags and attributes can be embedded within the digital files. For example, each exported digital file may be imbedded with user-entered data such as the people, location, and event name. This feature will allow the users to back up their files to another source (e.g., external computer hard drive) or to transport it to another venue (e.g., another website that is used for viewing and/or sharing digital files such as a social media website) where it can be viewed with these attributes. This export feature can provide users with the advantage of never losing key data that was stored simply because the user chooses to move its digital files to a new digital archiving system.

A method is also disclosed. The method may include the steps of storing a digital file in a file repository, associating a plurality of digital tags having different tag types with the digital file, providing a search function that permits simultaneously searching by a plurality of digital tag types and provides a search result, and providing a user-configurable output to display the search result. The digital tag types may include, for example, a person's name, a location, a recipe, a date, a relationship between individuals, an event name, a rating, and a document type.

Under the disclosed method, access may be provided to the repository via the Internet. Relationships between users may also be tracked such that a family tree can be displayed. A recipe may also be linked to a user or person. Finally, the method may include the step of outputting a digital file and its associated digital tags into a single file.

While the disclosure is susceptible to various modifications and alternative forms, specific exemplary embodiments thereof have been shown by way of example in the drawings and have herein been described in detail. It should be understood, however, that there is no intent to limit the disclosure to the particular forms disclosed, but on the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the disclosure as defined by the appended claims.

A plurality of advantages arise from the various features of the present disclosure. It will be noted that alternative embodiments of various components of the disclosure may not include all of the features described yet still benefit from at least some of the advantages of such features. Those of ordinary skill in the art may readily devise their own implementations of a digital file organization system that incorporate one or more of the features of the present disclosure and fall within the spirit and scope of the disclosure.

Application (Also Called "MemoryWeb Application" or "System")—

The Application is an online program constructed using a mix of freeware code as well as custom-built proprietary coding with an interface that has many functions including:

**UNIFIED PATENTS EXHIBIT 1001**
**Page 58 of 73**

US 10,621,228 B2

9

1) the ability to import, associate and embed Digital Tags to Digital Files by using existing Tags of a Digital File as well as the Application's custom Digital Tag options (also called the Application Digital Tag Organizer) for use in the Application; 2) view, sort, annotate, and share Digital Files from the various Application Views; 3) navigate using the proprietary Application Dot-Tag System; 4) filter Digital Files using the Application Advanced Filter System or Fast Search System; 5) store the Digital Files through an interactive Storage System through a User Relationship Table; and 6) export the Digital Files with the Digital Tags embedded within the Digital Files. This Application has already been disclosed in U.S. patent application Ser. No. 13/157,214 and incorporated herein by reference. This Application is also being trademarked as "MemoryWeb" with the US Commissioner for Trademarks on Dec. 26, 2013 under application No.: 86/152,930. The Application may be accessible over various user interfaces that may use the Internet and via applications that would be used on mobile communication devices such as smart phones (e.g., iPhones), Personal Digital Assistants (PDAs) and Tablets (e.g., iPads).

Application Views—

The Application Views utilizes the Application's ability to associate Digital Tags to Digital Files and display them in customized views such as Uploads, Collections, Slideshow, Location, Timeline, Family Tree, People Profile, and Recipes.

Application Advanced Filter System—

A function that provides search capabilities using one or more Digital Tags within the Application, resulting in a narrowed output display of the applied filters to display one or more Digital Files and viewed in one or more Application Views. The Application Advanced Filter System can allow Digital Files to be searched and sorted according to a plurality of types of data and can be used for creating and organizing special views. The user interface may be user-configurable, and can present the Digital Files on a user's screen based on these user inputs.

Application Dot-Tag—

The manner in which a Digital Tag is displayed within the Application using pill-shaped indicators that can reside near a file's image or overlaid on the file's image. MemoryWeb Tags are illustrated as Application Dot-Tags within the Application to help the user organize their Digital Files with key components of related information such as people, date of file, location, collection, star ranking, and recipe. The MemoryWeb Application Dot-Tag is more than just text (as traditional tagging systems) because Memory-Web Application Dot-Tags act as mini search engines that allow the user to see how many matching files there are to that MemoryWeb Tag and if selected will take the user to the corresponding Application View to illustrate the linked search results of that Application Dot-Tag. However, it should be understood that other shapes and indicators are contemplated by the present invention, and may even be user-configurable. For example, the indicator may take the form of a sticky note, a different shape, a doted shape, or any number of variations of indicators that may be functional in displaying one or more words. Colors may also be used to indicate differing categories of indicators, or differing associations/intersection of the indicators. Within the pill-shaped indicator, the specific Digital Tag information is used to display information about a Digital File. Throughout this document, the Application Dot-Tag is shown as illustrated in FIG. **29** (indicators **0650**, **0654**, **0655** and **0656**).

10

Application Digital Tag Organizer System—

Within the Application, a function for assigning one or more Digital Tags to one or more Digital Files at the same time through the Application Dot-Tag Organizer System. This feature allows Digital Tags to be assigned to items such as photos, videos, audio files, and documents. The information created from this functionality drives the outputs for the Application Views. The Application Digital Tag Organizer System will allow the tagging of key items as date, GPS location, star ranking, people (both name and facial recognition), album(s), family relationships, a date, event name, sharing rights, file type, document name, and recipes. Each of the Digital Tags is user-configurable.

Application Export System—

Ability to export Digital File(s) from the Application, with the Digital Tags that were created within or imported/uploaded into the Application, embedded inside the Digital File. The Digital Tags within the exported Digital File can then be viewed and used by any other applications that can read EXIF tags.

Application Programming Interface ("API")—

The Application Programming Interface (API) is the system that interacts with other communication points or services over HTTP via a POST, GET, PUT, DELETE methods. The API provides a way for users to access their MemoryWeb data outside of the web browser on mobile devices or other web connected devices. The actions within the API deliver MemoryWeb Digital Files and Digital Tags along with all meta data associated with such files and tags.

MW Automatic Uploader/Downloader Application—

Separate from the main MemoryWeb Application, there are additional proprietary applications created by Memory-Web for user to upload and download (export) Digital files to and from the main MemoryWeb Application. The first is the MW Automatic Uploader/Downloader built for Window's compatible computers. The second is the MW Automatic Uploader/Downloader build for MAC compatible computers. Both of the MW Automatic Uploader/Downloader applications can be installed on the user's computer to automatically upload the desired Digital Files from their computer to the main MemoryWeb Application. In addition, the MW Automatic Uploader/Downloader applications allow for Digital Files to be exported from the main MemoryWeb Application to a desired folder on the user's computer with the updated tags embedded within the Digital File.

Storage System—

A storage system can be a cloud-based Storage System (e.g., Amazon's AWS, Dropbox, Box.net, Deutsche Telecom's Cloud, etc.), hard-drive, server, or any venue that allows one's information to be stored. The storage system would act as a database and file repository for storage and retrieval of Digital Files to and from the Application.

Digital Files—

An electronic file that can be in various file formats (e.g., PNG, JPEG, PDF, TIFF, MP3, MP4, WAV, and GIF) that are of items such as photos, videos, audio files, and documents.

Digital Tags—

The word "Digital Tag" refers to any type of digital data that can be assigned to a file to distinguish and describe some aspect of that file through a tagging process. Digital Tags will be comprised of various groups of digital data including:

a) EXIF Tags—EXIF stands for "Exchangeable Image File Format" and is a standard that specifies the formats for images, sound, video, and ancillary tags. The EXIF standard is an Open Standard produced by the Standardization Committee and is detailed within their

UNIFIED PATENTS EXHIBIT 1001
Page 59 of 73

US 10,621,228 B2

<table>
<tr><td>11</td><td>12</td></tr>
</table>

document called *Standard of the Camera & Imaging Products Association*. Standard of the Camera & Imaging Products Association, CIPA DC-008 Translation-2012. Exchangeable image file format for digital still cameras: EXIF Version 2. 3. Established on April, 2010 and Revised on December, 2012. Prepared by: Standardization Committee. EXIF tags are also called "meta tags" or "metadata." The EXIF information is formatted according to the TIFF specification, and may be found in JPG, TIFF, PNG, JP2, PGF, MIFF, HDP, PSP and XCF images, as well as many TIFF-based RAW images, and even some AVI and MOV videos. The EXIF meta information is organized into different Image File Directories (IFD's) within an image. The names of these IFD's correspond to the ExifTool family 1 group names.

When Digital Files are captured with digital cameras (including smartphones), scanners and other systems handling image, video and sound files, certain EXIF tags are automatically populated within the Digital File and can cover a broad spectrum of information such as:

Descriptions (e.g., Title, Subject, Star Ratings, Tags, People, Comments)

Origin (e.g., Authors, Date taken, Copyright)

Image information (e.g., dimensions, color representation and size)

Camera Setting Information (e.g., camera maker, camera model), including static information such as the camera model and make, and information that varies with each image such as orientation (rotation), aperture, shutter speed, focal length, metering mode, and ISO speed information.

Advanced Photo Information (e.g., lens maker, lens model, contrast, brightness, EXIF version, etc.)

File Information (e.g., file name, item type (e.g., JPG file), date created, date modified, size, etc.)

A thumbnail for previewing the picture on the camera's LCD screen, in file managers, or in photo manipulation software.

Global Positioning System (GPS) information that is also known as geocoding.

The Application will auto-populate any existing EXIF Tags from the original Digital File upon upload into the Applications (as illustrated in FIG. **21**) and put this information into the Users Relationship Table on the Storage System.

b) Extensible Metadata Platform (XMP)—This is Adobe's Extensible Metadata Platform (XMP) format for labeling metadata within an Adobe file.

c) Png Textual Data (tEXt)—This is Portable Network Graphics (PNG) metadata format for labeling within a PNG file.

d) Microsoft Windows Tags—These are Microsoft Windows File Attributes that are stored in Data Blocks from Microsoft's system.

e) MemoryWeb Tags—These tags are typically developed within MemoryWeb and can relate to People Names, Recipes, Collections, Location Name, Family Relationships (also discussed in MemoryWeb Person Tags), Social Network Data (e.g., ID, contact IDs, etc.), File Folder Batch Name. This would be folder directory name that includes the name of each folder that eventually leads to the folder that the digital file was actually stored within the User's PC. This is used to help the user organize data within MemoryWeb based upon the

users organization system used on their PC. Facial Recognition Data, and other type of tags that are user defined.

f) MemoryWeb Person Tags—These user defined tags within MemoryWeb are specific to each person profile including such areas as Nicknames, Birthdates, Date of Birth, Date of Death, Biography, Family Relationships (e.g., Mother, Father, Brother, Sister, Daughter, Son, Spouse, etc.), Pets, and Firsts (e.g., First Steps, First Words, First time riding a bike, etc.).

The combination of all the aforementioned tags is collectively referred to as "Digital Tags." The list of groups and Digital Tag types will grow as technology in this area improves over time. These Digital Tags are also referred to as "File DNA" for MemoryWeb.

User Relationship Table—

Within the Application, each User will store the data related to Digital Files, Digital Tags, User Settings, and other specific information related to a User's repository of information is kept within the User Relationship Table.

Data Blocks—

Within the User Relationship Table, there are Data Blocks that will store information related to EXIF Tags, Microsoft Windows Tags, MemoryWeb Tags, and MemoryWeb Person Tags. These Data Blocks are used to generate the information that is displayed in such key components such as the Application Views and Application Dot-Tags.

Custom Code—

Proprietary scripts and code developed by MemoryWeb to enable key functions such as Dot-Tag relationships and ability to embed new user-defined tags into a file and/or override existing EXIF tags and the ability to navigate the application and it's functions via connections drawn from the associated tags

Open Source Libraries—

Non-proprietary code taken from the free, open source community integrated that is used by the Application.

User Interface—

The Application may be accessible over various "User Interfaces" including Personal Computers (e.g., Macs, Windows, etc.), Personal Digital Assistants (PDA) (e.g., iPhones) and Tablets (e.g., iPad). The User Interfaces can be controlled through the Application using various tools such as a keyboard, mouse, and touch screen.

The present invention relates to an Application that has many functions including: 1) the ability to import, associate and embed Digital Tags to Digital Files by using existing Tags of a Digital File as well as the Application's custom Digital Tag options (also called the Application Digital Tag Organizer) for use in the Application; 2) view, sort, annotate, and share Digital Files from the various Application Views; 3) navigate using the proprietary Application Dot-Tag System; 4) filter Digital Files using the Application Advanced Filter System or Fast Search System; 5) store the Digital Files through an interactive Storage System through a User Relationship Table; and 6) export the Digital Files with the Digital Tags embedded within the Digital Files.

Prior to the invention of digital photography, people tended to share photos by displaying printed copies in frames and albums or would store them in a container in hope of preserving these assets for future use or future generations. Important photos would often be inscribed on the back with significant details (people, location, and event) to preserve the memory of that particular occasion. Many people would share their memories by assembling an album that could be viewed with others. Occasionally, extra copies of special photos may have been printed for friends, rela-

UNIFIED PATENTS EXHIBIT 1001

US 10,621,228 B2

<table>
<tr><td>13</td><td>14</td></tr>
</table>

tives, etc. At one time, film slide shows were also a popular medium for sharing photo memories.

With the evolution of Digital Files, there has been explosive growth in the number of individuals taking digital photos, converting old photos to digital copies, making movies and gathering digital documents and in the sheer number of files people are capturing digitally. Today, virtually every personal computing device contains some kind of photo, movie or other type of digital file creator/player/ viewer/storer/etc.

At the same time, there is little to no cost for people to store large amounts of photos in various "containers" of the modern age. Facebook, Flickr, Shutterfly and countless other social media and specialty Digital Files sites allow users to post and share images to a community with a frequency and ease that continues to feed the fire of the digital revolution. However, they don't allow much organization of Digital Tags, dynamic viewing of Digital Files, and the ability to export the Digital Files with new Digital Tags. Questionable and ever-changing privacy terms for user/account information, including digital files, have also left the marketplace leery of posting their full digital archive and associated context to these sites.

What is needed to complement the widespread availability of Digital Files is a medium that allows people to organize, view, navigate, search, preserve and share these files with all the memory details captured, connected and vivified via an interactive interface. Such a solution would allow Digital Files, including documents, photos, videos and audio, to tell a full story now, and for generations to come.

As disclosed in detail herein, the application provides the much needed platform that saves a user significant time, provides significant information with minimal screen space, and provides an appealing and customizable interface that will enhance the user experience.

Anytime the MemoryWeb Application exchanges information with an external Storage System or User Interface such as a phone, tablet, computer or other internet based user device, the interaction with the MemoryWeb Application involves Application Programming Interface (API). The API's allow each system to call the specific Digital Files and Digital Tags associated with each request so they can be viewed.

Additional features of the disclosure will become apparent to those skilled in the art upon consideration of the following detailed description of preferred embodiments exemplifying the best mode of carrying out the invention as presently perceived.

The present disclosure relates to one or more of the following features, elements or combinations thereof. The Application allows the importation of Digital Files and then the association of Digital Tags to the Digital Files by using existing EXIF Tags of a Digital File as well as the Application's custom organization of Digital Tags for use in the Application. The Application then allows the Digital Files to be viewed, sorted, annotated, navigated, and shared using the various Application Views. The Application can also filter Digital Files using the Application Advanced Filter System functionality. The Digital Files can be stored through a Storage System that interacts with the Application. In addition, the Application allows for Digital Files to be exported with the Application's Digital Tags embedded within the Digital Files.

The Application may be accessible over various user interfaces that may use the Internet and via applications that would be used on User Interfaces such as Personal Digital Assistants (PDA) (e.g., iPhones) and Tablets (e.g., iPad).

The presently disclosed Application provides users with an interactive platform to gather, organize, view, share and archive Digital Files using a proprietary organization system called the Application Digital Tag Organizer and export the modified Digital files with the Application's Digital Tags embedded within the Digital Flies using the Application Export feature.

The Application allows users to create, navigate, search, view and share Digital Files, which could represent, for example, the memories a user has collected from the past and present, and could incorporate additional memories for generations to come. As outlined herein, various embodiments are disclosed that can accomplish these and other goals.

## DESCRIPTION OF EMBODIMENTS

In FIG. **20**, the overall process flow of MemoryWeb is depicted. Each of the boxes depicted that are Inside the Memory-Web System (**0050**) are detailed additional figures within this application. However, to help illustrate the overall process flow, FIG. **20** was created. In FIG. **20**, the process begins when original digital file(s) are uploaded to MemoryWeb (**0101**). This process can take place in a variety of ways including when a user manually selects uploads from the Uploads Application View (see FIG. **35** indicator **1701**), installs the a MW Automatic Uploader/Downloader Application on their computer, or imports Digital Files from the users' other sources (e.g., mobile phones, social networks, etc.).

Once a file is uploaded, the System Reading Phase (**0100**) begins. Information from the System Reading Phase is then sent to the System Interpreting and Adding Data to Relationship Table Phase (**0200**). During this phase, information is passed back and forth to the Third Party Facial Recognition System (**0400**) to the Third Party Facial Recognition Provider (**0401**). The system will also coordinate between the Third Party Social Media (Data Exchange) (**0500**) and then to various Third Party Media Providers (**0501**). Another key step from the System Interpreting and Adding Data to Relationship Table Phase is adding both the Digital Files and the corresponding tags to the User Relationship Table (**0300**). As illustrated in subsequent figures within the patent application, the User Relationship Table serves as the key repository for all of the user's data that generates virtually every display from the application. From the User Relationship Table, the user can use the Applications Digital Tag Organizer System (**0600**), the Continuous Link of the Application Dot-Tag System (**0700**), the Advanced Filters System (**0800**), or the Keyword Fast Search System (**0900**). The user can also share Digital File(s) through the Share to Social Network Provider System (**1000**) to a Third Party Social Network Provider (**0501**) that is outside the MemoryWeb system or use the Share to Individual System (**1200**) to a Person (**1201**) that is Outside the MemoryWeb system using the data from the User Relationship Table. To help generate some of the map views, the system will utilize a Third Party Geographical Mapping System (**1100**) that connects to a Third Party Geographical Mapping Provider (**1101**) that is Outside the MemoryWeb system. The user can also export Digital Files with the Digital Tags embedded within the Digital File using the Application Export System (**1300**) that will send a MemoryWeb Modified File from MemoryWeb (**1301**) to a designated location by the User that is outside the MemoryWeb system.

As illustrated in FIG. **21**, the System Reading Phase (**0100**) is described in further detail. The System Reading

UNIFIED PATENTS EXHIBIT 1001

Page 61 of 73

US 10,621,228 B2

15

Phase will first check if the digital file is a duplicate file (**0102**) that is already in the User's collection. If the file is a duplicate, it will not be uploaded (**0104**). However, if it is a new file for the user, the System Reading Phase will then locate the EXIF Image File Directories in the digital file (**0103**) and then send that information to the System Interpreting and Adding Data to Relationship Table Phase (**0200**).

As further illustrated in FIG. **21**, the System Interpreting and Adding Data to Relationship Table Phase will take the EXIF Image File Directories sent from the System Reading Phase and read and iterate through each EXIF tag item (**0201**). At this time, the system will identify faces from the digital file and then send this information to the Third Party Facial Recognition System (**0400**) that will coordinate with the Third Party Facial Recognition Provider (**0401**) that is outside the MemoryWeb. When the Third Party Facial Recognition System (**0400**) sends back data related to facial recognition of faces in the Digital File, it comes back then the system sends information related to people facial recognition tags to the MemoryWeb Person Tag (Data Blocks) within the User Relationship Table (**0300**). The detailed process of the Third Party Facial Recognition System (**0400**) is further explained in FIG. **25**.

During the Read & Integrate Through Each EXIF Tag item (**0201**) the process will also upload a the original Digital File in MemoryWeb (**0211**), the process will also store a copy of the original file within the User Relationship Table (**0300**) and create five duplicate copies (**0203**) of different resolution sizes as follows: XL Duplicate File (**0302**, Large Duplicate File (**0303**), Medium Duplicate File (**0304**), Small Duplicate File (**0304**), and a Thumbnail Duplicate File (**0306**). Each duplicate file is used in different parts of the application depending upon the photo size needed for such areas within the Application such as Application Views, Application Dot-Tags, and Application Digital Tag Organizer System.

Another embodiment during the Read and iterate through each EXIF tag item (**0201**) stage is determining if a MemoryWeb tag exists (**0204**). A MemoryWeb tag is a Digital Tag that is currently being used as an Application Dot-Tag within the Application. If it is not a Digital Tag that MemoryWeb is currently using, the application will Save EXIF data to the User Relationship Table for Digital File (**0205**) and send this to the User Relationship table. This is done in case there are EXIF data that are desired to be used in future releases of the Application. For the Digital Tags that are being used in the Application, the system will Parse EXIF data into MemoryWeb Tags (**0206**), look up MW tag data (**0207**) and determine if a Digital Tag currently exists (**0208**). If a Digital Tag does not exist, the system will Create a new MW tag data ((**0209**) and send this to the appropriate Data Blocks within the User Relationship Table (**0300**). If Digital Tag data does exist, the system will Associate existing tag data ((**0210**) to the appropriate Data Blocks within the User Relationship Table (**0300**).

The third and final area within FIG. **21** is the System Indexing Digital Files and Tag Data Blocks for a Digital File within the User Relationship table (**0300**). In the User Relationship Table, the user's information system information stored such as User Settings (**0390**). Copies of the Original Digital File (**0301**), XL Duplicate File (**0302**, Large Duplicate File (**0303**), Medium Duplicate File (**0304**), Small Duplicate File (**0304**), and Thumbnail Duplicate File (**0306**) are stored. The final area of the User Relationship Table relates to the data blocks including EXIF Tag (Data Blocks) (**0320**), Microsoft Windows Tag (Data Blocks) (**0320**),

16

MemoryWeb Tag (Data Blocks) (**0360**), and MemoryWeb Person Tag (Data Blocks) (**0380**).

In FIG. **22**, there are two charts that illustrate EXIF and MemoryWeb Tag Data Blocks. The first chart illustrates the EXIF Tags Version 2.3 (Data Blocks) (**0320**). For the EXIF Tags Version 2.3 (Data Blocks) (**0320**), the information from this table is an expert from an Open Source Library code produced by the Standardization Committee that is detailed within their document called Standard of the Camera & Imaging Products Association. While all the EXIF tags that are contained within a Digital File are read (as previously illustrated in FIG. **21** within the System Interpreting and Adding Data to Relationship Table Phase (**0200**)) and are stored within the system's User Relationship Table (**0300**), a summary of the primary EXIF tags that are currently used within MemoryWeb are illustrated in the EXIF Tag Blocks (**0320**). The EXIF tag information is organized into different Image File Directories (IFD's) or "Data Blocks" within an image and organized in the column heading of Tag Label (**0321**). The names of these IFD's correspond to an EXIF standard for ExifTool family 1 group names that are depicted in the column heading of EXIF Group (**0322**). The IFD's are stored within a specific data block location within a Digital File and these locations have a standard name of the specific location (**0323**) within the Digital File. The primary EXIF tags that are read and used by MemoryWeb to generate Application Dot-Tags are: Description Title (**0324**), Description Rating (**0325**), Origin Date Taken (**0326**), Digital File Width (**0327**), Digital File Height (**0328**), User Comment (**0329**), GPS Latitude (**0330**), GPS Latitude Ref (**0331**), GPS Longitude (**0332**), and GPS Longitude Ref (**0333**).

In FIG. **22**, the second chart illustrates the MemoryWeb Tag (Data Blocks) (**0360**) that overlap with standard EXIF Tag blocks. As previously illustrated in FIG. **21**, the EXIF Tag Data blocks are read and brought into the User Relationship Table (**0300**). When the data is stored within the system's User Relationship Table, they are also stored with the corresponding EXIF tag label as illustrated in the column called MemoryWeb Tag (**0361**). For example, when a Digital File is brought into MemoryWeb and the system reads the Origin Date Taken (**0326**) for the EXIF Tag block, the system will denote this in the MemoryWeb table as MediaAsset.DateCreated (**0364**). This designation is very important as it allows MemoryWeb to re-inject any updated or new MemoryWeb Tag data into the corresponding standard EXIF Tag blocks of a Digital File when it is exported from MemoryWeb (as previously illustrated in FIG. **20** with the Application Export System (**1300**)). Continuing with this example, if the Origin Date Taken is modified within the MemoryWeb system, when the file is exported through the Application Export System (**1300**), the new updated date from MemoryWeb (**0364**) will be mapped to the EXIF Tag Data block with the Tag Label of Origin Date Taken (**0326**) with the EXIF Group called ExifIFD (**0334**) and the Location called 0x9003 (**0335**).

In situations where there is no standard EXIF Tag data block for the MemoryWeb Tag for such items such as Collections, People Location Name, Recipe Name, etc. (**0367**), they are mapped to a general EXIF Tag data block called User Comment (**0329**). As the standards for EXIF Tag data blocks change, the system can be mapped to any new specific EXIF Tag data blocks. For example, if an EXIF Tag Data block is made for Recipe Name, the MemoryWeb Tag related to Recipe Name will be mapped specifically to that new EXIF Tag data block as opposed to User Comment.

In FIG. **23**, there are two charts that illustrate Microsoft Windows and MemoryWeb Tag Data Blocks. The first chart

**UNIFIED PATENTS EXHIBIT 1001**

**Page 62 of 73**

US 10,621,228 B2

17 | 18

illustrates the standard Windows Imaging Component (WIC) Metadata (Data Blocks) (**0340**). Microsoft Windows has their metadata tag blocks contained in areas called Tag Labels (**0341**). The primary WIC Metadata data blocks that are read and used by MemoryWeb to generate Application Dot-Tags are: File Name (**0342**) and File Folder Path (**0343**). The corresponding MemoryWeb Tag data blocks (**0360**) for the WIC metadata tag blocks are called MediaAsset.File-name (**0372**) for the Microsoft file name and MediaAsset.U-ploadBatch.Batchname (**0373**) for the Microsoft File Folder Path. The ability for MemoryWeb to read the File Folder Path from Microsoft is a unique process used within MemoryWeb to help the user organize their photos based upon the organization methods they have already used within Microsoft. For example, if the user stored a group of photos on their Microsoft computer in the file directory C:/Photos/2013/First Day of School, MemoryWeb will automatically place the photos that were located within that Microsoft File Folder Path into a MemoryWeb Application Dot-Tag under a collection called "First Day of School" based upon the last folder within the file folder path. An example of the Application Dot-Tag that would be generated from the File Folder Path is in FIG. **31** with the label "First Day of School" (**0770**). In addition, MemoryWeb will allow the user to view the photos that are within a specific File Folder Path in the MemoryWeb Uploads Application View so that they can organize photos from the same File Folder Path. An example of how this will be illustrated within MemoryWeb's Uploads Application View is in FIG. **35** with the groping of photos with the File Path Name C:/Photos/2013/First Day of School (**0709**).

In FIG. **24**, the MemoryWeb Person Tag Data Blocks (**0380**) that are contained with a User Relationship Table are illustrated. For any person that is added within a user's account, unique MemoryWeb Person Tag Data Blocks are stored including: Person Name (**0395**), Nickname (**0381**), Birthdate (**0382**), Date of Death (**0383**), Biography (**0384**), Mother (**0385**), Father (**0386**), Brother(s) (**0387**), Sister(s) (**0388**), Daughter(s) (**0389**), Son(s) (**0390**), Spouse(s) (**0391**), Facial Recognition (**0392**), FacebookID (**0393**), Pets (**0394**), and other data blocks that will be added in the future as the Application grows (**0396**). These data blocks are primarily used in the People Profile Application View as illustrated in FIG. **32** (indicator **1430**). One embodiment within the MemoryWeb Person Tag Data Block contains the FacebookID (**0393**). As illustrated in FIG. **26** (indicator **0507**), information from Third Party Media Providers will be exchanged within MemoryWeb and the user's FacebookID will be provided and stored within the MemoryWeb Person Tag Data Block. In addition, any of the User's contacts from Facebook will also be downloaded into the corresponding MemoryWeb Person Tag Data Blocks for any matching persons within the User's MemoryWeb account. The information from the Third Party Media Providers that are stored within MemoryWeb will be used to provide "push notifications" to the user for various items such as when the user or any one of its contacts posts a photo to that Social Media venue.

As illustrated in FIG. **25**, the Third Party Facial Recognition System (**0400**) is described in further detail. As photos are imported or uploaded into the Application, the systems will request thumbnail Digital Files (**0404**) from the User Relationship Table (**0300**). On a routine basis (e.g., daily), the system will retrieve all the thumbnails of Digital Files with unconfirmed faces (**0403**) and the send those Digital Files (**0404**) to the Third Party Recognition Provider (**0401**). The Third Party Facial Recognition Provider (**0401**) uses

their algorithms to find location of eyes, nose, mouth and many other points for each face detected in the photo. They will also determine gender, check if the person is smiling, have eyes open, lips sealed or wearing glasses. The Third Party Facial Recognition Provider will use their algorithms to associate potential matches of faces for the user's collection of photos. For each face, the system will send back attributes including gender (male, female), glasses (true, false), smiling (true, false), lips (sealed, parted), eyes, (open, closed), mood (happy, sad, angry, surprised, disgusted, scared, neutral), field in the response have two subfields: value (string) and confidence (integer). For each attribute, the Third Party Facial Recognition Provider will assign percentages of confidence (0% to 100%) for each attribute that can be used by the MemoryWeb Application to utilize.

The Third Party Facial Recognition Provider will then send the information relating to a person back to MemoryWeb (**0405**). The MemoryWeb Application parse the identified faces and corresponding Facial Recognition data for each Digital File (**0406**). The system will interact with the User Relationship Table and determine if the face is an existing (i.e., "trained") face in MemoryWeb where there is a Face ID in the User Relationship Table (**0407**). If not, the system generates a facial recognition record for unknown person and then sends information to MemoryWeb Person Tag (Data Blocks) in User Relationship Table (**0410**). If yes, the system will then determine if the face is above the system's thresholds for confirming a face is a specific person in the user's MemoryWeb system (**0408**). If no, system generates virtual unconfirmed facial recognition record for person and then sends information to MemoryWeb Person Tag (Data Blocks) in User Relationship Table (**0411**). If yes, the system records and associates specific face for Digital File with a MemoryWeb Person ID and sends to MemoryWeb Person Tag (Data Blocks) in User Relationship Table (**0409**).

Typically, the ability to confirm and deny facial recognition matches will be within the People Profile Application View as illustrated in FIG. **32** within the facial recognitions area (indicator **1442**). The system will also have other facial resonations area where the user can confirm or deny the suggested facial recognitions of a person for a Digital File. When the user denies the suggested facial recognition, the system dis-associates potential person match Tag, search's the user's collection for other potential matches, and then sends information to Tag Data Block of Relationship Table for the Digital File. If the user accepts the suggested facial recognition, the system sends this facial recognition tag confirmation to the User Relationship Table for the Digital File. Once a confirmation is made, the newly associated Digital File will have that confirmed person Application Dot-Tag associated to that Digital File for all Application Views. Each time an accepted or denied facial recognition is made for a specific person, the specific data points used for facial recognition is improved and sent to the Third Party Facial Recognition Provider for more accurate confirmations of that person during the next run for that person.

As illustrated in FIG. **26**, the Third Party Media System (Data Exchange) (**0500**) is described in further detail. There are numerous types of third party media systems that are contemplated for MemoryWeb including social network providers (e.g., Facebook, Twitter, and LinkedIn) and other photo sites (e.g., Flickr and Picasa). In addition, it is contemplated for the ability to print Digital Files from MemoryWeb using third party print providers such as Walgreens or Shutterfly. Further contemplated solutions might be from digital file warehouses such as Dropbox and box-

**UNIFIED PATENTS EXHIBIT 1001**
**Page 63 of 73**

US 10,621,228 B2

19 20

.net. All of the Third Party Media Systems will interact with MemoryWeb using the same system that is described within FIG. **26**. The Third Party Social Media System starts when the user initiates sharing of their information with Third Party Media Provider with MemoryWeb (**0502**). When this is initiated, the system will send registration information (**0503**) to the Third Party Media Provider (**0501**). Once received, the Third Party Media Provider will send back a confirmation with the Third Party Social Media ID (**0504**) and then the system will send the information (**0505**) to the User Settings Table (**0390**) within the User Relationship Table (**0300**). The system will then send daily requests from the User Relationship Table for contact names and IDs (**0506**) to the Social Media Provider (**0506**). If there are new contact names that are not part of the user's current people, the system will receive new contact names and IDs from the Social Media Provider (**0501**). The user will have the ability to confirm or deny matches (**0508**) with their contacts within MemoryWeb. If there is a match, the system will associate the existing person within MemoryWeb to the same ID of the person within the Third Party Social Media platform (**0509**) and then send this to the User Relationship Table. If there is not a match, the system will add this additional contact as a new person and send (**0510**) this to the User Relationship Table. If the user wants to share or print Digital Files from MemoryWeb, they can do this with the Share to Third Party Media Provider System (**1000**) that is further detailed within FIG. **46**.

In FIG. **27**, the MemoryWeb User Settings Table is illustrated. As illustrated in the User Settings Table (**1900**), various data blocks of information is stored including the User's Name (**1901**), Payment ID (**1902**) that is used with third party payment providers, Password (**1903**), Account Type (**1904**) (i.e., free or paid account), User's email (**1905**), Language preference (**1906**), Date format preference (**1907**), Email notification (**1908**) preferences, the ability to share Contacts (with third Party Social Media) (**1909**), Facebook ID (**1910**), API Token (**1911**), Payment Date (**1912**) and other settings that will evolve as the Application grows (**1913**).

In FIG. **28**, the Application Digital Tag Organizer System (**0600**) is illustrated. Within various Application Views the user can select, add, delete and edit MemoryWeb Tags for such areas as people, date, location, collections, star rankings, and recipes. An illustration of an Uploads Application View where MemoryWeb Tags for a Digital File can be selected, added, deleted, or edited is illustrated in FIG. **35**. The Application Digital Tag Organizer System begins when the user selects one or more Digital Files in MemoryWeb (**0601**). The system then sends a request to the User Relationship Table for the specific Digital File (**0602**). The system then retrieves the Digital File and the Digital File Tag Data Blocks (**0603**) from the User Relationship Table (**0300**). Next, the system will display the Digital File and the corresponding Digital File Tag Data Blocks in the form of Application Dot-Tags (**0604**). An example of how the system can illustrate a Digital File with the corresponding Application Dot-Tags is in FIG. **31** (indicators **0780, 0765, 0766, 0768, 0770,** and **0771**).

If the user selects an Application Dot-Tag (**0605**), the system will utilize the Continuous Link of Application Dot-Tags System (**0700**) to produce the results of that Application Dot-Tag within one of the Application Views that is later illustrated in FIG. **30**.

If the user selects add for a MemoryWeb Tag (**0606**), the user can add a new MemoryWeb Tag. When the user begins to type in text to add a tag, the system will produce suggestions on matching MemoryWeb Tags or the option to add a new tag (**0607**). If a matching tag is selected (**0608**), the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (**0610**). Alternatively, if the tag does not exist the user can create a new MemoryWeb Tag (**0609**) and then the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (**0611**).

If the user selects edit for a MemoryWeb Application Dot-Tag (**0612**), the user can add information text to edit the MemoryWeb Tag and the system will produce suggestions or matching MemoryWeb Tags or the option to add a new tag (**0613**). If there is a match within the user's system, the matching MemoryWeb Tag will appear and the user can select the MemoryWeb Tag (**0614**). Once the matching tag is selected, the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (**0616**). Alternatively, the user can create a new MemoryWeb Tag (**0615**) and then the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (**0617**). If the user selects delete for a MemoryWeb Application Dot-Tag (**0618**), the system deletes the association of MemoryWeb tag to Tag Data Block of Relationship Table for Digital File (**0619**).

In FIG. **29**, the Application Dot-Tag Shape and Content is illustrated (**0650**). MemoryWeb Tags are illustrated as Application Dot-Tags within the Application to help the user organize their Digital Files with key components of related information such as people, date of file, location, collection, star ranking, and recipe. The MemoryWeb Application Dot-Tag is more than just text (as traditional tagging systems) because Memory-Web Application Dot-Tags act as mini search engines that allow the user to see how many matching files there are to that MemoryWeb Tag and if selected will take the user to the corresponding Application View to illustrate the linked search results of that Application Dot-Tag (as illustrated in FIG. **30**). In essence, the Application Dot-Tags operate as mini search engines for the user's Digital Tags.

The structure of an Application Dot-Tag (**0650**) can take on an solid-line enclosed shape of a pill, dot or similar depiction (**0651**) and within the shape the name of the MemoryWeb Tag is displayed (**0653**) along with the number of Digital Files (**0652**) that are also associated with that same MemoryWeb Tag. FIG. **29** further illustrates more examples of the Application Dot-Tags. If the number of Digital Files associated with a specific MemoryWeb Tag is less than a certain number (e.g., 1000), the actual number of Digital Files associated with that MemoryWeb Tag is displayed. In FIG. **29**, this is illustrated with an Application Dot-Tag that has 453 files that are associated with the location of Cologne, Germany (**0654**). However, if the number of Digital Files associated with a specific MemoryWeb Tag are greater than the character length, a greater sign along with a number sequence that is less than the total number of associated Digital Files will be displayed (**0655**). In FIG. **29**, this is illustrated with an Application Dot-Tag that has ">999" (**0657**) as the number of Digital Files with the exact same MemoryWeb Tag and if the name of the MemoryWeb tag is longer than the text sequence, only a portion of the MemoryWeb tag will be displayed along with an ellipse as illustrated with "Holiday Photos from . . . " (**0658**). Finally, the Application Dot-Tag may be illustrated with a dotted or similar distinction (as opposed to a solid line) to help indicate a partial relationship (**0656**). In the illustration in

UNIFIED PATENTS EXHIBIT 1001

Page 64 of 73

US 10,621,228 B2

<table>
<tr><td>21</td><td>22</td></tr>
</table>

FIG. **29**, the dotted line is to indicate that only some of the selected Digital Files have the MemoryWeb Tag of Frank Smith.

In FIG. **30**, the Continuous Link of Dot Tag System is illustrated (**0700**). When a user selects an Application Dot-Tag, it will take them to the corresponding Application View that relates to the type of MemoryWeb Tag. The Continuous Link of Application Dot-Tag System begins when a user selects an Application Dot-Tag (**0701**).

If the Application Dot-Tag is a Person (**0702**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). A sample illustration of how a user can select a person Application Dot-Tag is in FIG. **31** (indicator **0764**). For a person tag, the system receives data for that person from the User Relationship Table and displays the relationship data in a People Profile View (**0709**). A sample illustration of a selected Person Application Dot-Tag is in FIG. **32** (indicator **1430**).

If the Application Dot-Tag is a Collection (**0703**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). A sample illustration of a collection Application Dot-Tag that can be selected is in FIG. **31** (indicator **0781**). For a collection tag, the system receives data for that collection from the User Relationship Table and displays the relationship data in a Collection View (**0710**). A sample illustration of a selected Collection Application Dot-Tag within a Collection View is in FIG. **33** (indicator **1530**).

If the Application Dot-Tag is a Location (**0704**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). A sample illustration of a location Application Dot-Tag that can be selected is in FIG. **31** (indicator **0768**). For a location tag, the system receives data for that location from the User Relationship Table and displays the relationship data in a Location View (**0711**). A sample illustration of a selected Location Application Dot-Tag within a Location View is in FIG. **34** (indicator **1630**).

If the Application Dot-Tag is a Date (**0705**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). A sample illustration of a date Application Dot-Tag that can be selected is in FIG. **31** (indicator **0766**). For a date tag, the system receives data for that date from the User Relationship Table and displays the relationship data in Uploads View with that date filtered (**0712**). A sample illustration of a selected Date Application Dot-Tag within Uploads View is in FIG. **40** (indicator **0861**).

If the Application Dot-Tag is a Recipe (**0706**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). For a recipe tag, the system receives data for that recipe from the User Relationship Table and displays the relationship data in a Recipe View with that date filtered (**0713**). A sample illustration of a selected Date Application Dot-Tag within Recipe View is in FIG. **36** (indicator **1800**).

The Application is contemplated to have additional types of Application Dot-Tags (**0707**) in the future including Family Trees, Timespan, etc. and each of these MemoryWeb Tags will go through the same continuous link of Application Dot-Tag process. For an additional type of Application Dot-Tag, the system will receive data from the User Relationship Table and displays the relationship data in the corresponding view for that type of Application Dot-Tag (**0714**).

If within any of the Application Views the user selects a Digital File (**0715**), the Digital File is then displayed in a Slideshow View (**0716**) where the user can again select an Application Dot-Tag (**0701**) and start the continuous link of Application Dot-Tag functionality over again. Also within an Application View, if the user selects another Application Dot-Tag (**0717**), the entire continuous link of Application Dot-Tag functionality begins again and sends the request back to ask if the newly selected Application Dot-Tag is a person (**0702**).

In FIG. **31**, the Slideshow view of a Digital File, Application Dot-Tags, and comments are illustrated (**0750**). When viewing a Digital File or group of Digital Files within the Slideshow Application View (**0750**), the selected Digital File is displayed in the center of the screen (**0754**). If the user wants to export this photo with all the associated Memory-Web Tags, they can select export (**0751**) which will initiate the Application Export System as illustrated in FIG. **49**. If the user wants to see the Digital File that is one file before the selected Digital File, they select the left arrow (**0752**) or they can select the right arrow (**0753**) to display the next photo in the sequence. Below the Digital File, the comments (**0755**) that are specific to that Digital File are depicted. If the user wants to edit the comments, they select edit (**0756**). If the user would like to see a moving slideshow of all the photos that are part of the group of Digital Files, they can select on the play sign (**0757**) or simply click the specific thumbnail of a Digital File (**0758**) to be displayed. The user can also have the slideshow in a full screen slideshow by selecting the full screen icon (**0759**). If the user wants to share the individual Digital file via email, they can select the mail icon (**0760**) or share it through a third party median provider, in this case Facebook (**0761**). A more detailed description on how the share functionality works is in FIG. **46** (indicator **1000**).

In FIG. **31**, each Application Dot-Tag that is associated with a Digital File is illustrated to the right of the Digital File under each major MemoryWeb Tag area. For this example, the People area (**0763**) has Application Dot-Tags of Jackson Smith (**0780**) and JC Smith (**0764**) associated with the selected Digital File. In the Dates area (**0765**), the Application Dot-Tag of August 28, 2013 (**0766**) is associated with the selected Digital File. In the Locations Area (**0767**), the Application Dot-Tag of Abe Lincoln Elementary School (**0768**) in the location associated with the selected Digital File. In the Collections Area (**0769**), the Application Dot-Tags of First Day of School (**0770**) and Jackson and JC Photos 2013 (**0771**) are associated with the selected Digital File. The Star Rankings Area (**0782**) shows that four out of five stars (**0773**) was selected for this Digital File. If the Digital File is associated with a Recipe (**0774**) the Application Dot-Tag would be illustrated in this area. The Media Type area indicates that this is a Memento (**0776**). If the user wants to delete this Digital File from the Application, they can select the Delete Item function (**0779**). If the user wants to edit the Application Dot-Tags, they can select the edit icon (**0762**) and all the MemoryWeb Tag areas will be in edit mode as later illustrated in FIG. **35**. Finally, any original Digital File detail (e.g., file name, camera specifications, etc.) is illustrated (**0778**).

In FIG. **32**, both of the People Application Views are illustrated. The first People Application View (**1400**) is used to display all the people that were created within the user's Application. This view can be seen by selecting "People" (**1401**) from any of the Application Views within the Application. The people can be listed in various sort orders though a drop-down (**1402**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. Additional sorts are contemplated such as age

**UNIFIED PATENTS EXHIBIT 1001**

**Page 65 of 73**

US 10,621,228 B2

23

sort. For each person, a thumbnail of their face along with their name is depicted. In this figure, Jon Smith (**1403**) and JC Jon Smith (**1404**) along with some other people are illustrated. Also, the user can determine if they want to have 20, 50 or 100 people shown at one time (**1405**) by selecting the corresponding number box. At the top of every Application View within the Application, the user can select Fast Search (**1450**) that is further described in FIG. **44**. Also at the top of every Application View within the Application, the user can select Apply Filters (**1451**) that is further described in FIGS. **37-43**.

In the second People Application View within FIG. **32**, a single people profile (**1430**) is illustrated. The individuals name is displayed at the top of the page (**1431**) along with their Nicknames (**1433**), when they were Born (**1434**), who their parents are (**1435**), Siblings (**1436**), Children (**1437**), and the person's Biography (**1438**). The Person Profile Photo of that individual is illustrated (**1439**) and if the user wants to change the profile photo, they can change by selecting change profile photo (**1440**). For each person, the system can allow the user to quickly see all the tags that are associated to a person. In this example, the system illustrates that there are four photos (**1452**) associated with that person and will also illustrate thumbnails of each of the four photos (**1446**). These thumbnails can be selected and then the user will be taken to the slideshow view for that Digital File. If the user selects Collections (**1441**), all of the collections that the person has been tagged within will be displayed. If the user selects Facial Recognitions (**1442**), all the faces that are confirmed or need to be confirmed are displayed. This is the area where the user can select to confirm or deny a suggested facial recognition through the Third Party Facial Recognition System that is illustrated in FIG. **25**. If the user selects Locations (**1443**), all of the Locations that the specific person has been tagged within will be displayed. If the user selects Family Relationships (**1444**), the seven people that the user is associated with will be displayed in a family chart or tree. If the user selects Recipe (**1445**), all the recipe's that the user has been tagged within will be displayed. If the user wants to edit any details within the individual people profile, they can select edit (**1447**) and all the fields will allow the ability to edit the details. If the user selects any of the Application Dot-Tags such as the individuals mother Jane Smith (Doe) (**1449**), the application will utilize the Continuous Link of Application Dot-Tag System (see FIG. **30**) and take the user to an individual people profile view of Jane Smith (Doe). If the user selects View all People (**1432**), the Application will go back to the multiple People View (**1400**).

In FIG. **33**, both of the Collection Application Views are illustrated. The first Collection Application View is used to display all the collections that were created within the user's Application (**1500**). This view can be seen by selecting "Collections" (**1501**) from any of the Application Views within the Application. The collections can be listed in various sort orders though a drop-down (**1502**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. For each collection, a thumbnail of a Digital File from that collection depicted. In this figure, Smith Family Photos (**1503**), Europe Trip (**1504**), First Day of School (**1505**), Jackson and JC Photos 2013 (**1506**), and Baseball Games (**1507**) is illustrated. At the top of every Application View within the Application, the user can select Fast Search that is further described in FIG. **44**. Also at the top of every Application View within the Application, the user can select Apply Filters that is further described in FIGS. **37-43**.

24

In the second Collections Application View within FIG. **33**, a single collection (**1530**) is illustrated. The individual collection name is displayed at the top of the page (**1532**). Thumbnails of each Digital File within the specific collections are illustrated. In this example, the system shows photos (**1533**) associated with the Smith Family Photos Collection. If the user wants to edit any Digital Files within the collection, they can select edit (**1535**) and then the user can add or delete any Digital Files as well as set the cover photo for a collection. If the user wants to share this collection (**1534**), they can select a method to share and this will take the user through the Share to Third Party Media Provider System illustrated later in FIG. **46**. If the user selects View all Collections (**1531**), the Application will go back to the multiple Collection View (**1500**).

In FIG. **34**, both of the Location Application Views are illustrated. The first Location Application View is used to display all the locations that were created within the user's Application (**1600**). This view can be seen by selecting "Locations" (**1605**) from any of the Application Views within the Application. The locations can be listed in various sort orders though a drop-down (**1606**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. For each location, a thumbnail of a Digital File from that location depicted. In this figure, Wrigley Field (**1601**), Abe Lincoln Elementary School (**1602**), Home Sweet Home (**1603**), and Stonehenge (**1604**) is illustrated. What is also contemplated instead of a Digital File from that location is that a zoomed in image of a map from the specific location using the Third Party Geographical Mapping System later depicted in FIG. **47**. At the top of every Application View within the Application, the user can select Fast Search that is further described in FIG. **44**. Also at the top of every Application View within the Application, the user can select Apply Filters that is further described in FIGS. **37-43**.

In the second Locations Application View within FIG. **34**, a single location (**1630**) is illustrated. The individual location name is displayed at the top of the page (**1632**). Thumbnails of each Digital File within the specific collections are illustrated. In this example, the system illustrates a one photo (**1633**) taken at Wrigley Field (**1634**) that is associated with the location called Wrigley Field. If the user wants to edit any Digital Files within the collection, they can select edit (**1637**) and then the user can add or delete any Digital Files. If the user wants to share the Digital Files associated with this location (**1636**), they can select a method to share and this will take the user through the Share to Third Party Media Provider System illustrated later in FIG. **46**. If the user selects View all Collections (**1631**), the Application will go back to the multiple Collection View (**1600**). As part of the individual Location View, an interactive map displaying a zoomed-in image of the specific location is displayed (**1635**).

In FIG. **35**, the Uploads Application View and how it uses the Application Digital Tag Organizer System is illustrated (**1700**). Similar to the concept of writing certain information "on the back of a photo," the system's digital tagging system (also called Application Digital Tag Organizer) allows a user to select large amounts of Digital Files and add Digital Tags that can characterize and document the digital file(s). Digital Files can be individually or group organized at the same time for many tags including, but not limited to, a person's name, family relationships of the subjects to the user and between each other (e.g., mother/father), location, date, album, comments, document type (e.g., birth certificate, poetry), recipe, ranking or rating, and sharing rights. One or more Digital

UNIFIED PATENTS EXHIBIT 1001

US 10,621,228 B2

25

Files can be selected at the same time and displayed with an overlaid check mark when activated (**1705** and **1710**) and then Digital Tags can be assigned to a single file at a time or to a plurality of files at once. For example, if a user wishes to assign the tag "grandma" to 100 photos at once, the system provides a way for a user to select all 100 photos (**1713**) and enter the tag only once. In addition, the system does include an indicator that appears when a user hovers over the Digital File providing all the relevant Digital Tags associated with that specific Digital File (**1737**) and in this example it shows the caption of "Family Smith finally sees Stonehenge," that four People are tagged to this photo, one collection is tagged to this photo, there are zero people recognized through Facial Recognition, and the date of this photo is from December 21, 2013. If the user wants to delete a single photo from uploads, they can click on the "x" (**1735**) that is displayed when the user hovers over the Digital File thumbnail. When there are multiple Digital Files, the user can determine how many images are displayed at one time in the Items Per Page Buttons (**1738**) that include such numbers as 20, 50 and 100 on the page at the same time. When there is are more Digital Files that items per page, they are automatically grouped by pages and a Page Button (**1739**) can be selected to see the next set of Digital Files.

In the Uploads Location View, Digital Files can be directly uploaded to the Application by selecting Upload Files (**1701**) and the user will have the option to select the specific Digital Files to be uploaded from their Storage System. Users also have the option to install the Memory-Web Download Application that can be installed on either a Microsoft or MAC computer that will automatically upload and sync photos to and from the users Storage System to the MemoryWeb Application. Also displayed is the amount of space being used by the user within the Application (**1702**). Uploads of Digital Files can be listed in various sort orders though a drop-down (**1703**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. In addition, the Digital Files can be sorted by File Batch Name (A-Z) or File Batch Name (Z-A). In FIG. **35**, the sort of File Batch Name (A-Z) is selected (**1703**) and this provides three groups of Digital Files with the names File Folder C:/2013/Family Fun (**1704**), File Folder C:/2013/General (**1706**), and of File Folder C:/2013/ First Day of School (**1709**). The File Batch Name is created when Digital Files are uploaded to the Application. The File Batch Name allows the user to see the file directory of how they had their Digital Files stored from another Storage System (e.g., on their computer hard drive) that allows for easier organization within the MemoryWeb Application. For example, in the sort of File Folder C:/2013/General (**1706**), two digital files (**1707** and **1708**) are illustrated that came from the exact same file folder path of the Users Storage system upon upload. At the top of every Application View within the Application, the user can select Fast Search that is further described in FIG. **44**. Also at the top of every Application View within the Application, the user can select Apply Filters that is further described in FIGS. **37-43**.

On the right side of FIG. **35**, the associated Application Dot-Tags along with the ability to organize one or more Digital Files at the same time is illustrated. At the top of the screen, it shows how two Digital Files are selected (**1712**) that correspond to the selected (checked) Digital Files (**1705** and **1710**). Below this area illustrates all the Application Dot-Tags that are associated with the two selected Digital Files. The user has the option to select all (**1713**) the Digital Files being viewed in the Uploads View as well as selecting none (**1714**). By selecting all, the user can administer

26

Application Dot-Tags to all the selected Digital Files at the same time. If the user wants to delete Digital Files, they can select the Digital Files to be deleted and then select the Delete Selection (**1715**) option.

In FIG. **35**, each Application Dot-Tag that is associated with the selected Digital File(s) is illustrated. For this example, the People area (**1716**) has Application Dot-Tags of Jackson Smith (**1734**), Jane Smith (**1733**), Jon Smith (**1731**), and JC Smith (**1717**) that are associated with the two selected Digital Files (**1710** and **1705**). If the user wants to add a person to all the selected Digital Files, they can click on "+Add People" (**1718**) that will display a pop-up where the user can search for an existing person within the user's existing people within the Application or add a new person to the user's group of people within the Application. It is contemplated to have a Facial Recognition suggestions appear in this area of the Application that will allow users to confirm or deny a recognized person to a specific Digital File. However, the current version of the People area is useful for situations where a face is not recognized, but the user desires to tag a person to a Digital File, they can manually assign a Person Application Dot-Tag to that Digital File for an existing person (e.g., if the person's back is turned, it is a document that contains that person, a piece of art created by that person, etc.).

In the Dates area (**1719**), the organize functionality for assigning a Digital Tag of a date within the Digital File(s) is illustrated. Upon upload, the date when the Digital File was created is automatically read by the Application and illustrated as an Application Dot-Tag (**1720** and **1730**). As illustrated in the Dates area, the Application Dot-Tags of July 4, 2013 (**1720**) and August 28, 2013 (**1730**) are illustrated as they correspond to the dates that are associated with each of the selected Digital Files. If the user wants to change the date for all the selected Digital Files, they can click on "+Add/Edit Date" (**1721**) that will display a pop-up where the user can add a new date for the selected digital files within the Application. This is a very useful feature when an incorrect date is assigned to a digital file (e.g., if a photo from October 31, 1951 was digitized on December 31, 2012, the digitized dates would show as an Application Dot-Tag that the user can change in this section to the correct date of October 31, 1951).

In the Locations area (**1722**), the organize functionality for assigning Digital Tags of locations within the Digital File(s) is illustrated. Upon upload, the GPS location of where the Digital File was created (if applicable) is automatically read by the Application and illustrated as an Application Dot-Tag for locations of the selected files. In the locations area, the Application Dot-Tags of Abe Lincoln Elementary School (**1723**) and Wrigley Field (**1735**) are illustrated as they correspond to the locations that are associated with each of the selected Digital Files. If the user wants to change the location for all the selected Digital Files, they can click on "+Add/Edit location" (**1724**) that will display a pop-up where the user can search for an existing location within the user's existing locations within the Application or add a new location to the user's group of locations within the Application. Another added function to assign a location to the selected Digital Files is to use Search with Map (**1732**) that utilizes the Application's Third Party Geographical Mapping System that is further illustrated in FIG. **47** that allows the user to type in any relevant information (e.g., location name, address, state, etc.) and then the Application will search and pinpoint that location on a map.

In the Collections Area (**1725**), the organize functionality for assigning Digital Tags of albums within the Digital

**UNIFIED PATENTS EXHIBIT 1001**

US 10,621,228 B2

| 27 | 28 |

File(s) is illustrated. Digital Files can be associated to multiple albums. As illustrated in the Collections area, the Application Dot-Tags of First Day of School (**1726**), Jackson and JC Photos 2013 (**1727**), and Baseball Games (**1728**) are associated with the Collections for the selected Digital Files. If the user wants to add a Collection to all the selected Digital Files, the user can click on "+Add/Create Collection" (**1729**) that will display a pop-up where the user can search for an existing Collection within the user's existing Collections within the Application or add a new Collection to the user's group of Collections within the Application.

Within the Uploads View, the ability to perform similar tagging of Star Rankings, Recipes, Family Relationships, and Media Types/Document Type are also contemplated as part of the Application Digital Tag Organizer System. For Star Rankings, it is contemplated to assign MemoryWeb Tags of star rankings within the Digital File(s). Upon upload, if the star ranking is already contained within the Digital File, it is automatically read by the Application and illustrated as an Application Dot-Tag. The user can select one or more Digital Files and then apply a star ranking between 1 and 5 in the Uploads Application View. For Recipes, it is contemplated to assign MemoryWeb Tags of Recipes to Digital File(s). The user can select one or more Digital Files and then type within the "Recipe" search bar to either add a new recipe or associate the Digital File(s) to an existing recipe. Digital Files can be associated to multiple recipes. For Media Type/Document Type, the user can choose from a list of common document types (e.g., Birth Certificate, Death Certificate, Marriage Certificate, etc.) can be utilized for common document type associations. Once a document type is assigned to one or more Digital Files, the document type appears within an Application Dot-Tag. Digital Files can be associated to multiple document types.

In FIG. **36**, an individual recipe view (**1800**) allows one to see all the information that is associated with a specific recipe. The name of the specific recipe is displayed at the top of the page (**1801**) and the People Profile picture of the "chef" associated with the recipe is illustrated (**1804**). If no chef is assigned, the user can select the "+add/edit chef" (**1803**) to either choose an existing person from the user's People in the Application or add a new person.

The view of various Digital Files within the recipe (**1808**) along with scrolling through the Digital Files using the arrow icons (**1814** and **1815**), the ability to share this recipe with others by selecting the sharing icon (**1812**), As the Digital Files are selected on using the film strip on the bottom, a larger thumbnail illustrating the Digital File is shown (**1807**). The recipe view also allows you to choose a chef for the recipe from the people within the user's Application. When a chef is selected, the profile picture (**1804**) of the person along with their name as an Application Dot-Tag (**1816**) is displayed. For each recipe, the user can insert the ingredients (**1809**), directions (**1810**), and comments (**1811**). Each of these areas can be edited by selecting the edit button (**1813**). Another contemplated feature allows the user to apply star rankings for the recipe as well as categorize they type of recipe (e.g., appetizer, entrée, etc.). It is further contemplated that the Digital Files within the individual recipe view may also include videos where they can be watched showing the chef making the recipe. It is also contemplated that the recipes will be interactive with external sources (e.g., the Food Network) so that recipes can be shared or imported with the Application and that visitors to the account will be able to post/share comments about the recipe. It is further contemplated that the user can print the recipe using a print icon.

In FIG. **37**, the Advanced Filters System is illustrated (**0800**). This feature allows the user to narrow the Digital Files being viewed within the Application Views by searching the user's entire collection of MemoryWeb Tags within the Application and then displaying the filtered information in one of the Application Views. Advanced Filters System can be filtered by such items as key words (or plurality of key words), event names, location, people, albums, star rating, file type, document type, and dates. A user may filter based on more than one criterion at a time. To help users quickly identify Digital Files that may still need to be organized, the advanced search filter also allows users to isolate files that have no date, no location, no people, no specific date/range, and no upload date information or are lacking any other tag. The Advanced Search Filter can be used within many of the views the Application to narrow the set of Digital Files being viewed. For example, you can use the Advanced Filter Button to only show the map view of locations a specific person has traveled in their lifetime.

When a user selects the "Advanced Filters" from almost any Application View (**0801**) (the button can be seen in FIGS. **32**, **33**, **34**, **35**, and **36**), a pop-up will appear that allows the user to type in text into the text box (**0802**). As the user is typing, the system sends a request (**0803**) to the User Relationship Table (**0300**) to look up any possible MemoryWeb Tag matches. The system will then produce the request (**0804**) and illustrate the potential matches of the filters to the user (**0805**). As the user types in another letter, the process of sending a request (**0803**) to the User Relationship Table (**0300**), producing results (**0804**) and producing a new set of results (**0805**) is re-run. If the user selects one of the suggested MemoryWeb tags (**0806**) and then selects to apply this filter (**0807**), the system will send this request to the User Relationship Table (**0300**). This portion of the Advanced Filter System is further illustrated in FIG. **38**.

If the Advanced Filter System is applied within the Uploads View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0809**). An example of this output is later illustrated in FIG. **39** (indicator **0850**).

If the Advanced Filter System is applied within the Collections View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0810**). An example of this output is later illustrated in FIG. **39** (indicator **0852**).

If the Advanced Filter System is applied within the Locations View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0811**). An example of this output is later illustrated in FIG. **40** (indicator **0856**).

If the Advanced Filter System is applied within the People View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0814**). An example of this output is later illustrated in FIG. **39** (indicator **0854**).

If the Advanced Filter System is applied within other contemplated views within the Application such as Recipe, Family Trees, Timespan, etc. the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0812**).

If the user decides to add an additional filter (**0813**), the process is repeated when the user selects "Advanced Filter" (**0801**) while the pre-existing filters are still applied. An example of this process is later illustrated in FIG. **42** and FIG. **43**. If the user selects an Application Dot-Tag, then the

UNIFIED PATENTS EXHIBIT 1001

US 10,621,228 B2

29 | 30

continuous Link of Application Dot-Tags System is engaged as illustrated in FIG. **30** (**0700**).

In FIG. **38**, the process of the Adding the First Application Dot-Tag using the Advanced Filter is illustrated. This is a visual depiction of the process that was illustrated in FIG. **37**. In Stage 1 (**0830**), the user selects "Apply Filters." This takes the user to Stage 2 where the Application generates the Apply Multiple Filters box (**0831**). The user can then type in the alphanumeric text search criteria within the Advanced Filters text box (**0838**). In this example, the word "Smith" was typed within the text box. As the alphanumeric text is typed within the text box, the application automatically generates the available filters (**0836**) that meet the criteria. In this example, the user selects the Application Dot-Tag of a person named JC Smith (**0832**). In Stage 3, "Apply" is selected and then the application lists the Application Dot-Tag of a Person named JC Smith as a current active filter (**0837**). This filter will then be applied to each Application view that is further illustrated in FIGS. **39** through **41**. If the user wants to clear all the filters, they can select "clear filters" (**0839**).

In FIG. **39**, an illustration of the results for a Single Application Dot-Tag Filter for each Application view is depicted. If the Advanced Filter is applied in the Uploads Application View (**0850**), the filter of "JC Smith" (**0851**) is illustrated and only the Digital Files that contain the person JC Smith are illustrated. If the Advanced Filter is applied in the Collections Application View (**0852**), the filter of "JC Smith" (**0853**) is illustrated and only the Collections that contain the person JC Smith are illustrated. If the Advanced Filter is applied in the People Application View (**0854**), the filter of "JC Smith" (**0855**) is illustrated and only the person named JC Smith is illustrated.

In FIG. **40**, an illustration of the results for a Single Application Dot-Tag Filter for a date within the Uploads Application View is depicted (**0860**). If the Advanced Filter is applied using a date filter within the Uploads Application View (**0861**), the filter date of "2013-07-04" (**0876**) is illustrated and only the Digital Files that contain that date are illustrated.

In FIG. **41**, an illustration of the results for a Single Application Dot-Tag Filter in the Location Application View is depicted (**0870**). Within the Location Application View the Digital Files are displayed within an interactive map (Google map shown as an example). The Location View can also provide additional outputs such as a journey route that identifies the specific locations for an event or trip that can be customized by users. In this view, individual or groups of Digital Files are illustrated as photo thumbnails (see indicators **0874** and **0875**) on the map and the user can select the thumbnail to see all the Digital Files with the same location (as seen FIG. **34** (indicator **1630**)) or the user can use the interactive map and narrow the map view by either using the zoom in/zoom out bar (**0876**) on the left or simply selecting the map. Note that the pinned locations include a thumbnail of the Digital File (or Collection cover) and the number of Digital Files for that location.

If the Advanced Filter is applied in the Locations Application View, the filter of "JC Smith" (**0872**) is illustrated and only the Digital Files that contain the person JC Smith are illustrated with their geographic location on the map. The user can select to clear this filter (**0873**) or see this Advanced Filter with the view of locations as a list (**0871**). In FIG. **41**, there are two thumbnails on the map (**0874** and **0875**).

In FIG. **42**, the process of the Adding another Application Dot-Tag using the Advanced Filter is illustrated. Continuing on the process that was illustrated in FIG. **38** where the first

Application Dot-Tag filter of "Person: JC Smith" was applied, the ability to add a second Application Dot-Tag if further illustrated in FIG. **42**. As with FIG. **38**, FIG. **42** is a visual depiction of the process that was illustrated in FIG. **37**. In Stage 1 (**0880**), the user selects "Apply Filters." This takes the user to Stage 2 where the Application generates the Apply Multiple Filters box (**0881**). The user can then type in the text search criteria for the second Advanced Filter within the Advanced Filters text box. In this example, the word "Abe" was typed within the text box. As the alphanumeric text is typed within the text box, the application automatically generates the available filters that meet the criteria. In this example, the user selects the Application Dot-Tag of a location named Abe Lincoln Elementary School (**0882**). In Stage 3 (**0883**), the application lists the Application Dot-Tags of both the Person named JC Smith (**0884**) as well as the location of Abe Lincoln Elementary School (**0885**) as part of the Current Active Filters. The user then selects "Apply" (**0886**) to see these filters illustrated in the Application Views. This filter will then be applied to each Application view as previously illustrated in FIGS. **39** through **41**.

In FIG. **43**, an illustration of the results for Adding Another Application Dot-Tag Filter in the Location Application View is depicted (**0890**). Continuing on the process that was illustrated in FIG. **42**, in FIG. **43** (**0890**) the Application Dot-Tag filters of "Person: JC Smith" (**0891**) and "Location: Abe Lincoln Elementary School" (**0892**) are illustrated. There is one overlapping location that contains both filters for a Digital File that is illustrated on the map (**0893**).

In FIG. **44**, the Fast Search System is illustrated (**0900**). Throughout the Application, groups or individual Digital Files can be searched quickly using the Fast Search bar that is at the top of each Application View. Once a key word or phrase is entered into this area, the user's entire collection of Digital Tags within the Application that includes all the Digital tags are searched for potential matches. This feature allows the user to search their entire collection of MemoryWeb Tags within the Application and then displays the information grouped by people, collections, locations, documents, and recipes. The Fast Search System can be searched by such items as key words (or plurality of key words), event names, location, people, albums, star rating, file type, document type, and dates.

When a user selects the Fast Search bar from almost any Application View (**0901**), the user can type in alphanumeric text into the text box (**0902**). As the user is typing, the system sends a request (**0903**) to the User Relationship Table (**0300**) to look up any possible MemoryWeb Tag matches. The system will then produce the request (**0904**) and illustrate the potential matches by category for the user (**0905**). As the user types in another letter, the process of sending a request (**0903**) to the User Relationship Table (**0300**), producing results (**0904**) and produce a new set of results (**0905**) is re-run. If the user selects one of the suggested MemoryWeb tags (**0906**), the system will send this request to the User Relationship Table (**0300**). This process is further illustrated in FIG. **45**.

If the user selects a person Fast Search tag, the system retrieves data for the person from the User's Relationship Table and displays the relationship data (**0907**) in the Person Profile View as illustrated in FIG. **32** (indicator **1430**).

If the user selects a collection Fast Search tag, the system retrieves data for the collection from the User's Relationship Table and displays the relationship data (**0908**) in the Collection View as illustrated in FIG. **33** (indicator **1530**).

UNIFIED PATENTS EXHIBIT 1001
Page 69 of 73

US 10,621,228 B2

31

If the user selects a location Fast Search tag, the system retrieves data for the location from the User's Relationship Table and displays the relationship data (**0909**) in the Location View as illustrated in FIG. **34** (indicator **1630**).

If the user selects a date Fast Search tag, the system retrieves data for the date from the User's Relationship Table and displays the relationship data (**0910**) in the Uploads View as illustrated in FIG. **40** (indicator **1861**).

If the Fast Search System is applied within other contemplated views within the Application such as Family Trees, Timespan, etc. the system retrieves data for the search from the User's Relationship Table and displays the relationship data (**0911**). As part of the contemplated search process is to also search comments related to a Digital File.

In FIG. **45**, the process of using the Keyword Fast Search is illustrated. This is a visual depiction of the process that was illustrated in FIG. **44**. In Stage 1 (**0930**), the user selects the Fast Search bar at the top of one of the Application Views. This takes the user to Stage 2 (**0931**) where the user can then type in the alphanumeric text search criteria within the Fast Search text box (**0932**). In this example, the word "Wrigley" was typed within the text box. As the alphanumeric text is typed within the text box, the application automatically generates the available MemoryWeb Tag results (**0933**) that meet the criteria. Note how the results are organized by various MemoryWeb Tag categories such as Person, Collection, Location, Recipe, and comments. In Stage 3 (**0934**), the user selects one of the results. In this example, the user selects the location of Wrigley Field (**0935**). When the user selects a specific MemoryWeb Tag, it takes them to Stage 4 where the information related to that tag is displayed in the corresponding view as discussed within FIG. **44**. For the example where the user selected the Location of Wrigley Field, the user was taken to the individual locations Application View where the location of Wrigley Field and the corresponding Digital Files are displayed (**0936**).

In FIG. **46**, the Share to Third Party Media Provider System (**1000**) is illustrated. This feature allows the user to share Digital Files from MemoryWeb directly to a third party application. The process begins when the user selects to share a Digital File or collection of Digital Files within the MemoryWeb Application (**1001**). Examples of where the user can select share can be seen in FIG. **31** (indicator **0760**), FIG. **33** (indicator **1534**), FIG. **34** (indicator **1636**), and FIG. **36** (indicator **1812**). Once the request is made, the system requests the Digital File and Tag Data Blocks (**1002**) from the User Relationship Table (**0300**). The system then retrieves the Digital File from the User Relationship Table (**1003**). At the same time, the system will also retrieve the Digital Tags from the Relationship Table (**1004**). The system will then inject the tags to the corresponding EXIF Tag Data Blocks (**1005**). The mapping of the EXIF Tag Data Blocks and those of MemoryWeb Data Blocks is illustrated in FIG. **22**. Note, for any tags that were modified within the MemoryWeb application, only the new tag information will be transferred into the EXIF Tag Data Blocks. The system then combines the EXIF Tag Data Blocks and embeds them within the Original Digital File (**1006**). The application then exports the Digital File with the new EXIF Tag Data Blocks using the Application Export System (**0300**) which then sends the Digital File outside the MemoryWeb Application to the Third Party Media Provider (**0501**).

In FIG. **47**, the Third Party Geographical Mapping System is illustrated (**1100**). When Digital Files are imported into MemoryWeb, if there is any GPS data available from the EXIF Tags (See FIG. **22** (indicators **0330**, **0331**, **0332**,

32

and **0333**)), the system will utilize this data and automatically create a MemoryWeb location tag within the Application (See FIG. **22** (indicators **0368**, **0369**, **0370** and **0371**)). However, if the GPS coordinates were missing from a Digital File when it was imported into the Application (See FIG. **50** (indicators **1418** and **1419**)), the user can add the Location (which the application will automatically add the associated GPS tags) to the Digital File using the Application Digital Tag Organization System (see FIG. **28**). As locations are associated with a Digital File, the Application can interact with a Third Party Geographical Mapping System to pull maps that correspond to the exact location of Digital Files that have a location tag (see FIG. **34** (indicator **1630** and FIG. **40**, indicator **0875**)). In addition, the Application utilizes a world map view to illustrate all the locations that are associated to one or more Digital Files for a user within the Location Application View (see FIG. **41** (indicator **0880**)).

The Third Party Geographical Mapping System begins when a Location Application Dot Tag (**1102**) is selected (**1104**), the system will send a request (**1105**) to the User Relationship Table (**0300**). Examples of when Location Application Dot-Tags can be selected are illustrated in FIG. **31** (indicator **0768** and FIG. **35**, indicators **1723** and **1735**). In FIG. **47** if the Locations Application View is selected (**1103**), the system will send a request (**1105**) to the User Relationship Table. The Location Application View can be selected from almost any Application view as illustrated in FIG. **34** (indicator **1605**). When either a single location or the world map view is selected, the system will retrieve the data (**1108**) from the User Relationship Table (**0300**) and send a request (**1106**) to the Third Party Geographical Mapping Provider (**1101**) who generates the map request and then sends the information back to the system for the specific location (**1107**). At the same time, the Application Dot-Tags and Digital Files associated with the location or map request are retrieved and then sent (**1109**) to the Locations Application view. The system will combine the map information along with the Application Dot-Tags and Digital Files and display this information within the Location Application View (**1100**). Examples of a single Location Application View can be seen in FIG. **34** (indicator **1630** and FIG. **40** indicator **0875**), and an example of a world map view can be seen in FIG. **41** (indicator **0880**).

In FIG. **48**, the Share to Individual System is illustrated (**1200**). The Share to an individual person or a group of people starts when a user initiates share of a Digital File or a Collection of Digital Files (**1201**). Examples of where the user share functions are illustrates are in FIG. **31** (indicators **0760** and **0761**), FIG. **33** (indicator **1534**), FIG. **34** (indicator **1636**), and FIG. **36** (indicator **1812**). Next, the system requests the Digital File and Tag Data Blocks (**1202**) from the User Relationship Table (**0300**). They system will retrieve corresponding Digital File (or collection of Digital Files) (**1203**) from the User Relationship Table.

At the same time, the system will also retrieve the Digital Tags of the Digital File from the Relationship Table (**1204**). The system will then inject the tags to the corresponding EXIF Tag Data Blocks (**1206**). The mapping of the EXIF Tag Data Blocks and those of MemoryWeb Data Blocks is illustrated in FIG. **22**. Note, for any tags that were modified within the MemoryWeb application, only the new tag information will be transferred into the EXIF Tag Data Blocks. The system then combines the EXIF Tag Data Blocks and embeds them within the Original Digital File (**1205**). The application then exports the Digital File with the new EXIF Tag Data Blocks using the Application Export System

UNIFIED PATENTS EXHIBIT 1001

US 10,621,228 B2

33                                                                                        34

(**1300**) which then sends the Digital File outside the MemoryWeb Application to an Individual or Group of People (**1207**).

In FIG. **49**, the Application Export System is illustrated (**1300**). The Application Export System starts when a user selects the export of a Digital File within the application (**1302**) or has installed the MW Automatic Uploader/Downloader Application (**1308**). An example of where the user can select the export of a Digital file within the Application is FIG. **31** (indicator **0751**). If the user has installed the MW Automatic Uploader/Downloader Application, the export functionality of the user's entire collection of Digital Files will be downloaded to the User's desired folder on their computer with the Digital Tags embedded within the Digital Files. If neither a user initiated download nor the MW Automatic Uploader/Downloader Application is not used, then the Application Export is not initiated (**1309**). For either a user initiated download or one using the MW Automatic Uploader/Downloader Application, the system requests the Digital File(s) and Tag Data Blocks (**1303**) from the User Relationship Table (**0300**). They system will retrieve corresponding Digital File (or collection of Digital Files) (**1304**) from the User Relationship Table. At the same time, the system will also retrieve the Digital Tags of the Digital File from the User Relationship Table (**1305**). The system will then inject the tags to the corresponding EXIF Tag Data Blocks (**1306**). The mapping of the EXIF Tag Data Blocks and those of MemoryWeb Data Blocks is illustrated in FIG. **22**. Note, for any tags that were modified within the MemoryWeb application, only the new tag information will be transferred into the EXIF Tag Data Blocks. The system then combines the EXIF Tag Data Blocks and embeds them within the Original Digital File(s) (**1307**). The application then exports the Digital File(s) with the new EXIF Tag Data Blocks to the desired Storage System of the user (**1301**).

In FIG. **50**, there are three charts for the Digital File Image File Directory Data Blocks of JPG Photo within Microsoft Before and After MemoryWeb. This Figure is meant to demonstrate how the EXIF Tag Data Blocks for a Digital File (in this example a JPG file) prior to the use of MemoryWeb Application appear and then how these EXIF Tag Data Blocks are populated with Digital Tags upon export from the MemoryWeb Application.

The first chart illustrates common EXIF Tags (Data Blocks) (**1401**) and lists certain common the EXIFTool Family 1 Group names that are displayed in the file properties of a JPG file when using Microsoft Windows (these are the same EXIF Tag Blocks that were illustrated in FIG. **22** (indicator **1320**)). In the second chart (**1402**), the Digital Tags associated with the original Digital File are displayed. In the third chart (**1403**), the updated Digital Tags for the same original Digital File once exported from the MemoryWeb Application is displayed.

In the second chart (**1402**), the original Digital File prior to import to the MemoryWeb Application did not have Digital Tags for data blocks such as Description Rating (**1416**), Description Comments (**1417**), GPS Latitude (**1418**), GPS Longitude (**1419**). Also in the second chart the Digital Tags for the data blocks of File Folder Path (**1420**) and File Date Created (**1421**) are illustrated.

In the third chart (**1403**), the original Digital File that was exported from the MemoryWeb Application now contains new or modified Digital Tags for certain data blocks. For example, a star rating of four out of five stars (**1410**) with the new MW Modified Digital File is now associated with the Description Rating (**1404**) where it was blank (**1416**) with the original file before using the MemoryWeb Application.

Another example is the listing of MemoryWeb Tags within the Description Comments data block (**1411**) as: CAPTION: Jackson and JC's first day at school!, PERSON: Jackson Smith, JC Smith, LOCATION NAME: Abe Lincoln Elementary School, COLLECTION: First Day of School, COLLECTION: Jackson and JC Photos 2013, DATE: 8/28/ 2013. All of these Digital Tags are now associated with the Description Comments (**1405**) where it was blank (**1417**) with the original file before using the MemoryWeb Application.

Also updated in the MW Modified Digital File are the GPS Latitude (**1412**) and GPS Longitude (**1413**) as Digital Tags that were assigned in the MemoryWeb Application using the location feature with the Application Digital Tag Organizer System. These tags now replace the blank tags (indicators **1418** and **1419**) that were in the original file before using the MemoryWeb Application.

A final example is how the date was modified in the MemoryWeb Application where a new date of August 28, 2013 (**1415**) was assigned to the Digital File. This replaced the old date that was originally tagged with a date of November 1, 2013 (**1421**). In a typical Digital File, only the date and perhaps the GPS location if taken with certain newer photo device is pre-populated in a Digital File. For the example in FIG. **50**, the Digital File may have been created or scanned on November 1, 2013, but with the MemoryWeb Application Digital Tag Organizer System the user was able to correctly assign the date the photo was taken and now this date is always part of the Digital File within the MemoryWeb Application, but also when the Digital File is exported from MemoryWeb.

A benefit of the Export System is that users can export a single Digital File or their entire set of Digital Files (using the MW Automatic Uploader/Downloader Application), with all the updated Digital Tags from the MemoryWeb Application embedded within the Digital File(s). This feature is unique as it will allow the users to back up their files to another source (e.g., external computer hard drive) or to transport it to another venue (e.g., another website that is used for viewing and/or sharing Digital Files such as a social media website) where it can be viewed with these Digital Tag attributes. This export feature can provide users with the advantage of never losing key data that was stored simply because the user chooses to move its Digital Files to a new digital system.

The application also contemplates the use of a Family Tree Application View where the individual people that have been created within the Application can be displayed with family relationships. This view can illustrate interactive family trees where one can see the family tree of an individual or family. Any family relationships created in the user's personal profile are already pre-populated by the Application for the Family Tree View. If a user selects on an individual within the family tree, it will take them to the people profile Application View of that person. Family Trees can quickly be viewed with the family tree drop-down sort feature. As with other areas within the Application, the family tree view can be narrowed down using an Advanced Filters System. For matching family members, the system will have drag/drop functionality to make new associations to a family tree. It is also contemplated that various family tree views could be displayed (e.g., pedigree chart, fan chart, directs descendants chart, etc.). In addition, it is contemplated that family tree relationships from either data files (e.g., GEDCOM files) or other sources (e.g., Family Search

UNIFIED PATENTS EXHIBIT 1001
Page 71 of 73

US 10,621,228 B2

35

database) would either be imported into the user's versions of the Application or utilize these sources in associating the family tree information.

Another Application View that is contemplated is Timespan or Timeline. The Timeline Application View will have an interactive timeline to display the dates within the Digital Files of the Application for a user. The timeline view acts as an interactive filter or funnel of Digital Files whereas when the user starts to define the parameters of dates towards the bottom, the information above it is filtered to display the major groups of Digital Files that meets the selected date range criteria in various formats until you are able to view an individual Digital File. This funnel approach is designed to allow the user to appreciate the vast amount of data that can be associated with a date range, but then allow them to filter the information with the user's desired criteria. This will be a very useful tool when users want to see the growth and progress of an individual as well as memorialize a lifetime of a friend or family member.

While the disclosure is susceptible to various modifications and alternative forms, specific exemplary embodiments thereof have been shown by way of example in the drawings and have herein been described in detail. It should be understood, however, that there is no intent to limit the disclosure to the particular forms disclosed, but on the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the disclosure as defined by the appended claims.

The invention claimed is:

1. A method comprising:

responsive to a first input, causing a map view to be displayed on an interface, the map view including:
(i) an interactive map;
(ii) a first location selectable thumbnail image at a first location on the interactive map; and
(iii) a second location selectable thumbnail image at a second location on the interactive map;

responsive to an input that is indicative of a selection of the first location selectable thumbnail image, causing a first location view to be displayed on the interface, the first location view including (i) a first location name associated with the first location and (ii) a representation of at least a portion of one digital file in a first set of digital files, each of the digital files in the first set of digital files being produced from outputs of one or more digital imaging devices, the first set of digital files including digital files associated with the first location;

responsive to an input that is indicative of a selection of the second location selectable thumbnail image, causing a second location view to be displayed on the interface, the second location view including (i) a second location name associated with the second location and (ii) a representation of at least a portion of one digital file in a second set of digital files, each of the digital files in the second set of digital files being produced from outputs of the one or more digital imaging devices, the second set of digital files including digital files associated with the second location; and

responsive to a second input that is subsequent to the first input, causing a people view to be displayed on the interface, the people view including:
(i) a first person selectable thumbnail image including a representation of a face of a first person, the first person being associated with a third set of digital files including digital photographs and videos;

36

(ii) a first name associated with the first person, the first name being displayed adjacent to the first person selectable thumbnail image;
(iii) a second person selectable thumbnail image including a representation of a face of a second person, the second person being associated with a fourth set of digital files including digital photographs and videos; and
(iv) a second name associated with the second person, the second name being displayed adjacent to the second person selectable thumbnail image.

2. The method of claim 1, wherein the map view further includes a first indication feature associated with the first location selectable thumbnail image, the first indication feature being based on a number of digital files in the first set of digital files.

3. The method of claim 2, wherein the first indication feature is connected to the first location selectable thumbnail image.

4. The method of claim 2, wherein the first indication feature includes a first number indicative of the number of digital files in the first set of digital files.

5. The method of claim 2, wherein the map view further includes a second indication feature associated with the second location selectable thumbnail image, the second indication feature being based on a number of digital files in the second set of digital files.

6. The method of claim 5, wherein the second indication feature is connected to the second location selectable thumbnail image.

7. The method of claim 5, wherein the second indication feature includes a second number indicative of the number of digital files in the second set of digital files.

8. The method of claim 2, further comprising, subsequent to the map view being displayed on the interface, responsive to an input that is indicative of zooming in on the interactive map, modifying the first indication feature.

9. The method of claim 2, further comprising, subsequent to the map view being displayed on the interface, responsive to an input that is indicative of zooming out on the interactive map, modifying the first indication feature.

10. The method of claim 2, further comprising, subsequent to the map view being displayed on the interface, responsive to an input that is indicative of a filter selection, modifying the first indication feature.

11. The method of claim 1, wherein the first location selectable thumbnail image is a first collection cover image and wherein the second location selectable thumbnail image is a second collection cover image that is different than the first collection cover image.

12. The method of claim 1, wherein the first location selectable thumbnail image includes a representation of at least one of the digital files in the first set of digital files, and wherein the second location selectable thumbnail image includes a representation of at least one of the digital files in the second set of digital files.

13. The method of claim 12 wherein the representation of the at least a portion of the one digital file in the first set of digital files is not overlaid on the interactive map, and wherein the representation of the at least a portion of the one digital file in the second set of digital files is not overlaid on the interactive map.

14. The method of claim 1, wherein the first location view includes a representation of at least a portion of all of the digital files in the first set of digital files and the second location view includes a representation of at least a portion of all of the digital files in the second set of digital files.

UNIFIED PATENTS EXHIBIT 1001
Page 72 of 73

US 10,621,228 B2

37

**15**. The method of claim **1**, further comprising:

responsive to an input that is indicative of a selection, in the first location view, of the representation of the at least a portion of the one digital file in the first set of digital files, causing a first digital file to be displayed on the interface; and

responsive to an input that is indicative of a selection, in the second location view, of the representation of the at least a portion of the one digital file in the second set of digital filed, causing a second digital file to be displayed on the interface.

**16**. The method of claim **1**, further comprising:

receiving alphanumeric text as a tag;

associating the tag with a first digital file in the first set of digital files;

receiving a request to export the first digital file; and

responsive to receiving the request to export, exporting the first digital file by causing the first digital file to be communicated along with the tag.

**17**. The method of claim **1**, further comprising, prior to receiving the first input, causing the interface to display a

38

plurality of selectable elements, the plurality of selectable elements including a location selectable element and a people selectable element, wherein the first input is indicative of a selection of the location selectable element, and wherein the second input is indicative of a selection of the people selectable element.

**18**. The method of claim **1**, further comprising responsive to an input that is indicative of a selection of the first person selectable thumbnail image, causing a first person view to be displayed on the interface, the first person view including (i) the first name and (ii) a representation of each digital file in the third set of digital files.

**19**. The method of claim **18**, further comprising responsive to an input that is indicative of a selection of the second person selectable thumbnail image, causing a second person view to be displayed on the interface, the second person view including (i) the second name and (ii) a representation of each digital file in the fourth set of digital files.

\* \* \* \* \*

UNIFIED PATENTS EXHIBIT 1001